**HYDEE FELDSTEIN SOTO**, City Attorney (SBN 106866)
**DENISE C. MILLS**, Chief Deputy City Attorney (SBN 191992)
**KATHLEEN KENEALY,** Chief Assistant City Attorney
**CORY M. BRENTE**, Senior Assistant City Attorney (SBN 115453)
**CHRISTIAN R. BOJORQUEZ,** Deputy City Attorney (SBN 192872)
200 N. Main Street, 6th Floor, City Hall East
Los Angeles, California 90012
Tel: (213) 978-7023 | Fax: (213) 978-8785
Email: christian.bojorquez@lacity.org

*Attorneys for Defendant* CITY OF LOS ANGELES

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| M.B., by and through her Guardian ad litem, Nayelli Bautista and L.D., by and L.D., by and through his Guardian ad litem, Jasmin Trinidad, individually and as successors in interest to CARLOS DE ANDA, deceased,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF LOS ANGELES, JOSE ARTEAGA MAYAN; KASSANDRA RODRIGUEZ; and DOES 1-10, inclusive,<br><br>Defendants. | **Case No. 2:24-cv-07642 SVW (SSC)**<br>*Assigned to Hon. Stephen V. Wilson; Ctrm 10A*<br>*Mag. Stephanie Christenseni; Ctrm 790 (Roybal)*<br><br>**DEFENDANT CITY OF LOS ANGELES AND NAMED, BUT UNSERVED, DEFENDANTS JOSE ARTEAGA MAYEN AND KASSANDRA RODRIGUEZ' NOTICE OF MOTION & MOTION FOR SUMMARY JUDGMENT OF THE FOURTH AMENDMENT SECTION 1983 CLAIMS; MEMORANDUM OF POINTS & AUTHORITIES; DECLARATIONS; EXHIBITS**<br><br>[Filed concurrently with Separate Statement; Notice of Lodging; Proposed Order]<br><br>Hearing Date:  April 28, 2025<br>Time:            1:30 pm<br>Courtroom:   10A |

TO THE HONORABLE COURT, PLAINTIFFS AND THEIR ATTORNEY OF

RECORD:

PLEASE TAKE NOTICE THAT on April 28, 2025, 1:30 pm, or as soon

thereafter as Counsel may be heard in Courtroom 10A of the above-entitled Court,

located at 1st Street, Los Angeles, California, before the Honorable Stephen V. Wilson,

Defendant CITY OF LOS ANGELES and ***named, but unserved, Defendants JOSE***

***ARTEAGA MAYAN and KASSANDRA RODRIGUEZ[1]*** will move this Honorable Court, pursuant to Fed. R. Civ. P. 56(c), for Summary Judgment or, in the alternative, Partial Summary Adjudication of the Issues, as to the entirety of Plaintiff M.B.'s Federal Claims, by and through her Guardian ad litem, Nayelli Bautista and L.D., by and L.D., by and through his Guardian ad litem, Jasmin Trinidad, individually and as successors in interest to CARLOS DE ANDA, deceased's Complaint based on the following grounds:

- First Claim – Unreasonable Search & Seizure - Excessive Force (42 U.S.C. § 1983);
- Third Claim – Denial of Familial Relationship – Substantive Due Process – 14th Amendment (42 U.S.C. § 1983);
- Fourth Claim – Municipal Ratification (42 U.S.C. § 1983); and
- Fifth Claim – Municipal Inadequate Training (42 U.S.C. § 1983).

The specific issues for adjudication include the following

1. Was the use of deadly force by Officers Mayen and Rodriguez objectively reasonable in response to the totality of the circumstances, which included Plaintiff's decedent, Carlos De Anda (hereinafter "De Anda") charging the Officers with a knife?

---

[1] It is important to highlight that Officers Jose Arteaga Mayen & Kassandra Rodriguez, while named Defendants, have not been served, nor have they appeared in this case. During the Rule 26 Conference of Counsel this Court entertained Defendant's desire to file a Summary Judgment Motion in this matter and the Parties had a thorough discussion with Counsel regarding the MSJ. This Court advised that it would only hear the Federal Claims, but would sever the State Claims. This Court set March 15, 2025 as the deadline for the filing of the MSJ Motion. At the time of that Rule 26 Conference of Counsel, both Officers Mayen & Rodriguez were not named Defendants. After the Conference, the Parties Stipulated for Plaintiffs to file leave to amend for a 1st Amended Complaint (Doc. #28). On 1/15/2025, this Court signed the Order on that Stipulation (Doc.#29), wherein Plaintiffs were Ordered to "serve the Defendant Officers directly (Doc. #29) & Defense Counsel also emailed the same to Counsel for Plaintiff. As of the date of filing, no service has been made. On that basis, Defendants have brought this Motion to Comply with this Court's Order & Minute Order (Doc.#25) which set forth March 15, 2025, as the last day to file the MSJ. Defense assumes the lack of service to be procedural, but does not want the filing of this MSJ to be considered an "Appearance" on behalf of Named, but not served Defendants Mayen & Rodriguez. Defendants request this Court require Plaintiffs to serve immediately so that this Motion may be heard, considered and ruled upon by this Court based upon the current scheduled hearing date.

2. Are Officers Mayen and Rodriguez entitled to qualified immunity for their decisions and implementations on the appropriateness of using lethal force to save both their lives and the lives of others in response to the imminent threat posed by De Anda?

3. Do the Officers' actions of using lethal force in less than 2 seconds to defend themselves from an armed individual that is charging directly at them and who has closed the distance while armed before firing in self-defense "shock the conscience?"

4. Did the City of Los Angeles have a policy of inadequate training that brought about injuries to De Anda?

5. Did the City of Los Angeles ratify a subordinate's unconstitutional decision or action and the basis for it?

6.[2]

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which has been ongoing, happened at the Rule 26 Conference before this Honorable Court, recent email and most recently during a telephonic conversation on March 14, 2025. Despite the parties' discussions, the issues raised in this Motion could not be resolved, although some agreements were arrived at and set forth in footnote #2 below.

This motion is based on Plaintiff's 1st Amended Complaint, the Memorandum of Points and Authorities attached hereto, the Separate Statement of Undisputed Facts and Conclusions of Law, the Declarations in Support of the Motion, the attached Exhibits, . . .

---

[2] On March 14, 2025, the parties had a telephonic conference an agreed that Plaintiffs would be Dismissing the following Claims: Plaintiffs' 2nd Claim for Denial of Medical Care & Plaintiffs' 6th *Monell* Claim of Custom or Policy.

1   Excerpts of Depositions, the Proposed Judgment, and any other evidence presented at the

2   time of the hearing.

3

4   DATED: March 15, 2025             HYDEE FELDSTEIN SOTO, City Attorney
                                      DENISE C. MILLS, Chief Deputy City Attorney
5                                     KATHLEEN KENEALY, Chief Assist. City Attorney
                                      CORY M. BRENTE, Senior Assistant City Attorney
6

7                                     By:  /s/ *Christian R. Bojorquez*

8                                     CHRISTIAN R. BOJORQUEZ, Deputy City Attorney
                                      *Attorneys for Defendant* CITY OF LOS ANGELES
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## STATEMENT OF FACTS

On September 13, 2023, at approximately 18:14 hours, a Communications Division (hereinafter "CD") Emergency Board Operator (hereinafter "EBO") received a 911 call from Rosa Maria Fuentes De Leon, a Spanish speaker, who requested a police response to 1133 South Vermont Avenue. De Leon reported that the suspect, later identified as Carlos De Anda (hereinafter referred to as "De Anda"), had taken a knife from her fruit stand and was last seen walking south on Vermont Avenue, toward Pico Boulevard. De Leon described De Anda as a male, 30-35 years of age, wearing a brown and white shirt, and orange shorts. (SUF 1). At approximately 20:06 hours, CD received a 911 call from Cruz, who requested a police response to 1235 New Hampshire Avenue. Cruz reported that there was a male, later identified as De Anda, across the street from her residence holding a sharp, shiny object in his hand and was threatening people with the object. (SUF 2)

