**HYDEE FELDSTEIN SOTO**, City Attorney (SBN 106866)
**DENISE C. MILLS**, Chief Deputy City Attorney (SBN 191992)
**KATHLEEN KENEALY**, Chief Assistant City Attorney (SBN 212289)
**CORY M. BRENTE**, Senior Assistant City Attorney (SBN 115453)
**CHRISTIAN R. BOJORQUEZ**, Deputy City Attorney (SBN 192872)
200 North Main Street, 6th Floor, City Hall East
Los Angeles, California 90012
Phone No.: (213) 978-7023 / Fax No.: (213) 978-8785
Email:  christian.bojorquez@lacity.org;

*Attorneys for Defendant* CITY OF LOS ANGELES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| M.B., by and through her Guardian *ad litem*, Nayelli Bautista and L.D., by and through his Guardian *ad litem*, Jasmin Trinidad, individually and as successors in interest to CARLOS DE ANDA, deceased,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>CITY OF LOS ANGELES; JOSE ARTEAGA MAYAN; KASSANDRA RODRIGUEZ; and DOES 1-10, inclusive,<br><br>                    Defendants. | Case No. 2:24-cv-07642 SVW (SSC)<br>*Assigned to Hon. Stephen V. Wilson; Ctrm 10A*<br>*Mag. Stephanie Christensen; Ctrm 790 (Roybal)*<br><br>**DEFENDANT CITY OF LOS ANGELES AND NAMED, BUT UNSERVED, DEFENDANTS JOSE ARTEAGA MAYEN AND KASSANDRA RODRIGUEZ' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>[Filed concurrently with Notice of Motion and Motion; Notice of Lodgment; and [Proposed] Order]<br><br>Hearing Date:  April 28, 2025<br>Time:            1:30 pm<br>Courtroom:    10A |

TO THE HONORABLE STEVEN V. WILSON, U.S. DISTRICT COURT JUDGE,

AND TO PLAINTIFF AND HER COUNSEL OF RECORD:

        Pursuant to Fed. R. Civ. Proc. 56 and Local Rule 56-1, Defendant CITY OF LOS

ANGELES, and named, but unserved, Defendants KASSANDRA RODRIGUEZ and

JOSE ARTEAGA MAYEN hereby submit this Separate Statement of Undisputed Material Facts, with reference to the supporting evidence, in support of their Motion for Summary Judgment or alternatively, Summary Adjudication of issues.

The Exhibits referred to herein are included in the Motion for Summary Judgement, Declarations, and the Notice of Lodgment.

DATED: March 15, 2025          HYDEE FELDSTEIN SOTO, City Attorney
                               DENISE C. MILLS, Chief Deputy City Attorney
                               KATHLEEN KENEALY, Chief Assist. City Attorney
                               CORY M. BRENTE, Senior Assistant City Attorney


                               By:  /s/ *Christian R. Bojojrquez*
                                 CHRISTIAN R. BOJORQUEZ, Deputy City Attorney
                                 *Attorneys for Defendant* CITY OF LOS ANGELES

## SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS

**ISSUE NO. 1: Officer Rodriguez's and Officer Mayen's Use of Deadly Force Was Objectively Reasonable Under the Totality of the Circumstances.**

| Fact No. | Defendants' Undisputed Material Facts | Supporting Evidence |
|---|---|---|
| 1. | On September 13, 2023, at approximately 18:14 hours, a Communications Division (hereinafter "CD") Emergency Board Operator (hereinafter "EBO") received a 911 call from Rosa Maria Fuentes De Leon, a Spanish speaker, who requested a police response to 1133 South Vermont Avenue. De Leon reported that the suspect, later identified as Carlos De Anda (hereinafter referred to as "De Anda"), had taken a knife from her fruit stand and was last seen walking south on Vermont Avenue, toward Pico Boulevard. De Leon described De Anda as a male, 30-35 years of age, wearing a brown and white shirt, and orange shorts. | Exhibit 1: LAPD Communications 911 Call; Exhibit 1-A: English Translation of 911 Call from Spanish speaker and caller Rosa Maria Fuentes De Leon with EBO (hereinafter "911 Call Translation") |
| 2. | At approximately 20:06 hours, CD received a 911 call from Cruz, who requested a police response to 1235 New Hampshire Avenue. Cruz reported that there was a male, later identified as De Anda, across the street from her residence holding a sharp, shiny object in his hand and was threatening people with the object. | Exhibit 2: LAPD Communications 911 Call |

