**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    --oOo--

4

5    M.B., by and through her Guardian ad
     litem, Nayelli Bautista and L.D., by
6    and through his Guardian ad litem,
     Jasmin Trinidad, individually
7    and as successors in interest to
     CARLOS DE ANDA, deceased.

8
          Plaintiff,
9
     v.                    Case No.  2:24-cv-07642-SVW-SSC
10
     CITY OF LOS ANGELES;
11   JOSE ARTEAGA MAYEN; KASSANDRA
     RODRIGUEZ; and DOES 3-10, inclusive,
12
          Defendants.
13   _____/

14

15        STENOGRAPHIC REPORTER'S TRANSCRIPT OF

16          DEPOSITION OF JOSE ARTEAGA MAYEN

17             FRIDAY, FEBRUARY 7, 2025

18

19

20   Reported Stenographically by:

21   KIMBERLY D'URSO, CSR 11372, RPR

22   Job No.  00135196

23

24

25

EXHIBIT 13  PAGE 1 OF 24

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 2

```
 1                     APPEARANCES

 2

 3   FOR THE PLAINTIFFS:

 4           LAW OFFICES OF DALE K. GALIPO
             BY:  MARCEL F. SINCICH, ESQ.
 5           21800 Burbank Boulevard, Suite 310
             Woodland Hills, California 91367
 6           818.347.3333
             msincich@galipolaw.com
 7

 8   FOR THE DEFENDANTS:

 9           LOS ANGELES CITY ATTORNEY'S OFFICE
             BY: CHRISTIAN R. BOJORQUEZ, ESQ.
10           Deputy City Attorney
             200 N. Main Street, 6th Floor, City Hall East
11           Los Angeles, California 90012
             213.978.7023
12           christian.bojorquez@lacity.org
                         --oOo--
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 3

```
 1                    INDEX OF EXAMINATION

 2   WITNESS:   JOSE ARTEAGA MAYEN

 3   EXAMINATION BY                                    PAGE

 4        MR. SINCICH............................4

 5

 6                 EXHIBITS FOR REFERENCE

 7   EXHIBIT              DESCRIPTION              PAGE

 8   1 - Google map.................................100

 9   2 - Marked image..............................110

10   3 - Aerial Bates-stamped as City 1131..........120

11   4 - Aerial image of gate, Bates-stamped City
          1114.......................................120
12
     5 - Image of Jose Arteaga Mayen................121
13
     6 - Video Bates-stamped City 968...............130
14
                         --oOo--
15

16      (Exhibits late-filed)

17

18

19

20

21

22

23

24

25
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 4

```
 1                      --oOo--

 2            BE IT REMEMBERED, that set on Friday, the

 3  7th day of February, 2025, commencing at the hour of

 4  10:05 a.m., thereof, JOSE ARTEAGA MAYEN appeared remotely

 5  in Los Angeles, California, before me, Kimberly E.

 6  D'Urso, an RPR and Certified Shorthand Reporter of the

 7  State of California, the following deposition was

 8  stenographically reported by me:

 9            (Whereby the Certified Shorthand Reporter

10            introduced herself on the record and

11            administered the oath to the deponent.)

12

13                      EXAMINATION

14  BY MR. SINCICH:

15       Q.   Thank you.  Good morning, Officer.  Could you

16  please state and spell your name for the record?

17       A.   Yes.  My name is Jose, J-O-S-E; Arteaga,

18  A-R-T-E-A-G-A; Mayen, M-A-Y-E-N.

19       Q.   Okay.  Have you had your deposition taken

20  before?

21       A.   I have not, sir.

22       Q.   Have you testified in court before?

23       A.   I have not.

24       Q.   Okay.  Do you understand that you just took an

25  oath to tell the truth today?
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 8

 1    I did use some type of force, and it was deadly force.

 2        Q.   Okay.  You used deadly force during the

 3    incident?

 4        A.   Yes, sir.

 5        Q.   How long after your arrival did you use deadly

 6    force?

 7        A.   Approximately seven to eight minutes.  Based on

 8    what I seen on my body-worn video, it was between seven

 9    to eight minutes.

10        Q.   Okay.  At 8:35, was it dark out?

11        A.   At 8:35, it was dark out, sir.

12        Q.   Did the incident generally occur in and around

13    a parking lot?

14        A.   The incident did occur inside a parking lot,

15    yes.

16        Q.   Do you know who owned the parking lot or what

17    the parking lot was intended for?

18        A.   I had no idea who was the owner of the parking

19    lot or where the parking lot was situated or who owns

20    it.  It was me getting there -- and I had no connection

21    to whether that parking lot was owned by anybody else,

22    and that parking lot just being there, you know.

23        Q.   Was there businesses in that surrounding area?

24        A.   There is one church on the northwest corner.

25    There's some residents that live right in front of that

EXHIBIT 13   PAGE 5 OF 24

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 11

