```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                         --oOo--

 4

 5  M.B., by and through her Guardian ad
    litem, Nayelli Bautista and L.D., by
 6  and through his Guardian ad litem,
    Jasmin Trinidad, individually
 7  and as successors in interest to
    CARLOS DE ANDA, deceased.
 8
            Plaintiff,
 9
    v.                         Case No.  2:24-cv-07642-SVW-SSC
10
    CITY OF LOS ANGELES;
11  JOSE ARTEAGA MAYEN; KASSANDRA
    RODRIGUEZ; and DOES 3-10, inclusive,
12
            Defendants.
13  _____/

14

15         STENOGRAPHIC REPORTER'S TRANSCRIPT OF

16           DEPOSITION OF KASSANDRA RODRIGUEZ

17              FRIDAY, FEBRUARY 7, 2025

18

19

20

21

22  Reported Stenographically by:

23  KIMBERLY D'URSO, CSR 11372, RPR

24  Job No.  00135196

25
```

Page 2

```
 1                    APPEARANCES

 2

 3   FOR THE PLAINTIFFS:

 4           LAW OFFICES OF DALE K. GALIPO
             BY:  MARCEL F. SINCICH, ESQ.
 5           21800 Burbank Boulevard, Suite 310
             Woodland Hills, California 91367
 6           818.347.3333
             msincich@galipolaw.com
 7

 8   FOR THE DEFENDANTS:

 9           LOS ANGELES CITY ATTORNEY'S OFFICE
             BY: CHRISTIAN R. BOJORQUEZ, ESQ.
10           Deputy City Attorney
             200 N. Main Street, 6th Floor, City Hall East
11           Los Angeles, California 90012
             213.978.7023
12           christian.bojorquez@lacity.org
                        --oOo--
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:24-cv-07642-SVW-SSC   Document 42-24   Filed 03/17/25   Page 3 of 17   Page ID #:416
M.B. vs CITY OF LOS ANGELES, ET AL.
Kassandra Rodriguez on 02/07/2025

Page 3

```
 1                  INDEX OF EXAMINATION

 2   WITNESS:  KASSANDRA RODRIGUEZ

 3   EXAMINATION BY                                        PAGE

 4         MR. SINCICH.............................4

 5

 6                  EXHIBITS FOR REFERENCE

 7   EXHIBIT              DESCRIPTION                      PAGE

 8   7 - Copies of images, Bates-stamped City 1162,
         1163......................................64
 9
     8 - Copy of image, Bates-stamped City 1112 and
10       1207......................................69

11   9 - Diagrams Bates-stamped as City 1269..........70

12   10- Video, Bates-stamped City 967................72

13                        --oOo--

14       (Exhibits late-filed)

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        --oOo--

 2             BE IT REMEMBERED, that set on Friday, the

 3   7th day of February, 2025, commencing at the hour of

 4   2:10 p.m., thereof, KASSANDRA RODRIGUEZ appeared remotely

 5   in Ontario, California, before me, Kimberly E. D'Urso, an

 6   RPR and Certified Shorthand Reporter of the State of

 7   California, the following deposition was stenographically

 8   reported by me:

 9              (Whereby the Certified Shorthand Reporter

10               introduced herself on the record and

11               administered the oath to the deponent.)

12

13                       EXAMINATION

14   BY MR. SINCICH:

15       Q.   Good afternoon, Officer.  Can you please state

16   and spell your name for the record?

17       A.   Good afternoon, sir.  It's Officer Kassandra,

18   K-A-S-S-A-N-D-R-A, Rodriguez, R-O-D-R-I-G-U-E-Z.

19       Q.   Okay.  Have you had your deposition taken

20   before?

