**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
 *dalekgalipo@yahoo.com*
Marcel F. Sincich, Esq (SBN 319508)
 *msincich@galipolaw.com*
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
Tel: (818) 347-3333
Fax: (818) 347-4118

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| M.B., by and through her Guardian *ad litem*, Nayelli Bautista; and L.D., by and through his Guardian *ad litem*, Jasmin Trinidad, individually and as successors in interest to CARLOS DE ANDA, deceased,<br><br>            Plaintiffs,<br><br>    vs.<br><br>CITY OF LOS ANGELES; JOSE ARTEAGA MAYAN; KASSANDRA RODRIGUEZ; and DOES 1-10, inclusive,<br><br>            Defendants. | Case No. 2:24-cv-07642-SVW-SSC<br><br>Assigned to:<br>Hon. District Judge Stephen V. Wilson<br>Hon. Mag. Judge Stephanie S. Christensen<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[Separate Statement of Genuine Disputes and Additional Material Facts; Objections to Defendants Separate Statement; Declaration of Marcel F. Sincich and attached exhibits; Declaration of Roger Clark; *filed concurrently herewith*]<br><br>Date:  April 28, 2025<br>Time:  1:30 p.m.<br>Ctrm:  10A |

# **<u>TABLE OF CONTENTS</u>**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

I.     INTRODUCTION ......................................................................................... 1

II.    STATEMENT OF RELEVANT FACTS ..................................................... 2

    A.    Officers were Not Responding to a Violent Crime, Knew De Anda Was Suffering a Mental Health Crisis, and Had No Plan ............. 2

    B.    Defendants' Use of Excessive Deadly Force Against De Anda with Cover, with Reasonable Alternatives, and Without Warning ........ 3

    C.    De Anda was Not an Immediate Threat of Death or Serious Injury .................................................................................................. 5

III.   LEGAL STANDARD UNDER RULE 56 .................................................... 7

IV.    OFFICERS USED EXCESSIVE FORCE SHOOTING WITHOUT WARNING FROM 28-30 FEET AWAY BUT WITH ALTERNATIVES ......................................................................................... 8

    A.    The Nature and Quality of the Intrusion—Deadly Force—Is Unparalleled and Was Unnecessary ................................................... 9

    B.    Government Interest Weigh in Favor of Finding that the Officers' use of Deadly Force Was Excessive ................................... 9

    C.    Plaintiffs' Denial of Familial Relationship Claim Survives ............. 14

    D.    Defendants are Not Entitled to Qualified Immunity .......................... 15

V.     CITY OF LOS ANGELES RATIFICATION & FAILURE TO TRAIN ....... 23

VI.    CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*Adickes v. S.H. Kress & Co.*,
   398 U.S. 144 (1970) ........................................................................7

*Anderson v. Creighton*,
   483 U.S. 635 (1987) ....................................................................7, 8

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ........................................................................7

*Ashcroft v. al–Kidd*,
   563 U.S. 731 (2011) ......................................................................17

*Blanford v. Sacramento Cnty.*,
   406 F.3d 1110 (9th Cir. 2005)......................................................18

*Blankenhorn v. City of Orange*,
   485 F.3d 463 (9th Cir. 2007)..........................................................9

*Brosseau v. Haugen*,
   543 U.S. 194 (2004).......................................................7, 8, 15, 16

*Brown v. Lynch*,
   831 F.3d 1146 (9th Cir. 2016).......................................................24

*Bryan v. MacPherson*,
   630 F.3d 805 (9th Cir. 2010)..............................................9, 11, 13

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ........................................................................7

*City & Cnty. of San Francisco, Calif. v. Sheehan*,
   575 U.S. 600 (2015) ......................................................................18

*City of Canton v. Harris*,
   489 U.S. 378 (1989) ......................................................................24

*Clouthier v. Cnty. of Contra Costa*,
   591 F.3d 1253 (9th Cir. 2010).......................................................24

*Connick v. Thompson*,
   563 U.S. 51 (2011) ........................................................................24

*Davis v. City of Las Vegas*,
   478 F.3d 1048 (9th Cir. 2007).......................................................12

*Deorle v. Rutherford*,
   272 F.3d 1272 (9th Cir. 2001)..........................................10, 12, 13

*Drummond v. City of Anaheim*,
   343 F.3d 1052 (9th Cir. 2003).......................................................10

*Espinosa v. City and Cnty. of San Francisco*,
   598 F.3d 528 (9th Cir. 2010).........................................................15

*Est. of Aguirre v. Cnty. of Riverside*,
    29 F.4th 624 (9th Cir. 2022)....................................................................13, 16

*Est. of Garcia Toribio v. City of Santa Rosa*,
    381 F. Supp. 3d 1179 (N.D. Cal. 2019) .................................................19

*Garlick v. Cnty. of Kern*,
    167 F. Supp. 3d 1117 (E.D. Cal. 2016)..................................................15

*Garmon v. City of Los Angeles*,
    828 F.3d 837 (9th Cir. 2016)..................................................................24

*George v. Morris*,
    736 F.3d 829 (9th Cir. 2013)..................................................................11

*Gillette v. Delmore*,
    979 F.2d 1342 (9th Cir. 1992)................................................................23

*Glenn v. Washington Cnty.*,
    673 F.3d 864 (9th Cir. 2011)..............................................10, 13, 15, 19

*Gonzalez v. City of Anaheim*,
    747 F.3d 789 (9th Cir. 2014)....................................................................8

*Graham v. Connor*,
    490 U.S. 386 (1989) ........................................................................8, 9, 10

*Gravelet–Blondin v. Shelton*,
    728 F.3d 1086 (9th Cir. 2013)................................................................17

*Green v. City and Cty. of San Francisco*,
    751 F.3d 1039 (9th Cir. 2014)................................................................13

*Greer v. City of Hayward*,
    229 F. Supp. 3d 1091 (N.D. Cal. 2017) .................................................15

*Harris v. Roderick*,
    126 F.3d 1189 (9th Cir. 1997)................................................................11

*Hayes v. County of San Diego*,
    736 F.3d 1223 (9th Cir. 2013)..........................................................14, 23

*Hernandez v. City of San Jose*,
    897 F.3d 1125 (9th Cir. 2018)..........................................................23, 24

*Hopkins v. Andaya*,
    958 F.2d 881 (9th Cir. 1992)....................................................................7

*Isayeva v. Sacramento Sheriff's Dep't*,
    872 F.3d 938 (9th Cir. 2017)....................................................................9

*Johnson v. Jones*,
    515 U.S. 304 (1995) ...............................................................................15

*Johnson v. Myers*,
    2025 WL 666365 (9th Cir. Mar. 3, 2025) .........................................17, 18

*Kisela v. Hughes*,
    138 S. Ct. 1148 (2018) .................................................................19

*Knox v. Southwest Airlines*,
    124 F.3d 1103 (9th Cir. 1997)......................................................15

*Lake Nacimiento Ranch Co. v. San Luis Obispo Cnty.*,
    841 F.2d 872 (9th Cir. 1987)..........................................................7

