**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
 *dalekgalipo@yahoo.com*
Marcel F. Sincich, Esq (SBN 319508)
 *msincich@galipolaw.com*
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
Tel: (818) 347-3333
Fax: (818) 347-4118

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| M.B., by and through her Guardian *ad litem*, Nayelli Bautista; and L.D., by and through his Guardian *ad litem*, Jasmin Trinidad, individually and as successors in interest to CARLOS DE ANDA, deceased, <br><br>               Plaintiffs, <br><br>     vs. <br><br>CITY OF LOS ANGELES; JOSE ARTEAGA MAYAN; KASSANDRA RODRIGUEZ; and DOES 1-10, inclusive, <br><br>               Defendants | Case No. 2:24-cv-07642-SVW-SSC <br><br>Assigned to: <br>Hon. District Judge Stephen V. Wilson <br>Hon. Mag. Judge Stephanie S. Christensen <br><br>**DECLARATION OF ROGER CLARK** <br><br>[*Filed concurrently with* Plaintiffs' Statement of Genuine Disputes and Additional Material Facts; Plaintiffs' Opposition to Defendants' Motion for Summary Judgment; Memorandum of Points and Authorities in support thereof; Declaration of Marcel F. Sincich and exhibits thereto] <br><br>Date:      April 28, 2025 <br>Time:     1:30 p.m. <br>Ctrm:    10A |

## DECLARATION OF ROGER CLARK

I, Roger A. Clark, hereby declare as follows:

1.      I am a police practices expert specializing in the procedures of police practices and proper police tactics, including proper procedures for the detention and arrest of individuals and the type and degree of force, if any, appropriate under different circumstances.

2.      I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so.

### Qualifications

3.      Attached hereto as "**Exhibit A**" is a true and correct copy of my Curriculum Vitae setting forth my qualifications to provide expert testimony in this matter, which I incorporate herein.  A summary of those qualifications is also as follows:

a.      My opinions are based in part on my training, professional experience and education.  I am a twenty-seven-year veteran of the Los Angeles County Sheriff's Department (LASD).  I was hired on December 1, 1965, and I retired from active service on March 31, 1993.  My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant.  I hold a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5).

b.      As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted investigation and apprehension methods.

c.      During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I supervised the training of cadets at our Reserve Training Academy.  They were taught proper investigation, interview, and apprehension procedures.  I also lectured the Reserve

1   Academy on the POST syllabus: "The Legal and Moral Use of Force and

2   Firearms."

3          d.       During the last five and one-half years of my career, I

4   commanded a specialized unit known as the North Regional Surveillance and

5   Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate,

6   observe and arrest major (career) criminals. I held this position until my

7   retirement from the Department on March 31, 1993.  The majority of our

8   cases were homicide cases.  Arrests frequently occurred in dynamic

9   circumstances including crimes in progress.

10         e.       As a Watch Commander and as a Lieutenant, I responded to,

11   investigated, and reported on the use of force and officer involved shootings.

12         f.       Since my retirement, I have testified as an expert on jail

13   procedures and jail administration, police procedures, police tactics,

14   investigative procedures, shooting scene reconstruction, trajectory, bullet

15   casings and police administration in Arizona State Courts, California Courts,

16   Washington State Courts and Federal Courts in California, Texas, Colorado,

17   Illinois, Indiana, Pennsylvania, and Washington.

18         g.       I have consulted and/or testified as an expert in dozens of cases

19   regarding law enforcement shootings and police practices and have been

20   certified as an expert on these areas in both State and Federal Courts.

21                              **Materials Reviewed**

22         4.       I have reviewed the following materials in this case: involved officer

23   body-worn camera video and digital in-car videos; deposition transcripts of

24   Defendants; FID Statements of the officers involved; LAPD investigative records;

25   photographs of the scene and evidence; prehospital care report and autopsy report;

26   LAPD policies and training documents; POST Learning Domains; Plaintiffs'

27   Complaint and the Protective Order.

28   / / /

## **Methodology**

5.      I make this declaration and my opinions based on my review of the above materials, and also based on my experience and knowledge of law enforcement training and standards.

6.      My general method is to: (1) review all of the relevant available material involved in the case to determine a factual understanding of the circumstances for which I've been asked to consult; (2) review all relevant POST Learning Domains, recent publications, recent case-law on point, pertinent training bulletins, and manuals to ensure that I apply the most modern and accurate law enforcement policies, practices, procedures, and standards to the case at issue; (3) rely on decades of experience, knowledge and training when evaluating and analyzing how the law enforcement training will be applied to real-world scenarios along with the risk involved with them; and (4) apply the discoverable facts to the standards that the law enforcement officers did or should have employed.

