# EXHIBIT A

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                  --oOo--

4

5   M.B., by and through her Guardian ad
    litem, Nayelli Bautista and L.D., by
6   and through his Guardian ad litem,
    Jasmin Trinidad, individually
7   and as successors in interest to
    CARLOS DE ANDA, deceased.

8

            Plaintiff,
9
    v.                      Case No.  2:24-cv-07642-SVW-SSC
10
    CITY OF LOS ANGELES;
11  JOSE ARTEAGA MAYEN; KASSANDRA
    RODRIGUEZ; and DOES 3-10, inclusive,
12
            Defendants.
13  _____/

14

15       STENOGRAPHIC REPORTER'S TRANSCRIPT OF

16          DEPOSITION OF JOSE ARTEAGA MAYEN

17             FRIDAY, FEBRUARY 7, 2025

18

19

20  Reported Stenographically by:

21  KIMBERLY D'URSO, CSR 11372, RPR

22  Job No.  00135196

23

24

25

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 2

```
 1                         APPEARANCES

 2

 3   FOR THE PLAINTIFFS:

 4            LAW OFFICES OF DALE K. GALIPO
              BY:  MARCEL F. SINCICH, ESQ.
 5            21800 Burbank Boulevard, Suite 310
              Woodland Hills, California 91367
 6            818.347.3333
              msincich@galipolaw.com
 7

 8   FOR THE DEFENDANTS:

 9            LOS ANGELES CITY ATTORNEY'S OFFICE
              BY: CHRISTIAN R. BOJORQUEZ, ESQ.
10            Deputy City Attorney
              200 N. Main Street, 6th Floor, City Hall East
11            Los Angeles, California 90012
              213.978.7023
12            christian.bojorquez@lacity.org
                          --oOo--
13

14

15

16

17

18

19

20

21

22

23

24

25
```

M.B. vs CITY OF LOS ANGELES, ET AL.
Jose Arteaga Mayen on 02/07/2025

Page 7

1        Q.   And if you don't understand any question, would

2   you let me know that as well?

3        A.   I will.

4        Q.   Okay.  For the purposes of the deposition, if

5   you respond to the question, it will be assumed that you

6   understood what the question was.  Okay?

7        A.   I understand.

8        Q.   Do you understand that you're here to discuss

9   the officer-involved shooting of Mr. Carlos De Anda?

10       A.   Yes, I do.

11       Q.   Do you recall the date of the incident?

12       A.   The date of the incident was September 13,

13   2023.

14       Q.   And do you know approximately what time the

15   incident occurred?

16       A.   The incident -- the actual OIS occurred on

17   September 13, 2023, at approximately 8:35 hour -- 8:35

18   p.m.

19       Q.   P.m.; is that right?

20       A.   Yes, p.m.

21       Q.   Okay.  How long were you on the scene -- strike

22   that.

23            Did you use force during the incident

24       A.   If by "force" you mean, yes, did I use any type

25   of force at the time that I arrived at the scene?  Yes,

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 8

```
 1    I did use some type of force, and it was deadly force.
 2        Q.   Okay.  You used deadly force during the
 3    incident?
 4        A.   Yes, sir.
 5        Q.   How long after your arrival did you use deadly
 6    force?
 7        A.   Approximately seven to eight minutes.  Based on
 8    what I seen on my body-worn video, it was between seven
 9    to eight minutes.
10        Q.   Okay.  At 8:35, was it dark out?
11        A.   At 8:35, it was dark out, sir.
12        Q.   Did the incident generally occur in and around
13    a parking lot?
14        A.   The incident did occur inside a parking lot,
15    yes.
16        Q.   Do you know who owned the parking lot or what
17    the parking lot was intended for?
18        A.   I had no idea who was the owner of the parking
19    lot or where the parking lot was situated or who owns
20    it.  It was me getting there -- and I had no connection
21    to whether that parking lot was owned by anybody else,
22    and that parking lot just being there, you know.
23        Q.   Was there businesses in that surrounding area?
24        A.   There is one church on the northwest corner.
25    There's some residents that live right in front of that
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 11

1  similar to the south side.  There is a small side where

2  it's approximately 4-feet tall that somebody could

3  easily jump over, and then it grows as it gets closer to

4  the west side.

5          But later -- well, at the time of the incident,

6  there's also a fencing that covers that area on the

7  north side, and that part was broken.

8      Q.   Okay.  When say you used deadly force during

9  the incident, how did you use deadly force?

10     A.   At the time, upon approval, we met Mr. -- we

11 saw Mr. De Anda, and he was armed with a knife.  He

12 decided to charge at one of our officers, which in this

13 case was Officer Kassandra.  And as he was closing the

14 distance on us, we used deadly force.  And by that, we

15 used our -- our firearms, my firearms.

16     Q.   Okay.  Yeah.  I don't know if it was an unclear

17 question.  I'm sorry.

18     A.   Oh, sorry.

19     Q.   Yeah.  So when you used deadly force during the

20 incident, you did so with your pistol?

21     A.   Yes, I used my pistol.

22     Q.   How many shots did you fire?

23     A.   I shot two shots, sir.

24     Q.   What type of pistol was it?

25     A.   Smith & Wesson --

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 12

```
 1              (Reporter clarification.)

 2              THE WITNESS:  -- 9 millimeter.

 3   BY MR. SINCICH:

 4      Q.   Inside of the parking lot, was there any kind

 5   of lights?

 6      A.   No, the parking lot was dark.  There was no

 7   lights.

 8      Q.   Were there any lights from the surrounding

 9   buildings?

10      A.   There was some -- I mean, there was some

11   lighting, but for the most part, it was a very dim

12   parking lot, and you couldn't make stuff out.  I had to

13   use my flashlight to shine into the parking lot.

14      Q.   Did officers use their spotlights from their

15   patrol vehicles to illuminate inside the parking lot, as

16   well?

17      A.   What I recall from my body-worn video, there

18   was a point that officers did use spotlights to shine

19   light at Mr. De Anda.

20      Q.   Was that prior to the officer-involved

21   shooting?

22      A.   That was prior to the officer-involved

23   shooting, yes.  And --

24      Q.   I'm sorry.  I didn't catch the last part.

25      A.   And also, at one point, the helicopter was
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 13

1  above right before the officer-involved shooting, and he

2  had a spotlight on Mr. De Anda, as well.

3      Q.    How long did the helicopter have a spotlight on

4  Mr. De Anda prior to the officer-involved shooting?

5      A.    I wouldn't be able to tell you exactly an

6  amount of time.   I just know that it was shortly after

7  that the officer-involved shooting occurred, after the

8  airship arrived.

9      Q.    Do you mean, like, within a few minutes?

10     A.    Probably seconds.

11     Q.    Okay.  When you fired your first shot at the

12  decedent, how far was he from you?

13     A.    When I fired my first shot at Mr. De Anda, as

14  he closed the distance on us, he was -- and this is just

15  based on my perception at the time and watching my

16  body-warn camera -- to me it felt like he was 10 feet

17  away.  After going over it, he was mostly like, like,

18  like, 20 to 24 feet away from me.  But at that time, to

19  me, it seemed like he was just 10 feet away from me.

20     Q.    Okay.  So at the time of the incident, your

21  belief was that he was 10 feet away from you?

22     A.    Yes.   At the time of the incident, my belief

23  was that he was approximately 10 feet away from me, due

24  to the pace that he was running at in my direction, and

25  knowing that he was armed with a knife, he closed that

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 14

```
 1   distance really quick.
 2       Q.   Closed what "distance really quick"?
 3       A.   So Mr. De Anda was to the east side of the
 4   wall, which was approximately, I want to say, like, to
 5   me, 100 feet away from me.  Within like a couple
 6   seconds, I want to say, like, probably six seconds, I
 7   felt that he was --
 8            (Reporter clarification.)
 9            THE WITNESS:  -- right in front of me.
10            (Reporter admonition to slow down.)
11   BY MR. SINCICH:
12       Q.   So it's your belief that within approximately
13   six or seven seconds, he went from 100 feet to what you
14   believed to be 10 feet?
15       A.   Yes.
16       Q.   Okay.  And why did you believe that he was only
17   10 feet away from you at the time?
18       A.   At that time, based on my perception, it's just
19   everything was moving so fast.  After attempting to have
20   a conversation with him and he was not cooperating with
21   me, me looking around my surroundings and making sure
22   that we had containment on him.  And once I kind of
23   glanced over to where he was again, at that point, he
24   began to run.
25            And that's when everything happened so quick
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 16

1    Q.    Did the decedent ever swing the knife at you?

2    A.    The decedent?

3    Q.    Yes.

4    A.    I mean -- I mean, I would not let anybody get

5    that close for them to swing a knife at me, sir.

6    Q.    Well, you said that he attempted to stab you;

7    right?

8    A.    Well, he tried --

9          MR. BOJORQUEZ:  Objection.  I think it's been

10   asked and answered.

11         But go ahead and answer.

12         THE WITNESS:  Like -- like I said earlier, he

13   charged at us with a knife.  I don't think anybody that

14   has a reasonable state of mind would come and -- a

15   reasonable -- let me take that back -- a reasonable

16   person will charge at an officer when he has a gun

17   pointed at them.

18   BY MR. SINCICH:

19   Q.    Okay.  Is it your testimony today that?

20   Mr. De Anda attempted to stab you?

21   A.    It is not my testimony whether he attempted to

22   stab me.  It is my testimony today that I believe that

23   he charged at officers.  He charged at officers armed

24   with a deadly weapon, and he gave me no choice at that

25   point to defend myself.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
Jose Arteaga Mayen on 02/07/2025

Page 17

1        Q.   I understand.  Is it fair to say that

2    Mr. De Anda did not attempt to stab anybody during this

3    incident?

4            MR. BOJORQUEZ:  Objection.  Completely

5    misstates the witness's testimony.  It's been asked and

6    answered several times.

7    BY MR. SINCICH:

8        Q.   You can respond, Officer.

9        A.   As I stated earlier, I do not know what

10   Mr. De Anda -- I mean, at that point in time, a

11   reasonable person would not charge at an officer with

12   handguns pointed at him.  If he's charging at us, at that

13   point, he -- he made his choice.  He charged toward me

14   and -- my partner Kassandra and myself.

15       Q.   Right.  I understand.  My question's a little

16   bit different.  I'm not asking about him charging.  I'm

17   just wondering if it's fair to say that Mr. De Anda did

18   not attempt to stab anybody during the incident?

19           MR. BOJORQUEZ:  Objection.  Clearly misstates

20   the witness's testimony, Counsel.

21   BY MR. SINCICH:

22       Q.   You can answer.

23           MR. BOJORQUEZ:  It's also been asked and

24   answered.  He told you what happened.

25   BY MR. SINCICH:

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 20

```
 1  statement.  But I don't think you're asking it in a

 2  manner that makes -- I'm having a hard time understanding

 3  your question as well, Counsel.