At approximately 20:08pm on September 23, 2023, the following LAPD Broadcast was made: "Any Olympic Unit, 415 Man in the Korean Church parking lot across from 1235 South New Hampshire. Tall male, red shorts, has a possible edged weapon in his hand. Code-Two, Incident 4317, RD 2056." (SUF 3) At approximately 8:13pm on September 23, 2023, the following LAPD Broadcast was made: "Any Olympic Unit, 415 Man with a knife, 2531 West Pico, at the church parking lot. Male Hispanic transient, 20's, two-toned, dark blue upper white bottom, pink shorts, vandalizing vehicle's window, holding a knife, threw rocks at patrons. Code-Two, Incident 4334, RD 2056." (SUF 4) Named Defendants LAPD Officers Jose Arteaga Mayen (hereinafter "Named Defendant Mayen"), and named Defendant Kassandra Rodriguez (hereinafter "Named Defendant Rodriguez"), as well as LAPD Officer Morse were wearing Body-Worn Videos which were activated and recording during the incident and were in full uniform. (SUF 5)

At approximately 8:28 p.m., Named Defendant Mayen and his partner Officer Morse were the first LAPD Unit to arrive at the incident location. (SUF 6) At the time

Named Defendant Mayen arrived at scene, the southern gate to the parking located mid-block on New Hampshire Avenue, between Pico Boulevard and 12th Street, was closed, which can be seen on the right side (East) of his BWV as he walks northbound along New Hampshire. (SUF 7) Named Defendant Mayan observed De Anda on the east side of the street, adjacent to a parking lot, and communicated his observations with his partner Officer Morse. Named Defendant Mayen then observed De Anda enter the parking lot through a gap in the fence line. Named Defendant Mayen yelled, "Hey! Hey!" but received no response from De Anda. (SUF 8) Named Defendant Mayen attempts to communicate with De Anda in hopes to de-escalate the situation involving De Anda. (SUF 9)

De Anda reaches down and arms himself with a knife at 8:29:37 p.m. De Anda's knife is a total of 15 inches with a 10-inch blade. (SUF 10) At approximately 8:29:40 pm on September 23, 2023, the following LAPD Broadcast was made by Officer Morse: "53, we need a backup. He re-armed himself with a knife." "53, let's set up a containment perimeter. So, I want a unit at Vermont and Pico; New Hampshire and Pico; Vermont and 12th; and New Hampshire and 10th…12th. He is still walking around the parking lot still." (SUF 11) Named Defendant Mayen initiated communication with De Anda in an attempt to develop a rapport with De Anda and de-escalate the situation De Anda had created.  This communication continued throughout the incident up until the shooting.  De Anda was advised to drop the knife several times and De Anda also stated "I don't want to live" during the incident.  Exhibit 8 is incorporated herein by reference, as if fully set forth herein and is attached herein as "Exhibit 8: English Translation of Named Defendant Mayen's original communications with De Anda in Spanish" as depicted in Exhibit 5: Mayen BWV: 20:29:24 – 20:35:55. Exhibit 8 sets forth the entirety of communications between Named Defendant Mayen and De Anza and was translated by Named Defendant Mayen as a true, accurate, correct and authentic translation.  (SUF 12)

/ / /

During Named Defendant Mayen's communication with De Anda, De Anda stated "I don't want to live." Named Defendant Mayen advises his partner and thereafter attempts to inquire of De Anda as to why De Anda does not want to live. (SUF 13) At approximately 8:33:23 p.m., Named Defendant Rodriguez and her partner Officer Hernandez arrive at the incident location.  Upon her arrival, the southern gate is now open.  Named Defendant Mayen, Named Defendant Rodriguez, nor their partners opened the gate, nor did anyone from the LAPD make that request.  (SUF 14) Named Defendant Rodriguez positions herself by the southern gate and holds her position while Named Defendant Mayen continues attempts to speak with De Anda. (SUF 15)

Despite Named Defendant Mayen's continued attempts to de-escalate by trying to relate to De Anda as a human being and trying to be considerate, De Anda terminated any ability to continue communications with Officers by advancing towards the southern gate where Named Defendant Rodriguez and her patrol vehicle were located.  De Anda suddenly stopped and appeared to hop to his left while armed with the knife. (SUF 16) Named Defendant Mayen had training on de-escalating, such as PATROL (Acronym) and mental evaluation training & Academy training, but the situation is dictated on the willingness of De Anda to cooperate with officers.  (SUF 17)

Named Defendant Rodriguez observed De Anda's advancement and when he stopped, Named Defendant Rodriguez did not fire her weapon because De Anda did not pose an imminent threat of death or serious bodily injury at that time.  It wasn't until De Anda, while still armed, began to advance again from a distance of approximately 20 – 25 feet which caused her to fire her weapon to prevent De Anda from killing her or hurting others, as he presented an imminent threat of serious bodily injury and/or death at that time to both Officers, herself and citizens behind her. It was something Named  Defendant Rodriguez recalls because De Anda's eyes seemed evil and aggressive, especially while running at her with a knife.  This engagement from De

Anda's initial advancement to the time she fired her first shot was eight (8) seconds. (SUF 18)

Named Defendant Rodriguez had less than one (1) second to react to De Anda's advancement towards her in deciding when to fire her weapon. Named Defendant Rodriguez fired a total of three (3) shots, assessing as she fired each shot while perceiving that De Anda still posed an imminent threat (while armed) of serious bodily injury and/or death and she stopped firing after her third (3rd ) shot, where she acknowledged that the threat De Anda posed had stopped. (SUF 19) Clip of named Defendant Rodriguez's BWV captures De Anda in possession of the knife prior to and throughout the shooting by both named Defendants Rodriguez and Mayen, including after the shooting wherein the weapon is still in the possession of De Anda as Officer Morse approaches De Anda and removes it from him. (SUF 20) Named Defendant Rodriguez provided the following statements to De Anda before she fired her weapon: "Hey, get, Put the, Put the Knife Down, Put the Knife Down, Put the" (1st Shot Fired) (SUF 21)

With respect to Named Defendant Mayen, he observed De Anda terminate communicating with him when De Anda can be seen advancing to the southern gate. Named Defendant Mayen tracked De Anda southbound along the east sidewalk, while providing orders to stop and to "put the knife down." After about 6 seconds, De Anda eventually stopped for approximately 3 seconds and Named Defendant Mayen did not fire at that time. Named Defendant Mayen did not fire his weapon because De Anda did not pose an imminent threat of death or serious bodily injury when he first stopped. It wasn't until De Anda, while still armed, began to advance again from a distance of approximately 20 – 25 feet which caused him to fire his weapon two (2) times to stop the imminent threat of serious bodily injury and/or death that De Anda posed. (SUF 22)

. . .

viii

Named Defendant Mayen had less than one (1) second to react to De Anda's advancement towards named Defendant Rodriguez and himself in deciding whether to fire or not.  Named Defendant Mayen fired a total of two (2) shots, assessing as he fired each shot while perceiving that De Anda still posed an imminent threat (while armed) of serious bodily injury and/or death and he stopped firing after his second (2nd) shot, where he acknowledged that the threat De Anda posed had stopped. (SUF 23)  Based upon the actions of De Anda, coupled with the totality of the circumstances, named Defendant Mayen believed De Anda was possibly under the influence of drugs and wanted to die. After the Los Angeles County Coroner's Office conducted a Toxicology Screen of De Anda, it revealed De Anda was positive for Methamphetamine. (SUF 24)

The BWVs of named Defendant Mayen (Exhibit 5 & 5-A), named Defendant Rodriguez (Exhibit 9 & 9-A & Exhibit 10 & 10-a) and Officer Morse's (Exhibit 12) are hereby incorporated herein by reference, as if set forth fully herein based upon the fact that they are essentially the "best evidence' in this case.  These BWVs captured, in real time, the events which led up to the tragic shooting of De Anda.  These BWVs provide the "best evidence" of how De Anda posed an imminent threat of serious bodily injury and/or death which caused named Defendants Mayen and Rodriguez to fire a total of five (5) shots to stop the threat De Anda posed to the officers and citizens in the area.  Even in the event, Plaintiff claims there are "disputed" facts above which are based almost entirely on the BWVs, these BWVs, alone, present the uncontroverted (undisputed) facts necessary for this Court to grant the requested relief. (SUF 25)