| Fact No. | Defendants' Undisputed Material Facts | Supporting Evidence |
|---|---|---|
| 3. | At approximately 20:08pm on September 23, 2023, the following LAPD Broadcast was made: "Any Olympic Unit, 415 Man in the Korean Church parking lot across from 1235 South New Hampshire. Tall male, red shorts, has a possible edged weapon in his hand. Code-Two, Incident 4317, RD 2056." | Exhibit 3: LAPD Communications Division - Olympic Division Audio Base Frequency |
| 4. | At approximately 8:13pm on September 23, 2023, the following LAPD Broadcast was made: "Any Olympic Unit, 415 Man with a knife, 2531 West Pico, at the church parking lot. Male Hispanic transient, 20's, two-toned, dark blue upper white bottom, pink shorts, vandalizing vehicle's window, holding a knife, threw rocks at patrons. Code-Two, Incident 4334, RD 2056." | Exhibit 4: LAPD Communications Division - Olympic Division Audio Base Frequency. |
| 5. | Named Defendants LAPD Officers Jose Arteaga Mayen (hereinafter "Named Defendant Mayen"), and named Defendant Kassandra Rodriguez (hereinafter "Named Defendant Rodriguez"), as well as LAPD Officer Morse were wearing Body-Worn Videos which were activated and recording during the incident and were in full uniform. | Declaration of Named Defendant Jose Mayen (hereinafter "Mayen Dec."), at ¶ 2; Declaration of Named Defendant Kassandra Rodriguez (hereinafter "Rodriguez Dec."), at ¶ 2; Declaration of Officer Morse |

| Fact No. | Defendants' Undisputed Material Facts | Supporting Evidence |
|---|---|---|
| | | (hereinafter "Morse Dec."), at ¶ 2. |
| 6. | At approximately 8:28 p.m., Named Defendant Mayen and his partner Officer Morse were the first LAPD Unit to arrive at the incident location. | Exhibit 5: Named Defendant Mayen's Body-Worn Video (hereinafter "Mayen BWV") at 20:28:37; Mayen Dec., at ¶ 3. |
| 7. | At the time Named Defendant Mayen arrived at scene, the southern gate to the parking located mid-block on New Hampshire Avenue, between Pico Boulevard and 12th Street, was closed, which can be seen on the right side (East) of his BWV as he walks northbound along New Hampshire. | Exhibit 5: Mayen BWV at 20:28:53 thru 20:28:58; Mayen Dec. at ¶ 4. |
| 8. | Named Defendant Mayan observed De Anda on the east side of the street, adjacent to a parking lot, and communicated his observations with his partner Officer Morse. Named Defendant Mayen then observed De Anda enter the parking lot through a gap in the fence line. Named Defendant Mayen yelled, "Hey! Hey!" but received no response from De Anda. | Exhibit 5: Mayen BWV at 20:29:24; Mayen Dec. at ¶ 5. |

| Fact No. | Defendants' Undisputed Material Facts | Supporting Evidence |
|---|---|---|
| 9. | Named Defendant Mayen attempts to communicate with De Anda in hopes to de-escalate the situation involving De Anda. | Exhibit 5: Mayen BWV at 20:29:24; Mayen Dec. at ¶ 6. |
| 10. | De Anda reaches down and arms himself with a knife at 8:29:37 p.m. De Anda's knife is a total of 15 inches with a 10-inch blade. | Exhibit 5: Mayen BWV at 20:29:37; Exhibit 6: Photos of Knife; Mayen Dec. at ¶ 7. |
| 11. | At approximately 8:29:40 pm on September 23, 2023, the following LAPD Broadcast was made by Officer Morse: "53, we need a backup. He re-armed himself with a knife." "53, let's set up a containment perimeter. So, I want a unit at Vermont and Pico; New Hampshire and Pico; Vermont and 12th; and New Hampshire and 10th…12th. He is still walking around the parking lot still." | Exhibit 7: LAPD Communications Division - Olympic Division Audio Base Frequency; Morse Dec. at ¶ 8. |
| 12. | Named Defendant Mayen initiated communication with De Anda in an attempt to develop a rapport with De Anda and de-escalate the situation De Anda had created.  This communication continued throughout the incident up until the shooting.  De Anda was advised to drop the knife several times and De Anda also stated "I don't want to live" during the incident.  Exhibit 8 is incorporated herein by | Exhibit 8: English Translation of Named Defendant Mayen's original communications with De Anda in Spanish (hereinafter "Mayan Translation"); Exhibit 5 Mayen BWV at 20:29:24 – 20:35:55; Mayan Dec. at ¶ |