```
1    similar to the south side.  There is a small side where
2    it's approximately 4-feet tall that somebody could
3    easily jump over, and then it grows as it gets closer to
4    the west side.
5          But later -- well, at the time of the incident,
6    there's also a fencing that covers that area on the
7    north side, and that part was broken.
8         Q.   Okay.  When say you used deadly force during
9    the incident, how did you use deadly force?
10        A.   At the time, upon approval, we met Mr. -- we
11    saw Mr. De Anda, and he was armed with a knife.  He
12    decided to charge at one of our officers, which in this
13    case was Officer Kassandra.  And as he was closing the
14    distance on us, we used deadly force.  And by that, we
15    used our -- our firearms, my firearms.
16        Q.   Okay.  Yeah.  I don't know if it was an unclear
17    question.  I'm sorry.
18        A.   Oh, sorry.
19        Q.   Yeah.  So when you used deadly force during the
20    incident, you did so with your pistol?
21        A.   Yes, I used my pistol.
22        Q.   How many shots did you fire?
23        A.   I shot two shots, sir.
24        Q.   What type of pistol was it?
25        A.   Smith & Wesson --
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 15

1   that he closed that distance.  And at that time, it felt

2   like he was approximately 10 feet away from me.

3        Q.   Right.  I'm wondering -- and I understand that

4   what you described of him "closing the distance."  I'm

5   wondering, what was actually -- for instance, what you

6   were looking at that made you believe that he was 10

7   feet away; like, the reason why you thought he was 10

8   feet away as opposed to any other distance?

9        A.   Well, I mean, like you said earlier, I don't

10  have a tape measure out there to, like, measure and have

11  that luxury to see where he's at.  That's just an

12  estimate based on the perception that I have at the

13  moment.

14       Q.   Okay.  And when you said that he was most

15  likely 20 or 24 feet away, do you recall saying that?

16       A.   Yes, I do.

17       Q.   Where did you get that number from?

18       A.   I was -- I went back to the scene and stood

19  where I stood, and I kind of had a better understanding,

20  in a more sterile environment, not having an active

21  threat trying to come and stab me.

22       Q.   And when you say he was trying to stab you, did

23  the decedent ever swing a knife at you?

24       A.   The decedent, he was armed with a knife, and he

25  had it raised.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 24

```
 1   he kept closing the distance.
 2        Q.   What do you mean "He kept closing the
 3   distance"?
 4        A.   As I shot my first round, he was approximately
 5   24 feet away from me, 23 feet away from me.  As he kept
 6   running and charging, my second shot was approximately
 7   20 feet to 21 feet away from me.
 8        Q.   And where were you aiming your first shot?
 9        A.   My first shot, I was aiming at center mass.
10        Q.   Did you intend to pull the trigger when you
11   fired the first shot?
12        A.   Can you clarify the question?
13        Q.   Did you pull the trigger of your gun in order
14   to make that round go off?
15        A.   At that time, yes.  Once -- I mean, once
16   Mr. De Anda charged at me, I made that decision to press
17   the trigger, yes.
18        Q.   Okay.  So you intentionally pressed the
19   trigger?
20        A.   If I have someone charging at me with a knife
21   and I have to defend myself, I mean --
22        Q.   I understand, sir.  But, like, it wasn't a
23   negligent discharge, for instance?
24             Have you ever heard of that phrase before?
25        A.   Yes, I have.
```

EXHIBIT 13  PAGE 8 OF 24

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 25

1       Q.   Okay. Was it an intentional shot or was it an

2   accidental shot?

3       A.   It was not an accidental shot, sir. Officer --

4   De Anda was approaching me, and I pressed the trigger.

5       Q.   Okay. And did you intend for that shot to

6   strike Mr. De Anda?

7       A.   Yes. Mr. De Anda was approaching me, and I had

8   to stop the threat at that time.

9       Q.   Did you believe that you struck him with that

10   shot?

11       A.   I wouldn't be able to say whether I struck him

12   or not. I don't have -- I mean, I don't have the

13   capacity to see where the round ever ended up, sir.

14       Q.   Did you believe that you struck him, or did you

15   believe that you missed?