21       A.   No, I have not.

22       Q.   Have you testified in court before?

23       A.   Yes, I have.

24       Q.   Approximately, how many times?

25       A.   Once.  One time.
```

| | | |
|---|---|---|
| 1 | | in between rounds? |
| 2 | A. | If De Anda had dropped the knife. |
| 3 | Q. | Okay. |
| 4 | A. | And if he would stop advancing towards me. |
| 5 | Q. | So you were paying attention to whether he had the knife in his hand? |
| 7 | A. | Yes. |
| 8 | Q. | Were you paying attention as to how he was holding the knife, like the position of it? |
| 10 | A. | Yes.  He was actually holding it -- maybe like head/eye level. |
| 12 | Q. | And is that what you were looking for when you were assessing, is if it was still there? |
| 14 | A. | Quickly, like how I said it was -- it happened so fast, within seconds.  But, yes, I did identify that he was still armed with the weapon while advancing towards me. |
| 18 | Q. | And so is that another thing that you were looking out for in your assessment is whether he was still moving? |
| 21 | A. | If he was advancing towards me, running at me? Yes. |
| 23 | Q. | And so you said "running."  Is the speed of his movement important to your analysis? |
| 25 | A. | It is important.  Because, you know, someone |

1  armed with a knife advancing towards me, it could close
2  distance, which in this case, he did, very quickly.
3      Q.   Would it be fair to say that if a person wasn't
4  closing the distance quickly, that that would change
5  your analysis?
6      A.   I mean, if he would have complied and dropped
7  the knife, then that would have changed this whole
8  situation.
9      Q.   Right.  What if a person has a knife and then
10 runs towards officers and stops, but then doesn't
11 advance quickly after that, would that change the
12 analysis?
13     A.   Well, in this case --
14          MR. BOJORQUEZ:  I'm going to make an
15 objection -- oh, sorry.  I'm just going to make an
16 objection.  I think it's an incomplete, improper
17 hypothetical.
18          But with that being said, you can go ahead and
19 answer.
20          THE WITNESS:  So, like how I said or I was
21 saying, is in this case, De Anda did advance towards me
22 and he did stop, which is -- at that moment, I did not
23 fire my firearm.  And once he -- I gave him commands to
24 drop the knife, he wasn't willing to comply, and that's
25 when he chose and ran towards me, and that's when I fired

1  my first round.

2  BY MR. SINCICH:

3      Q.   Okay.  How far was Mr. De Anda from you when he
4  stopped?

5      A.   I want to say approximately, maybe, 25 feet.

6      Q.   And then you said that he then moved in your
7  direction from that position until you fired your first
8  shot?

9      A.   Yes.  So he had stopped right there at the 25
10 feet and we made direct eye contact, and that's when he
11 chose to advance towards me.

12     Q.   How long was he stopped for?

13     A.   Maybe a second, a fragment of a second.

14     Q.   And then how long was it from the time that he
15 started moving again until you fired your first shot?

16     A.   Yeah, less -- the same.  A second or a fragment
17 of it.

18     Q.   So it was approximately less than a second to a
19 second that he was stopped?

20     A.   Yes.

21     Q.   And then he started moving and it was less than
22 a second to a second before you fired your first round?

23     A.   Yes.

24     Q.   How long was it in between your first and
25 second round?

1    A.   I would say -- I mean, it happened so quickly.
2    I would say a second.  Once I fired my first round,
3    he -- he still kept advancing towards me, and that's
4    when I fired my second and third round, as well.
5        Q.   Do you know how much time there was in between
6    your first and second round?
7        A.   I -- I don't recall.  Like how I said, it was a
8    matter of a second or so.
9        Q.   Okay.  And then do you know how much time there
10   was in between your second and third round?
11       A.   A fragment of a second, I would say, or a
12   second.
13       Q.   Do you know if you struck him with your first
14   round?
15       A.   I don't recall that.  I -- I just did see him
16   still armed with the knife and advancing towards me.
17       Q.   Do you know if you struck him with your second
18   round?
19       A.   That, as well, I --I don't recall.  But he was
20   still -- he was still armed with the knife and he was
21   still standing.  So, yeah.
22       Q.   What about your third round?
23       A.   My third round, that's when I saw the threat,
24   and he had dropped to the ground, still holding the
25   knife.  And that's when I -- I -- I put my firearm to a

Page 14

1  low ready because I saw that, the threat of him
2  advancing towards me to -- whether he tried to stab me
3  or kill me, he had stopped.
4       Q.   You mentioned commands.  What commands did you
5  give him prior to your use of force?
6       A.   I yelled to "Drop the knife" when he had stood
7  still when he ran towards me.
8       Q.   Did you give him any other commands?