*Landeros v. City of Tustin*,
    837 F.3d 1005 (9th Cir. 2016)..................................................9, 10

*Lopez v. Gelhaus*,
    871 F.3d 998 (9th Cir. 2017).........................................11, 12, 13

*Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ........................................................................7

*Merritt v. City of Los Angeles*,
    875 F.2d 765 (9th Cir. 1989)........................................................24

*Murnane v. Las Vegas Metro. Police Dep't*,
    No. 2:13-cv-01088-MMD, 2015 WL 1442262 (D. Nev. Mar. 30, 2015).......24

*N.E.M. v. City of Salinas*,
    761 F. App'x 698 (9th Cir. 2019)................................................16

*Navarro v. Block*,
    72 F.3d 712 (9th Cir. 1996)..........................................................24

*Nelson v. City of Davis*,
    685 F.3d 867 (9th Cir. 2012)........................................................10

*Nicholson v. City of Los Angeles*,
    935 F.3d 685 (9th Cir. 2019)........................................................15

*Oviatt v. Pearce*,
    954 F.2d 1470 (9th Cir. 1992)......................................................25

*Pembaur v. City of Cincinnati*,
    475 U.S. 469 (1986) ......................................................................24

*Penny v. Azmy*,
    No. 22-55572, 2024 WL 489287 (9th Cir. Feb. 8, 2024) ..............21

*Porter v. Osborn*,
    546 F.3d 1131 (9th Cir. 2008)......................................................14

*S.B. v. Cnty. of San Diego*,
    864 F.3d 1010 (9th Cir. 2017)................................................21, 22

*S.R. Nehad v. Browder*,
    929 F.3d 1125 (9th Cir. 2019).............................................8, 10, 23

*Santos v. Gates*,
    287 F.3d 846 (9th Cir. 2002)......................................................9, 15

*Scott v. Harris*,
550 U.S. 372 (2007) ........................................................................ 8

*Scott v. Smith*,
109 F.4th 1215 (9th Cir. 2024) ...................................................... 14

*Smith v. City of Hemet*,
394 F.3d 689 (9th Cir. 2005) .................................................. 10, 12

*St. Louis v. Praprotnik*,
485 U.S. 112 (1988) ...................................................................... 23

*Tan Lam v. City of Los Banos*,
976 F.3d 986 (9th Cir. 2020) ........................................................ 18

*Tennessee v. Garner*,
471 U.S. 1 (1985) ...................................................................... 9, 10

*Tennison v. City and Cnty. of San Francisco*,
570 F.3d 1078 (9th Cir. 2009) ...................................................... 14

*Trevino v. Gates*,
99 F.3d 911 (9th Cir. 1996) .......................................................... 23

*Velazquez v. City of Long Beach*,
793 F.3d 1010 (9th Cir. 2015) ........................................................ 9

*Vos v. City of Newport Beach*,
892 F.3d 1024 (9th Cir. 2018) .................................... 8, 13, 20, 21

*Wilkins v. City of Oakland*,
350 F.3d 949 (9th Cir. 2003) ............................................. 7, 8, 15

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This civil rights action arises from the excessive officer-involved shooting of Decedent Carlos De Anda ("De Anda") by Defendant Officers Jose Arteaga Mayan ("Mayen") and Kassandra Rodriguez ("Rodriguez"), on September 13, 2023. At least six (6) Los Angeles Police Department ("LAPD") officers contained De Anda in an empty parking lot, who was clearly suffering from a mental health crisis. De Anda attempted to jog out of an empty parking lot with a knife in hand, but Officer Rodriguez moved to block his path. De Anda immediately stopped and side-stepped away. Then after **slowly** taking about **one step**, not in the direction of any officer, and from **about 28-30 feet away**, **without making a furtive movement with the knife**, and **without warning**, Defendants opened fire. As De Anda was falling to the ground, the officers continued to fire including shooting him in the head. De Anda did not run at anyone, did not attempt to slash or stab anyone, never attempted to harm anyone, never verbally threatened anyone, and was 28-30 feet away. De Anda was not an immediate threat of death or serious bodily injury and Defendants failed to use the several less-lethal options and reasonable alternatives available to them.

Defendants' Motion presents a set circumstances that must be evaluated by a jury. Not only do they inappropriately attempt to persuade judgment in their favor with information unknown to the officers, but many material "facts" presented by the defense are inconsistent with their own statements and the forensic evidence. Now Defendants argue that De Anda orchestrated his own death, wanted to die, so the officers complied. Too often so-called highly trained police officers fail to take any responsibility for killing a human being. Here, a reasonable jury could find that the Defendants' insufficient training and unreasonable perception led to their choice to shot and kill De Anda. Further, Defendants' Motion fails because it is based on Defendants' disregard of Rule 56's requirement that there be no disputed issues of material fact and that the record must be viewed in the light most favorable to the

nonmoving party. When properly viewed at this stage, the videos show Defendants failing to de-escalate, failing to give a warning, failing to take cover and/or tactically reposition, failing to communicate with each other, and failing to attempt less-lethal force. Further, the videos show De Anda stopping, side-stepping, then shot while moving slowly, having taken merely one step, not in the direction of any officer, 28-30 feet away, and not making any threatening movements with the knife.

Given that the law was clearly established, Defendants exaggerated facts in statements to investigators saying that De Anda raised the knife up in a stabbing motion, despite the video showing it down by his side; that De Anda was running at officers, despite the video showing that he stopped and took merely one step; and that De Anda was only 10 feet away, despite the videos showing that he was 28-30 feet away and the City's findings that the shooting occurred from about 28 feet away.

Defendants' uses of deadly force were excessive, and they are not entitled to summary judgment. Further, the law was clearly established that officers violate the subject's constitutional rights under these circumstances, making qualified immunity just as inappropriate as summary judgment and the Defendants' use of deadly force.

## II.    STATEMENT OF RELEVANT FACTS

### A.    Officers were Not Responding to a Violent Crime, Knew De Anda Was Suffering a Mental Health Crisis, and Had No Plan

Defendants were not responding to a violent crime. (Plaintiffs' Additional Material Fact ("PAMF") 62-64.) Yet, knew they may be confronting a person with a knife and still had no plan. (PAMF 88.) This incident occurred in an empty parking lot, with no cars and no pedestrians. (PAMF 65.) They used a flashlight, spotlights and a helicopter to illuminate De Anda during the incident. (PAMF 66-67.) After about 1-2 minutes, Officer Mayen saw De Anda pick up a knife off the ground followed by officers calling for backup, establishing a perimeter, and containing De Anda. (PAMF 68-70.) Officer Mayen began to make verbal contact, screaming at De Anda, and learned that De Anda was potentially suffering from a mental health crisis.

(PAMF 71-72.) Thus, Officer Mayen told Officer Morse to call for the Mental Health Unit ("MEU") but never followed up on the request. (PAMF 73-74.)