## **Opinions**

*The Defendant Officers were not responding to a violent crime.*

7.      It is my opinion based on review of the records that the Defendant Officers were not responding to a violent crime.  The Defendant Officers knew that this was a "415-man" call, for a man suspected of having a knife and alleged to have been vandalizing vehicles.  Officer Mayen described a 415-man as possibly disturbing the peace and testified that it is not a crime to be a 415-man or having a knife in a parking lot.  Therefore, a reasonable officer in his position would believe they were called to investigate a possible vandalism of vehicles, which is a property crime, and can be a misdemeanor based on the amount of damage to the property.  It is further my opinion that officers should have but failed to have a plan to handle this situation, despite knowing the nature of the call.

*The Defendant Officers should have known that Mr. De Anda was potentially suffering from a mental health crisis.*

8.      It is my opinion that any reasonable officer under these circumstances would suspect Mr. De Anda to be suffering from mental health issues based on his erratic behavior and statements, and that a reasonable officer would have acted according to basic officer training with regard to encountering a person with a mental illness.  It is further my opinion that Officer Morse, with his extensive training and experience, or Officer Rodriguez, with her mental evaluation training, should have taken over and led the communication and de-escalation efforts with Mr. De Anda.  However, Officer Morse and Officer Rodriguez allowed a probationary officer to lead the communications and de-escalation attempts with a subject armed with a knife.

a.      "When responding to a call that involves a person who is experiencing a behavioral health crisis, officers should obtain as much information as possible to assess and stabilize the scene.  Information such as dispatch history and recent calls for service may be helpful.  The more information an officer has prior to contact, the more likely the response will be appropriate."  The record indicates that that the involved officers did not obtain pertinent information to assess and stabilize the scene, which contributed to their inappropriate response.

b.      When responding to a scene, officers are trained to stage when feasible, gather additional resources, and make a tactical plan which would include, analyzing the environment, creating time and distance, slowing things down, establishing which officer will be contact, which officers will be cover (both lethal and less-lethal), containing the subject, communication with officers and the subject, and contingency plans for likely outcomes.  The record shows that the officers involved failed to make a plan.

c.      Officers are trained that Time + Distance = Options.  Meaning officers should create time and distance and use reasonable options.  Officers should be away, as trained, that their mere presence may provoke a

potentially suicidal subject and that distance and cover should be utilized whenever possible.  In the context of a deadly force encounter, it means to exhaust all reasonable options first.

d.      Officers are trained that notification should be made to the Mental Evaluation Unit as soon as practical, which here it was not. Additionally, if the subject is armed with a weapon, as here given that Mr. De Anda had a knife, the Crisis Negotiations Team within Special Weapons and Tactics may be able to assist.  Officers understand that these two Department entities may provide specialized expertise, personnel, and tools to control and/or contain these emotionally-charged incidents.  It appears that the involved officers did not contact MEU or CNT.

e.      Officers are trained that mental illnesses are medical conditions that affect a person's thinking, feeling, mood, ability to relate to others, and disrupts daily functioning.  Under these circumstances, all involved officers should consider that the subject may have a strong and unrelenting fear of people; may be hearing voices or seeing visions; may be experiencing thoughts not based on reality; may not be able to understand commands, and may not be able to understand what is happening around them.  Offices should give the person time and space, and limit distractions, loud noises, and bright lights.  Officers should not consider a person potentially suffering from a mental illness to be non-compliant with commands with the understanding that the person may be confused, hallucinating, etc.  As trained, the last thing an officers should do is to use deadly force and kill a person who has stated to officers that they do not want to live.  Especially under these circumstances, and with the common understanding by officers that persons suffering from a mental illness are more likely to have force used on them by the police, officers should exhaust all reasonable alternatives prior to resorting to deadly force.

f.      As trained, by exercising tactical patience, officers are "doing nothing," officers are waiting for the most appropriate time to safely approach the subject.  If during the incident the subject's actions present a risk to officer safety or threat to the surrounding community, officers should rely on appropriate tactics, and utilize distance and cover to mitigate the threat and attempt to take the person into custody.  Tactical considerations include Planning, Assessment, Time, Redeployment and/or Containment, Other Resources, and Lines of Communication.  Tactical training also includes Control, Communicate, Coordinate, and Contain.  Officers are trained to designate contact/cover officers; designate lethal and redundant less-lethal force options; maintain distance and cover by utilizing available obstacles/carriers; consider using a ballistic shield; attempt to build a rapport; request additional resources including Air, MEU, SWAT, and RA.  Officers are trained that the use of distance and cover may provide officers with additional time (Distance + Cover = Time and Time = Options) to assess, communicate, and plan while waiting for the arrival of additional resources.