 4  BY MR. SINCICH:

 5       Q.   Do you understand the question, Officer?

 6       A.   I mean, it's just a little confusing, just the

 7  fact that you're saying if this person -- you're

 8  assuming this person is armed with a knife and he's not

 9  doing anything and he's not moving.  And you're saying

10  that he's not approaching me.  He's just posing a threat

11  from 20 feet.

12            I mean, it's -- a person 20 feet away from me

13  armed with a knife doesn't necessarily -- I mean, it's

14  not at that distance to stab me, no; but he does pose a

15  threat once he starts closing that distance, which could

16  be very -- in a few seconds -- in a few seconds.

17       Q.   Okay.  I think I understand your response.

18            Approximately how far was Mr. De Anda from

19  Officer Rodriguez when you fired your first round?

20            MR. BOJORQUEZ:  Objection.  Lacks foundation.

21  Calls for speculation at this point.

22            THE WITNESS:  I would not be able to tell you

23  how far Officer Rodriguez was standing from the suspect,

24  no.

25  BY MR. SINCICH:
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 21

1    Q.   When you fired your first round, do you know
2   where Officer Rodriguez was standing?

3    A.   I do not, sir.  I had -- I was running, and my
4   focus was on Mr. De Anda.

5    Q.   And when you say you "were running," which
6   direction were you running?

7    A.   I was running southbound.

8    Q.   Were you running towards Officer Rodriguez?

9    A.   I was running in the direction of Officer
10  Rodriguez, yes.

11    Q.   When you fired your second round, how far was
12  Mr. De Anda from you?

13    A.   As I stated earlier, I felt at that time that
14  he was approximately 10 feet away from me.

15    Q.   I just want to make sure my question is clear.
16  I think earlier I asked you about the first round.

17    A.   Yes.

18    Q.   At the time of the second round, was
19  Mr. De Anda approximately 10 feet away from you, based
20  off of your belief at the time of the incident?

21    A.   No.  At that time of the incident -- well,
22  sorry if I misspoke -- it was -- he had already stepped
23  forward, so he was approximately 8 feet at that time,
24  based on my perception at the moment.

25    Q.   Okay.  So based on your perception at the time

**M.B. vs CITY OF LOS ANGELES, ET AL.**
Jose Arteaga Mayen on 02/07/2025

Page 22

1   of the incident, you believed that he was 10 feet away

2   for your first shot and then 8 feet away for your second

3   shot?

4        A.   Based on my perception, yes.

5        Q.   Okay.  And then when you went back to the

6   scene, did you come to a different conclusion about his

7   distance at the time of your second shot?

8            MR. BOJORQUEZ:  Well, objection.  I think it

9   misstates the witness's testimony as to "a different

10  conclusion."  I think the witness mentioned that his

11  perception was the same.  It's just he just actually

12  measured the distance.  I don't think what you're saying

13  is a correct statement.

14  BY MR. SINCICH:

15       Q.   You can answer.

16       A.   Based on later standing in the place I stood,

17  like I said, in a sterile environment, I was able to see

18  and have a better perspective of where Mr. De Anda was

19  at the time.

20       Q.   So how far was he?

21       A.   I want to say, approximately 20 to 24 feet away

22  from me.

23       Q.   During the second shot?

24       A.   During the -- I want to say -- okay, I think

25  you misunderstood.  During the first shot, probably,

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 23

1  like, 24 feet away from me, 23 feet away from me.

2  During the second shot, approximately 20 to 21 feet away

3  from me.

4      Q.   Is it fair to say that, based off of the

5  calculations both from your belief and then from your

6  follow-up when you went back to the scene, is that you

7  believe that he came approximately 2 feet closer to you

8  by the time of your second shot?

9      A.   Can you repeat the question, please?

10     Q.   Is it fair to say that, based off your

11  assessment of the distance, that Mr. De Anda came

12  approximately 2 feet closer to you at the time of your

13  second shot?

14     A.   Is this based on my belief, or based on me

15  reassessing and going back to the scene?

16     Q.   What was your belief?

17     A.   My belief at the time of the incident, that he

18  did close the distance, from my 10 feet that I thought

19  where he was standing at first, to closing the distance

20  to 8 feet, towards my second shot.

21     Q.   And then when you went back to the scene and

22  reassessed?

23     A.   When I went back to the scene and reassessed,

24  it was approximately the same amount, where just a

25  distance had been approximately 20 to 25 feet, and then

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 24

 1    he kept closing the distance.

 2        Q.    What do you mean "He kept closing the

 3    distance"?

 4        A.    As I shot my first round, he was approximately

 5    24 feet away from me, 23 feet away from me.  As he kept

 6    running and charging, my second shot was approximately

 7    20 feet to 21 feet away from me.

 8        Q.    And where were you aiming your first shot?

 9        A.    My first shot, I was aiming at center mass.

10        Q.    Did you intend to pull the trigger when you

11    fired the first shot?

12        A.    Can you clarify the question?

13        Q.    Did you pull the trigger of your gun in order

14    to make that round go off?

15        A.    At that time, yes.  Once -- I mean, once

16    Mr. De Anda charged at me, I made that decision to press

17    the trigger, yes.

18        Q.    Okay.  So you intentionally pressed the

19    trigger?

20        A.    If I have someone charging at me with a knife

21    and I have to defend myself, I mean --

22        Q.    I understand, sir.  But, like, it wasn't a

23    negligent discharge, for instance?

24              Have you ever heard of that phrase before?

25        A.    Yes, I have.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 25

```
 1      Q.   Okay.  Was it an intentional shot or was it an
 2   accidental shot?
 3      A.   It was not an accidental shot, sir.  Officer --
 4   De Anda was approaching me, and I pressed the trigger.
 5      Q.   Okay.  And did you intend for that shot to
 6   strike Mr. De Anda?
 7      A.   Yes.  Mr. De Anda was approaching me, and I had
 8   to stop the threat at that time.
 9      Q.   Did you believe that you struck him with that
10   shot?
11      A.   I wouldn't be able to say whether I struck him
12   or not.  I don't have -- I mean, I don't have the
13   capacity to see where the round ever ended up, sir.
14      Q.   Did you believe that you struck him, or did you
15   believe that you missed?
16      A.   I wouldn't be able to say.  All I know is after
17   shooting my first shot and shooting my second shot,
18   De Anda went down, and I stopped shooting.
19      Q.   Okay.  Where were you aiming for your second
20   shot?
21      A.   I was aiming at center mass.
22      Q.   Okay.  And when you say "center mass," what
23   portion of his body were you aiming for?
24      A.   Center mass would be anywhere between his chest
25   and abdominal area.
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 26

1       Q.    Approximately, how much time was there in

2    between your first and second shot?

3       A.    I mean, based on reviewing my body-worn video,

4    I would say approximately a second in between each shot.

5       Q.    Did you assess in between your shots?

6       A.    I did assess between each shot, sir.

7       Q.    And did you intend to press the trigger for

8    your second shot?

9       A.    I did intend to press the trigger, due to the

10   fact that De Anda was still charging on my- -- on myself

11   and Officer Kassandra.

12      Q.    And did you intend for your second shot to

13   strike Mr. De Anda?

14      A.    As I said it before, once I pressed the

15   trigger, as soon as he went down, I stopped.  So, yes, I

16   had the intention to keep shooting, due to the fact that

17   he was still charging at me and posing a threat to

18   myself and my partner.

19      Q.    Okay.  Prior to firing your first shot, did you

20   hear any other shots being fired?

21      A.    No, I did not.

22      Q.    Did any other officer use force during the

23   incident, to your knowledge?

24      A.    To my knowledge, yes.

25      Q.    Who used force during the incident, to your

**M.B. vs CITY OF LOS ANGELES, ET AL.**
Jose Arteaga Mayen on 02/07/2025

Page 27

1      knowledge?

2          A.   At that time, Officer Kassandra.

3          Q.   Can you say that again?

4          A.   Officer Kassandra.  Kassandra Rodriguez.

5          Q.   Her name is Kassandra Rodriguez?

6          A.   Yes, sir.

7          Q.   Okay.  And what type of force did Officer

8      Rodriguez use?

9          A.   Officer Rodriguez used -- same, deadly force.

10         Q.   Is it fair to say Officer Rodriguez and you

11     fired almost simultaneously?

12         A.   I would not be able to correctly answer that

13     due to the fact that -- due to the moment, all I was

14     focusing on was my shooting and what was going on in

15     front of me, sir.

16         Q.   After you stopped shooting, did you hear any

17     other rounds being fired?

18         A.   After I stopped shooting, I did not hear any

19     other rounds being fired, no.

20         Q.   Do you know if anybody deployed less lethal

21     force during the incident?

22         A.   Nobody -- nobody -- any --

23              (Reporter clarification.)

24              THE WITNESS:  Nobody used less lethal force at

25     the time, but there was officers with less lethal force.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
Jose Arteaga Mayen on 02/07/2025

Page 28

1  BY MR. SINCICH:

2      Q.   Which officers had less lethal force?

3      A.   My partner, Officer Morse.

4      Q.   And what type of less lethal force option did

5  Officer Morse have?

6      A.   He had the 40 millimeter, less lethal option.

7      Q.   And can you spell Officer Morris's last name,

8  please?

9      A.   It's M-O-R-S-E.

10     Q.   Do you know where Officer Morse was at the time

11  of your use of force?

12     A.   At the time of the use of force, Officer Morse

13  was to the north of me, so to my left.

14     Q.   Was he on the sidewalk area?

15     A.   Officer Morse was standing -- yes, he was on

16  the sidewalk area with me.

17     Q.   Approximately how many feet away from you was

18  Officer Morse?

19     A.   I would not be able to say how far he was

20  because as I started running southbound, tracking

21  De Anda, Officer Morse was behind me, and I wouldn't be

22  able to tell you the distance he was from me.

23     Q.   Okay.  How many total officers were on scene at

24  the time of the use of deadly force?

25          MR. BOJORQUEZ:  Objection.  It lacks

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 29

1  foundation.  Calls for speculation.

2  BY MR. SINCICH:

3      Q.   If you know.

4      A.   I don't know.  I don't know how many officers

5  were at the scene.

6      Q.   At the time of your use of deadly force, how

7  many officers were you aware of that were on the scene?

8      A.   Like I said, I -- I really don't recall.

9  Everybody just -- based on what I seen on my body-worn

10  video, there was a lot of officers at the time.  I

11  didn't know everybody by name, so I wouldn't be able to

12  tell you exactly how many officers were at the scene,

13  no.

14      Q.   And I don't want you to answer this question

15  based off your recollection -- strike that.

16          I don't want you to answer base off of having

17  watched the video.

18      A.   Okay.

19      Q.   I'm wondering, at the time of your use of

20  force, how many officers did you believe were on the

21  scene with you?

22      A.   Including myself, four.

23          MR. BOJORQUEZ:  Again -- my apologies.

24  Objection.  I think the question is vague and ambiguous.

25          But if you understand it, answer.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 30

1    THE WITNESS:  Like I said, at that time, it was

2  myself, Officer Morse, who is my partner, Officer

3  Rodriguez, and her partner.

4  BY MR. SINCICH:

5    Q.   And do you know her partner's name?

6    A.   Officer Hernandez.

7    Q.   Do you know where Officer Hernandez was at the

8  time of your use of force?

9    A.   No.  I did not know where Officer Hernandez was

10  at the time of the use of force.

11    Q.   Did you see Officer Hernandez on scene prior to

12  your use of deadly force?

13    A.   Not to my recollection, I did not -- I did not

14  see.

15    Q.   Did you see him after your shooting?

16    A.   After the --

17    (Reporter clarification.)

18    THE WITNESS:  -- OIS, I did see Officer

19  Hernandez.

20  BY MR. SINCICH:

21    Q.   And where was Officer Hernandez when you saw

22  him after the shooting?

23    A.   After the shooting, I saw Officer Hernandez

24  with my partner, Officer Morse, attempting to render aid

25  and take De Anda into custody.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 31