///

///

///

# **TABLE OF CONTENTS**

I.    STATEMENT OF THE CASE                                                                v

II.   MEMORANDUM OF POINTS & AUTHORITIES                                   1


A.   *Standards on Summary Judgment*                                             1

B.   *Defendants Rodriguez & Mayen's Use of Deadly Force Was Reasonable*    3

C.   *Defendant Rodriguez & Mayen Are Entitled to Qualified Immunity*        10

D.   *Defendants Actions did Not Rise to a Level which Shocks the Conscience*

14

E.   *Plaintiffs have failed to Prove any Monell Violation*                   17

F.   *Plaintiffs Have No Evidence of Inadequate Training*                     18

III.  CONCLUSION                                                               19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF AUTHORITIES**

Cases

*Ashcroft v. al-Kidd,*
   563 U.S. 731, (2011) ...................................................................11

*Bhan v. NME Hosps., Inc.,*
   929 F.2d 1404 (9th Cir. 1991) .......................................................1

*Blanford v. Sacramento County,*
   406 F.3d 1110 (9th Cir. 2005) ................................... 7, 10, 12, 13

*Board of Cnty. Commr's v. Brown,*
   520 U.S. 397 (1997) .....................................................................17

*Bordanaro v. McCloud,*
   871 F.2d 1151 (1st Cir.1989) .......................................................19

*Bryan v. MacPherson,*
   630 F.3d 805 (9th Cir. 2010) .................................................2, 11

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) .......................................................................1

*City & Cnty. of San Francisco v. Sheehan,*
   135 S. Ct. 1765 (2015) .................................................................13

*City of Canton v. Harris,*
   489 U.S. 378 (1989) ...............................................................17, 19

*City of Escondido v. Emmons,*
   139 S. Ct. 500 (2019) ...................................................................12

*City of Los Angeles v. Heller,*
   475 U.S. 796 (1986) .....................................................................18

*City of Oklahoma v. Tuttle,*
   471 U.S.  (1985).............................................................................19

xi

*Cnty. of Sacramento v. Lewis,*
  523 U.S. 833 ...................................................................................15

*Diaz v. Cnty. of Ventura,*
  512 F. Supp. 3d 1030 (C.D. Cal. 2021) ........................................... 15, 16

*Est. of Hernandez v. City of Los Angeles,*
  No. 220CV04477SBKSX, 2021 WL 4139157 (C.D. Cal. Aug. 10, 2021) ...........9, 10

*Estate of Larsen v. Murr,*
  511 F.3d 1255 (10th Cir. 2008) ........................................................7

*Estate of Lopez v. Gelhaus,*
  871 F.3d 998 (9th Cir. 2017) ..........................................................10

*Estate of Serrano v. Trieu,*
  2016 U.S. Dist. LEXIS 37227 (N.D. Cal. Mar. 21, 2016) ...................................7, 8

*Estate of Toribio v. City of Santa Rosa,*
  381 F.Supp.3d 1179 (N.D. Cal. 2019) ........................................ 6, 7, 10, 13

*George v. Morris,*
  736 F.3d 829 (9th Cir. 2013) ...........................................................4

*Glenn v. Washington County,*
  673 F.3d 864 (9th Cir. 2011) ...........................................................4

*Gonzalez v. City of Anaheim,*
  747 F.3d 789 (9th Cir. 2014) ........................................................4, 16

*Graham v. Connor,*
  490 U.S. 386 (1989) .......................................................... 1, 2, 4, 5, 8, 9

*Groh v. Ramirez,*
  540 U.S. 551 (2004) ..................................................................13

*Harlow v. Fitzgerald,*
  457 U.S. 800 (1982) ..................................................................10

*Hayes v. County of San Diego,*
  736 F.3d 1223 (9th Cir. 2013) ..........................................................16

*Hunter v. Bryant,*
  502 U.S. 224, (1991) ........................................................................11

*J.P. v. City of Porterville,*
  801 F. Supp. 965 (E.D. Cal. 2011) ...............................................14

*Kisela v. Hughes,*
  138 S. Ct. 1148 (2018) ..........................................6, 7, 12, 13

*Malley v. Briggs,*
  475 U.S. 335 (1986) ........................................................................11

*McLenagan v. Karnes,*
  27 F.3d 1002 (4th Cir. 1994) ...........................................................8

*Merritt v. County of Los Angeles,*
  875 F.2d 765 (9th Cir. 1989) .........................................................18

*Monell v. Dep't of Soc. Servs.,*
  436 U.S. 658 (1978) ................................................17, 18, 19

*Mullenix v. Luna,*
  577 U.S. 7 (2015) ..........................................................................11

*Pearson v. Callahan,*
  555 U.S. 223 (2009) ....................................................10, 11, 13

*Peck v. Montoya,*
  51 F.4th 877 (9th Cir. 2022) ........................................................13

*Plumhoff v. Rickard,*
  134 S. Ct. 2012 (2014) ...................................................8, 9, 13

*Porter v. Osborn,*
  546 F.3d 1131 (9th Cir. 2008) ...........................................14, 15, 16

*Quintanilla v. City of Downey,*
  84 F.3d 353 (9th Cir. 1996) .........................................................18

*Reese v. Anderson,*
  926 F.2d 494 (5th Cir. 1991) ...........................................................8

*Reichle [v. Howards]*,
   566 U.S. [658,]...................................................................................11
*Rhodes v. McDaniel*,
   945 F.2d 117 (6th Cir. 1991) .................................................................7
*Richards v. Wills*,
   No. 2:19-CV-02043-JAD (BNW), 2022 WL 1128600 (D. Nev. Apr. 15, 2022)........6
*Rivas-Villegas v. Cortesluna*,
   142 S.Ct. 4 (2021) ...............................................................................11
*Roy v. Inhabitants of Lewiston*,
   42 F.3d 691 (1st Cir. 1994) ...................................................................7
*Ryder v. City of Topeka*,
   814 F.2d 1412 (10th Cir. 1987) ...............................................................8
*Scott v. Harris*,
   550 U.S. 372 (2007) .........................................................................2, 11
*Scott v. Henrich*,
   39 F.3d 912 (9th Cir. 1994) ...................................................................4
*Sherrod v. Berry*,
   856 F.2d 802 (7th Cir. 1988) ...................................................................8
*Smith v. Agdeppa*,
   81 F.4th 994 (9th Cir. 2023.) ..................................................................11
*Smith v. City of Hemet*,
   394 F.3d 689 (9th Cir. 2005) ...................................................2, 4, 6, 8, 11
*Tennessee v. Garner*,
   471 U.S. 1 (1985)................................................................................1
*Terry v. Ohio*,
   392 U.S. 1 (1975) .............................................................................2, 4
*Thompson v. Hubbard*,
   257 F.3d 896 (8th Cir. 2001) ...................................................................8

xiv

*Trevino v. Gates,*

    99 F.3d 911 (9th Cir. 1996) ....................................................................... 18

*Wallis v. Spencer,*

    202 F.3d 1126 ........................................................................................... 17

*Watkins v. City of San Jose,*

    No. 15-CV-05786-LHK, 2017 WL 1739159 (N.D. Cal. May 4, 2017) .................... 6

*Wesby,*

    138 S. Ct. [577] ........................................................................................ 11

*Wilkinson v. Torres,*

    610 F.3d 546 (9th Cir. 2010) ............................................................... 14, 15

*Zion v. Cty. of Orange,*

    874 F.3d 1072 (9th Cir. 2017) ................................................................. 13


Rules

*Fed. R. Civ. P. 56(a)* ......................................................................................... 1

## II.  <u>*MEMORANDUM OF POINTS & AUTHORITIES*</u>

A.     ***Standards on Summary Judgment:***

In this matter, after reviewing the facts related to an Officer Involved Shooting, wherein a knife wielding individual refused to comply with lawful orders and instead decided to charge at fully armed and uniformed Defendant Police Officers, Defendants ask this Court to grant summary adjudication of all the Federal Claims.  The tragic result of the choices made by Plaintiff decedent Carlos De Anda (hereinafter "De Anda") led to an unfortunate outcome: De Anda orchestrated his own death!  When facts such as these exist, the appropriate manner to defend against such claims is to rely upon the Uncontroverted Facts that exist and request this Honorable Court to dismiss claims pursuant to a Motion for Summary Judgment.