| Fact No. | Defendants' Undisputed Material Facts | Supporting Evidence |
|---|---|---|
| | reference, as if fully set forth herein and is attached herein as "Exhibit 8: English Translation of Named Defendant Mayen's original communications with De Anda in Spanish" as depicted in Exhibit 5: Mayen BWV: 20:29:24 – 20:35:55. Exhibit 8 sets forth the entirety of communications between Named Defendant Mayen and De Anza and was translated by Named Defendant Mayen as a true, accurate, correct and authentic translation. | 9. |
| 13. | During Named Defendant Mayen's communication with De Anda, De Anda stated "I don't want to live." Named Defendant Mayen advises his partner and thereafter attempts to inquire of De Anda as to why De Anda does not want to live. | Exhibit 8: Mayen Translation at page 4, 20:33:27; Exhibit 5: Mayen BWV at 20:33:23 thru 20:34:20; Mayen Dec. at ¶ 10. |
| 14. | At approximately 8:33:23 p.m., Named Defendant Rodriguez and her partner Officer Hernandez arrive at the incident location.  Upon her arrival, the southern gate is now open. Named Defendant Mayen, Named Defendant Rodriguez, nor their partners opened the gate, nor did anyone from the LAPD make that request. | Exhibit 9: Named Defendant Rodriguez' Body-Worn Video (hereinafter Rodriguez BWV at 20:34:15; Rodriguez Dec. at ¶ 4; Mayen Dec at ¶ 11; Deposition of Named Defendant Mayen |

| Fact No. | Defendants' Undisputed Material Facts | Supporting Evidence |
|---|---|---|
| | | (hereinafter "Mayen Depo") at page 8, lines 16-22; page 80:25 – 81:5; Deposition of Named Defendant Rodriguez (hereinafter "Rodriguez Depo") at page 31, lines 14-18; Morse Dec. at ¶ 3. |
| 15. | Named Defendant Rodriguez positions herself by the southern gate and holds her position while Named Defendant Mayen continues attempts to speak with De Anda. | Exhibit 9: Rodriguez BWV at 20:34:24 thru 20:35:48. Rodriguez Depo: page 14:22-25. |
| 16. | Despite Named Defendant Mayen's continued attempts to de-escalate by trying to relate to De Anda as a human being and trying to be considerate, De Anda terminated any ability to continue communications with Officers by advancing towards the southern gate where Named Defendant Rodriguez and her patrol vehicle were located.  De Anda suddenly stopped and appeared to hop to his left while armed with the knife. | Exhibit 5: Mayen BWV at 20:35:47 thru 20:35:55; Mayen Dec. at ¶ 12.; Exhibit 8: Mayen Translation. |
| 17. | Named Defendant Mayen had training on de-escalating, such as PATROL (Acronym) and mental evaluation training & Academy training, | Mayen Dec. at ¶ 6. |