16       A.   I wouldn't be able to say. All I know is after

17   shooting my first shot and shooting my second shot,

18   De Anda went down, and I stopped shooting.

19       Q.   Okay. Where were you aiming for your second

20   shot?

21       A.   I was aiming at center mass.

22       Q.   Okay. And when you say "center mass," what

23   portion of his body were you aiming for?

24       A.   Center mass would be anywhere between his chest

25   and abdominal area.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 26

1    Q.   Approximately, how much time was there in

2    between your first and second shot?

3    A.   I mean, based on reviewing my body-worn video,

4    I would say approximately a second in between each shot.

5    Q.   Did you assess in between your shots?

6    A.   I did assess between each shot, sir.

7    Q.   And did you intend to press the trigger for

8    your second shot?

9    A.   I did intend to press the trigger, due to the

10   fact that De Anda was still charging on my- -- on myself

11   and Officer Kassandra.

12   Q.   And did you intend for your second shot to

13   strike Mr. De Anda?

14   A.   As I said it before, once I pressed the

15   trigger, as soon as he went down, I stopped.  So, yes, I

16   had the intention to keep shooting, due to the fact that

17   he was still charging at me and posing a threat to

18   myself and my partner.

19   Q.   Okay.  Prior to firing your first shot, did you

20   hear any other shots being fired?

21   A.   No, I did not.

22   Q.   Did any other officer use force during the

23   incident, to your knowledge?

24   A.   To my knowledge, yes.

25   Q.   Who used force during the incident, to your

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 48

```
 1        Q.    Did you compile a report or anything like that?

 2        A.    No.

 3        Q.    What about from the December scene visit, did

 4   you write a report for that?

 5        A.    No.

 6        Q.    Was your body-worn camera --

 7              (Simultaneous speakers.)

 8              MR. BOJORQUEZ:  You're getting -- just,

 9   Counsel, you're get into kind of some close issues.  I'll

10   just represent, as the officer stated, they placed

11   themselves and then me as the suspect, as what they

12   recalled at the time of the incident to their perception,

13   and then that's where I measured that distance.

14              MR. SINCICH:  Oh.

15   BY MR. SINCICH:

16        Q.    Based off of -- did you hear what Mr. Bojorquez

17   just said, Officer?

18        A.    Yes.

19        Q.    Do you agree with his recollection of February

20   4th?

21        A.    Yes.

22        Q.    Okay.  And so when you were describing the

23   distances earlier on how it was between 20 to 25 feet,

24   do you recall that?

25        A.    Yes.
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 65

```
 1    that Mr. De Anda was under the influence of a narcotic?
 2        A.   Can you repeat the question, sir?
 3        Q.   Did you have any specific information at the
 4    time of the incident that Mr. De Anda was under the
 5    influence of a narcotic?
 6        A.   During the time of the incident, De Anda was --
 7             (Reporter clarification.)
 8             THE WITNESS:  -- rambling and inconsistent with
 9    his statements.
10    BY MR. SINCICH:
11        Q.   Okay.
12        A.   There -- I had no knowledge if he had taken any
13    narcotics at the time.  But based on his -- based on
14    what he was saying to us, based on what he was saying to
15    me and his ranting and walking back and forth, that
16    would lead me to believe that he could have possibly
17    have been under the influence of narcotics.
18        Q.   Okay.  What was Mr. De Anda wearing?
19        A.   Mr. De Anda was wearing a two-tone shirt.  I
20    believe it was a blue top, white bottom, with pink --
21    pink/red/orangey shorts.
22        Q.   Was he wearing any thick clothing, to your
23    knowledge?
24        A.   To my knowledge, at that time, he was not
25    wearing any thick clothing.
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 69

1    where I could identify that, especially him being so far

2    away from me.

3        Q.   So is it fair to say that, based on your

4    training, at least rambling, incoherent statements, and

5    pacing are of symptoms of a person potentially suffering

6    a mental health crisis?

7        A.   Well, potentially, maybe they could be going

8    through something, mentally, health-related.  But we, as

9    officers, don't react or don't act upon a person's

10   mental health.  We react on that person's behavior.

11       Q.   Right.

12       A.   So to my knowledge, at that time, he was under

13   the -- possibly under the influence of narcotics, yes.

14       Q.   And you also believed that he was possibly

15   suicidal; right?

16       A.   Just based on the knowledge that he told me he

17   wanted to kill himself, yes.