9       A.   No.  Just those.
10      Q.   Did you give him a warning that if he didn't
11 drop the knife, that you would use deadly force?
12      A.   I would have if I had time, but he didn't allow
13 me to have that time.  And we're, you know -- we're --
14 we would do so if it's feasible, but at that moment it
15 was not feasible for me to be able to tell him that.
16      Q.   How long were you on scene prior to your use of
17 force?
18      A.   I want to say -- I don't -- you know, when I --
19 reviewed my body-worn, I didn't really time stamp it,
20 but I want to say I was maybe at scene, maybe four or
21 five minutes.
22      Q.   Were there other officers there when you
23 arrived?
24      A.   I just knew Officer Morse and Officer Mayen
25 were trying to communicate with Mr. De Anda.

Page 31

1    A.    It was -- it was parked on the street, facing
2    northbound on the east side.
3    Q.    Was it, like, right in front of the apron?
4    A.    No, it wasn't.
5    Q.    Where was it in relation to that apron?
6    A.    From what I recall, it was south of the apron.
7    Q.    Okay.  And so you had pulled it forward and
8    then turned it slightly to the right?
9    A.    To get to facing east, yes.
10   Q.    Okay.  And did you feel that that would make
11   the vehicle better to be utilized as cover?
12   A.    If needed, yes.  If needed.  And then that's
13   when I identified better cover.
14   Q.    Did you ever communicate with any of the other
15   officers that that gate was open?
16   A.    No, I did not, because I assumed that they knew
17   it was open.  I -- I just kind of got to the scene and
18   just kind of worked with what I had.
19   Q.    Did you consider moving the vehicle onto the
20   apron to block the gate?
21   A.    No, because tactically, I feel that's not safe.
22   Because if I would have moved it onto the apron, it
23   would have overpenetrated because it's a small or --
24   yeah -- it's a small area of the driveway and apron.
25         So for whatever reason, if we needed to -- if

Page 36

1  Q.  Was there any update as to whether or not he
2  had a history of drug or alcohol use?
3  A.  Again, I don't know him.  I've never had an
4  encounter of him, and I had no knowledge, as well, as to
5  all that.
6  Q.  Did you have any specific information as to
7  whether or not he was under the influence of anything at
8  the time of the incident?
9  A.  I'm sorry.  Can you repeat that?
10  Q.  Did you have any specific information as to
11  whether or not he was under the influence of drugs or
12  alcohol at the time of the incident?
13  A.  At the time of the incident, no.  I had no
14  knowledge of -- of that at all.
15  Q.  Did you ever see Mr. De Anda slash or stab at
16  anybody with the knife?
17  A.  I mean, besides running at me with the knife
18  and being a violent threat to myself, I didn't observe
19  him.  And that's why, you know, I was forced to do what
20  I did, so I could prevent him from hurting somebody or
21  me.
22  Q.  Okay.  Do you believe that he was attempting to
23  stab you or slash at you with a knife?
24  A.  Yes.  So this day, I'll never forget the look
25  on his face running towards me with the knife.  And that

Page 37

1  look on his face looked evil.  I feel like he wanted to
2  kill me.  And I don't even know this guy or had an
3  encounter with him.
4       But, yes, I personally felt that he wanted to
5  kill me or hurt me.
6       Q.  What was he doing that made you believe that he
7  was attempting to slash or stab at you?
8       A.  He had the knife in his hand, and it was an was
9  aggressive matter.  He had it, I believe like how I said
10 earlier, it was eye level to -- it was eye level around
11 maybe right by his ear, running towards me and advancing
12 towards me.
13      And I feel like any good human being wouldn't
14 do that towards any human or especially a police
15 officer.
16      Q.  Did you consider that he might not be in his
17 correct state of mind because he was running with a
18 knife in his hand?
19      A.  I mean, I think regardless if -- if he was or
20 wasn't, like, if he -- he wouldn't have done that to try
21 to aggressively run at somebody with a knife.  So, I
22 mean, that could have been, because I feel like a good
23 person wouldn't, you know, do that.
24      Q.  Did you ever see him swing the knife at you?
25      A.  I wouldn't say a swing.  He was just holding it

1  Q.  And did he have -- at the time of the third
2  shot, not afterwards, but at the time of the third shot,
3  did he have the knife up by his ear in an aggressive
4  manner?
5  A.  Yes, he did.  He did -- he did still have it,
6  or else if he didn't, I wouldn't have -- I wouldn't have
7  shot to begin with.
8  Q.  And how would you describe his movement while
9  you were shooting?
10  A.  He was -- his movement, he was still charging,
11  advancing, running towards me, still with that knife.
12  Q.  So you would describe it as running?
13  A.  Yep, I would.
14  Q.  Was he running in your observations at full