Officer Rodriguez had mental illness training with the MEU on how to de-escalate these situations, therefore knowing that a person potentially suffering from a mental illness is not in complete control of their actions and thought processes. (PAMF 75-76.) On the other hand, Officer Mayen was on probation with only 10 months' experience. (PAMF 77.) Yet, Officer Mayen still was allowed to lead the communication with De Anda. (PAMF 78.) Officer Rodriguez did not even consider the possibility that De Anda was experiencing a mental health crisis because she did not evaluate and had no dialogue with him. (PAMF 79.) Still, Officer Rodriguez observed De Anda acting erratic but did not contact the MEU and did not know if it was ever contacted. (PAMF 80.) At that point, Officer Mayan knew that additional officers arrived and created the perimeter around the parking lot, and that officers had time, distance, and cover, and no one's life was in danger. (PAMF 81-82.)

Then, Officer Mayen saw De Anda distracted by officers attempting to enter the north-side parking lot, so he told the officers, "Hey, back up, back up. Stand by." (PAMF 83.) Officer Rodriguez admitted that it would be unsafe to go inside the parking lot, yet still went inside the fence, inside the parking lot. (PAMF 84.) Officer Mayen saw Officer Rodriguez enter the parking lot gate on the south side and had to call Officer Rodriguez out of the parking lot, saying, "No, no. Back up. Backup. Do not enter the parking structure." (PAMF 85.) Officer Mayen learned that the parking lot gate was open by observing Officer Rodriguez inside the parking lot. (PAMF 86.) By reasonable inference, Officer Mayen knew that officers entering the parking lot escalated the situation. (PAMF 87.)

### B.    Defendants' Use of Excessive Deadly Force Against De Anda with Cover, with Reasonable Alternatives, and Without Warning

*Defendants had Cover/Access to Cover*: (PAMF 89.) When confronting a person potentially armed with a knife, officers are trained to consider taking cover

because it provides officers with time and distance from the subject and an opportunity to verbally de-escalate the situation. (PAMF 90-92.) There were several vehicles parked on both sides of the streets that could have been used as cover and a fence atop a 3-foot wall as options to redeploy behind as cover if needed. (PAMF 93-95.) At the south gate, Officer Rodriguez placed her vehicle, with ballistic panels, south of the apron facing east so that it could be utilized as cover if needed; specifically positioned so that if De Anda came running towards officers, and they had no cover, they would have the vehicle close by to use as cover. (PAMF 96-98.) Officer Mayen also admitted to investigators that officers could have redeployed behind vehicles that were right next to the curb. However, Officer Mayen did not redeploy behind cover because Officer Rodriguez did not redeploy behind cover. (PAMF 99.) Officer Rodriguez left the cover of her vehicle because she saw Officers Morse and Mayen at the fence and wanted to be in line with them. (PAMF 100.)

*No Warning was Given*: Officers Rodriguez and Mayen did not give a warning prior to using deadly force. (PAMF 101.) No officer gave a warning prior to the use of deadly force. (PAMF 102.)

*Defendants Had Time and Opportunity*: Officer Mayen used deadly force approximately seven to eight minutes after arriving on scene while Officer Rodriguez used deadly force within 4-5 minutes of arrival. (PAMF 103-104.) According to Officer Mayen, after 7 minutes, De Anda ran for about 13 seconds, and stopped for 3 seconds prior to the officer-involved shooting. (PAMF 105.) Defendants admit that they fired within a fraction of a second of De Anda in a stopped position. (PAMF 106.) Officer Rodriguez admitted that De Anda's speed of movement was important to her analysis. (PAMF 107.) After stopping, De Anda took a few steps to the side, away from the Defendant Officers, both south and east, then in the process of taking about one slow step – not running – the Officers used deadly force. (PAMF 108-109.)

*Defendants Had Reasonable Alternatives*: Knowing the subject may be armed with a knife, the officers armed themselves with less lethal force options. (PAMF

110.) Officer Mayen admitted to investigators, "[w]e could have considered using less lethal." (PAMF 111.) Defendants were armed with OC spray and a Taser and had two extra 40 mm launders in the vehicles. (PAMF 112-114.) Defendants knew that the Taser could cause neuromuscular incapacitation for 5 seconds to allow officers to take the subject into custody. (PAMF 115.) Officer Morse was equipped with a 40 millimeter, less lethal launcher, just to Officer Mayen's left at the time of the force, while Officer Hernandez was just to the right of the Defendant Officers with a 40 mm launcher. (PAMF 116-117.) An airship was requested and arrived prior to the use of force. (PAMF 118.) Officer Mayen admits that one option was for officers to re-deploy behind the civilian vehicles and Officer Rodriguez considered bringing less lethal but admitted that she "should have voiced it sooner but [] I didn't." (PAMF 119-120.) Officer Rodriguez also never considered moving the vehicle onto the apron to block the gate. (PAMF 121.) No officer attempted less lethal force during the incident despite officers being armed with less lethal force. (PAMF 122.)

*Defendants' Used Deady Force*: the Defendant Officers intentionally used deadly force firing fire hollow-point rounds from their 9-millimeter pistol, designed to open and spread after hitting their target, aimed center mass, while admitting to have assessed between his shots, and intending that their shots strike De Anda. (PAMF 123-125.) Officers are trained to assess between rounds to determine if the subject is a deadly threat, including whether still advancing. (PAMF 126.) However, at the time of firing her second round, Officer Rodriguez did not even know how De Anda was holding the knife. (PAMF 127-128.)

### C.  De Anda was Not an Immediate Threat of Death or Serious Injury

*De Anda was not an immediate threat of death or serious bodily injury at the time*. (PAMF 129.) Prior to his use of deadly force, Defendants had no information that De Anda had ever physically injured anybody; and never saw De Anda physically injure anybody, including himself. (PAMF 130-131.) De Anda never attempted to slash, stab, or swing a knife at anyone. (PAMF 132.) Defendants also

had no information that De Anda had ever verbally threatened anybody and had never met De Anda before. (PAMF 133-135.) De Anda did not attempt to jump over a fence or run towards any civilian, and there were no civilians in the area, De Anda was contained. (PAMF 136-138.) Officer Mayen was about 30 feet from De Anda when he first saw him walking away from officers. (PAMF 139.) De Anda walked eastbound to the back of the parking lot, about 100 feet away from officers then began pacing back and forth. (PAMF 140-141.) Defendants admit that De Anda moved towards the exit where the gate was open before Officer Rodriguez moved south to block him. (PAMF 142-143.) Officer Rodriguez was on the apron, 3 feet south and 3 feet west of the gate, when she used deadly force. (PAMF 144.) Officer Mayen also ran toward Officer Rodriguez prior to using deadly force. (PAMF 145.) De Anda never made a furtive or threatening movement with the knife. (PAMF 146.)

*Distance Between De Anda and Officers*: When confronting a person armed with a knife, it is important for officers to maintain <u>and create distance</u> because it gives officers time to use other resources and de-escalate the situation. (PAMF 147-149.) Both officers admit that their use of deadly force is contingent on De Anda's distance. (PAMF 150.) Officer Mayen admitted that if a person is 20 feet away, they are too far to use the knife at anyone or stab anyone. (PAMF 151.) Officer Rodriguez admitted that De Anda was not an imminent threat when he stopped 25 feet away. (PAMF 152.) According to Officer Rodriguez, the City diagram accurately reflects the positions of the officers and De Anda during the shots, showing Defendants about 28-30 feet away from De Anda at the time of the first shot. (PAMF 154-155.)