*The Defendant Officers had multiple options for cover at the time of their use of deadly force.*

9.      The Defendant Officers had multiple options for cover at the time of the uses of deadly force including: the fence to the north of the apron, the block wall to the south of the apron, the officer vehicles with ballistic doors, and the several civilian vehicles parked on the east sidewalk of the street.  The Defendant Officers also had space to maneuver, and tactically reposition to create distance and time, if necessary.  It is my opinion that the officers' failure to take cover is evident of their lack of sufficient training.  Officers essentially testified that they left cover because the other officer was not behind cover.  This is unacceptable tactically and as an excuse not to utilize cover.  Officers are trained to communicate with each other.

1  Meaning, a reasonable officer should call their partner to a safer position instead of

2  moving from a safer position to meet a partner in a potentially unsafe area.

3  *The Defendant Officers did not give a warning prior to using force.*

4      10.    It is clear from the video evidence and the officers' testimonies that no

5  officer gave a deadly force warning to Mr. De Anda prior to their use of deadly

6  force.

7  *The Defendant Officers had several alternatives to the use of deadly force.*

8      11.    It is my opinion based on review of the record that the Defendant

9  Officers had, but failed to use, several reasonable alternatives to the use of deadly

10  force including: several 40 millimeter less-lethal launchers, Tasers, batons,

11  OC/pepper spray, the ability to de-escalate including with verbal communication

12  and redeployment/repositioning.  Officers Morse and Hernadez were armed with the

13  40 mm launcher at the time of the use of deadly force and designated as less-lethal

14  cover.  Generally, Officer Morse was to the left of Officer Mayen and Officer

15  Hernandez was to the right of Officer Rodriguez approximately at the time of the

16  force.

17  *Mr. De Anda was not an immediate threat of death or serious bodily injury at the*

18  *time of the use of deadly force.*

19      12.    It is my opinion that any reasonable officer under these circumstances

20  would _not_ consider Mr. De Anda to be an immediate threat of death or serious

21  bodily injury at the time, as defined by basic officer training; that the use of deadly

22  force against Mr. De Anda by the Defendant Officers was inappropriate and

23  unnecessary under the circumstances of this case, violated the standard of care,

24  violated basic law enforcement training, and violated POST standards.  Relevant to

25  my analysis in this matter is what was known to the Defendant Officers at the time

26  they used deadly force.

27          a.    Pursuant to POST basic training and under the law, a peace

28              officer is only justified in using deadly force if under the totality of the

circumstances, the force is necessary to defend against an imminent threat of death or serious bodily injury.  A threat of death or serious bodily injury is "imminent" only if the subject has the present ability, opportunity, and apparent intent to immediately cause death or serous bodily injury.  An imminent threat is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that must be instantly confronted and addressed.  The totality of the circumstances includes the conduct of the officer leading up to the use of deadly force.

b.     The Officers had Mr. De Anda contained and alone in an empty parking lot.  Prior to his use of deadly force, officers had no information that Mr. De Anda had ever physically injured anybody in the past; never saw Mr. De Anda physically injure anybody, including himself; had no information that Mr. De Anda had ever verbally threatened anybody; never heard Mr. De Anda verbally threaten anybody.  There were no civilians nearby to be threatened.  The Defendant Officers had approximately 28 feet (according to FID investigators) between them and Mr. De Anda.  The Defendant Officers claimed to have assessed between rounds.  Mr. De Anda never attempted to slash, stab, or swing a knife at anyone; never made a furtive or threatening movement with the knife; and was not running towards officers.

c.     When confronting a person with a knife, distance is important.  Distance gives officers time to use other resources and de-escalate the situation.  Officers are trained to attempt to create distance and time.  Here, the Defendant Officers left positions of cover to block Mr. De Anda's path, causing him to stop his movement, and side-set away from them within seconds of the use of deadly force.  Both officers admit that their use of deadly force is contingent on Mr. De Anda's distance.  Still, Officer Rodriguez was approximately 28 feet away from Mr. De Anda at the time of her first shot, according to FID, and Officer Mayen was 25 feet away.