```
 1      Q.   Okay.  Prior to this incident, had you ever

 2   used deadly force in the field before?

 3      A.   No.

 4      Q.   Prior to this incident -- strike that.

 5           After this incident, up to today's date, had

 6   you used deadly force in the field before?

 7      A.   You're saying after September 13, 2023, from

 8   the -- to now, have I used deadly force?  Is that your

 9   question?

10      Q.   It glitched just a little bit for me, but I

11   think you did repeat it back correctly.  So I'll just

12   repeat the question.

13           From the date of the incident until today, have

14   you used deadly force in the field?

15      A.   No.  I have not used deadly force in the field

16   after that incident.

17      Q.   And, I'm sorry, I might have jumped over this

18   in the beginning.  But are you an officer with the Los

19   Angeles Police Department?

20      A.   Yes, I work for the Los Angeles Police

21   Department.

22      Q.   What's your current rank?

23      A.   Police Officer II.

24      Q.   And what was your rank at the time of the

25   incident.
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 32

1     A.   I was a Probation Officer I.  I was in

2   probation -- probationary officer.

3     Q.   Who was your supervisor or field training

4   officer at the time?

5     A.   At that time, I had already passed my formal

6   training, which would be Phase 2.  I was in my informal

7   period of probationary period.  Officer Morse was my

8   partner for that day, and he was a P-3, a training

9   officer.

10     Q.   Okay.  In your time in law enforcement, have

11   you encountered, other than this incident, a person with

12   a knife in their hand before?

13     A.   Prior to this incident, I cannot recall if I

14   had encountered anybody with a knife.  I know radio

15   calls that will come out with people armed with knives,

16   but a lot of times, by the time we get to the scene,

17   they'll either listen to officers' commands and they

18   have dropped the knife, or the knife was no longer in

19   the -- in their possession by the time we arrived.

20     Q.   What about after the incident?  Had you

21   encountered anybody that had a knife in their hand?

22     A.   After the incident, I have encountered people

23   with knives in their hands, yes.

24     Q.   How many times?

25     A.   I wouldn't be able to tell you.  I don't

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 33

1   recall, sir.  I don't have a number.  There's a lot of

2   people armed with knives --

3          (Simultaneous speakers.)

4          THE WITNESS:  -- when we go to radio calls.

5   BY MR. SINCICH:

6      Q.   Could you give me an approximate number?

7      A.   It's been a long time, but -- I wouldn't be

8   able to give you, like, an approximate number, sir, no.

9      Q.   Are you talking about something like a dozen or

10  talking about a thousand?

11     A.   Oh, no, it would definitely less than a

12  thousand.  It would be probably -- I want to say, like

13  probably a good amount, like 20 to 30 times.

14     Q.   Okay.  Out of the approximately 20 or 30 times,

15  is it fair to say that when you've encountered a person

16  with a knife, other than this incident, you did not use

17  deadly force against them?

18     A.   Well, I did not use deadly force on them due to

19  the fact that those people obey officers' commands, or

20  they dropped the knife, or they would comply in the

21  process of us having that conversation.  They would take

22  the -- they would drop the knife and we'll be able to

23  take them into custody without incident.

24     Q.   Okay.  Based on your training and experience,

25  is it fair to say that officers should not shoot a

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 36

1    force against them; correct?

2        A.    We -- in the 20 or 30 times that I have

3    encountered a person with a knife, I have not used

4    deadly force.  Well, if it's feasible, we'll be -- and

5    that person puts us in that situation, we'll use a type

6    of force.

7        Q.    Right.  So there has to be more involved in the

8    circumstance than just the person having a knife, in

9    order to use deadly force, based on your training.  Is

10   that fair?

11       A.    Yes.  Based on my training and experience, I

12   would not just shoot a person just armed with a knife

13   and just, like, talking.

14            Like in this incident, De Anda was armed with a

15   knife.  I attempted to talk to him.  I attempted to have

16   a conversation with him.  And at one point, he made the

17   choice to charge at officers.

18            So, like I said earlier, our goal is to talk

19   people into compliance.  Not -- we don't want to go in

20   there and shoot somebody.

21       Q.    Is it fair to say based on your training, that

22   officers can't use deadly force merely because a person

23   isn't complying with commands?

24       A.    If a person -- I mean, if a person is not

25   complying with commands, there's -- there's other force

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 37

1   that we could use.  We have --

2            (Reporter clarification.)

3            THE WITNESS:  -- our less lethal, our 40

4   millimeter, we have our beanbags, Taser, and pepper

5   spray that we could use to deescalate a situation.

6   BY MR. SINCICH:

7       Q.   Right.  So is it fair to say that if a person

8   is just not complying with commands, that deadly force

9   should not be used?

10            MR. BOJORQUEZ:  Again, I think it's an

11   incomplete and improper hypothetical.

12            But you can answer.

13            THE WITNESS:  I think that just because a

14   person is armed with a knife and he's not being

15   complying, as officers we have other resources.  And I

16   understand that deadly weapons should only be used when

17   it's an imminent threat or death or bodily injury to

18   myself or others.  But like I said earlier, that person

19   decides how we're going to treat the situation.

20            Every situation is different.  We can't treat

21   one situation the same as the next, because we are not in

22   control of what that person is doing or saying.  And our

23   goal is to get compliance.  Take them into custody.  And

24   like I said earlier, there's other force that we could

25   use that is less lethal, and deadly force should be our

**M.B. vs CITY OF LOS ANGELES, ET AL.**
Jose Arteaga Mayen on 02/07/2025

Page 39

1  and I think it misstates the witness's prior testimony to

2  this deposition.

3  BY MR. SINCICH:

4      Q.   You can answer, Officer.  I'm just trying to

5  use the words that you just used in your last response.

6  But you can answer, if you understand.

7      A.   De Anda posed -- posed a threat that could

8  cause death to myself or serious bodily injury by him

9  being armed with a knife and closing the distance the

10 way that he did.  He -- we -- he gave us no choice for

11 us to use deadly force because he was armed with a

12 deadly weapon.

13     Q.   Okay.  And so that what's I was trying to ask

14 in one of the prior questions, that the two -- the two

15 things that you stated that led you to believe that he

16 was a deadly threat was that he was armed with a knife

17 and that he was closing the distance; is that fair to

18 say?

19     A.   He was armed with a knife, he was closing the

20 distance, posing a threat to myself, yes.

21     Q.   Are there any other facts that led you to

22 believe that he posed a deadly threat, other than he was

23 armed with a knife and he was closing the distance?

24     A.   Do you mean by the time that we made contact

25 with him, throughout the incident?

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 40

1  Q.  I'm just wondering, what other facts led you to
2  believe that he was a deadly threat, specifically, other
3  than -- if anything, other than he was armed with a
4  knife and he was closing the distance?
5  A.  Prior -- when we arrived at scene and I
6  attempted to -- to talk to Mr. De Anda, he had -- he
7  mentioned that he wanted to kill himself, yes.  There
8  was that information that I had, and that I related that
9  to my partner.
10  Q.  Okay.  Did you see him attempt to harm himself
11  at all?
12  A.  When -- when we arrived at scene, he -- that's
13  when we observed him arm himself with a knife.  At no
14  point did I see him attempting to, like, harm himself,
15  no.  But he was telling me that he -- he wanted to kill
16  himself.
17        MR. SINCICH:  Okay.  Let's go ahead and take a
18  break.  I've got 10:57.  Is it okay to come back at --
19  oh, it just turned 10:58.  Is it okay to come back at
20  11:05?
21        THE CERTIFIED STENOGRAPHER:  Sure.  See you
22  back then.
23        (Break taken.)
24  BY MR. SINCICH:
25  Q.  Did you review any documents in preparation for

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 43

 1      Q.    And is there a number associated with the
 2   directives?

 3      A.    Yes.  So it's going to be use of force,
 4   directive number 3.  And then it's going to be the
 5   beanbag shotgun, directive number 4.  And then the last
 6   one, directive number 1 for --

 7           (Reporter clarification.)