Summary judgment is appropriate where the record, taken in the light most favorable to the opposing party, indicates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*.  The party moving for summary judgment must present evidence that negates an essential element of the opposing party's case or show that the opposing party does not have evidence necessary to support its case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). The burden then shifts to the nonmoving party to demonstrate there is a triable issue of material fact as to the cause of action or affirmative defense.  But the nonmoving party cannot rest on mere allegations or denials of the moving party's evidence.  *Bhan v. NME Hosps., Inc.,* 929 F.2d 1404, 1409 (9th Cir. 1991).

In police cases, many of the litigated claims in Federal Court focus on allegations of excessive/unreasonable uses of force in officer involved shooting incidents.  In a case involving excessive force, courts examine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor,* 490 U.S. 386, 397 (1989).  This inquiry "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396, quoting *Tennessee v. Garner,*

471 U.S. 1, 8 (1985). Because "police officers are often forced to make split-second judgments," reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." Id. at 396-97 (*citing Terry v. Ohio,* 392 U.S. 1, 20-22 (1975)).

The Fourth Amendment's "objective reasonableness" standard governs excessive force claims. *Graham v. Connor,* 490 U.S. 386, 388 (1989). The reasonableness standard "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted). Essentially, a Court must "balance the amount of force applied against the need for that force." *Bryan v. MacPherson,* 630 F.3d 805, 823-24 (9th Cir. 2010). In applying this reasonableness standard it "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396. "[W]hether the suspect poses an immediate threat to the safety of the officers or others" is the "most important" of the *Graham* factors. *Smith v. City of Hemet,* 394 F.3d 689, 702 (9th Cir. 2005).

In this matter, Defendant Officers Rodriguez and Mayen's conduct was objectively reasonable and thus did not violate the Fourth Amendment. Defendant rely heavily upon Defendants Rodriguez and Mayen's Body-Worn videos. (SUF 1-25). Plaintiffs will attempt to cloud the video footage from Defendants Rodriguez and Mayen's Body-Worn cameras to create a triable issue of fact, but this Court should "view[] the facts in the light depicted by the" video footage in this matter. (quoting *Scott v. Harris,* 550 U.S. 372, 380-81 (2007)). It is important to note that the United States Supreme Court has explicitly ruled that video footage is often the best evidence in determining the constitutionality of law enforcement use of force and "speaks for itself." *Scott v. Harris, supra,* 550 U.S. at 378. When there is video evidence of an incident, such that any contrary facts can be "so utterly discredited by the record that no reasonable jury could have believed [plaintiffs],"

2

summary judgment should be granted. *Id.* at 380.  Even assuming arguendo that their actions could possibly rise to the level of a constitutional violation, the Officers are nonetheless entitled to qualified immunity.  Pursuant thereto, Defendants are entitled to summary judgment as the use of deadly force was objectively reasonable in response to De Anda's imminent threat that he created while refusing to drop his knife and obeying the Officers' commands.

**B.    *Defendants Rodriguez & Mayen's Use of Deadly Force Was Reasonable:***

The use of deadly force was, is and always will remain the most undesirable decision an Officer ever is forced to make.  Consequently, just because the use of deadly force may be undesirable, does not mean it is improper, nor does it mean that an Officer's actions should be second-guessed.

In the case at bar, the entirety of the incident was captured on Officers' Body-Worn cameras, which depicts De Anda armed with a 15-Inch knife, wandering aimlessly through the streets of Los Angeles.  After attempts to de-escalate, De Anda proceeds to run in the direction of a police vehicle and despite observing uniformed and armed officers, he runs directly towards them while armed and refuses to comply with several commands to drop the knife.  The Body-Worn videos of Defendants Rodriguez and Mayen provide this Court with not only the best evidence of what transpired in this incident, but most importantly, the Uncontroverted Facts of the underlying shooting. (SUF 25).  It was not until De Anda closed to within 20-25 feet that the first lethal shot was fired, with the final shot being fired within a few feet closer to the officers.  (SUF 18 & 22) Defendant Mayen had six (6) minutes 22 seconds from his initial verbal contact with De Anda until the time De Anda started running south towards Officers. (Exhibit 5: Mayen BWV.)  Defendant Rodriguez had one (1) minute 29 seconds from her initial position observing De Anda until he started running towards the area of Defendant Rodriguez, her partner Officer Hernandez and the patrol car. (Exhibit 9: Rodriguez BWV.)  De Anda abruptly stopped.  Once De Anda stopped, he appeared to hop to his side and after three (3) to (4) four seconds, he advanced with a knife in hand towards

Defendants Rodriguez and Mayen, despite being alone in an entire parking lot with various avenues of escape. (SUF 16). As a result of De Anda's imminent threat of harm he created by deciding to advance towards Defendants Rodriguez and Mayen while armed, Defendants Rodriguez and Mayen, in a fraction of a second, were forced to use deadly force in a dynamic situation to stop De Anda's knife-wielding attack that he posed by rapidly advancing towards Defendants Rodriguez and Mayen. (SUF 18 & 22). Based upon these undisputed facts, there can be no question that the Defendants Rodriguez and Mayen were entitled to use lethal force to defend their lives and the lives of others.

When evaluating a Fourth Amendment claim, "[i]t is imperative that the facts be judged against an objective standard." *Terry, supra,* 392 U.S. at 21. "Factors relevant to assessing whether an officer's use of force was objectively reasonable include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempt to evade arrest by flight." *Gonzalez v. City of Anaheim,* 747 F.3d 789, 793 (9th Cir. 2014) (en banc), quoting *Graham, supra,* 490 U.S. at 396. As a general rule, "[a]n officer's use of deadly force is reasonable [ ] if the 'officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Scott v. Henrich,* 39 F.3d 912, 914 (9th Cir. 1994), quoting *Garner,* 471 U.S. at 3 (emphasis omitted). "[W]hether the suspect poses an immediate threat to the safety of the officers or others" is the ***"most important"*** of the *Graham* factors. *Smith v. City of Hemet,* 394 F.3d 689, 702 (9th Cir. 2005) (emphasis added). "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn v. Washington County,* 673 F.3d 864, 872 (9th Cir. 2011). But the "most important" factor is "whether the suspect posed an immediate threat to the safety of the officers or others." *George v. Morris,* 736 F.3d 829, 838 (9th Cir. 2013) (citation omitted). Even the most cursory review of the undisputed

facts – and especially the Body-Worn videos of this incident – confirm that Defendants Rodriguez and Mayen's actions were objectively reasonable.

Turning to the first *Graham* factor (the severity of the crime at issue), De Anda was wielding a knife wandering the streets with the ability to wreak havoc. Due to the fear he instilled in the neighborhood, Defendants Mayen and thereafter Rodriguez, along with their partners, Officers Morse and Hernandez were summoned to the property only after 9-1-1 calls were placed by a variety of callers. (SUF 2, 3, 4, 6) Upon arrival, Defendant Mayen observed an armed and dangerous De Anda, who had made his way into a parking lot. Upon making contact, Defendant Mayen attempted to de-escalate the situation and despite those extensive efforts, including speaking in Spanish, to deescalate the situation, De Anda refused to participate in the de-escalation process and instead chose to ignore all commands, stated he wanted to die and thereafter terminated any ability to de-escalate the situation when De Anda decided to cut-off any communication with Defendant Mayen and began rapidly advancing towards the south where Defendant Rodriguez, her partner Officer Hernandez and their patrol car were located, despite having access to multiple areas of escape. (SUF 12, 13, 16, 18). Even after realizing Defendant Rodriguez' presence as a fully uniformed and armed Los Angeles Police Officer, De Anda continued to advance towards her and subsequently Defendant Mayen with a deadly weapon in hand. (SUF 18, 20, 22).