| Fact No. | Defendants' Undisputed Material Facts | Supporting Evidence |
|---|---|---|
| | but the situation is dictated on the willingness of De Anda to cooperate with officers. | |
| 18. | Named Defendant Rodriguez observed De Anda's advancement and when he stopped, Named Defendant Rodriguez did not fire her weapon because De Anda did not pose an imminent threat of death or serious bodily injury at that time. It wasn't until De Anda, while still armed, began to advance again from a distance of approximately 20 – 25 feet which caused her to fire her weapon to prevent De Anda from killing her or hurting others, as he presented an imminent threat of serious bodily injury and/or death at that time to both Officers, herself and citizens behind her. It was something Named Defendant Rodriguez recalls because De Anda's eyes seemed evil and aggressive, especially while running at her with a knife. This engagement from De Anda's initial advancement to the time she fired her first shot was eight (8) seconds. | Exhibit 9: Rodriguez BWV at 20:35:47 thru 20:35:55; see also, Exhibit 9-A: Demonstrative "Slow Motion & Zoomed" Clip of Exhibit 9 (hereinafter "Exhibit 9-A"); Rodriguez Depo at page 10:12 – 22; page 11:3 - page 12:1; page 52: 19-24; page 60:15 – page 61:1; page 36:22 - page 37:5; page 12:3 - 11; Mayen Depo at 128:19 – 130:1; Rodriguez Dec. at ¶ 6. |
| 19. | Named Defendant Rodriguez had less than one (1) second to react to De Anda's advancement towards her in deciding when to fire her weapon. Named Defendant Rodriguez fired a | Exhibit 9: Rodriguez BWV at 20:35:55 – 20:35:58; Rodriguez Dec. at ¶ 7; Rodriguez Depo at page |

| Fact No. | Defendants' Undisputed Material Facts | Supporting Evidence |
|---|---|---|
| | total of three (3) shots, assessing as she fired each shot while perceiving that De Anda still posed an imminent threat (while armed) of serious bodily injury and/or death and she stopped firing after her third (3rd) shot, where she acknowledged that the threat De Anda posed had stopped. | 13:13 –page 14:3; page 39:8-11; see also, Exhibit 9-A |
| 20. | Clip of named Defendant Rodriguez's BWV captures De Anda in possession of the knife prior to and throughout the shooting by both named Defendants Rodriguez and Mayen, including after the shooting wherein the weapon is still in the possession of De Anda as Officer Morse approaches De Anda and removes it from him. | Exhibit 10: Clip of Rodriguez BWV – Shooting to Recovery of Knife (hereinafter "Rodriguez BWV – Recovery Knife") at 20:35:46 thru 20:36:49; See also, Exhibit 10-A: Demonstrative "Slow Motion" Clip of Exhibit 10 (hereinafter "Exhibit 10-A); Rodriguez Dec. at ¶s 8-9. |
| 21. | Named Defendant Rodriguez provided the following statements to De Anda before she fired her weapon: "Hey, get, Put the, Put the Knife Down, Put the Knife Down, Put the" (1st Shot Fired) | Exhibit 9: Rodriguez BWV at 20:35:48 thru 20:35:55; Rodriguez Dec. at ¶9. |

| Fact No. | Defendants' Undisputed Material Facts | Supporting Evidence |
|---|---|---|
| 22. | With respect to Named Defendant Mayen, he observed De Anda terminate communicating with him when De Anda can be seen advancing to the southern gate. Named Defendant Mayen tracked De Anda southbound along the east sidewalk, while providing orders to stop and to "put the knife down."  After about 6 seconds, De Anda eventually stopped for approximately 3 seconds and Named Defendant Mayen did not fire at that time.  Named Defendant Mayen did not fire his weapon because De Anda did not pose an imminent threat of death or serious bodily injury when he first stopped.  It wasn't until De Anda, while still armed, began to advance again from a distance of approximately 20 – 25 feet which caused him to fire his weapon two (2) times to stop the imminent threat of serious bodily injury and/or death that De Anda posed. | Exhibit 5: Mayen BWV at 20:35:47 thru 20:35:57; See also, Exhibit 5-A: Demonstrative "Slow Motion" Clip of Exhibit 5 (hereinafter "Exhibit 5-A") at 20:35:47 thru 20:35:57  Mayen Depo: 125:20 – 126:22; 127:8 – 128:18; 11:19-23; 15:3-21; 48:3-21; 83:18 – 84:4; 24:2 – 25:18; Mayen Dec at ¶  14. |
| 23. | Named Defendant Mayen had less than one (1) second to react to De Anda's advancement towards named Defendant Rodriguez and himself in deciding whether to fire or not. Named Defendant Mayen fired a total of two (2) shots, assessing as he fired each shot while | Exhibit 5: Mayen BWV at 20:35:55 thru 20:35:58; Mayen Depo: 24:2 – 25:18; 26:5-18; Mayen Dec at ¶ 14; Exhibit 9: Rodriguez BWV at 20:35:55 thru |