18       Q.   And based on your training, is it's possible

19   for a person who's suffering a mental health crisis to

20   be suicidal?

21       A.   If the person has the will and the desire to

22   take their own life, I -- I believe that that person

23   will go through with it.  And it's unfortunate, but I

24   mean, if that person has that will to do it, they'll

25   find a way to do it, if they're suffering from any

EXHIBIT 13   PAGE 13 OF 24

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 80

```
 1    street that could have been used as cover in this

 2    incident?

 3         A.   There were civilian vehicles parked on both

 4    sides of the street.  And, yes, they could have been

 5    used as cover.  But De Anda was not in the street; he

 6    was inside a parking lot where we were using a fence as

 7    cover.

 8         Q.   So was the fence -- and the small wall, was

 9    that creating a barrier in between officers and Mr. De

10    Anda?

11         A.   Yes.  Mr. De Anda could not approach us because

12    there was a fence in between himself when -- and --

13    himself and myself.  And if necessary, we had the

14    vehicles to re-deploy.

15         Q.   One of the options was to re-deploy behind the

16    civilian vehicles, if necessary?

17         A.   If necessary, yes.  But like I said, he was

18    behind bars, so, therefore, there was no -- he never --

19    he never charged at us through those bars.  He saw an

20    opening, and he decided to charge where the opening was.

21         Q.   Do you think it would have been tactically

22    sound for officers to be in the opening as opposed to

23    behind the bars?

24         A.   Do you mean inside the parking lot?

25         Q.   No.  Just exposed from the opening that you
```

M.B. vs CITY OF LOS ANGELES, ET AL.
Jose Arteaga Mayen on 02/07/2025

Page 81

1    just mentioned?

2        A.    To my knowledge, when -- when I arrived at

3    scene, to my knowledge, that parking lot was closed.  I

4    had no knowledge of it being open.  It wasn't until

5    later that I discovered that that parking lot was open.

6        Q.    Okay.  And was there an option also to

7    re-deploy behind the officer vehicle or vehicles that

8    were nearby?

9        A.    My vehicle was nowhere in the -- nowhere near

10   the location where I could re-deploy to it.  The

11   officers that were just south of me, I wouldn't be able

12   to say what they determined at that time, no.

13       Q.    Could you have used their vehicle as cover?

14       A.    I think I felt that -- like I said, at that

15   time, I didn't have a clear -- my focus was on De Anda.

16   And at that point, I was still behind a fence where I

17   still had cover.

18       Q.    Okay.  When you were moving south on the

19   sidewalk towards Officer Rodriguez, did you know that

20   the fence was open over there?

21       A.    I had knowledge that the fence was open once I

22   observed Officer Rodriguez in that area.  Yes.

23       Q.    Did you see her ever go inside the fence,

24   actually inside the parking lot?

25       A.    Yes.  That's when I had knowledge that the

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 83

```
 1   could --
 2            (Reporter clarification.)
 3            THE WITNESS:  -- observe De Anda at that time.
 4   BY MR. SINCICH:
 5       Q.   When you're confronted with a person armed with
 6   a knife, is it important for officers to keep a
 7   distance?
 8       A.   When we're confronted with any person armed
 9   with a deadly weapon, it's important for us to maintain
10   a distance.
11       Q.   In particular, with someone with a knife, a
12   distance becomes even more important than someone with a
13   gun; is that fair?
14       A.   If a person is armed with a knife?
15       Q.   Distance is even more important than a person
16   armed with a gun; is that fair?
17       A.   I don't think I understand your question, sir.
18       Q.   So, for instance, a person armed with a gun
19   might still be a deadly threat, even if they're 50 feet
20   away; right?
21       A.   If a person is armed with a gun and they're 50
22   feet away, yes, they're still a threat.
23       Q.   But a person that's armed with a knife at 50
24   feet away, they're much less of a threat; isn't that
25   fair?
```

EXHIBIT 13  PAGE 16 OF 24

M.B. vs CITY OF LOS ANGELES, ET AL.
Jose Arteaga Mayen on 02/07/2025

Page 84

1    A.   No.  Well, because a person armed with a knife,

2    like in this case, he could be 100 feet away and could

3    close the distance within five seconds and still pose a

4    threat.

5    Q.   Okay.  Was it important in this case to

6    establish a perimeter?

7    A.   Yes.

8    Q.   Why?

9    A.   We had -- even though we could see into the

10   parking lot where he was at and there was nobody in the

11   parking lot, there was a building to the east of the

12   parking lot.  There was a 76 gas station to the south of

13   that building.