15  speed?  Half speed?  Slow speed?  Anything like that?
16  A.  I mean, I don't -- I don't really know -- I
17  mean, I don't know him, so I don't know what his full
18  speed would be or his low speed.  But, I mean, in my
19  perspective and my observations, he was running at me
20  really quickly and fast and -- for things to happen in a
21  matter of second.
22  Q.  At the time of your first shot, was he in range
23  at that particular moment to strike anybody with a
24  knife?
25  A.  I'm sorry.  Can you repeat the question?

1 threat to me, and he wasn't willing to comply.  So I
2 think he, you know, made that decision, regardless of the
3 distance, because he -- he could have dropped that knife
4 and we could have, you know -- there wouldn't be the
5 situation.
6 BY MR. SINCICH:
7     Q.   So when in your mind, at the time of the
8 incident, did he move from being a threat to an imminent
9 deadly threat?
10    A.   When he ran at me.  When he was running towards
11 me with the knife.
12    Q.   So the whole time that he was running, or was
13 there a particular place in time?
14    A.   When he ran towards me and he stopped at what I
15 said was around 25 feet, yes, when he stopped initially.
16 So he had the chance to -- and he had the choice to drop
17 that knife, but he dictated me to -- to use deadly force
18 against him.
19    Q.   In your mind, was he an imminent threat of
20 death or serious bodily injury when he stopped at
21 approximately 25 feet away?
22    A.   When he stopped, no, because -- and that's why
23 I didn't fire until he advanced towards me and closed
24 that.
25    Q.   And you believed, at least at the time, that he

1  remember."
2         Line 17, Detective Arteaga:  "Is this a
3  possibility he could have been coming to you for -- to
4  get -- for safety or get help."
5         Line 20, Officer Rodriguez:  "No."
6         MR. SINCICH:  Thank you for reading that.
7         MR. BOJORQUEZ:  Well, Counsel, like I said, I'm
8  just trying to make sure that you're being honest and
9  fair.  And the way that you read it was not.  So I just
10 wanted to make sure we don't have any error on City 335
11 in a document that you're representing to the witness.
12 BY MR. SINCICH:
13     Q.   Officer Rodriguez?
14     A.   Yes, sir.
15     **Q.   Did you see a facial expression when he was**
16 **jogging towards you?**
17     A.   So, I know right here I said "I don't
18 remember."  Obviously, this was a big thing in my life
19 that I've never gone through.  But -- and how I had said
20 in the past that eye -- or what I said previously is the
21 eye contact that he made with me, it wasn't some sort of
22 eye -- facial expression, I guess.
23         But it was -- it was something I said that I
24 would never forget because the eye contact that he made
25 with me was just -- it was just -- it just seemed evil

Page 61

1  and aggressive, especially running at you with a knife.
2     Q.  Did you ever tell the detectives that he had an
3  evil look in his eyes?
4     A.  No, because I didn't, again -- I went through
5  something that was, you know -- my adrenalin was all
6  over.  And that was something, I guess, that -- that
7  popped up later on, my adrenalin had went down after
8  this interview.
9     Q.  Did you ever tell the detectives that he made
10 eye contact with you?
11    A.  They didn't ask me that.
12    Q.  Did you ever tell them that when you were
13 describing the incident?
14    A.  No.  I wasn't asked that, so I didn't -- I
15 didn't say that.
16    Q.  Were you asked to describe why you used deadly
17 force?
18    A.  Yes, I did.  And that's when I told them how
19 the incident occurred.
20    Q.  Okay.  Do you recall telling the detectives
21 that his eyes were really big?
22    A.  Yes, I do.
23    Q.  And at that point in time, did you describe
24 whether or not he made eye contact with you?
25         MR. BOJORQUEZ:  I guess, vague and ambiguous.

Page 77

1  STATE OF CALIFORNIA)
                      ) ss:
2  COUNTY OF ALAMEDA  )

3

4            I, KIMBERLY E. D'URSO, do hereby certify:

5            That the witness named in the foregoing
6  deposition was present remotely and duly sworn to testify
7  to the truth in the within-entitled action on the day and
8  date and at the time and place therein specified;

9            That the testimony of said witness was reported
10 by me in shorthand and was thereafter transcribed through
11 computer-aided transcription;

12           That the foregoing constitutes a full, true and
13 correct transcript of said deposition and of the
14 proceedings which took place;

15           Further, that if the foregoing pertains to the
16 original transcript of a deposition in a federal case,
17 before completion of the proceedings, review of the
18 transcript [ ] was [ ] was not requested.

19           That I am a certified stenographic reporter and
20 a disinterested person to the said action;

21           IN WITNESS WHEREOF, I have hereunder subscribed
22 my hand this 21st day of February, 2025.

23 _____

24 KIMBERLY D'URSO, CSR NO. 11372, RPR

25