*Officers vs. De Anda's Size, Age, Capabilities, and Number*: Officer Mayen estimated De Anda to be 5'6" and 150 pounds. (PAMF 156.) Officer Mayen was 5'7" and 150 pounds, equipped with OC spray, a Taser, flashlight, baton, and ballistic vest. (PAMF 157.) Officer Rodriguez was 5'2" and 145 pounds, with nearly 4-years' experience, equipped with OC spray, a Taser, flashlight, baton, and ballistic vest. (PAMF 158.) Officer Morse was 5'7" and 220 pounds, with 27 years' experience,

equipped with OC spray, a Taser, flashlight, baton, and ballistic vest. (PAMF 159.)
Officer Henandez was 5'9" and 190 pounds, equipped with OC spray, a Taser,
flashlight, baton, and ballistic vest. (PAMF 160.) Backup was arriving, in addition to
the four officers in the immediate area, totaling 14 officers. (PAMF 161-63.)

## III.    LEGAL STANDARD UNDER RULE 56

Summary judgment is only appropriate when there is no genuine issue as to
any material fact and the moving party is entitled to judgment as a matter of law. Fed.
R. Civ. P. 56. The burden of establishing the absence of a genuine issue of material
fact lies with the moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23
(1986). Defendants cannot meet their burden. At this stage, a court's function is not
to weigh the evidence, make credibility determinations, or determine the truth but to
determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 249 (1986). Here, the Court must view the evidence and draw all
reasonable inferences therefrom in the light most favorable to the nonmoving party.
*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *Lake Nacimiento Ranch
Co. v. San Luis Obispo Cnty.*, 841 F.2d 872, 875 (9th Cir. 1987). A fact is "material"
if its proof or disproof is essential to an element of plaintiff's case. *Celotex Corp.*,
477 U.S. at 322-23. A factual dispute is "genuine" "if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "Where
the record taken as a whole could not lead a rational trier of fact to find for the non-
moving party, there is no genuine issue for trial." *Matsushita Elec. Industrial Co.,
Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Even entirely circumstantial
evidence is sufficient to create a triable issue of fact. *Hopkins v. Andaya*, 958 F.2d
881, 888 (9th Cir. 1992). Further, the reasonableness of an officer's belief "is a
quintessentially 'fact-specific' question, not a question that judges should try to
answer 'as a matter of law.'" *Brosseau v. Haugen*, 543 U.S. 194, 206 (2004) (Stevens
J., dissenting); *Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *Wilkins v. City of
Oakland*, 350 F.3d 949, 956 (9th Cir. 2003).

The undisputed fact that De Anda was moving slowly from about 28 feet away, with the knife down by his side, while officers had cover and less-lethal alternatives available, and was shot without warning, precludes summary judgment. Additionally, in a deadly force case such as this, where De Anda cannot testify, the Court must carefully examine all evidence in the record to determine whether the officer's story is internally consistent and consistent with known facts. *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794–95 (9th Cir. 2014). The Court must also examine circumstantial evidence that, if believed, would tend to discredit the police officer's story, all to "ensure that the officer[s] [are] not taking advantage of the fact that the witness most likely to contradict [their] story—the person shot dead—is unable to testify." *Id.*; *see Brosseau*, 543 U.S. at 206 (Stevens J., dissenting) (the reasonableness of an officer's belief "...is a quintessentially 'fact-specific' question, not a question that judges should try to answer 'as a matter of law'..."); *Anderson*, 483 U.S. at 641; *Wilkins*, 350 F.3d at 956. Which is exactly the case here.

Finally, where there is video of the use of excessive force, the Court must view the facts in the light depicted by the videotape in Plaintiffs' favor. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) ("The record is viewed in light most favorable to the nonmovants..., so long as their version of the facts is not blatantly contradicted by the video evidence."). Even where video evidence exists, the circumstances may be such that reasonable factfinders could draw divergent conclusions from what the video evidence shows. *See S.R. Nehad v. Browder*, 929 F.3d 1125, 1132-39 (9th Cir. 2019) (disputed issues of material fact precluded summary judgment in an action alleging excessive use of force even though the evidence included surveillance footage).

## IV.    OFFICERS USED EXCESSIVE FORCE SHOOTING WITHOUT WARNING FROM 28-30 FEET AWAY BUT WITH ALTERNATIVES

Defendants' use of excessive force is analyzed under the Fourth Amendment's objective reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989).

"[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "Underlying *Graham's* objective-reasonableness test is the clear principle that the force used to make an arrest must be balanced against the need for force: it is the need for force which is at the heart of the *Graham* factors." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1025 (9th Cir. 2015) (*citing Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007)). The Court must carefully balance "the nature of the harm and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010) (*quoting Graham*, 490 U.S. at 396); *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002) ("Force is excessive when it is greater than is reasonable under the circumstances.").

## A. The Nature and Quality of the Intrusion—Deadly Force—Is Unparalleled and Was Unnecessary

The nature and quality of the intrusion here cannot be understated—Officers used deadly force against De Anda. *Tennessee v. Garner*, 471 U.S. 1, 9 (1985) (deadly force intrusiveness is unmatched). "The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life' and because such force 'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.'" *Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting *Garner*, 471 U.S. at 9). Officers used the highest level of force against De Anda, which is "extreme" and should only be used in limited circumstances. *Id.* at 1011. The only dispute is whether the governmental interests at stake were sufficient to justify it.

## B. Government Interest Weigh in Favor of Finding that the Officers' use of Deadly Force Was Excessive

The use of deadly force must be balanced against the purported need for it. *See Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946-47 (9th Cir. 2017).

Government interest factors to balance against the type of force used include "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight," *Graham*, 490 U.S. at 396, (4) the availability of alternative methods to effectuate an arrest or overcome resistance, *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005), (5) the giving of a warning prior to the use of force, *Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012), and (6) whether it should have been apparent to officers that the person they used force against was emotionally disturbed, *see Glenn v. Washington Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011); *see also Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001).

The Ninth Circuit has cautioned that "[b]ecause such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [it has] held on many occasions that summary judgment…in excessive force cases should be granted sparingly." *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003). Further, it reaffirmed that "summary judgment is not appropriate in §1983 deadly force cases that turn on the officer's credibility that is genuinely in doubt." *Nehad*, 929 F.3d at 1133 (noting genuine doubts about officer credibility regarding perceptions as compared to other evidence). The government interests under *Graham* and its progeny do not support the use of such extreme force.

*No immediate threat of death to officers*: This Court's analysis should start with the most important *Graham* factor – whether the subject posed an immediate threat to the safety of officers or others. *Smith*, 394 F.3d at 702. "Deadly force is permissible only 'if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm.'" *Landeros*, 837 F.3d at 1011 (quoting *Garner*, 471 U.S. at 11). In other words, the use of deadly force is only permissible in the most limited circumstances—when necessary to prevent death or serious bodily injury. *Garner*, 471 U.S. at 3; Cal. Pen. Code §835a. Viewing the facts and all

reasonable inferences in the light most favorable to Plaintiffs, De Anda did not pose an immediate threat of death or serious bodily injury to any person at the time of the shooting. De Anda did not display any assaultive behavior; did not verbally threaten anyone; did not harm anyone; and did not attempt to strike, stab, or slash at anyone. (PAMF 129-163.) *See Lopez v. Gelhaus*, 871 F.3d 998, 1008 (9th Cir. 2017).