13. Hypothetically, if an officer is confronting a person with a knife in hand and the person takes approximately one step towards an officer from a distance of over 20 feet, after having ran and stopped, with four officers present, each with less-lethal options and two designated as less-lethal cover, having the ability to reposition and use cover, and without providing a warning, and while the subject is not moving directly towards officers or making a threatening movement with the knife, it would be a clear violation of basic police training, violation of the POST standards, and clearly inappropriate to use deadly force, namely because the subject would not be an immediate risk of death or serious bodily injury at the time. Additionally, the subject under this hypothetical would not have the opportunity to be a death threat and is not showing an apparent intent to cause a death threat. *A reasonable officer would know that the law was clearly established at the time of the incident that officers could not use deadly force under these circumstances.*

14. It is my opinion that any reasonable officer would know that the law was clearly established at the time of the incident that law enforcement officers could not use deadly force under these circumstances. POST training is designed to provide officers with information to use their police powers within the law, which includes the use of deadly force. As stated above, pursuant to POST basic training and under the law, deadly force is only justified if necessary to defend against an imminent threat of death or serious bodily injury, meaning the subject has the present ability, opportunity, and apparent intent to immediately cause death or serous bodily injury. Any reasonable officer would know that when confronted with a man armed with a knife, there are three important details, more than anything else, that weigh in the decision to use deadly force: (1) the distance from the subject, (2) how fast the subject is moving, if at all, and (3) what the subject is doing with his hands/knife. It is obvious to any reasonable officer, if a subject is over 20 feet away, not moving fast, and not making a furtive movement with or towards a weapon, the use of deadly force is absolutely not allowed. From their FID

statements the Defendant Officers claimed that Mr. De Anda was half the distance from them that he actually was, claimed that he was running towards them, and claimed that he had the knife up by his ear in a threatening manner. However, based on the FID investigation, the BWC videos, and the Defendant Officers' depositions, the Defendant Officers knew that De Anda was over 25 feet away, stopped for several seconds, took one step, was not moving fast, and did not have the knife next to his ear in a threatening manner.

*The Defendant City had insufficient training and ratified the Defendant Officers use of deadly force.*

15.    It is my opinion that the Defendant Officers had insufficient training to handle this situation as demonstrated by their statements related to the incident and their conduct during the incident described above. Knowing the nature of the call, a man potentially with a knife, the officers failed to develop a plan. Thereafter, the officers discovered that the subject was potentially suffering from a mental health crisis, but failed to call MEU, failed to assign a sufficiently trained officer to communicate with Mr. De Anda despite who more qualified officers immediately present, and failed to de-escalate the situation pursuant to officer training. The Defendant Officers failed to have situational awareness to include where other officers were located, and whether the gate was opened. The Defendant Officers failed to communicate with each other including coordination of assignments, positions, and information collected. The Defendant Officers, despite having time and opportunity to assess the situation, including by their testimony that they assessed between rounds, failed to perform an adequate assessment to include improper range estimation and improper perception of Mr. De Anda's conduct. Finally, the Defendant Officers overreacted in their use of deadly force, in violation of basic officer training. All of which are examples of an indication that the City of Los Angeles failed to adequately train its officers for the situations that they are expected to encounter.

16.     It is my opinion that the City of Los Angeles has ratified the inappropriate use of deadly force in this matter.  City officials, including the Chief of Police (COP), reviewed the officers' statements, the videos, and other investigative records, and found that the use of deadly force here was "necessary" and within policy.  The City's Use of Force Review Board (UOFRB) assessed the circumstances and evidence related to the use of deadly force and in appropriately opined that Officer Rodriguez and Officer Mayen's use of deadly force was "objectively reasonable, proportional and necessary."  The COP concurred with the UOFRB's findings.  Therefore, the Chief found that the Defendant Officers' use of deadly force to be within police requiring no further action.  Additionally, according to the City of Los Angeles Inspector General's (IG) review and analysis, they concurred with the Chief's analysis and findings.  Finally, the Board of Police Commissions (BOPC) held a meeting on September 3, 2024, during which the BOPC adjudicated this officer-involved shooting and adopted the recommendations provided to them.  The failure of the UOFRB, COP, IG, and BOPC to find independently and/or collectively and clearly communicate to all officers in the Department that the Defendant Officers' use of deadly force was a violation of policy because Mr. De Anda was not an immediate threat of death or serious bodily injury at the time, is especially concerning and a direct reflection of the City and Department's training.  Also concerning is the likely perspective of all the officers in the Department based on this ratification – that it is permissible to use deadly force under circumstances such as these.

I declare under penalty of perjury that the foregoing is true and correct. Executed March 28, 2025, at Santee, CA

Roger A. Clark