 8           THE WITNESS:  It's going to be for the use of
 9   force.

10   BY MR. SINCICH:

11      Q.    Have you seen any photographs of the scene?

12      A.    No.  I have not seen any photographs of the
13   scene.

14      Q.    Have you seen anybody else's body-worn camera
15   video?

16      A.    I've seen my own.

17      Q.    And were you able to see that video prior to
18   giving your statement to FID?

19      A.    Yes.  I was able to see my video prior to
20   giving my statement to FID.

21      Q.    How many times have you been back to the scene
22   since the incident?

23      A.    Since the incident, I'm going to say, twice.

24      Q.    When was the first time you went back to the
25   scene?

**M.B. vs CITY OF LOS ANGELES, ET AL.**
Jose Arteaga Mayen on 02/07/2025

Page 44

```
 1      A.   Sometime last year I went back to the scene.

 2      Q.   Approximately what month?

 3      A.   I'm going to say sometime in December.

 4      Q.   And when was the second time you went back to

 5   the scene?

 6      A.   I went back to the scene -- this is Friday;

 7   right?  So I went it back to the scene Tuesday.

 8   Tuesday.

 9      Q.   So that would have been February 4th, 2025?

10      A.   February 4th, yeah, I believe so.  Yes.

11      Q.   How long were you at the scene in December?

12      A.   In December, I want to say, like, a couple

13   minutes.

14      Q.   Were you with anybody?

15      A.   No.  I was just --

16           (Reporter clarification.)

17           THE WITNESS:  -- working patrol.

18   BY MR. SINCICH:

19      Q.   Did you go back to the scene specifically

20   because of this case, or were you responding to a

21   different call?

22      A.   In December, I was -- no, I was not responding

23   to a call.  I was just driving in the area.

24      Q.   Did you have a partner with you at the time?

25      A.   At the time, I was working by myself.
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 45

```
 1       Q.   Other than conversations with your attorneys,

 2   did anybody tell you to go back to the scene?

 3       A.   No.

 4       Q.   And how long were you at the scene in February?

 5       A.   In February, I was approximately there, like, I

 6   want to say, 20 minutes, 30 minutes.

 7       Q.   Were you with anybody?

 8       A.   Was I -- was I with anybody?

 9       Q.   Were you with anybody?

10       A.   Yes.

11       Q.   Who were you with?

12       A.   I went back with my -- my attorney, just to

13   give, like, perception --

14       Q.   Okay.  I don't want you to tell me anything

15   that's attorney-client privilege; okay?

16       A.   I'm sorry.

17       Q.   So anything that your attorney was talking to

18   you about or you were talking to your attorney, I don't

19   want to know about that.  Is that fair?

20       A.   Fair.

21       Q.   Okay.  That works on both sides.  I just want

22   to, you know, keep it fair like that.

23            Was there anybody else that -- well -- strike

24   that.

25            When you say your "attorney," are you referring
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 49

1    Q.   Did you receive those distances from when you

2    were working with the other officers and your attorney

3    at the scene on February 4th?

4    A.   Did I get the distances on February 4th?

5    Q.   I'm wondering if when you testified earlier

6    about the distances between you and the subject, did you

7    get those distances based of your scene visit on

8    February 4th?

9    A.   Yes.

10   Q.   Okay.  And was a tape measure used to measure

11   the distance?

12   A.   Sorry.  Yes.  We had a -- we had a tape

13   measure.

14   Q.   Other than those two scene visits, had you ever

15   done a walk-through of the incident with anybody, other

16   than your attorney?

17   A.   I only done a walk-through the day of the

18   incident itself, for FID purposes.

19   Q.   Okay.  And when you did the walk-through, was

20   it on-scene?

21   A.   By "on-scene," was that we were all there?

22   Q.   Well, sometimes people call it a

23   "walk-through," even though they do it on a map.

24   A.   Oh.

25   Q.   And some people do a walk-through by actually

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 52

1    on June 6th, 2022.

2        Q.    Between high school and going to the academy,

3    did you have any jobs?

4        A.    I did.

5        Q.    Where did you work?

6        A.    I worked at Macy's, Foot Locker, and

7    construction.

8        Q.    Anything besides that?

9        A.    No.  Those were -- that's what I did.

10        Q.    So no prior military or law enforcement

11    experience?

12        A.    No.

13        Q.    And when did you graduate the academy?

14        A.    On November 18, 2022.

15        Q.    When you were at the academy, did you train

16    from the POST learning domains?

17        A.    Yes.

18        Q.    And is "POST" the "Peace Officer Standards and

19    Training"?

20        A.    "POST" is the basic training that every officer

21    should receive in the state of California, yes.

22        Q.    And did those learning domains include tactics

23    in the use of force?

24        A.    They did.

25        Q.    And so after you graduated, you said that you

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 53

1   were on probation; right?

2       A.   Yes.

3       Q.   And how long was the probation?

4       A.   Probation is broken up in two phases.  The

5   first 60 -- or six months, would be formal probation

6   where you are paired up with a training officer.  Each

7   two months you get switched to a new training officer.

8   And then you go into informal probation where you get to

9   work with other Police Officer IIs, and sometimes you

10  get also officers -- you could work with P-3s, as well.

11      Q.   And so you were a police officer for about ten

12  months at the time?

13      A.   That's correct, yes.

14      Q.   And you were in uniform during the incident?

15      A.   Yes, I was in an LAPD uniform.

16      Q.   You had mentioned that you were shooting a 9

17  millimeter weapon; right?

18      A.   Yes.

19      Q.   What kind of bullets were you using?

20      A.   They're hollow-point.

21      Q.   What does it mean to be a "hollow-point

22  bullet"?

23      A.   A "hollow-point bullet" is designated for when

24  it strikes its intended target, that it won't go through

25  that person, causing further damage if there's people

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 54

1  behind them.  It's designated for it to kind of come to

2  a stop.

3      Q.   If -- do I understand you correct that the

4  hollow-point rounds have some kind of mechanism so that

5  they don't go through the intended target and then harm

6  an unintended target?

7      A.   Correct.  They're designated to spread once

8  they hit a target.

9      Q.   Okay.  And is the spread that you're talking

10  about how it slows down so that it doesn't go through

11  the target and hit something behind it?

12      A.   Well, I'm not an expert in firearms, but, yes

13  it's intended for it to not go through that target and

14  hit a target that you don't want -- you don't want to

15  hit.

16      Q.   And when you say "spread," what did you mean by

17  that?

18      A.   It's just the hollow-point will open up as it

19  strikes the target and it will come either -- it will

20  come to a stop.

21      Q.   Okay.  And were you wearing a ballistic vest at

22  that time?

23      A.   I was.

24      Q.   Does that mean it was a bulletproof vest?

25      A.   Yes.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 55

1    Q.    My understanding is that there was some officer

2    vehicles just to the west of where you were standing; is

3    that correct?

4    A.    There was a vehicle to the west, yes.

5    Q.    And did those -- those vehicles have some kind

6    of protective doors?

7    A.    To my knowledge, they have ballistic panels,

8    yes.

9    Q.    Do you know if any dash camera observed the

10   officer-involved shooting?

11   A.    Not to my knowledge, no.

12   Q.    Do you know if the helicopter recorded the

13   officer-involved shooting?

14   A.    Not to my knowledge.

15   Q.    Are you right-handed or left-handed?

16   A.    I'm right-handed.

17   Q.    Earlier you said that officers had less lethal

18   with them, and I know you had mentioned that Officer

19   Morse had the 40; right?

20   A.    Yes.

21   Q.    Did you have any less lethal options on your

22   person?

23   A.    On my person, I had the Taser and my pepper

24   spray.

25   Q.    Anything else?

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 56

1        A.    No.    It was just the Taser and the pepper

2    spray.

3        Q.    Is the Taser the kind that can either be

4    deployed --

5              (Reporter clarification.)

6    BY MR. SINCICH:

7        Q.    -- in drive stun or probe mode?

8        A.    Yes.

9        Q.    And in probe mode, is it designed to cause

10    neuromuscular incapacitation?

11        A.    If -- if the Taser works correctly and you

12    actually hit the target, then it would, yes.    It's

13    intended to cause muscular -- what was the word you

14    used?

15        Q.    Neuromuscular incapacitation.

16        A.    Yes.    It's intended for that, if it -- if it

17    hits the target in its designated area.    Yes.

18        Q.    In training, did you have to get Tased in order

19    to arm yourselves with a Taser?

20        A.    Can you repeat the question?

21        Q.    Have you ever been Tased before?

22        A.    I have been Tased, yes.

23        Q.    It was part of training?

24        A.    It was a part of training, yes.

25        Q.    When you're Tased, do you essentially stand

**M.B. vs CITY OF LOS ANGELES, ET AL.**
Jose Arteaga Mayen on 02/07/2025

Page 57

1  with two partners on your left and right to catch you?

2      A.   When -- when we got Tased in the academy, yes,

3  there is two people holding you up.

4      Q.   And why are they holding you up, to your

5  knowledge?

6      A.   So we don't -- so I don't fall to the ground.

7      Q.   Is that one of the common effects of the Taser,

8  is that a person will fall down?

9          MR. BOJORQUEZ:  Objection.  I think it lacks

10  foundation.  Call for speculation.  It's an incomplete,

11  improper hypothetical.

12  BY MR. SINCICH:

13      Q.   You can answer.

14      A.   For the Taser, if it's used correctly and both

15  probes actually hit the person and it incapacitates

16  them -- it's designed to incapacitate them for five

17  seconds, so you can take them into custody.  If used

18  correctly, that person will fall and we'll be able to

19  take them into custody.  And -- and that's what it's

20  designed for.  But it doesn't mean that it always works,

21  or that it is deployed in the way that it's intended to.