Next, there can be absolutely no dispute that De Anda posed an imminent threat. The Defendant Officers resorted to lethal force only after all other measures (including verbal warnings, attempting to engage in communications, including directions to drop the knife) had failed, coupled with the fact that De Anda was advancing/charging towards them with a knife in-hand. (SUF 12, 13, 16, 18, 19, 20, 21, 22, 23). Despite De Anda's initial advancement, Defendants Rodriguez and Mayen did not fire initially. (SUF 18 & 22). Instead, it was not until De Anda stopped his advancement and thereafter thrusted himself again continuing to advance towards Defendants Rodriguez and Mayen, wherein they were forced to use deadly force to stop the threat De Anda posed, knife in-hand.

Both Body-Worn videos of Defendants Rodriguez and Mayen demonstrate their clear understanding of evaluating the threat and not overreacting. They Provided De Anda with the benefit of the doubt when De Anda came to a stop, by providing clear orders to drop the knife. The Body-Worn videos demonstrate these threatening actions of De Anda while armed and the balancing of the interests of Defendants Rodriguez and Mayen in providing opportunities, both verbally and holding their fire, for De Anda to stop his deadly actions. (SUF 12, 13, 16, 18, 19, 20, 21, 22, 23). Courts have consistently found the use of lethal force reasonable and lawful in far less threatening situations. See *Watkins v. City of San Jose,* No. 15-CV-05786-LHK, 2017 WL 1739159, at *10 (N.D. Cal. May 4, 2017), aff'd sub nom.; *Buchanan v. City of San Jose,* 782 F. App'x 589 (9th Cir. 2019) ("Although the officers may have been in more danger if the officers had waited for Decedent to advance closer to the officers, the pace of Decedent's advance and his failure to follow direct commands to drop the knife and get on the ground indicate that the officers had probable cause to believe that the suspect pose[d] a significant threat of death or serious physical injury to the officer[s].") (citation omitted).

It is well settled that "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force." *Smith v. City of Hemet,* 394 F.3d 689, 704 (9th Cir. 2005); *Kisela v. Hughes,* 138 S. Ct. 1148, 153 (2018) (reversing denial of qualified immunity where an erratic, knife-armed suspect who was hacking a tree moved toward a civilian in a perceived-threatening manner, despite officer commands to drop the knife, the officer's use of deadly force was entitled to judgment); *Richards v. Wills,* No. 2:19-CV-02043-JAD (BNW), 2022 WL 1128600, at *1 (D. Nev. Apr. 15, 2022) (shovel wielding suspect advanced on civilians), affirmed sub nom.; *Richards v. Las Vegas Metr. Police Dep't,* No. 22-15745, 2023 WL 2945313, at *1 (9th Cir. Apr. 14, 2023); *Watkins v. City of San Jose,* No. 15-CV-05786-LHK, 2017 WL 1739159, at *8 (N.D. Cal. May 4, 2017) (suspect running toward officers with a knife in his hand). For example, in *Estate of Toribio v. City of Santa Rosa,* 381 F.Supp.3d 1179 (N.D. Cal. 2019) *("Toribio"),* an officer fired five shots at a knife-wielding suspect, who

appeared to be charging the officers.  However, it turned out the suspect had only been running to a bathroom.  *Id.* at 1189.  The Court in *Toribio* nonetheless concluded that no Fourth Amendment violation occurred, despite that the officer might have mistakenly assumed the suspect was charging him.  *Id.*

This principle was also confirmed in *Blanford v. Sacramento County,* 406 F.3d 1110 (9th Cir. 2005).  After erratic conduct in a residential neighborhood, a sword-armed suspect failed to comply with officers' commands to drop the weapon, and then approached a home – beginning to pass through an outer gate before the first shot and attempting to open the garage door before the other shots.  *Id.* at 1112-1114.  The *Blanford* Court held that, even when the sword-armed suspect began to turn away from the officers' position for the third of three volleys of shots, all of the officers' uses of deadly force were reasonable because the suspect continued to wield the sword in a threatening manner despite multiple officer commands.  *Id.* at 1112-1119; see also *Kisela,* 138 S. Ct. at 1153 (citing *Blanford* with approval on use of force precedent).  *See also Roy v. Inhabitants of Lewiston,* 42 F.3d 691, 696 (1st Cir. 1994) (where knife-armed suspect approached officers, use of deadly force was reasonable); *Rhodes v. McDaniel,* 945 F.2d 117, 120 (6th Cir. 1991) (where machete-armed suspect approached officers, use of deadly force was reasonable); *Estate of Larsen v. Murr,* 511 F.3d 1255, 1260-61 (10th Cir. 2008) (finding "no genuine issue of material fact" where parties disputed whether decedent, who was armed with knife and advancing on officer, was seven or twenty feet away when officer shot him; holding a "reasonable officer need not await the 'glint of steel' before taking self-protective action" because "by then, it is often too late to take safety precautions") (internal citations omitted).

A similar conclusion was reached in *Estate of Serrano v. Trieu,* 2016 U.S. Dist. LEXIS 37227 (N.D. Cal. Mar. 21, 2016).  After taking notice of the fact that officers are trained that because a knife-armed suspect can so rapidly close a distance of under 21 feet, officers should treat a knife-armed suspect within 21 feet as an imminent threat of death or serious bodily injury.  *Id.* at *18-20 (reviewing cases showing such training), the

*Serrano* Court held that where a knife-armed suspect advanced on an officer, the officer's use of deadly force was reasonable as a matter of law. *Id.* at *5-9, 14-26.

The fact that Defendants Rodriguez and Mayen's Body-Worn videos capture a clear, unobstructed and detailed accounting of De Anda advancing towards the officers, while armed, is significantly within the parameters of these above-listed cases, including the *Serrano* Court which held that a knife wielding suspect advancing towards officers makes the use of deadly force reasonable as a matter of law. It is important to highlight that even in cases wherein no weapon was found, Courts have found the use of deadly force reasonable even in circumstances where it is later discovered that the suspect was unarmed; reasonableness is determined based upon the information available to the officer at the time the force is applied, not based upon later-acquired information. *See, e.g., Sherrod v. Berry,* 856 F.2d 802, 804-05 (7th Cir. 1988); *McLenagan v. Karnes,* 27 F.3d 1002, 1005 (4th Cir. 1994); *Reese v. Anderson,* 926 F.2d 494, 496, 500-01 (5th Cir. 1991); *Ryder v. City of Topeka,* 814 F.2d 1412, 1421 (10th Cir. 1987). "An officer is not constitutionally required to wait until he[/she] sets eyes upon the weapon before employing deadly force to protect himself[/herself] against a fleeing suspect who turns and moves as though to draw a gun." *Thompson v. Hubbard,* 257 F.3d 896, 899 (8th Cir. 2001). Indeed, the *Sherrod* Court held that evidence the suspect was unarmed is not only irrelevant, but also inadmissible in evidence. *Sherrod,* 856 F.2d at 805-07.

Significantly, it is well-established that the number of gunshots is irrelevant, so long as the use of deadly force was reasonable. *Plumhoff v. Rickard,* 134 S. Ct. 2012, 2021-22 (2014) ("if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended"). Rather, the "most important" factor under *Graham* is whether the suspect posed an "immediate threat to the safety of the officers or others." *Smith v. City of Hemet,* 394 F.3d 689, 702 (9th Cir. 2005).

Presumably, Plaintiffs will argue that De Anda was merely trying to run away as opposed to advancing towards the Defendant Officers and was shot when he had fallen.