| **Fact No.** | **Defendants' Undisputed Material Facts** | **Supporting Evidence** |
|---|---|---|
| | perceiving that De Anda still posed an imminent threat (while armed) of serious bodily injury and/or death and he stopped firing after his second (2nd) shot, where he acknowledged that the threat De Anda posed had stopped. | 20:35:58; Rodriguez Depo at page 39:8-11; see also, Exhibit 9-A. |
| 24. | Based upon the actions of De Anda, coupled with the totality of the circumstances, named Defendant Mayen believed De Anda was possibly under the influence of drugs and wanted to die. After the Los Angeles County Coroner's Office conducted a Toxicology Screen of De Anda, it revealed De Anda was positive for Methamphetamine. | Mayen Depo: 65:3-17; 69:3-17; Exhibit 8: Mayen Translation at page 4, 20:33:27 – 20:34:14; Exhibit 5 Mayen BWV at 20:33:27 – 20:34:14; Exhibit 11: Los Angeles County Coroner's Office Toxicology Report De Anza (hereinafter "Exhibit 11: Tox Report"). |
| 25. | The BWVs of named Defendant Mayen (Exhibit 5 & 5-A), named Defendant Rodriguez (Exhibit 9 & 9-A & Exhibit 10 & 10-a) and Officer Morse's (Exhibit 12) are hereby incorporated herein by reference, as if set forth fully herein based upon the fact that they are essentially the "best evidence' in this case. These BWVs captured, in real time, the events which led up to the tragic shooting of De Anda. | Exhibit 5 - Mayen BWV; Exhibit 5-A - Mayen BWV (Slow Motion 0.4x); Exhibit 9 - Rodriguez BWV; Exhibit 9-A - Rodriguez BWV Clip (Zoom & Slow Motion 0.4x speed); Exhibit 10 - Rodriguez BWV – |

| Fact No. | Defendants' Undisputed Material Facts | Supporting Evidence |
|---|---|---|
| | These BWVs provide the "best evidence" of how De Anda posed an imminent threat of serious bodily injury and/or death which caused named Defendants Mayen and Rodriguez to fire a total of five (5) shots to stop the threat De Anda posed to the officers and citizens in the area. Even in the event, Plaintiff claims there are "disputed" facts above which are based almost entirely on the BWVs, these BWVs, alone, present the uncontroverted (undisputed) facts necessary for this Court to grant the requested relief. | Shooting to Recovery of Knife; Exhibit 10-A - Rodriguez BWV Clip – Shooting to Recovery of Knife (Slow Motion 0.4x speed); Exhibit 12 - Morse BWV |

**ISSUE NO. 2:  Officer Rodriguez and Officer Mayen Are Entitled to Qualified Immunity**

| Fact No. | Defendants' Undisputed Material Facts | Supporting Evidence |
|---|---|---|
| 26. | Undisputed Material Fact Nos. 1 through 25 are incorporated and reasserted herein by reference, as if set forth fully and completely herein. | See Evidence in support of Fact Nos. 1 through 25. |

**ISSUE NO. 3: Officer Rodriguez and Officer Mayen's Actions did not Rise to a Level Which Shocks the Conscience**

| Fact No. | Defendants' Undisputed Material Facts | Supporting Evidence |
|---|---|---|
| 27. | Undisputed Material Fact Nos. 1 through 25 are incorporated and reasserted herein by reference, as if set forth fully and completely herein. | See Evidence in support of Fact Nos. 1 through 25. |

**ISSUE NO. 4: Plaintiffs have failed to Prove any *Monell* Violations**

| Fact No. | Defendants' Undisputed Material Facts | Supporting Evidence |
|---|---|---|
| 28. | Undisputed Material Fact Nos. 1 through 25 are incorporated and reasserted herein by reference, as if set forth fully and completely herein. | See Evidence in support of Fact Nos. 1 through 25. |