14        And then there was residents to the north of

15   that building -- to the parking lot, as well, where he

16   could have easily jumped the fence on either side and

17   pose a threat to the people that he would encounter.

18   Q.   So you wanted to make sure that he was

19   contained inside the parking lot?

20   A.   Yes.

21   Q.   Did the officers establish a perimeter?

22   A.   My partner, Officer Morse, requested a

23   perimeter and a perimeter was established.

24   Q.   Is it important in these kind of tactical

25   situations for officers to communicate with each other

EXHIBIT 13  PAGE 17 OF 24

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 125

1    know where one of the officers was, which was Officer

2    Hernandez.

3        Q.    And did you -- did you request that Officer

4    Rodriguez stay out of the parking lot?

5        A.    I did ask her, yes.  I told her to stay out of

6    the parking lot.

7        Q.    And did she listen to you when you asked her to

8    do that?

9        A.    She moved back, yes.

10       Q.    Okay.  And why did you ask her to step back?

11       A.    I answered earlier -- like I answered earlier,

12   to keep that line where we could keep her on-site, like,

13   she has visual of me and I have visual of her.

14       Q.    Okay.  So at the time of the incident, when

15   Mr. De Anda was 30 feet away, is it fair to say you

16   didn't use force on him?

17       A.    At that point, he was not actively charging at

18   us.  He was -- he picked up the knife and he began to

19   walk away from us.

20       Q.    Oh, I'm sorry.  At some point in your notes you

21   said that he had stopped.  Do you recall that?

22       A.    Yes.  At this point, he was -- De Anda was

23   charging towards -- towards us.  He came to a stop and

24   then he proceeded to charge us again.

25       Q.    And when he was initially charging from the

M.B. vs CITY OF LOS ANGELES, ET AL.
Jose Arteaga Mayen on 02/07/2025

Page 126

```
 1   100-feet position until he stopped, how would you
 2   describe his movement?
 3        A.   From where he was initially at the 100 feet, he
 4   was charging in a very rapid pace.  Probably took him
 5   from where he was standing to where we were at, probably
 6   like six seconds.  He got there really fast, in a very
 7   was aggressive manner, with a knife, with the knife
 8   pointing in our direction.
 9        Q.   And you demonstrated that he had the knife up
10   by his ear in his right hand?
11        A.   Yes.  That was my perception at the time.  Yes,
12   that's what I saw.
13        Q.   Okay.  And how long did he stop for?
14        A.   I mean, to me, at that time, it was really
15   quick.  It was -- it was a matter of seconds.
16        Q.   Approximately how many seconds?
17        A.   Approximately three seconds.
18        Q.   And then how many more steps did he take after
19   he stopped before you fired your first shot?
20        A.   I wouldn't be able to tell you how many steps
21   he took.  I just know that he rushed and he began
22   sprinting in our direction.
23        Q.   When you say he "rushed" or "sprinted," was it
24   the same speed as he previously went, faster, or slower?
25        A.   Just about the same pace, from what I observed.
```

EXHIBIT 13   PAGE 19 OF 24

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 127

1    Q.   Okay.  And according to your notes, it was

2    approximately 21 seconds between the time that he

3    stopped and the time of the shot; is that fair?

4    A.   From the time that he began to run to the time

5    of the OIS, based on my notes, yes.  That's what I have

6    written down.

7    Q.   I have from the time that he stopped at 35

8    seconds to the first shot at 56 seconds.  Did I write

9    that down correctly?

10   A.   Yes.  There was only three seconds' difference

11   from the time that he stopped to the time that the OIS

12   occurred, three seconds after.

13   Q.   Okay.  So what was the time stamp when he

14   stopped, according to your notes?

15   A.   According to my notes, he came to a stop at

16   2035, with 53 seconds.

17   Q.   Okay.

18   A.   So it will be 8:35 with 53 seconds, p.m.

19   Q.   Okay.  When you gave your statement, you said

20   that you unholstered your weapon at 25 feet away.  Do

21   you recall that?

22   A.   No.  Can you -- do you have the paper in front

23   of you?  I do not recall the distance that I gave.