Defendants were not facing a situation where somebody was in immediate danger. De Anda was not moving in the direction of any officer. All officers were behind cover or had access to cover, and the ability to maneuver. All officers had less-lethal force options but failed to attempt them. (PAMF 89-122.) On the other hand, De Anda was alone in an empty parking lot, having stopped and was moving slowly, from a great enough distance that gave officers time to analyze and act with less-intrusive alternatives without resorting to deadly force – 28-30 feet away. Defendants assessed their target, saw that he was not an immediate threat of death or serious bodily injury, and intentionally fired center mass knowing it would likely kill De Anda. (PAMF 147-156.) Then, after continuing to assess, Defendants continued firing despite recognizing De Anda falling and turning away from officers as he collapsing to the ground. "A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Bryan*, 630 F.3d at 826. It was incumbent on Defendants to control their emotions, not overreact, and to refrain from the use of deadly force because it was not necessary.

Finally, the fact that a suspect has a deadly weapon does not render the use of deadly force reasonable. *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013); *Glenn*, 673 F.3d at 872-73; *see also Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997) ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed.").

Viewing the video evidence in the light most favorable to Plaintiffs, De Anda was moving slowly, 28-30 feet away from officers. There are no objective factors to

justify the Officers' claim that De Anda was an immediate threat of death or serious bodily injury. *See Deorle*, 272 F.3d at 1281 ("a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."); *Lopez*, 871 F.3d at 1008-10 (finding the armed subject's position and movement immediately prior to the shooting did not support a reasonable belief of a threat). Accepting Plaintiffs' version, De Anda did not present an immediate threat of death or serious bodily harm to anyone when he was shot.

*Seriousness of crime*: Defendants were responding to a call for vandalism and knew De Anda was suffering from a mental health crisis. This is not an issue of a violent crime in progress. Further, Defendants did not have any information that De Anda had harmed any person or even attempted to harm any person. This factor clearly does not support the use of deadly force. For example, in *Deorle*, the plaintiff "brandish[ed] a hatchet" and a crossbow and was verbally abusive to officers, threatening to "kick [their] ass." 272 F.3d at 1276-77. He also continually roamed about his property despite officers' orders. *Id*. Nevertheless, the Ninth Circuit did not consider this sufficient active resistance to warrant use of the beanbag shotgun, noting that "the crime being committed, if any, was minor." *Id.* at 1282-85. Thus, this factor weighs in favor of finding that the Officers' use of deadly force was excessive. *Id.* at 1283 (governmental interest in using deadly force is diminished when person was not committing a serious crime).

*Not attempting to flee*: De Anda was attempting to flee. Nevertheless, this factor alone can never justify the use of deadly force.

*Available alternatives*: Defendants ignored numerous less-intrusive alternatives, such as continuing to use verbal commands, tactical repositioning, using cover, maneuvering to gain more distance and time, and the use of less-lethal options. (PAMF 110-122.) *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1054 (9th Cir. 2007) (quoting *Smith*, 394 F.3d at 701) ("[c]ourts may also consider 'the availability of alternative methods of capturing or subduing a suspect.'"). Use of deadly force

could have been avoided had Defendants used appropriate de-escalation tactics and less-intrusive alternatives. Instead, Defendants ignored the several less-lethal options and escalated the situation by resorting to deadly force. *See Glenn*, 673 F.3d at 872; *Green v. City and Cty. of San Francisco*, 751 F.3d 1039, 1051 (9th Cir. 2014). This factor also weighs heavily in Plaintiffs' favor.

*No warning given*: Before using deadly force, officers must issue a warning, when feasible. *Est. of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 628 (9th Cir. 2022). Here it is undisputed that Defendants failed to give a warning to De Anda. It is further undisputable that in the several minutes prior to the use of deadly force, it was feasible to give a warning. *See Lopez*, 871 F.3d at 1007. Accordingly, Defendants are not entitled to summary judgment as a matter of law.

*Emotionally disturbed*: Lastly, Defendants knew that De Anda was suffering from a mental health crisis. Defendants and believed that the MEU should have been called. (PAMF 72-79.) But Defendants ignored De Anda' mental health crisis, and did not call the MEU; instead, escalated the situation in violation of basic officer training for interacting with persons suffering from a mental health crisis and shot De Anda instead of helping him. The Ninth Circuit emphasized that officers should exercise "greater effort to take control of the situation through less intrusive means" when confronting mentally ill or unstable suspects. *Bryan*, 630 F.3d at 829. It was objectively unreasonable for Defendants to fail to take De Anda's emotional stability into consideration when determining which tactics to employ and whether to use deadly force. *See Deorle*, 272 F.3d at 1283 ("Even when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual."); *see also Vos*, 892 F.3d at 1034 ("Finally, it is undisputed that Vos was mentally unstable, acting out, and at times invited officers to use deadly force on him. These indications of mental illness

create a genuine issue of material fact about whether the government's interest in using deadly force was diminished."). Under Plaintiffs facts and all reasonable inferences therefrom, Defendants knew De Anda was suffering from a mental health crisis. Thus, the government's interest in using deadly force is greatly diminished. For all the reasons discussed, a reasonable jury could find that Defendants' use of deadly force was objectively unreasonable in violation of the Fourth Amendment.

### C.    Plaintiffs' Denial of Familial Relationship Claim Survives

When the evidence is viewed in the light most favorable to Plaintiffs, the use of excessive force here shocks the conscious in violation of the Fourteenth Amendment, based on the context of this case. *See Tennison v. City and Cnty. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009). The deliberate indifference standard applies when the officer has time to deliberate and would satisfy a due process violation that "shocks the conscience." *Tennison*, 570 F.3d at 1089. The Court indicated that the standard higher only applies in situations "that escalate so quickly that the officer must make a snap judgment." *Porter v. Osborn*, 546 F.3d 1131, 1137-40 (9th Cir. 2008) (collecting cases). However, the "snap judgment" to use deadly force must be a reaction to an unforeseen escalation by the subject. *Hayes v. County of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013).

Here, there was no "snap judgment." The encounter lasted longer than 5 minutes without escalating and as discussed above, and the events leading to the shooting happened slowly followed by De Anda moving toward the exit of the parking lot. Then Defendants moved to the exit to block the emotionally disturbed De Anda's path, who was able to recognize their movements and immediately stopped for several seconds. Then, providing additional time to deliberate prior to the shots, De Anda side-stepped away from Defendants. After taking just one step, with time to deliberate even further given the distance of 28-30 feet, Defendants chose not to take the time and instead were deliberately indifferent by opening fire. *See, e.g.*, *Scott v. Smith*, 109 F.4th 1215, 1228 (9th Cir. 2024); *Nicholson v. City of*

*Los Angeles*, 935 F.3d 685, 692-93 (9th Cir. 2019). Moreover, even though Defendants admitted that they had the opportunity and time to continually assess (i.e., deliberate) between shots, they continued to fire. Under these circumstances, Defendants' decision to employ deadly force was clearly in reckless disregard for De Anda's life. Notably, Defendants were aware of available less-lethal alternatives but neglected to allow an opportunity to use them.