22      Q.   At the time of the incident, did you have

23  training in how to deploy the Taser?

24      A.   I did.

25      Q.   Did you know how to deploy the Taser at the

**M.B. vs CITY OF LOS ANGELES, ET AL.**
Jose Arteaga Mayen on 02/07/2025

Page 58

```
 1   time, correctly?

 2       A.   I did.

 3       Q.   Before you left the station that day, did you

 4   test your Taser to make sure it was functioning

 5   properly?

 6       A.   Yes.  We test the Taser for -- to see if it's

 7   functioning properly and if it has battery, as well.

 8       Q.   Do you know what the maximum effective range of

 9   the Taser that you were armed with is?

10       A.   The ranges of a Taser are 0 to 15, and

11   effective range will be, like, 7 to 15.

12       Q.   And when you say those numbers, are you talking

13   in feet or yards?

14       A.   Those are -- would be feet.

15       Q.   Is there an option to use cartridges that reach

16   out to 20 feet or beyond?

17       A.   There is an option, yes, to use cartridges.

18   There are -- they're able to go that distance, yes.

19       Q.   Was that an option that you had that day?

20       A.   That was not an option --

21            MR. BOJORQUEZ:  One second.  Objection.  I

22   think the question is an incomplete hypothetical.  I

23   think it's vague and ambiguous as to time.  I think it

24   also lacks foundation.  Calls for speculation.

25   BY MR. SINCICH:
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 65

 1    that Mr. De Anda was under the influence of a narcotic?

 2        A.   Can you repeat the question, sir?

 3        Q.   **Did you have any specific information at the**

 4    **time of the incident that Mr. De Anda was under the**

 5    **influence of a narcotic?**

 6        A.   During the time of the incident, De Anda was --

 7             (Reporter clarification.)

 8             THE WITNESS:  -- rambling and inconsistent with

 9    his statements.

10    BY MR. SINCICH:

11        Q.   **Okay.**

12        A.   There -- I had no knowledge if he had taken any

13    narcotics at the time.  But based on his -- based on

14    what he was saying to us, based on what he was saying to

15    me and his ranting and walking back and forth, that

16    would lead me to believe that he could have possibly

17    have been under the influence of narcotics.

18        Q.   **Okay.  What was Mr. De Anda wearing?**

19        A.   Mr. De Anda was wearing a two-tone shirt.  I

20    believe it was a blue top, white bottom, with pink --

21    pink/red/orangey shorts.

22        Q.   **Was he wearing any thick clothing, to your**

23    **knowledge?**

24        A.   To my knowledge, at that time, he was not

25    wearing any thick clothing.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 66

1     Q.   Did you have any specific information that he

2     might be suffering from a mental health crisis at the

3     time?

4     A.   At that time, just the comment that he made

5     that he was possibly suicidal.  That he said that he

6     wanted to kill himself.  That's all the information I

7     had.

8     Q.   And do you have training from the academy and

9     the LAPD about dealing with people who could be

10    suffering from a mental health crisis?

11    A.   We -- we do get training, but we are no experts

12    in deciding whether that person is mentally ill.

13    Q.   Right.  Based on based on training that you

14    received, are symptoms such as rambling, ranting,

15    inconsistent statements, and walking back and forth, are

16    they consistent with a person that could be suffering

17    from a mental health crisis?

18    A.   As I stated, based on what he was doing and

19    those actions, to my knowledge, he was under -- possibly

20    under some narcotics.  And just my knowledge and extent

21    to his -- if any, had any mental illness, it was just

22    based on the statement that he made that he was

23    suicidal.

24    Q.   Okay.  What I'm wondering is based off the

25    training that you did receive, are the symptoms of

**M.B. vs CITY OF LOS ANGELES, ET AL.**
Jose Arteaga Mayen on 02/07/2025

Page 67

1  rambling, ranting, inconsistent statements, and walking

2  back and forth, are those consistent someone who could

3  be suffering from a mental health crisis, in addition to

4  potentially being under the influence?

5      A.   Well, like I said, I'm no expert.  Everybody --

6  any person that has a mental illness gets treated

7  different and has different reactions and acts

8  differently.  I cannot compare one person to the next.

9          But every situation is different.  So I don't

10  know what their mental health or what their capacity is.

11  I'm not an expert to say whether or not that person is

12  mentally ill or not.

13          Just based on my training and experience, if

14  someone that is acting the way Mr. De Anda was acting,

15  to my knowledge, at the time, it was just that he was

16  possibly under narcotics.

17      Q.   Are you an expert in narcotics?

18      A.   I am not, sir.

19      Q.   When you received training in persons

20  potentially suffering from a mental health crisis, did

21  they inform you as to the possible symptoms that a

22  person could be exhibiting?

23      A.   When we go through training for mental health,

24  we -- we get information on possible symptoms they could

25  be going through, yes.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 68

1     Q.   And are some of those symptoms that you are

2  instructed about, did they include a person walking back

3  and forth or pacing?

4     A.   Like I said, like, based on this incident, it

5  was just his statement saying that he was suicidal that

6  led me to believe that maybe he was going through

7  something.

8     Q.   Based on your training in dealing with persons

9  suffering -- potentially suffering from a mental health

10  crisis, did the instructors tell you that some of the

11  symptoms that a person could be exhibiting include

12  pacing, such as walking back and forth?

13     A.   I mean, like I said earlier, it just depends on

14  the patient, whether or not -- whatever they're

15  experiencing at the time.  Every scenario is different.

16  Every person is different.

17     Q.   And is that one of the things the instructors

18  told you to look out for?

19     A.   Just based -- if you're talking about academy

20  training, a lot of times when we do these trainings,

21  people are rambling, incoherent.  They do different

22  things, and that's just for training purposes.  But when

23  we're out there in the field, people act different, you

24  know.

25         People -- we're not in a safe place anymore

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 69

1  where I could identify that, especially him being so far

2  away from me.

3      Q.   So is it fair to say that, based on your

4  training, at least rambling, incoherent statements, and

5  pacing are of symptoms of a person potentially suffering

6  a mental health crisis?

7      A.   Well, potentially, maybe they could be going

8  through something, mentally, health-related.  But we, as

9  officers, don't react or don't act upon a person's

10 mental health.  We react on that person's behavior.

11     Q.   Right.

12     A.   So to my knowledge, at that time, he was under

13 the -- possibly under the influence of narcotics, yes.

14     Q.   And you also believed that he was possibly

15 suicidal; right?

16     A.   Just based on the knowledge that he told me he

17 wanted to kill himself, yes.

18     Q.   And based on your training, is it's possible

19 for a person who's suffering a mental health crisis to

20 be suicidal?

21     A.   If the person has the will and the desire to

22 take their own life, I -- I believe that that person

23 will go through with it.  And it's unfortunate, but I

24 mean, if that person has that will to do it, they'll

25 find a way to do it, if they're suffering from any

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 70

1   mental health.

2      Q.   I'm not sure I understand your response.  But

3   I'm just wondering if, based on your training, a person

4   who's suffering from a mental health crisis, if they

5   could be suicidal, if that's just part of your training?

6      A.   If a person -- like I said, if a person is

7   suicidal and they have the will to do it, and they're

8   suffering from any mental health, they could -- they

9   could potentially go through with it, yes.

10      Q.   I want to talk to you about the information you

11   knew from the initial call to the scene.  What did you

12   receive from that call?

13      A.   From the radio call that I recall, it was a

14   "415 man with a knife," which means he was disturbing

15   the peace.  He was armed with a knife and vandalizing

16   vehicles.

17      Q.   Okay.  Did you know anything else about

18   Mr. DeAnda from that call, all the way until your

19   arrival?

20      A.   It was just what I knew was based on what the

21   radio call had -- had stated.

22      Q.   Okay.  And then other than your observations on

23   scene, did you ever learn anything else about Mr. DeAnda

24   prior to your use of deadly force?

25      A.   Prior to that, all I knew was that he had

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 71

1  mentioned that he -- he wanted to kill himself.

2      Q.   Okay.  What does a "415 man" mean?

3      A.   A "415 man" means he's just, in our terms, to

4  be "a person disturbing the peace."

5      Q.   Could that also mean a person who's suffering

6  from some kind of mental health crisis?

7      A.   I mean, it could mean -- it could mean a

8  various amount of things.  It could be someone has a

9  loud radio in the middle of the -- of the street or

10  someone running in and out of traffic.  415 is just a

11  term for somebody that is being -- is disturbing the

12  peace at the moment.

13      Q.   Is it always a crime to be a 415 man?

14      A.   It's not always a crime to be 415.  I mean, we

15  get radio calls where there's an argument going on and

16  it's just an argument.  I mean, just because you're

17  yelling doesn't mean that a crime has occurred.

18      Q.   It a crime for a man to have a knife in the

19  parking lot?

20      A.   It's not a crime to have a knife.  It's a crime

21  to -- it's how you wield that knife and you put other

22  people's life in danger.

23      Q.   And, of course, vandalism, that's a crime;

24  right?

25      A.   Vandalism is a crime.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 72

1    Q.   Do you know what the code is for that crime?

2    A.   594 PC.

3    Q.   And do you know if that's a felony or a

4    misdemeanor?

5    A.   Depending on the amount, it could be a

6    misdemeanor or a felony.

7    Q.   Okay.  So what was your understanding of

8    whether or not you were responding to a felony call or a

9    misdemeanor call at the time?

10   A.   At the time of the incident, I just had the

11   comments of the call.  It was just:  A 415 man armed

12   with a knife, vandalizing vehicles.

13   Q.   You didn't know if it was going to be a felony

14   or misdemeanor potential?

15   A.   At that time, I did not have that information,

16   no.

17   Q.   And once you arrived on scene, did you gain any

18   other knowledge as to whether or not the vandalism was

19   going to be a felony or a misdemeanor?

20   A.   No.  I did not gain any more knowledge.  My --

21   my purpose at that time was talking to Mr. De Anda.

22   Q.   Okay.  Had you ever met Mr. De Anda before?

23   A.   I had never seen Mr. De Anda before this

24   incident.

25   Q.   Did he tell you his name during the incident?

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 73

1      A.    He did not tell me his name.

2      Q.    Besides telling you that -- well, what he did

3  he say that made you believe that he was potentially

4  suicidal?

5      A.    He stated in Spanish, "Mi quiero matar," which

6  means, "I want to kill myself."

7      Q.    I know you mentioned he was rambling and saying

8  some things that were incoherent.  What other things did

9  you understand, other than "I want to kill myself"?

10      A.    Once I got that statement from him -- once he

11  said that statement that he wanted to kill himself, I

12  proceeded to ask him his name again, and he -- he

13  mentioned something along the lines that -- that people

14  saw him as crazy, and that's it.

15           (Reporter clarification.)

16  BY MR. SINICICH:

17      Q.    Did you have any -- and I think you mentioned

18  something to this accord, so I'm sorry if I already

19  asked it, but did you have any specific information that

20  he was under the influence of drugs at the time?

21      A.    At the time, I did not have the any type of

22  information that said that he was under the influence.

23  I believe a second radio call was generated while we

24  were there, but I don't recall -- I don't recall the

25  comments.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 74