However, that argument fails on two fronts:  First, it is based upon the 20/20 vision of hindsight, by speculating as to what De Anda knew and what was in his mind, coupled with an assumption that no threat existed when he started to fall.  The High Court has expressly rejected such notions, confirming that the "'reasonableness' of a particular use of force *must be judged from the perspective of a reasonable officer on the scene,* rather than with the 20/20 vision of hindsight."  *Graham,* 490 U.S. at 396 (emphasis added).  More importantly, just because an assailant may be fleeing or ducking does not mean they are not an imminent threat.  In fact, a virtually identical argument was rejected recently in *Est. of Hernandez v. City of Los Angeles,* No. 220CV04477SBKSX, 2021 WL 4139157, at *5 (C.D. Cal. Aug. 10, 2021).  In *Hernandez,* Plaintiffs argued that the officer's use of lethal force was unreasonable because the second and third volley of shots (which included the fatal shots) were fired only after the decedent had fallen to the ground.  As the *Hernandez* Court confirmed, just because a suspect has fallen to the ground does not mean the threat has ended. The opinion in *Hernandez* is also instructive on how such claims should be evaluated, stating:

> Moreover, it is important to evaluate the shooting in the real-world context in which it occurred. A judicial description of a shooting as involving "volleys" is analytically useful so long as it is not used—wittingly or unwittingly—to distort the split-second reality unfolding before the officer who has to make life-and-death decisions with imperfect information and without much time to reflect. The six shots in this case were fired in approximately six seconds. Even after the first two shots, Decedent remarkably continued to rise in the direction of the officer. The question is not whether another officer might have waited to evaluate the rising man's next move to see if he would stop, charge at the officer, or advance toward the crowd. The question is whether firing six shots under these circumstances was unconstitutional. The Supreme Court answered that question in *Plumhoff:* the shooting must stop when "the threat has ended." 572 U.S. at 777-78.

*Hernandez,* 2021 WL 4139157, at *5.

When evaluated in light of *Hernandez* and the Supreme Court's other similar holdings, there is no question that the Defendants Rodriguez and Mayen's use of lethal force was objectively reasonable.  While the officer in *Hernandez* was 44 feet away and had at least 6 seconds to respond, the Officers here were a mere 20-25 feet away from

Decedent De Anda and had less than 8 seconds from when he began to advance on the Officers to the time of shooting. (SUF 18, 19, 22, 23). Moreover, even in that 8 seconds, De Anda stopped for 3-4 seconds and thereafter advanced again providing Defendant Rodriguez and Mayen less than a second to evaluate the threat and fire their weapons. (SUF 19 & 23). Indeed, none of the cited cases involved imminent threats that were so clearly captured by video evidence as demonstrated by Defendants Rodriguez and Mayen's Body-Worn cameras, nor as rapidly evolving. (SUF 25). The actions of De Anda were far more egregious than those addressed in *Toribio, Trieu, Blanford,* or *Hernandez,* all of which found the use of lethal force to be objectively reasonable. Consistent therewith, the use of lethal force by Defendants Rodriguez and Mayen during such a short time period, even providing De Anda an opportunity to stop advancing and drop his knife, De Anda nevertheless advanced towards the Defendant Officers making their use of deadly force reasonable. For these reasons, summary adjudication should be granted as to the First claim, if not the entirety of Plaintiffs' claims.

## C. *Defendant Rodriguez & Mayen Are Entitled to Qualified Immunity:*[3]

Although the Defendant Officers' actions were objectively reasonable, they are further protected by numerous immunities. Critically, qualified immunity shields government officials from liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "[Q]ualified immunity is to be determined at the earliest possible point in the litigation[.]" *Estate of Lopez v. Gelhaus,* 871 F.3d 998, 1021 (9th Cir. 2017).

---

[3] Defendants incorporate by reference, as if fully set forth herein, the arguments and legal analysis set forth in "B. Defendants Rodriguez & Mayen's Use of Deadly Force Was Reasonable" for purposes of efficiency and to avoid repetition of related argument.

1    The qualified immunity analysis is two-pronged factor analysis, but Courts have

2    discretion "in deciding which of the two prongs . . . should be addressed first in light of

3    the circumstances in the particular case at hand." *Pearson, supra,* 555 U.S. at 236. Under

4    the first prong, the issue is whether the facts, taken in the light most favorable to the party

5    asserting the injury, show the defendant's conduct violated a constitutional right. *Id.* at

6    232. Under the second prong, the issue is whether the constitutional right in question was

7    "clearly established" at the time the conduct at issue occurred. *Id.* at 232, 236.

8    In analyzing whether qualified immunity applies, a Court addresses the above-

9    mentioned questions: 1) did the defendant's conduct violate a constitutional right, and 2)

10   was the right at issue clearly established, such that every reasonable officer would have

11   understood his conduct to be improper. *Scott v. Harris,* 550 U.S. 372, 377 (2007); *Smith*

12   *v. Agdeppa,* 81 F.4th 994, 1001 (9th Cir. 2023.)  This section addresses the second

13   question – whether De Anda's rights under the facts of this case were clearly established.

14   The other question was handled in the previous sections, which are incorporated herein

15   for reference.  As stated by the Ninth Circuit:

16       For a right to be clearly established, it must be "sufficiently clear that every
17       reasonable official would understand that what he is doing violates that right."
         *Mullenix v. Luna,* 577 U.S. 7, 11–12 (2015) (per curiam) (quoting *Reichle [v.*
18       *Howards]*, 566 U.S. [658,] 664 [(2012)]). This is a high standard: "existing
         precedent must have placed the statutory or constitutional question beyond
19       debate." Id. at 12 (*quoting Ashcroft v. al-Kidd,* 563 U.S. 731, 741, (2011)).  This
         means that "every 'reasonable official would understand that what he is doing' is
20       unlawful." *[D.C.] v. Wesby,* 138 S. Ct. [577] 589 [(2018)] (quoting *[Ashcroft v.]*
         *al-Kidd,* 563 U.S. [731] 741–42 [(2011)]). The "rule must be 'settled law,' which
21       means it is dictated by 'controlling authority' or 'a robust consensus of cases of
         persuasive authority.'" *Wesby,* 138 S. Ct. at 589–90 (first quoting *Hunter v.*
22       *Bryant,* 502 U.S. 224, 228, (1991) (per curiam); then quoting al-Kidd, 563 U.S. at
23       735). This "demanding" requirement "protects 'all but the plainly incompetent or
         those who knowingly violate the law'" and calls for "a high 'degree of
24       specificity.'" *Wesby,* 138 S. Ct. at 589–91 (first quoting *Malley v. Briggs,* 475 U.S.
25       335, 341 (1986); then quoting *Mullenix,* 577 U.S. at 13); *see also Rivas-Villegas v.*
         *Cortesluna,* 142 S.Ct. 4, 7-8 (2021) (per curiam).
26
27   *Agdeppa, supra,* 81 F.4th at 1001–02.

28

1    As "is particularly important in excessive force cases," "the clearly established

2    right must be defined with specificity." *City of Escondido v. Emmons,* 139 S. Ct. 500,

3    503 (2019). "[The Supreme Court] has repeatedly told courts . . . not to define clearly

4    established law at a high level of generality." *Id., citing Kisela v. Hughes,* 138 S. Ct.

5    1148, 1152 (2018). Although there appear to be no cases that squarely govern the

6    specific facts of this case (which by itself confirms the Officers' entitlement to qualified

7    immunity), *Kisela* and *Sheehan* are instructive and demonstrate Defendant Officers'

8    entitlement to qualified immunity. In *Kisela v. Hughes,* 584 U.S. ___, 138 S. Ct. 1148

9    (2018), the Supreme Court held it was not clearly established that shooting a suspect

10   armed with a knife to protect a bystander standing within "striking distance" of the

11   suspect would violate the Fourth Amendment. The Supreme Court highlighted that the

12   law enforcement officers on scene were separated from the suspect and the bystander by

13   a chain-link fence and the suspect had failed to acknowledge "at least two" commands to

14   drop the knife. *Kisela,* 138 S. Ct. at 1153-54.