**ISSUE NO. 5:  Plaintiffs Have No Evidence of Inadequate Training**

| Fact No | Defendants' Undisputed Material Facts | Supporting Evidence |
|---|---|---|
| 29. | Undisputed Material Fact Nos. 1 through 25 are incorporated and reasserted herein by reference, as if set forth fully and completely herein. | See Evidence in support of Fact Nos. 1 through 25. |

**ISSUE NO. 6:  No Evidence Exists to Support a Failure to Provide Medical Care:**

| Fact No. | Defendants' Undisputed Material Facts | Supporting Evidence |
|---|---|---|
| 30. | Undisputed Material Fact Nos. 5 through 6 are incorporated and reasserted herein by reference, | See Evidence in support of Fact Nos. 5 through 6. |

| Fact No. | Defendants' Undisputed Material Facts | Supporting Evidence |
|---|---|---|
| | as if set forth fully and completely herein. | |
| 31. | LAPD Officer Matthew Morse (hereinafter "Officer Morse") broadcasts shots fired and requests a rescue ambulance (hereinafter "RA") to scene. Requests rescue team for the suspect. | Exhibit 12: Named Defendant Morse's Body-Worn Video (hereinafter "Morse BWV") at 20:36:10; Morse Dec., at ¶ 2. |
| 32. | Officer Morse requests officers to glove up. | Exhibit 12: Morse BWV at 20:36:18 |
| 33. | Officer Morse advises officers that the suspect still has the knife 'on there.' | Exhibit 12: Morse BWV at 20:36:29 |
| 34. | Officer Morse instructs officers that he will get the knife out the way. | Exhibit 12: Morse BWV at 20:36:32 |
| 35. | Officer Morse states "we got to help this guy." | Exhibit 12: Morse BWV at 20:36:39 |
| 36. | Officer Morse again states he will get the knife and "you guys start working on him." | Exhibit 12: Morse BWV at 20:36:40 |
| 37. | Officer Morse removes knife from suspect. | Exhibit 12: Morse BWV at 20:36:41 |
| 38. | Officers first place hands on suspect. | Exhibit 12: Morse BWV at 20:36:47 |
| 39. | Officers turn suspect over. | Exhibit 12: Morse BWV at 20:36:52 |
| 40. | Officer Morse asks if anyone knows where suspect was hit. Female officer indicates "head, head." | Exhibit 12: Morse BWV at 20:36:54 |

| Fact No. | Defendants' Undisputed Material Facts | Supporting Evidence |
|---|---|---|
| 41. | Officer seen placing handcuff on suspect. | Exhibit 12: Morse BWV at 20:37:01 |
| 42. | Officer Morse asks if any officer has 'first aid or something that can put pressure on his head.' | Exhibit 12: Morse BWV at 20:37:13 |
| 43. | Officer Morse tells female officer she can cut off his shirt and put pressure on the wound. | Exhibit 12: Morse BWV at 20:37:26 |
| 44. | Female officers seen cutting DeAnda's shirt off | Exhibit 12: Morse BWV at 20:37:35 |
| 45. | Officer Morse broadcasts suspect is in custody. RA is cleared to come in. | Exhibit 12: Morse BWV at 20:37:36 |
| 46. | Female officer begins to apply pressure to suspect's head with a cloth. | Exhibit 12: Morse BWV at 20:37:48 |
| 47. | Female officer suggests putting suspect on his side and then they proceed to do so. | Exhibit 12: Morse BWV at 20:37:51 |
| 48. | DeAnda is placed on his side with pressure applied to head. | Exhibit 12: Morse BWV at 20:38:00 |
| 49. | DeAnda is placed on his back. | Exhibit 12: Morse BWV at 20:38:56 |
| 50. | Officer Morse asks if police vehicles can be moved to make room for the RA. | Exhibit 12: Morse BWV at 20:39:00 |
| 51. | Officer Morse gives instructions to have vehicles moved to give access to RA. | Exhibit 12: Morse BWV at 20:39:05 |
| 52. | Female officer seen looking for pulse on suspect.  Officer Morse advises that if there is a pulse, no need for CPR - "heartbeat, no CPR." | Exhibit 12: Morse BWV at 20:39:21 |