24   Q.   This is City 230.  At the bottom of the page,

25   from line 23, to 25:  "I unholstered when the suspect

EXHIBIT 13   PAGE 20 OF 24

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 128

```
 1   made, I want to say, probably 25 feet away from us.

 2   That's when I unholstered."

 3            Did I read that correctly?

 4       A.   Yes, sir.

 5       Q.   Okay.  Is it fair to say that you unholstered

 6   when he was 25 feet away?

 7       A.   From the position that I was standing at the

 8   moment where I was tracking him, he was -- to my

 9   perception, he was standing approximately 25 feet away.

10   Yes.

11       Q.   And he was -- when you unholstered your weapon,

12   you didn't shoot him immediately?

13       A.   At that time, I didn't feel that I had to

14   shoot, because he came to a stop.  He completely

15   stopped.  I gave him numerous commands to drop the

16   knife, in hopes that he would drop the knife, knowing

17   that there was a firearm pointed at him.  He decided not

18   to stop and continued running toward officers.

19       Q.   Did you ever give him a warning that if he

20   didn't stop or drop the knife that you would use deadly

21   force?

22       A.   At that time, I did not give him a warning, due

23   to the fact that everything happened so quick.

24   Everything happened so fast that I was unable to give

25   him a warning that if he stops -- if he doesn't stop I
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 129

1    will shoot him.  But I did tell him multiple times to

2    drop the knife --

3            (Reporter clarification.)

4            THE WITNESS:  -- and I believe that a

5    reasonable person would have dropped the knife if they

6    see that two officers have guns pointed at them.

7    BY MR. SINCICH:

8        **Q.  And is there a reason why you did not re-deploy**

9    **to cover behind the vehicles?**

10       A.  If I would have re-deployed, I would have

11   covered Officer Rodriguez, and I would have been put in

12   a situation where I was not able to take a shot.

13       **Q.  Is it fair to say that because of Officer**

14   **Rodriguez's position, you could not move to cover?**

15       A.  No.  That's not -- that's not accurate.  Due to

16   the fact she had to hold a position just because De Anda

17   was charging in her direction.

18       **Q.  Why do you believe that she had to hold her**

19   **position?**

20       A.  If she would have moved, De Anda could have

21   exited our containment, and as I mentioned earlier, put

22   the lives of other people that were standing by in the

23   parking lot structure and across the street in danger,

24   and we would have been in a -- in a situation where he

25   was running free with a knife and could have potentially

EXHIBIT 13  PAGE 22 OF 24

**M.B. vs CITY OF LOS ANGELES, ET AL.**
Jose Arteaga Mayen on 02/07/2025

Page 130

1    harmed other people.

2         Q.   Okay.  And the standard I believe you alluded

3    to earlier:  To use deadly force, there has to be an

4    immediate threat of death force or serious bodily

5    injury?

6         A.   Or death.

7         Q.   Let me see if there's any other exhibit I

8    wanted to show you, sir -- Officer.  I'm sorry.

9              We'll mark as Exhibit 6, a portion of your

10   body-worn camera video.  And this is City 968.

11             (Exhibit Number 6 was marked.)

12             (Video being played.)

13   BY MR. SINCICH:

14        Q.   I'm going to pause it after the first six

15   seconds.  Are you able to hear it?

16        A.   I am.

17        Q.   Okay.  I'm just going to turn it up a little

18   bit.  And it's about 50 seconds, so I'm just going to

19   press play.

20             (Video being played.)

21   BY MR. SINCICH:

22        Q.   Did that depict approximately a minute prior to

23   and your officer-involved shooting?

24        A.   That was approximately 30 seconds, yes.

25             MR. BOJORQUEZ:  Counsel, before you ask him

EXHIBIT 13  PAGE 23 OF 24

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 133

1  STATE OF CALIFORNIA)
                     ) ss:
2  COUNTY OF ALAMEDA  )

3

            I, KIMBERLY E. D'URSO, do hereby certify:
4

5           That the witness named in the foregoing

6  deposition was present remotely and duly sworn to testify

7  to the truth in the within-entitled action on the day and

8  date and at the time and place therein specified;

9           That the testimony of said witness was reported

10 by me in shorthand and was thereafter transcribed through

11 computer-aided transcription;

12          That the foregoing constitutes a full, true and

13 correct transcript of said deposition and of the

14 proceedings which took place;

15          Further, that if the foregoing pertains to the

16 original transcript of a deposition in a federal case,

17 before completion of the proceedings, review of the

18 transcript [ ] was [ ] was not requested.

19          That I am a certified stenographic reporter and

20 a disinterested person to the said action;

21          IN WITNESS WHEREOF, I have hereunder subscribed

22 my hand this 21st day of February, 2025.

23 _____

24 KIMBERLY D'URSO, CSR NO. 11372, RPR

25

EXHIBIT 13  PAGE 24 OF 24