Finally, since there is a genuine dispute as to whether Defendants had time to deliberate, the court may be unable on summary judgment to resolve which standard applies in this case. *See Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1168 (E.D. Cal. 2016) ("In the face of genuine disputes of material fact, the Court is not compelled to find which of the standards applies as a matter of law."); *Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1108 (N.D. Cal. 2017) ("Here, there is evidence to support both standards, and the determination should be left to the jury.").

### D.    Defendants are Not Entitled to Qualified Immunity

Defendants are not entitled to qualified immunity for two reasons. First, there are disputed issues of material fact that preclude qualified immunity at this stage. *See Johnson v. Jones*, 515 U.S. 304, 313 (1995); *Glenn*, 673 F.3d at 870, fn. 7 (citing *Espinosa v. City and Cnty. of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010)); *Cunningham v. City of Wenatchee*, 345 F.3d 802, 809 (9th Cir. 2003); *Gates*, 287 F.3d at 855 n.12 (declining to decide the qualified immunity issue "because whether the officers may be said to have made a 'reasonable mistake' of fact or law may depend on the jury's resolution of disputed facts and the inferences it draws therefrom"); *Knox v. Southwest Airlines*, 124 F.3d 1103, 1109 (9th Cir. 1997) (no qualified immunity where there are triable issues of fact); *Brosseau*, 543 U.S. at 206 (Stevens J., dissenting) (the reasonableness of an officer's belief "…is a quintessentially 'fact-specific' question, not a question that judges should try to answer 'as a matter of law…'"); *Wilkins*, 350 F.3d at 956 ("Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of

fact in their favor, and against the non-moving party, summary judgment is not appropriate). Here, the key material factual disputes bearing on the reasonableness of Defendants' use of deadly force are: whether it was feasible for Defendants to give a warning; whether the alternative less-lethal force options were feasible; whether Defendants reasonably believed De Anda was 10 feet from officers; whether De Anda made a threatening movement with the knife; whether officers should have been behind cover; and whether De Anda was falling to the ground when Defendants fired the shot at his head, killing him.

Thus, prior to moving on, the Court must first resolve these factual disputes in Plaintiffs' favor, and assume that De Anda was moving slowly, not towards officers, holding the knife in a non-threatening manner, over 28 feet away from officers, who had access to cover, who had less-lethal options, and failed to give a warning. Further, De Anda did not commit a serious or violent crime, was not attempting to run at anyone, was not attempting to harm or strike anyone, did not harm anyone, was not about to harm anyone, and never verbally threatened anyone. In other words, a reasonable jury can find that De Anda was not an immediate risk of death or serious bodily injury. *Est. of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 629 (9th Cir. 2022) (where the subject posed no immediate threat to the officers or others, the "'general constitutional rule' applies 'with obvious clarity'" rendering the officer's decision to shoot objectively unreasonable).

Secondly, at the time of the shooting, "it was clearly established that officers may not use deadly force against a person who is armed but cannot reasonably be perceived to be taking any furtive, harrowing, or threatening actions," especially when less-lethal options are available. *N.E.M. v. City of Salinas*, 761 F. App'x 698, 700 (9th Cir. 2019). To determine whether the officer violated clearly established law, courts look to "cases relevant to the situation [Defendants] confronted," *Brosseau*, 543 U.S. at 200 (quotation marks omitted), mindful that there need not be a case "directly on point." *Gravelet–Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th

Cir. 2013) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).

Instructive here is the Ninth Circuit's recently published opinion in *Johnson v. Myers*, 2025 WL 666365 (9th Cir. Mar. 3, 2025). On April 14, 2019, several Seattle police officers responded to a domestic violence call regarding an abusive boyfriend. *Id.* at *1. An officer attempted to build a rapport with the subject convincing him to leave and spend a few nights at a friend's house. *Id.* On May 8, 2019, officers responded to another domestic violence call from the same woman this time stating that the subject was threatening to kill them both with a knife. *Id.* at *2. Four officers responded, including officers from the April call, also equipped with Tasers. *Id.* Officers announced their presence, kicked in the door, and saw the subject was standing in the hallway with a knife in his hand. *Id.* The officers shouted overlapping commands and then shot the subject as he was raising his hands, killing him. *Id.* The officer's estimated that the subject was only about 4.5 feet from them when they shot, and claimed he was moving forward toward them at the time of the shooting. *Id.* Importantly, this shooting occurred within seconds of the encounter. *Id.* *4. The Ninth Circuit affirmed the denial of qualified immunity. *Id.* *3. The Court highlighted that the officers had reasonable alternatives including de-escalation with verbal communication and less-lethal force but made no attempt to use them. *Id.* * 4.

Relying on *Glenn v. Washington Cnty.*, the *Johnson* Court found it was clearly established law that the shooting violated the Fourth Amendment in the light most favorable to plaintiffs because

> "(1) it is disputed whether Smith brandished or threatened the officers with his knife, so we must assume at this stage that he did not; (2) Smith may not have been actively resisting arrest; (3) Smith may not have comprehended the officers's commands because they were shouted at the same time and were inconsistent, and the officers gave no warnings; and (4) the use of a taser might have been available."

*Id.* at *5. Here, it is disputed whether De Anda brandished or threatened the officers with a knife; De Anda may not have been actively resisting arrest at the time of the shots; De Anda never verbally threatened anyone; De Anda had not moved towards

officers; De Anda was not attacking officers; De Anda was not rapidly approaching officers; De Anda may not have comprehended the officers' commands; no warning was given; and several less-lethal options were available. Importantly, this incident lasted over 5 minutes as opposed to seconds; and De Anda was 28-30 feet away as opposed to under 5 feet.

Likewise, where there is a small subject, agitated with had a mental health issue and armed with what officers believed to be a knife, the Ninth Circuit clearly established that deadly force is not reasonable when there is distance, less-lethal alternatives, and no warning was given. *See Tan Lam v. City of Los Banos*, 976 F.3d 986, 991-92 (9th Cir. 2020). De Anda is even less threatening and the subject in *Tan Lam* because this call was not for attempted domestic violence, and De Anda had never was within arm's reach of an officers in an enclosed area without room to maneuver and had not just stabbed an officer with the knife like the Tan Lam subject. *See Id.* at 992.