```
 1      Q.   Did you have any information as to whether or
 2   not he had a history of drug use?
 3      A.   Do you mean at the moment --
 4           (Simultaneous speakers.)
 5      Q.   Yeah.
 6      A.   -- of the incident?
 7      Q.   Prior to your use of deadly force.
 8      A.   Prior to that, I had not met Mr. De Anda.  I
 9   did not know anything about him.
10      Q.   But prior to your use of deadly force, did you
11   have any information that he ever physically injured
12   anybody?
13      A.   Prior to the incident, no.  I had no
14   information that he had injured anybody.
15      Q.   And did you see him physically injure anybody
16   during the incident?
17      A.   When we arrived at seen, De Anda was walking
18   northbound on New Hampshire, away from us.  That's --
19   that's what I observed.
20      Q.   Did you ever see him physically injure anybody?
21      A.   I did not see him physically injure anybody,
22   no.
23      Q.   Did you have any information that he verbally
24   threatened anybody prior to your use of force?
25      A.   What was the question?
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 75

1    Q.    Did you have any information that he verbally

2    threatened anybody prior to your use of deadly force?

3    A.    Prior to the use of deadly force, I did not

4    have -- no, I did not have any information.  It was just

5    the radio call.

6    Q.    What was his approximate height?

7    A.    If I were to estimate, probably, like, 5'6".

8    Q.    And what would you estimate his weight to be?

9    A.    Probably, like, 150.

10            (Reporter requests a break.)

11            (Break taken.)

12   BY MR. SINCICH:

13   Q.    Officer Mayen, what was the approximate age of

14   Mr. De Anda, that you believed?

15   A.    At that time, I believed approximately 30 years

16   of age.

17   Q.    Okay.  And how tall are you?

18   A.    5'7".

19   Q.    And how much did you weigh at the time of the

20   incident?

21   A.    Approximately 150.

22            Did you get my answer?

23   Q.    Yes, sir.  Thanks.

24   A.    Okay.

25   Q.    Is it fair to say that when dealing with a

**M.B. vs CITY OF LOS ANGELES, ET AL.**
Jose Arteaga Mayen on 02/07/2025

Page 76

1   person who could potentially be suicidal, the goal is to

2   get the person help?

3       A.   Well, as officers, we always assess the

4   situation, just because this person might be under

5   the -- might be going through some mental health crisis

6   or possibly under the influence of anything.  If that

7   person poses a threat, we will assess that first and

8   make sure that we take that threat of death or serious

9   bodily injury to myself or others, before assessing

10  whether or not that person needs help.

11          Like I said, we're going to a location where

12  all we have based on is how that person is behaving, and

13  we react to their behavior at the time.  If we have

14  time, and that person is willing to be in the process,

15  and if we are able to take them into custody, then we'll

16  take the necessary steps to get that person the help

17  that he needs or that she needs.

18      Q.   Based on the information in the call, you knew

19  that he was potentially armed with a knife, prior to

20  your arrival; right?

21      A.   Based on the radio call, yes.  I had a -- I had

22  that information that he was armed with a knife.

23      Q.   And so prior to even seeing Mr. De Anda, was

24  there certain safety considerations that you had in

25  mind, knowing that you could be confronting a person

M.B. vs CITY OF LOS ANGELES, ET AL.
Jose Arteaga Mayen on 02/07/2025

Page 77

1    potentially armed with a knife?

2        A.   Well, at that time, when we got off the

3    vehicle, we -- we kind of -- when we got off the

4    vehicle, we tried to locate him first and make sure that

5    he's not an active threat to us or to the people that

6    were standing by.  So we had to assess whether we're

7    not -- whether we're going to use cover.  We already had

8    our less lethal with us, so we had to assess the

9    situation as it was presenting itself.

10       Q.   And so you mentioned cover.  That's one of the

11   things that is important when dealing with a person with

12   a knife?

13       A.   It's part of my job, sir, to respond to people

14   on radio calls, and sometimes they're going to be armed

15   with knives, yes.

16       Q.   Is cover an important tactical consideration in

17   situations like that?

18       A.   Taking cover, it's important.  We always take

19   that into consideration, what we can use as cover.

20       Q.   Why is cover important?

21       A.   Cover gives us time and distance from the

22   suspect, and we're able to try to articulate or

23   de-escalate the situation, if the person allows it.

24       Q.   And so, is time and distance also important

25   considerations?

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 78

1       A.    Time, yes.   Time and distance are also

2    important considerations.   But like I said earlier,

3    time, distance, and cover will always be determined by

4    the person that we're dealing with.

5       Q.    **Do you have training that -- as part of your**

6    **tactics -- that officers should attempt to create time?**

7       A.    Can you repeat the question?

8       Q.    **As part of your tactical training, are officers**

9    **trained that they should attempt to create more time?**

10      A.    In a perfect scenario, we will have all the

11    time in the world to try to de-escalate somebody that is

12    armed.   But a lot times when we go to these radio calls,

13    people -- they're the ones in control of the situation.

14             So they dictate whether we're going to have

15    hours or we're going to have a couple of minutes to have

16    our reaction, based on what they're -- what they're

17    doing.

18      Q.    **Based on your training, is there anything that**

19    **officers can do to create more time to de-escalate the**

20    **situation?**

21      A.    Like I said --

22             MR. BOJORQUEZ:   It's an incomplete, improper

23    hypothetical.   Lacks and foundation.   Calls for

24    speculation.

25             But go ahead and answer.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 79

1          THE WITNESS:  Like I said, we don't -- we don't

2     control time and space.  Time, space, distance, we don't

3     control that.  The person dictates whether we're going to

4     have a lot of time or we're going to have a little amount

5     of time on our hands.

6     BY MR. SINCICH:

7          Q.    Do you determine your position during an

8     incident?

9          A.    What do you mean by "position"?

10         Q.    Like, where you stand?

11         A.    So when I arrive at a scene, I determine

12    whether -- where to get cover at that time, like, to

13    keep an eye on the suspect.  But at the end of the day,

14    the other person is one that decides whether or not that

15    place is going to be -- if we're going to even have

16    cover or time, you know, or the distance.

17         Q.    Is it fair to say that if cover is available,

18    officers should attempt to stay behind cover?

19         A.    If -- if -- if cover is available, me, as an

20    officer, I will try to take cover, but we to go

21    different scenarios and every location is different.

22    Sometimes it could be an open field to an indoor

23    apartment, and you don't have the luxury to always have

24    cover.

25         Q.    Were there civilian vehicles parked on the

**M.B. vs CITY OF LOS ANGELES, ET AL.**
Jose Arteaga Mayen on 02/07/2025

Page 80

1    street that could have been used as cover in this

2    incident?

3        A.    There were civilian vehicles parked on both

4    sides of the street.  And, yes, they could have been

5    used as cover.  But De Anda was not in the street; he

6    was inside a parking lot where we were using a fence as

7    cover.

8        Q.    So was the fence -- and the small wall, was

9    that creating a barrier in between officers and Mr. De

10   Anda?

11       A.    Yes.  Mr. De Anda could not approach us because

12   there was a fence in between himself when -- and --

13   himself and myself.  And if necessary, we had the

14   vehicles to re-deploy.

15       Q.    One of the options was to re-deploy behind the

16   civilian vehicles, if necessary?

17       A.    If necessary, yes.  But like I said, he was

18   behind bars, so, therefore, there was no -- he never --

19   he never charged at us through those bars.  He saw an

20   opening, and he decided to charge where the opening was.

21       Q.    Do you think it would have been tactically

22   sound for officers to be in the opening as opposed to

23   behind the bars?

24       A.    Do you mean inside the parking lot?

25       Q.    No.  Just exposed from the opening that you

**M.B. vs CITY OF LOS ANGELES, ET AL.**
Jose Arteaga Mayen on 02/07/2025

Page 81

1    just mentioned?

2        A.    To my knowledge, when -- when I arrived at

3    scene, to my knowledge, that parking lot was closed.   I

4    had no knowledge of it being open.   It wasn't until

5    later that I discovered that that parking lot was open.

6        Q.    Okay.  And was there an option also to

7    re-deploy behind the officer vehicle or vehicles that

8    were nearby?

9        A.    My vehicle was nowhere in the -- nowhere near

10   the location where I could re-deploy to it.   The

11   officers that were just south of me, I wouldn't be able

12   to say what they determined at that time, no.

13       Q.    Could you have used their vehicle as cover?

14       A.    I think I felt that -- like I said, at that

15   time, I didn't have a clear -- my focus was on De Anda.

16   And at that point, I was still behind a fence where I

17   still had cover.

18       Q.    Okay.  When you were moving south on the

19   sidewalk towards Officer Rodriguez, did you know that

20   the fence was open over there?

21       A.    I had knowledge that the fence was open once I

22   observed Officer Rodriguez in that area.  Yes.

23       Q.    Did you see her ever go inside the fence,

24   actually inside the parking lot?