15   In *Kisela,* officers responded to a call that a woman (Hughes) was hacking a tree

16   with a large kitchen knife. *Kisela,* at 1151. While a woman (Chadwick) was talking to

17   the officers, Hughes came out of the house, brandishing a large kitchen knife. *Id.*

18   Hughes matched the description of the woman described in the call, and the officers drew

19   their weapons and told Hughes to drop the knife. *Id.* Hughes did not comply or even

20   acknowledge the officers' presence. *Id.* Concerned for Chadwick, one officer *(Kisela)*

21   fired four times at Hughes through the fence. *Id.*

22   Without considering whether the officer's actions were unlawful, the Supreme

23   Court found that the officer was entitled to qualified immunity. In reversing the Ninth

24   Circuit, the Supreme Court noted inapposite of the Ninth Circuit's conclusion that "the

25   most analogous Circuit precedent favors *Kisela,*" citing to *Blanford. Id.* at 1153. The

26   High Court went on to state that based on the decision in *Blanford* and the great

27   similarities between the cases, "a reasonable officer could have believed [that the use of

28   deadly force did not violate the Fourth Amendment] was true in the instant case."

1    In *Sheehan,* officers were called to a group home where a resident *(Sheehan)* began

2   acting erratically and threatened to kill her social worker and closed herself in her room.

3   *City & Cnty. of San Francisco v. Sheehan,* 135 S. Ct. 1765, 1770 (2015).  Upon arrival,

4   the officers entered Sheehan's room, where Sheehan immediately grabbed a knife and

5   threatened to kill the officers.  *Id.*  The officers retreated and closed the door again to re-

6   assess the situation.  *Id.,* at 1770-71.  Concerned that Sheehan could escape and harm

7   someone else, the officers re-entered the room and used pepper spray to try and subdue

8   Sheehan.  *Id.,* at 1771.  When that proved ineffective, the officers then shot Sheehan

9   multiple times.  *Id.*  Both the Ninth Circuit and Supreme Court agreed that the officers'

10  use of force in entering Sheehan's room the second time was reasonable.  *Id.* at 1775.

11  While the High Court in *Sheehan* declined to decide whether a constitutional violation

12  occurred, it stressed that without clearly established law providing "fair and clear

13  warning of what the Constitution requires," the officers were entitled to qualified

14  immunity.  *Sheehan supra,* at 1777, 1778, citing *Plumhoff,* 572 U.S. at 779.

15    Even if judged in hindsight and had Defendants Rodriguez and Mayen made a

16  mistake or misjudged the actual threat posed by De Anda, they are nonetheless entitled to

17  qualified immunity.  The protection of qualified immunity applies regardless of whether

18  the officer's error is "a mistake of law, a mistake of fact, or a mistake based on mixed

19  questions of law and fact."  *Pearson v. Callahan,* 555 U.S. 223, 231 (2009), quoting

20  *Groh v. Ramirez,* 540 U.S. 551, 567 (2004).  There is no telling what De Anda could or

21  may have done if the Officers had not responded as quickly as they did – and there is no

22  case law squarely governing the facts of this case to indicate that their actions were

23  unlawful.  In fact, as demonstrated in *Toribio, Blanford, Kisela,* and *Sheehan,* Defendant

24  Rodriguez and Mayen undoubtedly could have concluded their actions were lawful.

25  Thus, they are entitled to qualified immunity, thereby precluding all of Plaintiffs' federal

26  claims as against Defendants Rodriguez and Mayen.

27  / / /

28  / / /

**D.    *Defendants Actions did Not Rise to a Level which Shocks the Conscience:*[4]**

Plaintiffs' Third claim avers that the Defendant Officers denied them due process. Children and Parents have a Fourteenth Amendment liberty interest in each other's "companionship and society." *Wilkinson v. Torres,* 610 F.3d 546, 554 (9th Cir. 2010); *see also Hardwick v. Cnty. of Orange,* 980 F.3d 733, 740-41 (9th Cir. 2020) (acknowledging the Fourteenth Amendment's guarantee against unwarranted state interference with the right to familial association applies equally to "parent-child" and "child-parent" relationships). Initially, "[w]here a claim for interference with familial relationships is integrally predicated upon, or entwined with, other conduct that is alleged to be unconstitutional, a finding that the other conduct was constitutional generally will preclude recovery for interference with familial relationship." *J.P. v. City of Porterville,* 801 F. Supp. 965, 988-989 (E.D. Cal. 2011). Assuming arguendo that a constitutional violation did occur, Plaintiffs' claim still fails.

To state a substantive due process claim under the Fourteenth Amendment, a plaintiff must show that the conduct at issue "shocks the conscience." *Porter v. Osborn,* 546 F.3d 1131, 1137 (9th Cir. 2008). The standard requires official conduct that "shocks the conscience" in depriving a child and/or parent of that interest "is cognizable as a violation of due process." *Wilkinson, supra,* 610 F.3d at 554. In evaluating whether a law enforcement's officer's use of force "shocks the conscience" (violates the Fourteenth Amendment right to familial association), a Court must first determine whether the circumstances were such that "actual deliberation" by the officer was practical. *Id.* "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Id.* At the other extreme, "where a law enforcement officer **makes a snap judgment because of an escalating situation,** his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.*(emphasis added.) This is a much higher standard than

---

[4] Defendants incorporate by reference, as if fully set forth herein, the arguments and legal analysis set forth in "B. Defendants Rodriguez & Mayen's Use of Deadly Force Was Reasonable" for purposes of efficiency and to avoid repetition of related argument.

the objective reasonableness standard of the Fourth Amendment. *Peck v. Montoya,* 51 F.4th 877, 893 (9th Cir. 2022).

As mentioned above, if an officer is confronted with a fast-paced situation in which deliberation is not practical, his or her conduct will only shock the conscience if the act was committed with a "purpose to harm unrelated to law enforcement activities." *Wilkinson, supra,* 610 F.3d at 554. "Deliberation" is not to be interpreted in the narrow, technical sense of the word used in criminal law. *Porter supra,* 546 F.3d 1131, 1140 (9th Cir. 2008), citing *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 851 n. 11 (1998). In a fast-paced situation, "only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 836 (1998). Prior precedent has confirmed that even a five-minute altercation that ended in a shooting left no time for an officer's deliberation. *Porter, supra,* 546 F.3d at 1139

An officer acts with a purpose to harm to "induce ... lawlessness, or to terrorize, cause harm, or kill." *Lewis, supra,* 523 U.S. at 855. This determination requires "an appraisal of the totality of facts in a given case." *Id.* at 850. In the seconds between De Anda's initial advancement while armed with a knife, pausing for a moment and then rushing directly at Defendants Rodriguez and Mayen, these Officers were not afforded time and thus did not have time to "deliberate." They were forced to make split-second decisions to save their own lives, as well as others. Here, no genuine issue of material fact exists as to whether Defendants Rodriguez and Mayen's use of force violated the Fourteenth Amendment. As an initial matter, the heightened purpose-to-harm standard applies to Plaintiffs' Fourteenth Amendment claim because "actual deliberation" was not practical under the circumstances – less than ten (10) seconds passed between the time De Anda began to initially advance, stopped within 25 feet of Defendants and then continued his advance while armed with a knife. *Diaz v. Cnty. of Ventura,* 512 F. Supp. 3d 1030, 1047 (C.D. Cal. 2021)(applying purpose-to-harm standard despite "lengthy car chase" and "approximately hour-long standoff" because "the moments before [defendant

15

officer] used lethal force upon [decedent] were fast-paced and occurred within a matter of seconds"). Accordingly, Defendants Rodriguez and Mayen "faced an evolving set of circumstances that took place over a short time period" and required "split-second decisions." See *Porter v. Osborn supra,* 546 F.3d 1131, 1133, 1139 (9th Cir. 2008) (holding purpose-to-harm standard applied where, over the course of approximately five minutes, defendant officers responding to a call about an apparently abandoned vehicle "shouted at a startled and confused [suspect] to get out of his car," "pepper sprayed him through the open window" when he failed to comply, and fatally shot him when he "began to drive the car slowly forward").