| Fact No. | Defendants' Undisputed Material Facts | Supporting Evidence |
|---|---|---|
| 53. | Officer Morse instructs to keep pressure on the wound. | Exhibit 12: Morse BWV at 20:39:28 |
| 54. | Handcuff is removed. Female officer indicates DeAnda is moving. | Exhibit 12: Morse BWV at 20:40:00 |
| 55. | Officer Morse says 'let's keep playing it like we hope he is going to survive, we're gonna try to keep him alive.' | Exhibit 12: Morse BWV at 20:40:06 |
| 56. | Female officer advises DeAnda still has a pulse. | Exhibit 12: Morse BWV at 20:40:13 |
| 57. | Officer Morse says they are three blocks from the RA. | Exhibit 12: Morse BWV at 20:40:26 |
| 58. | All the while female officer seen with finger on pulse of suspect. | Exhibit 12: Morse BWV at 20:39:21-20:35:58 |
| 59. | Officer Morse says 'come on guys, come on guys' – speaking out loud looking for the paramedics. | Exhibit 12: Morse BWV at 20:41:58 |
| 60. | Officer Morse indicates it is clear for the RA. | Exhibit 12: Morse BWV at 20:42:24 |
| 61. | RA Paramedics arrive and are seen walking up to the scene of incident. | Exhibit 12: Morse BWV at 20:42:25 |

# CONCLUSIONS OF LAW

**Conclusion of Law No. 1:**

Summary judgment is appropriate where the record, taken in the light most favorable to the opposing party, indicates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The party moving for summary judgment must present evidence that negates an essential element of the opposing party's case or show that the opposing party does not have evidence necessary to support its case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). The burden then shifts to the nonmoving party to demonstrate there is a triable issue of material fact as to the cause of action or affirmative defense. But they cannot rest on mere allegations or denials of the moving party's evidence. *Bhan v. NME Hosps., Inc.,* 929 F.2d 1404, 1409 (9th Cir. 1991).

In police cases, many of the litigated claims in Federal Court focus on allegations of excessive/unreasonable uses of force in officer involved shooting incidents. In a case involving excessive force, courts examine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor,* 490 U.S. 386, 397 (1989). This inquiry "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396, quoting *Tennessee v. Garner,* 471 U.S. 1, 8 (1985). Because "police officers are often forced to make split-second judgments," reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." Id. at 396-97 (*citing Terry v. Ohio,* 392 U.S. 1, 20-22 (1975)).

The Fourth Amendment's "objective reasonableness" standard governs excessive force claims. *Graham v. Connor,* 490 U.S. 386, 388 (1989). The reasonableness standard "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."

*Id.* at 396 (internal quotation marks omitted).  Essentially, a Court must "balance the amount of force applied against the need for that force." *Bryan v. MacPherson,* 630 F.3d 805, 823-24 (9th Cir. 2010).  In applying this reasonableness standard it "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396. "[W]hether the suspect poses an immediate threat to the safety of the officers or others" is the "most important" of the *Graham* factors. *Smith v. City of Hemet,* 394 F.3d 689, 702 (9th Cir. 2005).

**Conclusion of Law No. 2:**

When evaluating a Fourth Amendment claim, "[i]t is imperative that the facts be judged against an objective standard." *Terry, supra,* 392 U.S. at 21.  "Factors relevant to assessing whether an officer's use of force was objectively reasonable include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempt to evade arrest by flight." *Gonzalez v. City of Anaheim,* 747 F.3d 789, 793 (9th Cir. 2014) (en banc), quoting *Graham, supra,* 490 U.S. at 396.  As a general rule, "[a]n officer's use of deadly force is reasonable [ ] if the 'officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Scott v. Henrich,* 39 F.3d 912, 914 (9th Cir. 1994), quoting *Garner,* 471 U.S. at 3 (emphasis omitted).  "[W]hether the suspect poses an immediate threat to the safety of the officers or others" is the ***"most important"*** of the *Graham* factors. *Smith v. City of Hemet,* 394 F.3d 689, 702 (9th Cir. 2005) (emphasis added).  "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn v. Washington County,* 673 F.3d 864, 872 (9th Cir. 2011).  But the "most important" factor is "whether the suspect posed an

immediate threat to the safety of the officers or others." *George v. Morris,* 736 F.3d 829, 838 (9th Cir. 2013) (citation omitted).