Defendants' reliance on *Toribio*, *Blanford*, *Kisela*, and *Sheehan* is misplaced. Just as in *Johnson* Court pointed out, "in each of those cases there were critical factors that are absent here." *Johnson*, 2025 WL 666365 at *5. Unlike *Sheehan*, De Anda did not verbally threaten the officers, officers here failed to attempt less-lethal force, and here De Anda was not "only a few feet from a cornered" officer. *See City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 605, 612-13 (2015). Unlike *Blanford*, De Anda was not armed with a two-and-half-foot sword and did not make "a loud growling" sound after being told to drop the sword. *See Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1112-13 (9th Cir. 2005). Interestingly, there, "[t]he deputies followed Blanford at a safe distance of 20 to 25 feet as they were trained to do for persons with edged weapons." *Id*. at 1112. In other words, if 20-25 feet is a safe distance, then 28-30 feet here surely is. Unlike *Kisela*, where the Supreme Court did not address the question of whether there was a constitutional violation, De Anda was not "within striking distance" of anyone. *See Kisela v.*

*Hughes*, 138 S. Ct. 1148, 1154 (2018). Finally, unlike *Toribio*, a non-binding case, De Anda did not jump on a person's bed, threaten the person with a knife, prevent the person from leaving, then slash at the person with the knife twice, followed by officers entering the small area of the house and attempting less-lethal force and the subject being only 6-8 feet from officers. *Est. of Garcia Toribio v. City of Santa Rosa*, 381 F. Supp. 3d 1179, 1183-86 (N.D. Cal. 2019).

     *Toribio*, *Blanford*, *Kisela*, and *Sheehan* support how the law was clearly established. Defendants knew that deadly force is only justified when necessary to stop an imminent deadly threat—meaning the subject must have the present ability, opportunity, and apparent intent to cause death—no matter how great the fear of future harm and no matter how great the likelihood of harm. (PAMF 173-177.) Knowing that law—that a knife-subject must be close enough to cause harm including these cases where the subject was within 10 feet of officers—Defendants told investigators that De Anda was approximately within 10 feet of them when they opened fire. (PAMF 164-169.) Nevertheless, it is undisputed that Defendants were at least 25 feet away from their own Motion (SUF 18), yet 28 feet away based on the City's investigation (PAMF 154), and still a jury could find the distance to be as much as 30 feet away (PAMF 155). Here, deadly force was obviously excessive.

     Like in *Johnson*, *Glenn* is sufficiently analogous. *Glenn* presented a case in which a man was shot in his driveway by police officers, where officers knew he was agitated, intoxicated, carrying a knife, and threatening to kill himself; yet the Court denied qualified immunity to officer whom shot the man with several beanbag rounds causing the man to move toward innocent civilians, followed by deadly force that killed him. *Glenn*, 673 F.3d at 869. Here, as in *Glenn*, De Anda had not threatened, attacked, or injured anyone; he had not committed a violent crime; the failure to drop the knife may have been the result of confusion by a mentally impaired person. Thus, as in *Glenn*, there are triable issues of fact as to whether rapidly resorting to deadly force was reasonable considering the less-lethal force

1  option. *Id.* at 879-80.

2        The most analogous Ninth Circuit case is *Vos v. City of Newport Beach*,

3  where a mentally unstable man was shot from 20 feet away while running towards

4  eight officers with an object, believed to be scissors, raised above his head. 892 F.3d

5  at 1033-34. The officers were responding to a 911 call reporting Vos's erratic

6  behavior in a 7-Eleven convenience store. *Id.* at 1028. Vos, behaving violently and

7  threateningly, threatened to take a hostage, and injured a person with scissors. *Id.* at

8  1129. Upon arrival, officers quickly realized Vos was potentially mentally unstable

9  or under the influence of drugs. *Id.* at 1029. As here, "officers only suspected the

10 possibility of substance abuse," at the time. *Id.* at 1030. They called for backup,

11 leading to a standoff between Vos and eight officers. *Id.* at 1029-30. The officers

12 were armed with various levels of force: one 40-mm less-lethal firearm, tasers, and

13 lethal weapons. *Id.* at 1033. They positioned their vehicles in formation and used the

14 doors for cover. *Id.* at 1029. Minutes later, Vos ran out and towards the officers. *Id.*

15 at 1030. Brandishing a metal object above his head, Vos ignored the officers'

16 commands to "Drop the weapon." *Id.* at 1029. As he ran at officers, Vos was shot

17 first with a less-lethal round and then almost immediately with lethal shots from two

18 officers. *Id.* at 1029. When shot, Vos was within 20 feet of the officers. *Id.* at 1033.

19 Despite being struck, he continued to charge, ultimately collapsing in front of them.

20 *Id.* at 1030, 1033.

21       The Court found that a reasonable jury could conclude that the officers' use of

22 deadly force was objectively unreasonable in violation of the Fourth Amendment.

23 *Id.* at 1034. The analysis centered on the second *Graham* factor: whether Vos posed

24 an immediate threat. The court considered that: the officers' position behind cover;

25 outnumbering Vos eight to one; as Vos charged the officers, he had raised

26 something in his hand, but he was not armed with a gun; and the officers had less-

27 lethal methods available to stop Vos. The Court found, based on these factors and

28 "construing the facts as they are presented by [Plaintiffs] and depicted in the video

footage, a reasonable jury could conclude that Vos was not an immediate threat such that the use of deadly force was warranted." *Id.* at 1032. The Court rejected the defendant's argument that deadly force was reasonable because Vos "forced the confrontation" by charging the officers. *Id.* The court found that the availability of less-lethal options was critical. *Id*. at 1033. Given that less-lethal force options were available to the officers and could have been effective in stopping Vos and ending the threat, the use of deadly force was not objectively reasonable. *Id*. at 1034.

There are many significant similarities between *Vos* and the current case: officers were responding to a call regarding De Anda' erratic behavior, aware he potentially suffered a mental health crisis; a standoff ensued involving De Anda and six officers, equipped with both lethal and less-lethal weapons; De Anda was shot when he was approximately 28-30 feet away from officers; and several less-lethal force options were available at the time. Moreover, De Anda presented even less of a threat than Vos. Unlike Vos, who had injured a bystander with a sharp object, it is undisputed that De Anda had not threatened, assaulted, or injured anyone. And while Vos charged at the officers running, De Anda stopped jogging and merely took one step. Despite being shot from 20 feet away, Vos's rapid movement brought him to the pavement near the officers. In contrast, De Anda, barely took a step and still landed 20 feet away. Finally, while Vos brandished a perceived deadly weapon above his head, De Anda held the knife down near his leg in a non-threatening manner, not swinging, stabbing or slashing at anyone. For all the reasons above, *Vos*, which was decided 5 years before this incident, put Defendants on notice that it was objectively unreasonable to use deadly force. *See also Penny v. Azmy*, No. 22-55572, 2024 WL 489287, at *2 (9th Cir. Feb. 8, 2024) (holding, *Vos* confirms that deadly force against a possibly mentally ill subject despite being outnumbered with several less intrusive options available, and no immediate threat of serious physical injury—even where the subject could have had a deadly weapon—was excessive).