25       A.    Yes.  That's when I had knowledge that the

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 82

```
 1   fence was open.
 2       Q.   And did you call her out of the parking lot?
 3       A.   Yes.  I -- I called her out of the parking lot
 4   so we could have a line and that we could observe Mr. De
 5   Anda from -- from where we were standing.  Like, that I
 6   could have a perception where she's at, and she could
 7   see -- possibly see where we're standing at, and we try
 8   not to cross that line.
 9       Q.   Did you feel that she was putting herself in an
10   unsafe position by going in front of the line when she
11   was entered the parking lot?
12       A.   I'm unable to answer that due to the fact that
13   I do not know what her perception was from where she was
14   standing.
15       Q.   What about from your perception where you were
16   standing?
17       A.   From my perception from where I'm standing,
18   like I stated, to my knowledge, that gate was closed
19   until they arrived at scene.  And I wasn't -- I told
20   her -- in this incident, I told her to step back, to get
21   out -- out of the parking lot.
22       Q.   And you told her to step out because you
23   thought it was unsafe?
24       A.   No.  We needed to keep that line where --
25   because, I mean, we needed to keep that line to where we
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 83

```
 1   could --
 2            (Reporter clarification.)
 3            THE WITNESS:  -- observe De Anda at that time.
 4   BY MR. SINICICH:
 5       Q.   When you're confronted with a person armed with
 6   a knife, is it important for officers to keep a
 7   distance?
 8       A.   When we're confronted with any person armed
 9   with a deadly weapon, it's important for us to maintain
10   a distance.
11       Q.   In particular, with someone with a knife, a
12   distance becomes even more important than someone with a
13   gun; is that fair?
14       A.   If a person is armed with a knife?
15       Q.   Distance is even more important than a person
16   armed with a gun; is that fair?
17       A.   I don't think I understand your question, sir.
18       Q.   So, for instance, a person armed with a gun
19   might still be a deadly threat, even if they're 50 feet
20   away; right?
21       A.   If a person is armed with a gun and they're 50
22   feet away, yes, they're still a threat.
23       Q.   But a person that's armed with a knife at 50
24   feet away, they're much less of a threat; isn't that
25   fair?
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
Jose Arteaga Mayen on 02/07/2025

Page 84

1      A.    No.  Well, because a person armed with a knife,

2  like in this case, he could be 100 feet away and could

3  close the distance within five seconds and still pose a

4  threat.

5      Q.    Okay.  Was it important in this case to

6  establish a perimeter?

7      A.    Yes.

8      Q.    Why?

9      A.    We had -- even though we could see into the

10  parking lot where he was at and there was nobody in the

11  parking lot, there was a building to the east of the

12  parking lot.  There was a 76 gas station to the south of

13  that building.

14        And then there was residents to the north of

15  that building -- to the parking lot, as well, where he

16  could have easily jumped the fence on either side and

17  pose a threat to the people that he would encounter.

18      Q.    So you wanted to make sure that he was

19  contained inside the parking lot?

20      A.    Yes.

21      Q.    Did the officers establish a perimeter?

22      A.    My partner, Officer Morse, requested a

23  perimeter and a perimeter was established.

24      Q.    Is it important in these kind of tactical

25  situations for officers to communicate with each other

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 85

1   as a team?

2       A.    It's important to -- as -- in this case we were

3   the primary unit, and it was important for every officer

4   to know what was going on.   And based on what I could

5   hear from the radio, my partner was giving out

6   information as it was becoming available.

7       Q.    What information did you learn from the radio?

8       A.    That he had set up a perimeter.   The perimeter

9   was contained.   And that we should -- we should just

10  wait and try to see what Mr. De Anda -- if we could talk

11  him down to de-escalate the situation.

12      Q.    And that was established by Officer Morse?

13      A.    What was?

14      Q.    That plan to create the perimeter and try to

15  de-escalate the situation?

16      A.    For the perimeter, it was Officer Morse that

17  was setting up a perimeter.   Upon arrival at the

18  airship, airship stated that the perimeter was good.

19  But that was just to establish that De Anda was

20  contained within the parking lot.

21      Q.    Did anybody create a plan?

22      A.    What do you mean by "plan," sir?

23      Q.    Do you have training in how to create a plan?

24      A.    Yes.   Creating a plan --

25           MR. BOJORQUEZ:   Again -- I'm sorry.   Sorry.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
Jose Arteaga Mayen on 02/07/2025

Page 88

```
 1      A.   Like, what time we put out the backup?

 2      Q.   How long prior to your use of force did the

 3   backup call go out?

 4      A.   I would have to take a guess, for approximately

 5   five minutes.

 6      Q.   I don't want you to guess.  But just based on

 7   your recollection of what happened during incident, is

 8   it fair to say that it was approximately five minutes?

 9      A.   It was approximately five minutes --

10           (Reporter clarification.)

11           THE WITNESS:  -- that my partner put out the

12   backup and then the OIS occurred.

13   BY MR. SINCICH:

14      Q.   When your partner put out a backup call, was it

15   your belief that there was going to be additional

16   officers en route?

17      A.   When we request for a backup, it's for the

18   primary -- based on what the primary unit is observing.

19   It's for other officers to come and assist that primary

20   unit.

21      Q.   Did you hear anybody over the radio respond

22   that they were in route?

23      A.   Due to the fact that it's an ongoing incident,

24   we -- they -- they could have possibly arrived and not

25   announced --
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 89

1          (Reporter clarification.)

2          THE WITNESS:  They could have possibly arrived

3    and not announced that they were already at that

4    location, because it's an ongoing incident where

5    information is being put out consistent.

6    BY MR. SINCICH:

7          Q.   Right.  Okay.  I'm wondering if you actually

8    heard anybody put out that they were en route prior to

9    your use of deadly force?

10         A.   I could hear the sirens coming from in the

11   area.

12         Q.   Okay.  Did anybody ever call for additional

13   resources?  For instance, I know the air unit was

14   called?

15         A.   Yes.

16         Q.   And the air unit arrived?

17         A.   Yes.

18         Q.   Was there a call for any other additional

19   resources?

20         A.   Not to my recollection.  There was no other

21   call to any other resources, no.

22         Q.   Do you know if a canine team was available?

23         A.   For a canine team to come out, we need -- we

24   need -- we need to establish a command post, which takes

25   time.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 90

1    Q.    True.

2    A.    And we did not have that time available to us.

3    Q.    Did you have any less lethal options available

4    to you in your vehicle?

5    A.    My partner had our 40 millimeter.

6    Q.    Do you know if there were shields in your

7    vehicle?

8    A.    I -- I do not recall if we checked out a shield

9    on that date.

10    Q.    How long prior to your use of force did you

11    come to the belief that he was potentially suicidal?

12    A.    From the moment that I got there to -- I don't

13    understand your question.

14    Q.    I'm wondering, how long prior to your use of

15    force was it that you came to the belief that he was

16    potentially suicidal?

17          Are you looking at a document right now?

18    A.    I'm just looking at a note.

19    Q.    Do you have notes with you?

20    A.    What was that?

21    Q.    Do you have notes with you?

22    A.    Just of my body-worn video.

23    Q.    Could you hold it up to the screen, please?

24    A.    It's a blank sheet of paper.

25    Q.    Okay.  Are the notes just time stamps?  I

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 91

```
 1    couldn't read it right there.

 2        A.    Yes.

 3        Q.    Can you just read off what your notes say?

 4        A.    It says:  "Made contact with PR, 2028:38."

 5              "Contact with suspect, 2029:24."

 6              "Suspect began to run, 2035:40."

 7              "Suspect stopped, 2035:53."

 8              "OIS, 2035:56."

 9              "Second shot, 2035:57."

10              And my last note was:  "RA requested, 2036:13."

11        Q.    Okay.  So my question was, prior to the OIS,

12    how long was it when you determined that he could be

13    potentially suicidal?

14        A.    Possibly, I want to say, like, four minutes,

15    three minutes.

16        Q.    Did you request a Smart Unit to arrive?

17        A.    I asked my partner if he could request a Smart

18    Unit.  But the way that a Smart Unit works is that it

19    needs to be a Code 4, which it's -- everybody is in

20    custody, the person involved is in custody.  They're

21    going to respond to a command post, and they would not

22    respond to an active situation, due to the fact that

23    they have a civilian with them, and we're not going to

24    put that person in that particular position of danger.