Further, there is no evidence that Defendants Rodriguez and Mayen acted with a purpose to harm De Anda for reasons that were unrelated to legitimate law enforcement objectives. *Hayes v. County of San Diego,* 736 F.3d 1223, 1230 (9th Cir. 2013). Instead, the shooting served the legitimate law enforcement purpose of stopping a dangerous suspect from inflicting great bodily injury or death on another. *See Zion v. Cty. of Orange,* 874 F.3d 1072, 1077 (9th Cir. 2017); *Hayes, supra,* 736 F.3d at 1230-31. Furthermore, it is believed Plaintiffs cannot produce any evidence that either Defendant had any "ulterior motives" for using deadly force against De Anda. *See Gonzalez v. City of Anaheim,* 747 F.3d 789, 795, 797-98 (9th Cir. 2014) (holding no genuine issue of material fact existed as to whether defendant officer had purpose to harm where, although reasonable jury could conclude officer "did not reasonably perceive an immediate threat[,]" plaintiffs had produced no evidence that officer had "ulterior motives" for using deadly force). See *Diaz, supra,* 512 F. Supp. 3d at 1047 (finding no genuine issue of material fact existed as to whether defendant officer had purpose to harm where he "fired four shots in rapid succession and stopped when [decedent] hit the ground" because, "[a]t most, a jury could conclude that [defendant officer] irrationally panicked out of a false sense of fear"). Accordingly, Plaintiffs' Third claim fails.

/ / /

1 | ***E.       Plaintiffs have failed to Prove any Monell Violations:***

2 |      Municipalities are not subject to respondeat superior liability for federal civil rights

3 | claims. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690 (1978); *Wallis v. Spencer,* 202

4 | F.3d 1126, 1144, n. 16 (9th Cir. 2000).  However, having concluded that Section 1983

5 | does not permit respondent superior liability in suits against state actors, the *Monell* Court

6 | announced that claimants suing state actors must establish that their alleged injury was

7 | the result of a "policy or custom" of that state actor. *Board of Cnty. Commr's v. Brown,*

8 | 520 U.S. 397, 403 (1997).  Plaintiffs are seeking to hold the City liable for violating their

9 | civil rights under *Monell* pursuant to a custom, policy or practice of the Los Angeles

10 | Police Department.  To hold a public entity, such as the City of Los Angeles, liable a

11 | plaintiff must prove that the entity caused, in some meaningful sense, the alleged harm.

12 | The "first inquiry in any case alleging municipal liability under § 1983 is the question

13 | whether there is a direct causal link between a municipal policy or custom and the alleged

14 | constitutional deprivation." *City of Canton v. Harris,* 489 U.S. 378, 385 (1989).

15 |      To prove a custom, policy or practice, a plaintiff must show that the conduct

16 | complained of reflects, "practices of state officials so permanent and well settled as to

17 | constitute a custom or usage with the force of law."  *Monell, supra,* 436 U.S. at 691.

18 | Accordingly, this requires that "the action that is alleged to be unconstitutional

19 | implements or executes a policy, statement, ordinance, regulation, or decision officially

20 | adopted and promulgated." *Id.* at 690.  In a section 1983 case, a plaintiff must offer

21 | enough evidence to create a genuine issue of material fact as to both: 1) the existence of a

22 | constitutional violation; and 2) municipal responsibility for that violation.  *Monell supra,*

23 | 436 U.S. at pp. 690-91.  As argued above, there was no constitutional violation.

24 |      As a prerequisite to establishing Section 1983 municipal liability, plaintiff must

25 | satisfy one of three conditions: (1) the plaintiff may prove that a city employee

26 | committed the alleged constitutional violation pursuant to a formal governmental policy

27 | or a long-standing practice or custom which constitutes the standard operating procedure

28 | of the local governmental entity; (2) the plaintiff may establish that the individual who

committed the constitutional tort was an official with final policy-making authority and
that the challenged action itself this constituted an act of official governmental policy;
and (3) the plaintiff may prove that an official with final policy-making authority ratified
a subordinate's unconstitutional decision or action and the basis for it. After proving that
one of the three circumstances existed, a plaintiff also must show that the circumstance
was: (1) the cause in fact; and (2) the proximate cause of the constitutional deprivation.
See *Trevino v. Gates,* 99 F.3d 911, 918 (9th Cir. 1996).

Moreover, in *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986), the Supreme
Court held that a public entity is not liable for Section 1983 damages under a policy that
can cause constitutional deprivations when the factfinder or a Court concludes that an
individual officer, acting pursuant to the policy, inflicted no constitutional harm to the
plaintiff. If a person has suffered no constitutional injury at the hands of the individual
police officer, the fact that the departmental regulations might have authorized the use of
constitutionally excessive force is quite beside the point. *Quintanilla v. City of Downey,*
84 F.3d 353, 355 (9th Cir. 1996).

As discussed above, the uncontroverted facts prove that Defendants Rodriguez and
Mayen did not commit a constitutional violation. Accordingly, there can be no *Monell*
violation. Moreover, even if a constitutional violation were shown, there is no evidence
demonstrating an unconstitutional custom, policy, or practice. Therefore, the City is
entitled to summary judgment on Plaintiffs' *Monell* claim as a matter of law.

## F.   *Plaintiffs Have No Evidence of Inadequate Training:*

Finally, Plaintiffs have no proof that the City of Los Angeles had a policy of
inadequate training that brought about their injuries. Under Ninth Circuit precedent, a
party must show three things to make out a viable claim of inadequate training. *Merritt v.
County of Los Angeles,* 875 F.2d 765, 770 (9th Cir. 1989): 1) First, a plaintiff must show
that the existing program is inadequate. *Id.* at 770; 2) Second, a plaintiff must prove that
the training, policy, or lack thereof, amounts to a "deliberate indifference" to the rights of
the people with whom the officials come into contact. *Id.* at 770; and 3) Finally, a

plaintiff must prove causation. *Id.* at 770. Specifically, a plaintiff must show that the deliberate indifference on the part of the municipality actually caused the constitutional violation at issue. *Id.* at 770.

No evidence supports that the City of Los Angeles failed to train or supervise. "Only where a municipality's failure to train its police officers in a relevant respect" evidencing a "deliberate indifference to the rights of inhabitants, can such a shortcoming be thought of as a city policy, custom or practice actionable under Section 1983." *Canton v. Harris, supra,* 489 U.S. at 388. The same standard applies where the claim is a failure to adequately supervise. *Bordanaro v. McCloud,* 871 F.2d 1151, 1158 (1st Cir.1989). Consequently, municipal liability based upon a failure to train cannot be derived from a single incident. *City of Oklahoma v. Tuttle,* 471 U.S. 925, 823 (1985).

Plaintiffs cannot provide admissible evidence which would establish that the Defendant's failed to train any of its involved Officers. Accordingly, Plaintiffs' *Monell* claim for failure to train against the City of Los Angeles should be dismissed.

### III.  CONCLUSION

In the seconds between De Anda's initial advancement while armed with a knife, pausing for a moment and then rushing directly at Defendants Rodriguez and Mayen, these Officers were not afforded time and thus did not have time to "deliberate." They were forced to make split-second decisions to save their own lives, as well as others against a knife wielding aggressor that had various options available in the event he wanted to escape. Instead, De Anda orchestrated his own death by following through on the mission he had on the night in question: "I don't want to live!" Ultimately, De Anda's will and desire was too strong of a force for Defendant Rodriguez and Mayen to overcome. Despite the valiant efforts of both Defendants Rodriguez and Mayen in trying to de-escalate and provide the benefit of the doubt to De Anda, De Anda unfortunately ensured that his suicidal ideations would become a reality at the expense of these two Defendant Officers that were trying to help him. The undisputed evidence related to this

incident, to which Defendants have relied upon, are supported entirely by the BWVs, which speak for themselves, as they demonstrate a "real world" unobstructed view into the imminent threat of serious bodily injury and/or death facing Defendants Mayen and Rodriguez on September 13, 2023, which is rarely captured so clearly. For the all the reasons set forth above, all Federal Claims should be dismissed in their entirety.

DATED: March 15, 2025         HYDEE FELDSTEIN SOTO, City Attorney
                              DENISE C. MILLS, Chief Deputy City Attorney
                              KATHLEEN KENEALY, Chief Assist. City Attorney
                              CORY M. BRENTE, Senior Assistant City Attorney


                              By:  /s/ *Christian R. Bojorquez*

                              CHRISTIAN R. BOJORQUEZ, Deputy City Attorney
                              *Attorneys for Defendant* CITY OF LOS ANGELES