**Conclusion of Law No. 3:**

Although the Defendant Officers' actions were objectively reasonable, they are further protected by numerous immunities. Critically, qualified immunity shields government officials from liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "[Q]ualified immunity is to be determined at the earliest possible point in the litigation[.]" *Estate of Lopez v. Gelhaus,* 871 F.3d 998, 1021 (9th Cir. 2017).

The qualified immunity analysis is two-pronged factor analysis, but Courts have discretion "in deciding which of the two prongs . . . should be addressed first in light of the circumstances in the particular case at hand." *Pearson, supra,* 555 U.S. at 236. Under the first prong, the issue is whether the facts, taken in the light most favorable to the party asserting the injury, show the defendant's conduct violated a constitutional right. *Id.* at 232. Under the second prong, the issue is whether the constitutional right in question was "clearly established" at the time the conduct at issue occurred. *Id.* at 232, 236.

**Conclusion of Law No. 4:**

To state a substantive due process claim under the Fourteenth Amendment, a plaintiff must show that the conduct at issue "shocks the conscience." *Porter v. Osborn,* 546 F.3d 1131, 1137 (9th Cir. 2008). The standard requires official conduct that "shocks the conscience" in depriving a child and/or parent of that interest "is cognizable as a violation of due process." *Wilkinson v. Torres,* 610 F.3d 546, 554 (9th Cir. 2010). In

evaluating whether a law enforcement's officer's use of force "shocks the conscience" (violates the Fourteenth Amendment right to familial association), a Court must first determine whether the circumstances were such that "actual deliberation" by the officer was practical. *Id.* "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Id.* At the other extreme, "where a law enforcement officer ***makes a snap judgment because of an escalating situation,*** his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.* (emphasis added.) This is a much higher standard than the objective reasonableness standard of the Fourth Amendment. *Peck v. Montoya,* 51 F.4th 877, 893 (9th Cir. 2022).

**Conclusion of Law No. 5:**

As a prerequisite to establishing Section 1983 municipal liability, plaintiff must satisfy one of three conditions: (1) the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a long-standing practice or custom which constitutes the standard operating procedure of the local governmental entity; (2) the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself this constituted an act of official governmental policy; and (3) the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it. After proving that one of the three circumstances existed, a plaintiff also must show that the circumstance was: (1) the cause in fact; and (2) the proximate cause of the constitutional deprivation. See *Trevino v. Gates,* 99 F.3d 911, 918 (9th Cir. 1996).

In *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986), the Supreme Court held that a public entity is not liable for Section 1983 damages under a *Monell* that can cause constitutional deprivations when the factfinder or a Court concludes that an individual officer, acting pursuant to the policy, inflicted no constitutional harm to the plaintiff. If a

person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point. *Quintanilla v. City of Downey,* 84 F.3d 353, 355 (9th Cir. 1996).

**Conclusion of Law No. 6:**

Under Ninth Circuit precedent, a party must show three things to make out a viable claim of inadequate training. *Merritt v. County of Los Angeles,* 875 F.2d 765, 770 (9th Cir. 1989): 1) First, a plaintiff must show that the existing program is inadequate. *Id.* at 770; 2) Second, a plaintiff must prove that the training, policy, or lack thereof, amounts to a "deliberate indifference" to the rights of the people with whom the officials come into contact. *Id.* at 770; and 3) Finally, a plaintiff must prove causation. *Id.* at 770. Specifically, a plaintiff must show that the deliberate indifference on the part of the municipality actually caused the constitutional violation at issue. *Id.* at 770.

DATED: March 15, 2025         HYDEE FELDSTEIN SOTO, City Attorney
DENISE C. MILLS, Chief Deputy City Attorney
KATHLEEN KENEALY, Chief Assist. City Attorney
CORY M. BRENTE, Senior Assistant City Attorney


By: _/s/ Christian R. Bojorquez_
    CHRISTIAN R. BOJORQUEZ, Deputy City Attorney
    *Attorneys for Defendant* CITY OF LOS ANGELES