Further, in *S.B. v. Cnty. of San Diego*, 864 F.3d 1010, 1014 (9th Cir. 2017),

two deputies responded to a reportedly aggressive, mentally ill, and under the
influence man who threatened his family. Three deputies, armed with non-lethal and
lethal weapons, entered a house searching for Brown. Inside the house, officers
found Brown with knives in his pockets. Despite Brown's erratic behavior and
threats, the officers were able to get him to kneel, but he did not comply with orders
to keep his hands up. Then Brown, six to eight feet away from a deputy, grabbed a
knife from his pocket. Without further warning, a deputy fatally shot him. The Ninth
Circuit found that the deputy's "use of deadly force was not objectively reasonable,
and therefore violated Brown's Fourth Amendment right against excessive force."
*Id.* at 1014. The court's ruling relied on several factors: the officer's prior
knowledge of Brown's mental illness and intoxication; kneeling, which constituted
partial compliance; the immediate use of lethal force once Brown grabbed the knife;
the 6–8 foot distance between Brown and the closest officer; the officer's inability
to see his colleagues at the time; lack of warning; and availability of less-lethal
force. *Id.* at 1014. Similarly, De Anda was reported for erratic behavior, potentially
under the influence of drugs and suffering from a mental health crisis. Just like
Brown, De Anda was confronted by multiple officers, equipped with both lethal and
less-lethal weapons. But De Anda posed far less danger than Brown because: De
Anda, unlike Brown, had not threatened anyone, his knife pointed downwards and
being not drawn out in a threatening manner, and De Anda was 28-30 feet away
from the officers—triple the distance between Brown and the officer. Thus, based
on the Ninth Circuit's reasoning in *S.B.*, it can be concluded that the use of deadly
force against De Anda was not objectively reasonable and violated his clearly
established Fourth Amendment rights.

Based on Ninth Circuit precedent, it is evident that Defendants are not entitled
to qualified immunity under the circumstances of this case. The key material factual
disputes should preclude granting qualified immunity on summary judgment as they
relate directly to the reasonableness of Defendants' use of deadly force. And the

precedent set by the Ninth Circuit in *Vos*, *Glenn*, *S.B.*, and recently solidified in *Johnson*, clearly establish "that officers may not use deadly force against a person who is armed but cannot reasonably be perceived to be taking any furtive, harrowing, or threatening actions," especially when less-lethal options are available and potentially effective. *See also Nehad*, 929 F.3d at 1134 (excessive force held triable issue where suspect made no "sudden movements" or "move[d] the supposed knife," was "seventeen feet away" from police, was "walking" at "relatively slow pace," and was given no warning of lethal force); *Hayes v. County of San Diego*, 736 F.3d 1223, 1227-28, 1233-35 (9th Cir. 2013) (reversing summary judgment where officers shot an emotionally disturbed man who held a large knife pointed downward and took one to two steps toward an officer still six to eight feet away).

## V.    CITY OF LOS ANGELES RATIFICATION & FAILURE TO TRAIN

First, if the Court were to grant the officers qualified immunity, the *Monell* claims could go on. Still, Defendants did deprive De Anda of his constitutional rights and Defendants are not entitled to summary judgment. Second, Defendants do not move for summary judgment regarding Plaintiffs' claim for ratification. Thus, Plaintiffs need not address it. Instead, Defendants argue against the unconstitutional policy claim (Mot. at 17:1-18:20) yet acknowledge that Plaintiffs have dismissed that claim during the parties' conference of counsel (*id.* at iii, fn. 2). However, Plaintiffs have shown that City has ratified the use of excessive force here. (PAMF 172); *See*, *e.g.*, *Hernandez v. City of San Jose*, 897 F.3d 1125, 1131 (9th Cir. 2018); *see also St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final"); *Trevino v. Gates*, 99 F.3d 911, 920-21 (9th Cir. 1996); *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992). Importantly, a single decision by a municipal policymaker "may be sufficient to trigger section 1983 liability under *Monell*, even though the decision is not intended to govern future situations." *Gillette*, 979 F.2d at 1347 (citing *Pembaur*

1  *v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986)).

2  In the present case, Plaintiffs have provided sufficient evidence for a

3  reasonable jury to find that City final policymakers, made the conscious affirmative

4  choice to ratify Defendants' excessive force by finding it within policy after review

5  of the investigative records. *See, e.g.*, *Hernandez v. City of San Jose*, 897 F.3d 1125,

6  1131 (9th Cir. 2018). A reasonable jury could find that Defendant City, through its

7  Use of Force Review Board, Chief of Police, Inspector General, and Board of Police

8  Commissioners, knew the Defendants violated training and policy regarding

9  encounters with a person suffering from a mental health crisis and the use of deadly

10  force, yet egregiously sent a message to the entire Department that shooting a slow-

11  moving man at 28 feet despite reasonable alternatives is permissible. Defendant City

12  made a deliberate choice to find this use of force within policy and not disciplining

13  the Officers despite having the option to make clear to the Officers and other

14  Department members that this and similar misconduct will not be tolerated and

15  knowing that the officers' version of events contradicts the video evidence. (PAMF

16  170-172); *See Pembaur,* 475 U.S. at 483-84 (plurality opinion)). Moreover, a policy

17  of inaction may be a municipal policy within the meaning of *Monell*. *See Brown v.*

18  *Lynch*, 831 F.3d 1146, 1152 (9th Cir. 2016); *Navarro v. Block*, 72 F.3d 712, 714-15

19  (9th Cir. 1996). "[T]he Ninth Circuit described inadequate discipline as a form of

20  ratification by an official with final policymaking authority—by failing to discipline

21  an officer, an official may ratify the officer's unconstitutional conduct." *Murnane v.*

22  *Las Vegas Metro. Police Dep't*, No. 2:13-cv-01088-MMD, 2015 WL 1442262, at *3

23  (D. Nev. Mar. 30, 2015) (citing *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1253

24  (9th Cir. 2010)).

25  Next, the City is culpable for its failure to adequately train Officers. *See*

26  *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *City of Canton v. Harris*, 489 U.S.

27  378, 388-91 (1989); *Garmon v. City of Los Angeles*, 828 F.3d 837, 846 (9th Cir.

28  2016); *Merritt v. City of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989). "[A] local

governmental body may be liable if it has a policy of inaction and such inaction amounts to a failure to protect constitutional rights." *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992). As an initial matter, the City has training documents that if followed would have resulted in the takin of De Anda into custody without killing him. As here, poor training leads to undesirable results. Given that Defendants did not comply with basic officer training, there is a genuine dispute as to whether the City provided adequate training to its officers regarding the use of deadly force. Despite training documents, Defendants failed to have a plan; failed to call MEU; failed to de-escalate the situation; failed to communicate with each other; failed use cover; failed to create distance, redeploy, or maneuver; failed to give a warning; failed to attempt less-lethal force; failed to properly assess De Anda's distance; and failed to properly assess De Anda's apparent intent (i.e., he was not making a threatening movement with the knife).

This is no mere mistake, the City obviously failed to adequately train its officers in these areas. The City was deliberately indifferent given that it ratified the use of excessive force, and did not

## VI.    **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motions for Summary Judgment in full.

DATED:  March 31, 2025                **LAW OFFICES OF DALE K. GALIPO**

                                                            */s/    Marcel F. Sincich*
                                                          Dale K. Galipo, Esq.
                                                          Marcel F. Sincich, Esq.
                                                          *Attorney for Plaintiffs*