25              So for a Smart Unit to arrive, it's going to
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 92

```
 1   take some time for them to get to a command post.  And

 2   in this incident, Mr. De Anda did not provide us with

 3   this time.  He ran fairly quickly in a couple seconds

 4   and closed that distance with officers.

 5        Q.   Did you have any training in how to communicate

 6   with a person who's potentially suicidal?

 7        A.   At that time, all I wanted to know is what was

 8   going on with him.  I want to talk to him.  I wanted him

 9   to put that knife down, and try to get some compliance

10   from him.  I don't think -- I wouldn't consider myself

11   an expert in talking to someone that is possibly

12   under -- going through some mental illness.

13        Q.   Did you have any training in how to communicate

14   with a person who's potentially suicidal?

15        A.   Based on my training from the academy, I mean,

16   that's what I had.  And like I said earlier, a lot of

17   times, they are just scenario-based, and we know that at

18   one point, the person at the scenario, we could easily

19   say "Stop" or ask a question, and this incident is a

20   fluid situation where if that person is not willing to

21   go with the process, then we're unable no help due to

22   the fact that he's decides what's going on and he's

23   dictating what he's going to give us, the type of

24   information he's going to give us.

25        Q.   So I understand what you're saying.  What I'm
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
Jose Arteaga Mayen on 02/07/2025

Page 93

1    wondering is, is if you had training on how to

2    communicate with a person who's potentially suicidal?

3        A.    Well, my point -- as officers, we just want to

4    de-escalate the situation.  So, like I said, I'm no

5    expert in talking to someone that is possibly suicidal.

6    I just try to relate to them as a human being and try to

7    be as considerate as I can.  Like, that's why I asked

8    for his name multiple times because I wanted to address

9    him by name.

10       Q.    I appreciate that.  What I'm wondering is were

11   you trained to do that, or is that just based on your

12   own commonsense?

13       A.    I have training --

14             (Simultaneous speakers.)

15             MR. BOJORQUEZ:  Go ahead.

16             THE WITNESS:  I have training on de-escalating,

17   but a lot of that was me, as a human being, trying to

18   talk to another human being, to drop that knife, and to

19   try to be compliant with officers.

20   BY MR. SINCICH:

21       Q.    But no specific training on dealing with

22   someone who's potentially suicidal?

23             MR. BOJORQUEZ:  Objection.  Completely

24   misstates the witness's testimony.  He said he had

25   training, and then he described what he was trying to do,

**M.B. vs CITY OF LOS ANGELES, ET AL.**
Jose Arteaga Mayen on 02/07/2025

Page 94

 1  Counsel.

 2          MR. SINCICH:  I heard the response.

 3  BY MR. SINCICH:

 4      Q.   You can answer.

 5      A.   Like I said, I have training on de-escalating a

 6  situation.  This situation is dictated on the

 7  willingness of that person to cooperate with officers.

 8      Q.   So what's the title of the training that you

 9  received that gives you specific instructions on

10  communicating with a person who's potentially suicidal?

11      A.   Like I said, we don't -- when we arrive at

12  scene, we respond to people's behavior.  So based on his

13  behavior, I was trying to de-escalate that situation --

14          (Simultaneous speakers.)

15      Q.   Yeah.

16      A.   -- from getting into a moment where it will be

17  a lethal force.

18      Q.   I understand that.

19          What's the title of the training?

20      A.   "Use of Force Directives."

21      Q.   The "Use of Force Directives" give you --

22          (Reporter clarification.)

23  BY MR. SINCICH:

24      Q.   -- specific training on communicating with a

25  person who's potentially suicidal?

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 95

1      A.   The "Use of Force" training is just a sterile

2   paper where it's just policy.  We get training in the

3   academy, and from patrol acronym, and we do get some

4   mental evaluation training.

5      Q.   Okay.

6           (Pause.)

7   BY MR. SINCICH:

8      Q.   Did you ever hear the decedent verbally

9   threaten any officer?

10     A.   A lot of the times I couldn't hear a lot of

11   what he was saying, due to the noise in the area.

12     Q.   So did you ever hear him verbally threaten any

13   officer?

14     A.   Not that I -- not that I could recall.  Like I

15   said, there's a lot of noise in that area.

16     Q.   Was the decedent alone in the parking lot?

17     A.   Yes, the decedent was alone in the parking lot.

18     Q.   Did you see any civilians around that area

19   within 30 seconds prior to your use of force?

20     A.   There was people right across the street.

21   There was neighbors across the street, and people coming

22   out of the church across the street, as well.

23     Q.   Were they on the street, or were they in their

24   own parking lot, or anything like that?

25     A.   From the time that we got there, they were on

**M.B. vs CITY OF LOS ANGELES, ET AL.**
Jose Arteaga Mayen on 02/07/2025

Page 96

1   the sidewalk.

2       Q.   Did any officers tell those people to go to a

3   different location?

4       A.   Not to my knowledge.

5       Q.   Did you feel that those people were in any kind

6   of jeopardy at their distance?

7       A.   If Mr. De Anda ran to an open space and was

8   able to get out of our containment, those people were in

9   danger.

10      Q.   Did you ever see Mr. De Anda run towards a

11  civilian?

12      A.   I did not see Mr. De Anda run towards a

13  civilian, but I did see him run towards the exit where

14  the gate was open.   If he was reasonable and he did not

15  want anything to do with officers, he could have easily

16  jumped over one of the north or south fences and had

17  left the location.

18      Q.   Did you ever see him attempt to jump over a

19  fence?

20      A.   I did not see him attempt to jump a fence, no.

21      Q.   Were there any cars in the parking lot?

22      A.   There was no cars in the parking lot.

23      Q.   When you first saw him, did you see a knife in

24  his hand?

25      A.   When I first saw him, I was unable to clearly

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 97

1    see his hands, so I did not know if he was armed or not

2    armed.

3        Q.    At some point, you saw him pick up the knife

4    from the ground; right?

5        A.    Yes.  At some point when he was inside the

6    parking lot, I could see him bend over and pick up a

7    knife from the ground.

8        Q.    How long were you there prior to seeing him

9    pick up the knife?

10        A.    Was I at scene, you mean?

11        Q.    Yes.

12        A.    Probably a minute or two minutes.

13        Q.    Okay.  In your notes you said:  "Contact with

14    PR."  Do you recall that?

15        A.    Yes.

16        Q.    Is that the party who reported?

17        A.    Yes.  That was one of the parties that

18    reported.

19        Q.    Did you make contact with a PR?

20        A.    My partner did.

21        Q.    Did your partner tell you anything that the PR

22    said?

23        A.    My partner stated that the suspect was

24    traveling northbound on New Hampshire.

25        Q.    Anything else?

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 98

```
 1      A.   No.  No more information from that.

 2      Q.   And then according to what you annotated, there

 3   was approximately six minutes from the time that you

 4   made contact with him to the time that he started to

 5   run?

 6      A.   Approximately six minutes, yes.

 7      Q.   And in that six-minute time frame, is that when

 8   you were communicating with Mr. De Anda?

 9      A.   From the time that I made contact with him, I

10   started to communicate with him, yes.

11      Q.   And when you first saw Mr. De Anda, how far was

12   he from you?

13      A.   I would say approximately -- he was already --

14   I was outside the fence.  He was inside the fence.  When

15   I first saw him, he was approximately, like, 30 feet

16   away from me.

17      Q.   And then did he move anywhere?

18      A.   Yes.  He proceeded to walk eastbound in the

19   parking lot, away from.

20      Q.   I'm sorry.  He walked away from you?

21      A.   Yes.  He was walking away from us.

22      Q.   And how far away from you did he go?

23      A.   I want to say approximately 100 feet away from

24   us.

25      Q.   Okay.  And then what did he do after that?
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 99

1      A.    That's when he started walking back and forth

2   and pacing against the east side of the wall.

3      Q.    Okay.  And other than his pacing at about 100

4   feet away, did he move anywhere else before he started

5   running?

6      A.    After observing my body-worn camera, I can see

7   him bend down once or twice, and then --

8           (Reporter clarification.)

9           THE WITNESS:  -- he began to pace back and

10   forth again.

11      Q.    What occurred immediately prior to him running?

12      A.    He -- what occurred prior to him running?

13      Q.    Yes.

14      A.    So he tried to run northbound in the parking

15   lot first.

16      Q.    Okay.  When you say that he ran, from your

17   notes, are you referring to when he ran northbound or

18   southbound?

19      A.    When he ran southbound to the gate.

20      Q.    Okay.  So how far northbound did he run from

21   that spot that was 100 feet away from you?

22      A.    From the east sidewall where he was to the

23   north side where he was -- he tried first was -- I

24   wouldn't be able to tell you.  It was pretty far.  But

25   he didn't -- he didn't run a long distance.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
Jose Arteaga Mayen on 02/07/2025

Page 100

1    Q.   Okay.  Was he further than 100 feet away from

2    you after he went north?

3    A.   No, he was closer.

4    Q.   How much closer?

5    A.   Probably, like, 20 -- 20 feet closer.  Probably

6    like, he was 80 feet away from us.

7    Q.   Okay.  And did he move again after he was 80

8    feet away?

9    A.   Yeah.  He went back to the east wall again.

10   Q.   So he was about 100 feet away at that point?

11   A.   Again, yes.

12   Q.   And then did he move again after that?

13   A.   After that, that's when he decided to charge

14   towards the open -- the opening of the parking lot.

15   Q.   Okay.  I'm going to mark as Exhibit 1, what

16   purports to be a Google map here.  I'm going to show you

17   on my screen.

18        (Exhibit Number 1 was marked.)

19        MR. SINCICH:  I don't see the button for share

20   screen, for some reason.  Oh, here it is.

21   BY MR. SINCICH:

22   Q.   Okay.  Can you see my screen?

23   A.   No, I cannot.

24   Q.   You can't see that?

25   A.   Now I can.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 128

1   made, I want to say, probably 25 feet away from us.

2   That's when I unholstered."

3           Did I read that correctly?

4   A.   Yes, sir.

5   Q.   Okay.  Is it fair to say that you unholstered

6   when he was 25 feet away?

7   A.   From the position that I was standing at the

8   moment where I was tracking him, he was -- to my

9   perception, he was standing approximately 25 feet away.

10  Yes.

11  Q.   And he was -- when you unholstered your weapon,

12  you didn't shoot him immediately?

13  A.   At that time, I didn't feel that I had to

14  shoot, because he came to a stop.  He completely

15  stopped.  I gave him numerous commands to drop the

16  knife, in hopes that he would drop the knife, knowing

17  that there was a firearm pointed at him.  He decided not

18  to stop and continued running toward officers.

19  Q.   Did you ever give him a warning that if he

20  didn't stop or drop the knife that you would use deadly

21  force?

22  A.   At that time, I did not give him a warning, due

23  to the fact that everything happened so quick.

24  Everything happened so fast that I was unable to give

25  him a warning that if he stops -- if he doesn't stop I

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Jose Arteaga Mayen on 02/07/2025**

Page 133

```
 1  STATE OF CALIFORNIA)
                      ) ss:
 2  COUNTY OF ALAMEDA  )

 3
             I, KIMBERLY E. D'URSO, do hereby certify:
 4

 5           That the witness named in the foregoing

 6  deposition was present remotely and duly sworn to testify

 7  to the truth in the within-entitled action on the day and

 8  date and at the time and place therein specified;

 9           That the testimony of said witness was reported

10  by me in shorthand and was thereafter transcribed through

11  computer-aided transcription;

12           That the foregoing constitutes a full, true and

13  correct transcript of said deposition and of the

14  proceedings which took place;

15           Further, that if the foregoing pertains to the

16  original transcript of a deposition in a federal case,

17  before completion of the proceedings, review of the

18  transcript [ ] was [ ] was not requested.

19           That I am a certified stenographic reporter and

20  a disinterested person to the said action;

21           IN WITNESS WHEREOF, I have hereunder subscribed

22  my hand this 21st day of February, 2025.

23  _____

24  KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```