# EXHIBIT C

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                     --oOo--

4

5  M.B., by and through her Guardian ad
   litem, Nayelli Bautista and L.D., by
6  and through his Guardian ad litem,
   Jasmin Trinidad, individually
7  and as successors in interest to
   CARLOS DE ANDA, deceased.

8
          Plaintiff,
9
   v.                    Case No.  2:24-cv-07642-SVW-SSC
10
   CITY OF LOS ANGELES;
11 JOSE ARTEAGA MAYEN; KASSANDRA
   RODRIGUEZ; and DOES 3-10, inclusive,
12
          Defendants.
13 _____/

14

15        STENOGRAPHIC REPORTER'S TRANSCRIPT OF

16         DEPOSITION OF KASSANDRA RODRIGUEZ

17            FRIDAY, FEBRUARY 7, 2025

18

19

20

21

22 Reported Stenographically by:

23 KIMBERLY D'URSO, CSR 11372, RPR

24 Job No.  00135196

25

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

```
 1                       APPEARANCES

 2


 3   FOR THE PLAINTIFFS:

 4              LAW OFFICES OF DALE K. GALIPO
                BY:  MARCEL F. SINCICH, ESQ.
 5              21800 Burbank Boulevard, Suite 310
                Woodland Hills, California 91367
 6              818.347.3333
                msincich@galipolaw.com
 7


 8   FOR THE DEFENDANTS:

 9              LOS ANGELES CITY ATTORNEY'S OFFICE
                BY: CHRISTIAN R. BOJORQUEZ, ESQ.
10              Deputy City Attorney
                200 N. Main Street, 6th Floor, City Hall East
11              Los Angeles, California 90012
                213.978.7023
12              christian.bojorquez@lacity.org
                         --oOo--
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 6

1      A.    Uh-huh.

2      Q.    Do you understand that I have -- an entitled to

3    your best estimate from your best recollection?

4      A.    Yes.  And I'll do my best as well to give you a

5    general answer, the best that I could.

6      Q.    Yeah.  What we really want to do is make sure

7    that you aren't guessing about anything.  And I'll

8    define a "guess" as maybe trying to draw a logical

9    conclusion about something that you don't have direct

10   information about.

11     A.    Uh-huh.

12     Q.    Whereas an estimate, it's not going to be

13   precisely accurate -- that's why it's an estimate -- but

14   it's based off of your firsthand knowledge being on a

15   scene and experiencing an event.

16     A.    Okay.

17     Q.    Okay.  Is there any reason why you wouldn't be

18   able to give your best testimony today?

19     A.    No, there's no reason.

20     Q.    Okay.  Do you understand you're here to discuss

21   the officer-involved shooting of Mr. De Anda?

22     A.    Yes, I'm aware.

23     Q.    Okay.  Do you recall the time of the incident?

24     A.    Yes.  It was, I believe, at 8:35 p.m.

25     Q.    Okay.  And do you recall the date?

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 7

1    A.    Yes.   September 13th, 2023.

2    Q.    Did you use force during the incident?

3    A.    Yes, I did.

4    Q.    What type of force did you use?

5    A.    I used deadly force.

6    Q.    When you used deadly force, is that from

7    shooting rounds from your firearm?

8    A.    Yes, I did shoot rounds from my firearm.

9    Q.    What type of firearm were you using?

10    A.    I had my department-issued Smith & Wesson 9.

11    Q.    And when you say "9," do you mean the caliber,

12    9 millimeter?

13    A.    Yes, I'm sorry.   9 millimeter.

14    Q.    How many rounds did you fire during the

15    incident?

16    A.    I fired approximately three rounds.

17          (Reporter clarification.)

18    BY MR. SINCICH:

19    Q.    And I didn't mention that earlier, but because

20    we have a court reporter taking everything down, it's

21    important for us not to talk over each other and to

22    speak loud enough for our court reporter to understand

23    what we're saying.   Okay?

24    A.    Uh-huh.

25    Q.    And I know that in normal conversations,

M.B. vs CITY OF LOS ANGELES, ET AL.
Kassandra Rodriguez on 02/07/2025

Page 8

1  sometimes we say kind of that response of a "uh-huh" or

2  "huh-uh," for responding.  But if you could give an

3  either "yes" or "no" when you're responding in the

4  affirmative or negative, so that way it's very clear for

5  the record.  Okay?

6      A.   Yes, I got it.

7      Q.   Okay.  And at the end of the deposition, you'll

8  have an opportunity, after the transcript is complete,

9  to be able to review and to make any changes to your

10  responses that you believe are necessary.

11           And I caution you that if you make any

12  substantive responses to your -- to your -- excuse me --

13  any substantive changes to your responses, that that

14  could be used against you later on?

15      A.   Okay.  I understand.

16      Q.   Okay.  So you fired three rounds?

17      A.   Yes, I fired three rounds.

18      Q.   Where were you aiming when you fired those

19  three rounds?

20      A.   I was aiming at the center body mass.

21      Q.   For all three rounds?

22      A.   Yes, sir.

23      Q.   And for center body mass, is that the chest,

24  kind of torso area?

25      A.   It's the chest, yes, in between -- yeah, I

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 9

1    guess the abdomen.

2        Q.    Okay.  And did you intentionally pull the

3    trigger each time you fired?

4        A.    Yes, I did.

5        Q.    Did you intend that your shots strike Mr.

6    De Anda?

7        A.    I was hoping to, yes, to stop the threat.

8        Q.    Okay.  And "to stop the threat," the assumption

9    was that if your shot struck him, that that would stop

10   the threat; is that what you're referring to?

11       A.    Yes, that's what I was referring to.

12       Q.    Did you assess in between rounds?

13       A.    I did, as best as I could.  It happened so

14   quickly that it was a fragment of a second.

15       Q.    Were you trained to assess in between rounds?

16       A.    Yes, we were trained.

17       Q.    What's the training on assessing in between

18   rounds?

19       A.    We -- we assess to see if the threat is still

20   there.  But, you know, according to our sights and if

21   the threat it is obviously still there, we're going to,

22   you know -- our whole intent is to stop that -- stop the

23   threat.  So I did assess, yes.

24       Q.    What were the type of things that you were

25   looking for in this situation, when you were assessing

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 10

1  in between rounds?

2      A.    If De Anda had dropped the knife.

3      Q.    Okay.

4      A.    And if he would stop advancing towards me.

5      Q.    So you were paying attention to whether he had

6  the knife in his hand?

7      A.    Yes.

8      Q.    Were you paying attention as to how he was

9  holding the knife, like the position of it?

10      A.    Yes.  He was actually holding it -- maybe like

11  head/eye level.

12      Q.    And is that what you were looking for when you

13  were assessing, is if it was still there?

14      A.    Quickly, like how I said it was -- it happened

15  so fast, within seconds.  But, yes, I did identify that

16  he was still armed with the weapon while advancing

17  towards me.

18      Q.    And so is that another thing that you were

19  looking out for in your assessment is whether he was

20  still moving?

21      A.    If he was advancing towards me, running at me?

22  Yes.

23      Q.    And so you said "running."  Is the speed of his

24  movement important to your analysis?

25      A.    It is important.  Because, you know, someone

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

 1   armed with a knife advancing towards me, it could close

 2   distance, which in this case, he did, very quickly.

 3       Q.   Would it be fair to say that if a person wasn't

 4   closing the distance quickly, that that would change

 5   your analysis?

 6       A.   I mean, if he would have complied and dropped

 7   the knife, then that would have changed this whole

 8   situation.

 9       Q.   Right.  What if a person has a knife and then

10   runs towards officers and stops, but then doesn't

11   advance quickly after that, would that change the

12   analysis?

13       A.   Well, in this case --

14           MR. BOJORQUEZ:  I'm going to make an

15   objection -- oh, sorry.  I'm just going to make an

16   objection.  I think it's an incomplete, improper

17   hypothetical.

18           But with that being said, you can go ahead and

19   answer.

20           THE WITNESS:  So, like how I said or I was

21   saying, is in this case, De Anda did advance towards me

22   and he did stop, which is -- at that moment, I did not

23   fire my firearm.  And once he -- I gave him commands to

24   drop the knife, he wasn't willing to comply, and that's

25   when he chose and ran towards me, and that's when I fired

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 12

1  my first round.

2  BY MR. SINCICH:

3      Q.   Okay.  How far was Mr. De Anda from you when he

4  stopped?

5      A.   I want to say approximately, maybe, 25 feet.

6      Q.   And then you said that he then moved in your

7  direction from that position until you fired your first

8  shot?

9      A.   Yes.  So he had stopped right there at the 25

10  feet and we made direct eye contact, and that's when he

11  chose to advance towards me.

12      Q.   How long was he stopped for?

13      A.   Maybe a second, a fragment of a second.

14      Q.   And then how long was it from the time that he

15  started moving again until you fired your first shot?

16      A.   Yeah, less -- the same.  A second or a fragment

17  of it.

18      Q.   So it was approximately less than a second to a

19  second that he was stopped?

20      A.   Yes.

21      Q.   And then he started moving and it was less than

22  a second to a second before you fired your first round?

23      A.   Yes.

24      Q.   How long was it in between your first and

25  second round?

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 14

1    low ready because I saw that, the threat of him

2    advancing towards me to -- whether he tried to stab me

3    or kill me, he had stopped.

4         Q.    You mentioned commands.  What commands did you

5    give him prior to your use of force?

6         A.    I yelled to "Drop the knife" when he had stood

7    still when he ran towards me.

8         Q.    Did you give him any other commands?

9         A.    No.  Just those.

10        Q.    Did you give him a warning that if he didn't

11   drop the knife, that you would use deadly force?

12        A.    I would have if I had time, but he didn't allow

13   me to have that time.  And we're, you know -- we're --

14   we would do so if it's feasible, but at that moment it

15   was not feasible for me to be able to tell him that.

16        Q.    How long were you on scene prior to your use of

17   force?

18        A.    I want to say -- I don't -- you know, when I --

19   reviewed my body-worn, I didn't really time stamp it,

20   but I want to say I was maybe at scene, maybe four or

21   five minutes.

22        Q.    Were there other officers there when you

23   arrived?

24        A.    I just knew Officer Morse and Officer Mayen

25   were trying to communicate with Mr. De Anda.

M.B. vs CITY OF LOS ANGELES, ET AL.
Kassandra Rodriguez on 02/07/2025

Page 15

1     Q.    Did you have a partner in your vehicle?

2     A.    Yes, I did.

3     Q.    Were you the driver?

4     A.    Yes, I was the driver.  And my partner, Officer

5   Hernandez, was the passenger.

6     Q.    Okay.  In the four to five minutes that you

7   were on scene, prior to the use of force, did you hear

8   anybody give a deadly force warning?

9     A.    I did not.  I had -- it was loud and at a

10   distance.  I had heard no communication -- or I couldn't

11   read out words, I guess you could say.

12     Q.    What about in the 30 seconds prior to your use

13   of force, did you hear anybody give a deadly force

14   warning?

15     A.    Again, De Anda didn't allow us that time.  But

16   from what I heard and observed, I didn't hear anything

17   like that.  And I think, you know, him armed with a

18   knife, I think, like, a rational person wouldn't -- how

19   do I say this?  A rational person doesn't need to be

20   told that when they're running at a -- with a knife

21   towards an officer.

22     Q.    Did you consider that he might not be in his

23   right mind at the time?

24     A.    Again, I -- I -- I didn't have communication

25   with him at all.  I was just there for -- to back up my

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 16

1    other officers.  I did know that he was obviously

2    dangerous if he was armed with a knife, but as far as

3    any sort of, you know -- if he was mentally ill, I had

4    no -- I was not aware of that at all.

5         Q.   Did you consider that to be a possibility?

6         A.   I mean, I -- I -- again, I didn't really have

7    time to evaluate him or have any dialogue at all.  I did

8    see him pacing back and forth with officers, I guess,

9    while trying to communicate.

10        Q.   Is it fair to say that he was acting erratic

11   during the incident?

12        A.   He was acting erratic.  It seemed like whatever

13   conversation was going on with those other officers and

14   him, he didn't seem to be complying with what, I guess,

15   they were asking.

16        Q.   Did it appear, based on your observations, that

17   he was acting irrationally?

18        A.   Again, I -- I was there just a few minutes.  I

19   was more solely focused that he -- that this man was a

20   danger to myself and the public because he was armed

21   with a knife and not complying with officers.

22        Q.   Have you ever been in an OIS before?

23        A.   No.  I -- I have never been.

24        Q.   Are you currently still an officer with the

25   LAPD?

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 18

```
 1      Q.   Was that your first assignment was patrol?

 2      A.   Yes, patrolling.  Yes.

 3      Q.   When did you graduate the academy?

 4      A.   I graduated April of 2020.

 5      Q.   Did you learn from the POST learning domains in

 6   the academy?

 7      A.   Yes.  Every officer has to be POST certified

 8   and go through that training.

 9      Q.   Are officers also expected to know what their

10   department policies are?

11      A.   Yes.  We're trained in that as well, with

12   policies, as far as our directives and what the police

13   officer standard training provides us.

14      Q.   How long after the incident did you shift to a

15   different assignment from patrol?

16      A.   Let's see.  A year and a -- like, maybe a year.

17      Q.   Okay.  And was there a different assignment in

18   between your current one and patrol?

19      A.   No.  No.

20      Q.   Okay.

21      A.   I came -- I went straight to patrol -- or I

22   came from patrol to my current assignment.

23      Q.   Did you have any other jobs prior to going to

24   the academy?

25      A.   Yes, I did.  I worked at the gym at 24 Hour
```

M.B. vs CITY OF LOS ANGELES, ET AL.
Kassandra Rodriguez on 02/07/2025

Page 19

1   Fitness, and I worked at Disneyland.

2        Q.   During your time in law enforcement, other than

3   this incident, had you experienced a person who was

4   armed with a knife?

5        A.   Yes, I have.  I've gone to many radio calls.

6        Q.   How many times?

7        A.   I can't give you an approximate answer.  I've

8   been on the job for five years.  It's -- there's been

9   numerous times.

10       Q.   And when you say "numerous," do you mean dozens

11   or hundreds?  Can you --

12       A.   I mean, again, like, I've -- I've been

13   patrolling for five years.  I would say yes, maybe a

14   hundred or more.

15       Q.   Out of the hundred or more times that you had

16   an experience with a subject with a knife in their hand,

17   is it fair to say that you didn't use deadly force

18   against them?

19       A.   No, because usually the individuals will comply

20   with us, you know, we're able to de-escalate, and

21   they're willingly, you know, able to follow our

22   commands.  So that's, you know -- my ideal goal is to be

23   able to talk this person into handcuffs and they're safe

24   and I'm safe.

25            So, yeah, I could probably say that all those

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

1   situations were successful.

2       Q.   Is it fair to say that if the subject has a

3   knife in the hand, that fact alone, it wouldn't justify

4   the use of deadly force?

5       A.   Well, that person having a knife, I mean, they

6   dictate what the outcome is.  I mean, we could -- we

7   have tools to de-escalate, as far as just verbal.  We --

8   we have other tools as far as our less lethal.

9           But again, with that person having that knife,

10  they -- I think the reasonable person knows not to run

11  at a police officer with a knife.

12      Q.   Do you have training in encountering people who

13  may not be acting reasonably?

14      A.   What are you referring to, exactly?

15      Q.   I'm just asking.  I'm not referring to anything

16  in particular.

17      A.   I mean, we have -- we go through our mental

18  evaluation for mental illness, if -- if that's what...

19      Q.   Do you have training -- did you have that

20  training prior to this incident?

21      A.   Yes.  I have had mental illness training with

22  or our MEU unit and training on how to de-escalate

23  situations, as well.

24      Q.   When you had training regarding mental illness

25  with MEU, was that a course that you went through?

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 21

```
1        A.    Yes.  We go through a week long of working with

2    that unit or, I guess, them, you know, training us on

3    different scenarios, I guess, just getting us educated

4    as far as the different mental illnesses that are out

5    there that we would come across.

6              (Reporter clarification.)

7              THE WITNESS:  MEU.

8  BY MR. SINCICH:

9        Q.    And what does "MEU" stand for?

10       A.    "Mental Evaluation Unit."

11       Q.    During that one-week course, were you trained

12   on any kind of tactical considerations that you should

13   be aware of?

14       A.    We -- we do, yes.  But again, usually, that --

15   that all falls on -- I mean, every situation that we

16   come across is different and every individual we come

17   across is different.  And they dictate on how we react

18   with the -- the mental -- when it comes to mental

19   illness.

20       Q.    What are some of the tactical considerations

21   did you receive in training with regard to persons

22   potentially suffering a mental illness?

23       A.    Just that, you know, they -- they might not be

24   in the -- I guess, you know -- I wouldn't say the right

25   state of mind, but, I mean, it's an illness that, you
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 22

1    know, sometimes that they -- they -- they can't overcome

2    within themselves, I guess.

3          So I guess for us, our -- our best, you know,

4    thing is to try to verbally and try to de-escalate and

5    try to talk to them and calm them down so we could get

6    compliance on whatever it is, you know.  We want to help

7    them, so I always try to do my best to talk to them as

8    best as possible and see what kind of help that they

9    need.

10   Q.   When you say "That they can't overcome within

11   themselves," what do you mean by that?

12   A.   I mean, for example, like, there's, like,

13   schizophrenia as a mental illness; correct?  This person

14   is just hearing voices and they're over here trying to,

15   I guess, fight against that and do the right thing.  So

16   I guess that -- I'm sure that could conflict with that

17   person's decisions and thought processing.

18   Q.   Based on that training, is it fair to say that

19   sometimes a person doesn't have complete control over

20   their actions?

21   A.   I think it depends on the individual for --

22   when it comes to illness.  They could choose to get the

23   help that they need and maybe try to overcome that.

24   Q.   All right.

25   A.   Or I guess just make themselves healthy as best

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 23

1  as they could.

2      Q.   Right.  Sometimes people go undiagnosed with

3  mental health illnesses; is that fair?

4      A.   Yeah.  I mean, I think that could be fair to

5  somebody if they could be in denial or just maybe

6  something that they're unaware of.

7      Q.   Did you consider that it's possible that Mr.

8  De Anda fell under that circumstances during this

9  incident?

10         MR. BOJORQUEZ:  Objection.  Lacks foundation.

11  Calls for speculation.

12  BY MR. SINCICH:

13      Q.   And I didn't say it in the kind of ground

14  rules, but your counsel might give an objection.  And

15  unless like he did earlier where he instructed you not

16  to answer, after the objection, you can respond to the

17  question.

18      A.   Okay.  Sorry.  Could you repeat the question?

19         MR. SINCICH:  Could you repeat that for us,

20  please?

21         THE CERTIFIED STENOGRAPHER:  Yes, one moment.

22         (Record read.)

23         THE WITNESS:  At the time, I -- I wouldn't have

24  any knowledge of that.  So at the time I didn't think so,

25  because I -- I had -- I wasn't able to evaluate him.  I

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 24

 1   had no dialogue or anything to communicate with him.  So

 2   at the time, I wouldn't say so.

 3   BY MR. SINCICH:

 4       Q.   In the four or five minutes that you were on

 5   scene, did you hear Mr. De Anda say anything?

 6       A.   I did not, no.  I -- I didn't hear him.  I saw

 7   officers trying to communicate with him, but I did not

 8   hear anything being said.

 9       Q.   In the four to five minutes that you were on

10   scene, prior to your use of force, did anybody

11   communicate an update of information about Mr. De Anda

12   to you?

13       A.   All I could hear is Officer Morse over -- over

14   there, just setting up containment.  They said that --

15   they gave his clothing description and that he was still

16   armed with the knife.  And when I got to the scene, I

17   visually saw that as well.

18       Q.   When you first got to the scene, what did you

19   do?

20       A.   When I first got there, I -- my partner and I,

21   we -- we saw the police vehicle, which belonged to

22   Officer Mayen and Morris, that was parked where the

23   radio call was at, at the church.  I saw a group of

24   bystanders right there ask me -- and I asked them where

25   the officers were and where Mr. De Anda was.  And that's

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 25

1  when one of them had pointed towards the northern

2  direction, and that's when I saw the officers mid-block.

3            And that's when I -- I saw from -- as I walked

4  closer, that's when I saw them trying to talk to Mr.

5  De Anda.  That was inside the gate of that empty parking

6  lot.

7       Q.   What was the distance from the original call

8  that you referenced to the location of where the OIS

9  occurred?

10      A.   It was kind of the -- because they were across

11  the street from each other, the location, I would say --

12  I'm not trying to guess.  I know we said that before.

13  But just maybe an estimate of maybe 200 feet or less, I

14  would say, from the church to that -- the apron of the

15  parking lot, or so.

16      Q.   Okay.  Did you have any less lethal options on

17  your person?

18      A.   On myself, I had my OC spray and I had my

19  Taser.

20      Q.   Did have any less lethal options in your

21  vehicle?

22      A.   Yes, we had a 40-millimeter.

23      Q.   Anything else?

24      A.   No.

25      Q.   Did you have a shield in your vehicle?

M.B. vs CITY OF LOS ANGELES, ET AL.
Kassandra Rodriguez on 02/07/2025

Page 26

1    A.   I don't recall having a shield.  Yeah, I --
2    I -- I don't remember.

3    Q.   Were you wearing a ballistic vest?

4    A.   Yes, I was wearing my ballistic vest.

5    Q.   And you had a body-worn camera on at the time?

6    A.   Yes, I had my body-worn.

7    Q.   Have you reviewed your body worn camera?

8    A.   Yes, I have.

9    Q.   When is the last time you reviewed it?

10   A.   I reviewed it maybe a few days ago.

11   Q.   And have you read your statement to FID?

12   A.   Yes, I have read my statement.

13   Q.   And when is the last time you read that?

14   A.   I read my statement yesterday.

15   Q.   Did you review anything else in preparation for
16   this deposition?

17   A.   Just my directives from the department.  I,
18   yes, read over my transcript and my -- my FID interview
19   and my body-worn.

20   Q.   Who did you consider to be the supervisor on
21   scene during the incident?

22   A.   Who did I consider?  There -- because at the
23   time of the incident, there was no supervisor at scene.
24   But as far as incident commander was Officer Morse.

25   Q.   Okay.  Did you rely on Officer Morse to create

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 27

1   a plan for the incident?

2       A.   I wouldn't say rely.  But, yes, it seemed like

3   he did have a plan.  I mean, I feel like all of us

4   officers, we come into situations where we -- we try to

5   have a plan.  But our -- with our job, we need to adapt

6   to change, depending on the individual.

7           So it seemed like he did have a good plan as

8   far as requesting a backup and getting resources there,

9   as far as myself being a resource for him, as a backup

10  officer, and to contain the -- you know, the suspect and

11  hopefully, like how I said, will comply to drop the

12  knife, because that's our ideal goal at the end of the

13  day.

14      Q.   Was there anything else that was your

15  understanding of the plan once you arrived?

16      A.   Officer Morse -- I mean, as far as -- yeah,

17  that's -- that's usually how -- I mean, I feel like

18  every officer, our ideal plan is to contain the

19  situation and the individual, and we're hoping that they

20  could comply and we get them into handcuffs and we get

21  them whatever, you know, resources or help that they

22  need, or if -- you know, if they committed a crime, then

23  we have to arrest them.

24      Q.   Did you achieve containment during this

25  incident?

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 28

```
 1      A.   I would say that our -- our containment, yes,
 2  was -- at least on my end, I had containment, yes.
 3      Q.   Besides you as backup, were any other
 4  additional resources requested, to your knowledge?
 5      A.   We -- well, they requested an airship.  It took
 6  a while for airship to come, but they eventually came.
 7      Q.   How long is "a while"?
 8      A.   If I was there maybe or four or five minutes at
 9  scene, I want to say they -- they got there around --
10  right before the incident happened of the OIS.
11           (Simultaneous speakers.)
12  BY MR. SINCICH:
13      Q.   I'm sorry.
14      A.   Sorry.  Go ahead.
15      Q.   Go ahead.  I want you to finish.  I just didn't
16  know that you had something else.
17      A.   Yeah.  So I want to say they arrived maybe a
18  minute before the actual OIS.  So on my time -- like, I
19  would say my estimated time stamp of my body-worn would
20  be, like, at the four- or five-minute mark.
21      Q.   Okay.  Based on your experience, how quickly
22  does an airship typically respond?
23      A.   It -- I guess you could say every situation
24  radio call is different, especially with them, as well.
25  They're busy.  They have the whole, you know, LAPD.
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

1      I'm sure they section it off the way that they

2   do, but it just literally depends on them.  If there's

3   another -- you know, if there's a help call, I'm sure

4   they're going to take that into priority than another

5   general radio call.

6      Q.   Do you know if the Smart or MEU team was ever

7   contacted?

8      A.   I -- at the time, I had no knowledge or I

9   wasn't sure at all.

10     Q.   Okay.  Did you know whether or not any officers

11   wanted a Smart or MEU team to be contacted?

12     A.   At that time, I -- like how I said, I was

13   just -- I don't want to be like, I was just kind of

14   there, but I didn't -- I didn't hear anything being said

15   as far as that, because I wasn't right there with the

16   primary officers or had contact with Mr. De Anda.

17     Q.   After you left the church area, did you go over

18   to where the parking lot was?

19     A.   Yes, I did.  I walked over there on foot.  I

20   had my partner move our black-and-white vehicle towards

21   that direction.

22     Q.   Why did you have your partner move the vehicle?

23     A.   Because initially when we got to the scene --

24   it's off of Pico and New Hampshire.  So I had my -- I

25   parked my black-and-white vehicle at the corner.  So

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 31

1    A.    It was -- it was parked on the street, facing

2    northbound on the east side.

3    Q.    Was it, like, right in front of the apron?

4    A.    No, it wasn't.

5    Q.    Where was it in relation to that apron?

6    A.    From what I recall, it was south of the apron.

7    Q.    Okay.  And so you had pulled it forward and

8    then turned it slightly to the right?

9    A.    To get to facing east, yes.

10    Q.    Okay.  And did you feel that that would make

11    the vehicle better to be utilized as cover?

12    A.    If needed, yes.  If needed.  And then that's

13    when I identified better cover.

14    Q.    Did you ever communicate with any of the other

15    officers that that gate was open?

16    A.    No, I did not, because I assumed that they knew

17    it was open.  I -- I just kind of got to the scene and

18    just kind of worked with what I had.

19    Q.    Did you consider moving the vehicle onto the

20    apron to block the gate?

21    A.    No, because tactically, I feel that's not safe.

22    Because if I would have moved it onto the apron, it

23    would have overpenetrated because it's a small or --

24    yeah -- it's a small area of the driveway and apron.

25         So for whatever reason, if we needed to -- if

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

1   Officer Mayen and Officer Morris needed to render aid or

2   help to me, it would be in the way of -- if I would have

3   moved it on the apron.

4        Q.   Was it possible to use the vehicle, for

5   instance, like, on the sidewalk, but not in the parking

6   lot, to help contain the parking lot?

7        A.   Again, it would have overpenetrated that --

8   that area right there, and we need that -- that could be

9   an officer safety issue.  That area needed to be open,

10  just in case if I needed help or even to -- if even

11  De Anda needed help, where we needed to render aid to

12  him in that parking lot and if my vehicle was right

13  there, it would have been blocking that entry.

14       Q.   Did any officer ever let you know that Mr.

15  De Anda was potentially suicidal?

16       A.   At that moment, I had -- I had no knowledge

17  that he was suicidal.

18       Q.   What was the information that you got from the

19  original call?

20       A.   It wasn't -- so, again, it wasn't my call.  I

21  just responded to an officer backup.  But I did hear

22  previously the call come out, or at least one of them,

23  that there was a man armed with a knife.

24       Q.   What was your understanding of what the crime

25  was that you were potentially responding to?

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 33

1      A.   From what I heard Officer Morse communicate

2   over the air when he was communicating to our airship

3   was a vandalism and -- yeah.

4      **Q.   Based on your training and experience, is**

5   **vandalism a violent crime?**

6      A.   Yes, it -- it can be.  It could be a

7   misdemeanor or a felony.  But...

8      **Q.   Vandalism, is that -- well, how would you**

9   **define "vandalism"?**

10      A.   I mean, it's somebody that's, you know,

11   recklessly, you know, destroying somebody's property or

12   their own property, you know, that doesn't belong to

13   them but is destroying it, and...

14      **Q.   So it's a destruction of property, not harm to**

15   **a person?**

16      A.   No -- so, yeah, I guess it's a property -- it's

17   a property crime.  You know, it is a property crime.

18   But if it's a felony and this person is committing this

19   crime, this person is showing aggression committing this

20   crime.

21      **Q.   What makes it a felony as opposed to a**

22   **misdemeanor, to your knowledge?**

23      A.   There's -- it just depends on how much property

24   and the value of -- of what's damaged.

25      **Q.   Do you know what that threshold is in terms of**

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 34

1    the value of the property?

2        A.   It's 450.

3        Q.   Did you have any information as to whether or

4    not he was suspected of causing more than $450 in

5    damage?

6        A.   Again, when I got to the -- the call, I had --

7    I didn't know much and I just knew that he was a

8    vandalism suspect, and he was armed with a really big

9    knife from what I visually observed.  But, no, I didn't

10   know the value at that moment.

11       Q.   So with regard to just what you were just

12   responding to, it could have been a misdemeanor

13   vandalism?

14       A.   I mean, it -- it -- it could have.  But I --

15   even if it was a misdemeanor or felony, he was still

16   armed with a knife, you know.  That wasn't really the

17   big issue.  It was just more that he had that huge knife

18   and he could have hurt me or somebody else.  So I think

19   even the vandalism, to be honest, is a little irrelevant

20   whether it's a misdemeanor or a felony.

21       Q.   Okay.  Did you ever see Mr. De Anda harm

22   anybody?

23       A.   I didn't see him harm anybody.  But, I mean,

24   that's why -- the whole reason why I was there and why I

25   had to use deadly force, because he made me to, because

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 35

1  I prevented that from happening to myself and to anyone

2  else behind me, which there was quite a few people from

3  the church.

4      Q.   Was there anybody -- well, you said the church

5  was about 200 feet away; right?

6      A.   I'm estimating, yes.  It was behind me.

7      Q.   Was there any other civilians that were --

8  other than the people at the church, did you see any

9  other civilians around?

10     A.   I didn't see anybody presently, but I knew he

11 definitely had access to the public, because of the

12 parking lot, there's apartments on the east side.

13         There's also -- I know to the north side

14 there's other -- there's residents there, as well.  And

15 then to the south side, there's a 76 gas station, at a

16 pretty busy intersection on Vermont and Pico where

17 there's always people coming and going.

18     Q.   Okay.  Before your use of force, did you have

19 any information that he had ever harmed a person?

20     A.   At that time, no, I didn't.  I -- I didn't have

21 any.

22     Q.   Did you have any information as to whether or

23 not he had a criminal history?

24     A.   No.  I never had any contact with him.  I

25 didn't have any knowledge of priors.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 36

1      Q.    Was there any update as to whether or not he

2    had a history of drug or alcohol use?

3      A.    Again, I don't know him.  I've never had an

4    encounter of him, and I had no knowledge, as well, as to

5    all that.

6      Q.    Did you have any specific information as to

7    whether or not he was under the influence of anything at

8    the time of the incident?

9      A.    I'm sorry.  Can you repeat that?

10      Q.    Did you have any specific information as to

11    whether or not he was under the influence of drugs or

12    alcohol at the time of the incident?

13      A.    At the time of the incident, no.  I had no

14    knowledge of -- of that at all.

15      Q.    Did you ever see Mr. De Anda slash or stab at

16    anybody with the knife?

17      A.    I mean, besides running at me with the knife

18    and being a violent threat to myself, I didn't observe

19    him.  And that's why, you know, I was forced to do what

20    I did, so I could prevent him from hurting somebody or

21    me.

22      Q.    Okay.  Do you believe that he was attempting to

23    stab you or slash at you with a knife?

24      A.    Yes.  So this day, I'll never forget the look

25    on his face running towards me with the knife.  And that

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 37

1   look on his face looked evil.  I feel like he wanted to

2   kill me.  And I don't even know this guy or had an

3   encounter with him.

4          But, yes, I personally felt that he wanted to

5   kill me or hurt me.

6      Q.   What was he doing that made you believe that he

7   was attempting to slash or stab at you?

8      A.   He had the knife in his hand, and it was an was

9   aggressive matter.  He had it, I believe like how I said

10  earlier, it was eye level to -- it was eye level around

11  maybe right by his ear, running towards me and advancing

12  towards me.

13         And I feel like any good human being wouldn't

14  do that towards any human or especially a police

15  officer.

16     Q.   Did you consider that he might not be in his

17  correct state of mind because he was running with a

18  knife in his hand?

19     A.   I mean, I think regardless if -- if he was or

20  wasn't, like, if he -- he wouldn't have done that to try

21  to aggressively run at somebody with a knife.  So, I

22  mean, that could have been, because I feel like a good

23  person wouldn't, you know, do that.

24     Q.   Did you ever see him swing the knife at you?

25     A.   I wouldn't say a swing.  He was just holding it

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 38

1  above his head, running at me.  And I think that, right

2  there, is enough that shows aggressiveness and intention

3  to cause harm.

4      Q.   Did he have the knife in that position next to

5  his head in an aggressive manner at the time of your

6  second shot?

7      A.   Yes.  From what I recall, he was still running

8  at me with that knife, in the same position.

9      Q.   And did he have the knife in that same position

10  up next to his head in an aggressive manner at the time

11  of your third shot?

12     A.   On that third shot is when I saw the threat had

13  stopped and he fell to the ground.  And he fell to the

14  ground with the knife still in his hand.

15     Q.   I'm not sure if I understand what you mean, "On

16  that third shot"?

17     A.   Yeah.  So after I fired my third round, he fell

18  to the ground with the knife in his hand.  So I believe

19  that shot is what stopped the threat and him advancing

20  with the knife towards me.

21     Q.   Do you believe that your third shot impacted

22  Mr. De Anda?

23     A.   I would like to think so, if that's what made

24  him stop advancing towards me, instead of him keep

25  coming directly at me.  Yes, I would like to think so.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 39

```
 1      Q.   And did he have -- at the time of the third
 2  shot, not afterwards, but at the time of the third shot,
 3  did he have the knife up by his ear in an aggressive
 4  manner?
 5      A.   Yes, he did.  He did -- he did still have it,
 6  or else if he didn't, I wouldn't have -- I wouldn't have
 7  shot to begin with.
 8      Q.   And how would you describe his movement while
 9  you were shooting?
10      A.   He was -- his movement, he was still charging,
11  advancing, running towards me, still with that knife.
12      Q.   So you would describe it as running?
13      A.   Yep, I would.
14      Q.   Was he running in your observations at full
15  speed?  Half speed?  Slow speed?  Anything like that?
16      A.   I mean, I don't -- I don't really know -- I
17  mean, I don't know him, so I don't know what his full
18  speed would be or his low speed.  But, I mean, in my
19  perspective and my observations, he was running at me
20  really quickly and fast and -- for things to happen in a
21  matter of second.
22      Q.   At the time of your first shot, was he in range
23  at that particular moment to strike anybody with a
24  knife?
25      A.   I'm sorry.  Can you repeat the question?
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 40

1      Q.   At the moment of your first shot, was Mr.

2   De Anda in range to strike somebody with the knife?

3      A.   I mean, yes, he could have.  He could have --

4   he could have quickly advanced towards me, which I would

5   be the first person to get stabbed with the knife, yes.

6      Q.   So in order to have -- actually use the knife

7   against anybody, he would have had to continue to

8   advance?

9      A.   Yeah.  He could have continued to advance, but

10  he also, too, could have jumped those walls to gain

11  access to other people.  But again, I felt that I was

12  the closest target to him, which is why he advanced

13  towards me.

14      Q.   Is it fair to say that you didn't know what was

15  going on in his mind at that time?

16      A.   I mean, I -- I -- again, I had no dialogue or

17  communication.  I didn't even know anything to -- as far

18  as his mental health or if he was under the influence of

19  narcotics.  So, I mean, I would -- I wouldn't say that I

20  know anything.

21         But I know that the -- that somebody in their

22  right mind wouldn't run at a police officer if they

23  didn't want to get hurt.

24      Q.   Do you believe that he wanted you to shoot at

25  him?

M.B. vs CITY OF LOS ANGELES, ET AL.
Kassandra Rodriguez on 02/07/2025

Page 42

1    Q.    So at the time of your first shot, if he didn't

2    advance any further, at the time of your first shot --

3    A.    Uh-huh.

4    Q.    -- was he in range to be able to use the knife

5    against anybody?

6    A.    I mean, back to what I -- I answered before,

7    this question.  He -- he quickly could have, yes, closed

8    that distance to -- to hurt somebody with the knife.

9         He could have easily complied if I asked him to

10   drop the knife, and that would have been a whole

11   different ball game and the OIS would have never

12   happened.

13   Q.    So what I'm wondering is, what was his distance

14   at the time of your first shot?

15   A.    I believe I -- I want to say I answered that

16   already.  I want to say it was, like, 25 feet.

17   Q.    And what was his distance at the time of your

18   second shot?

19   A.    When he advanced towards me, I would say he

20   closed in a little distance.  So I would want to say,

21   honestly, maybe like, 21, 23 feet.

22   Q.    And then what was his distance at the time of

23   your third shot?

24   A.    I would say, probably 19 feet, because that's

25   when he -- he stopped.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
Kassandra Rodriguez on 02/07/2025

Page 43

1    Q.   Okay.  Now, when you gave your statement to the

2    FID detectives, you gave them different distances; is

3    that fair?

4    A.   It could have been, yes, because back on that

5    transcript, I was really nervous.  And I didn't have,

6    you know -- I did do a walk-through, but I didn't know

7    the exact feet.  I just kind of estimated it at best as

8    I could at that time.

9    Q.   And I take it now you're not as nervous?

10   A.   No.  No.

11   Q.   And do you have any other information as to the

12   exact amount of feet?

13   A.   As far as the feet, no.

14   Q.   Did you ever go back to the scene after the

15   incident?

16   A.   Yes, I have.

17   Q.   Okay.  How many times?

18   A.   I mean, recently, like how my partner said

19   before, how we went this week.  I mean, I still

20   patrol -- or I used to patrol the area, so

21   unfortunately, I would have to pass by there.  But as

22   far as stopping at the scene, I do my best to avoid that

23   area, to be honest with you.

24   Q.   Were you listening in on the prior deposition?

25   A.   Yes, I was.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 44

1    Q.    Were you in the same room as Officer Mayen?

2    A.    No, I was not.

3    Q.    How were you listening in to the deposition?

4    A.    Through via Zoom.

5    Q.    I didn't see your name on the screen.  Maybe I

6    just didn't recognize it on there.

7    A.    Yeah, sorry.

8    Q.    We had announced that Detective Chang was on,

9    and I'm not sure that we announced that you were on on

10   the prior deposition.

11   A.    Oh, okay.

12   Q.    I wasn't specifically looking for it, but

13   either way.

14         And when did you go back to the scene?

15   A.    Recently.  Yeah, a few days ago.  What was the

16   date?  What's today's date?  On the 4th, I think.

17   Q.    All right.  And were measurements taken at the

18   scene when you went there on the 4th?

19   A.    Yes, with me and Officer Mayen and the other

20   officers that were involved, as well.

21   Q.    Okay.  Besides taking measurements, did you do

22   anything else?

23   A.    No, that was it.  I just observed it looks very

24   different in daylight because this incident did occur at

25   night.  So -- yeah, I was just, you know -- a different

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 45

 1   view.

 2          MR. SINCICH:  We've been doing about an hour.

 3   Let's give our court reporter a break.

 4            (Break taken.)

 5   BY MR. SINCICH:

 6     Q.   From your review of your statement to FID, what

 7   was the distance that you gave them for your first shot?

 8     A.   I don't remember.  Do -- do you recall what

 9   page that's on so that I could look back on the?

10     Q.   I might find it in a minute.  Do you recall

11   anything different than the measurements that you took

12   this week?

13     A.   To be quite honest with you, I'd -- I'd have to

14   see where it's at.  I don't -- I don't really remember,

15   and I don't want to guess, either.

16     Q.   Do you have your statement in front of you?

17     A.   Yeah, I do.  Do you know what page you're

18   referring to, sir?

19     Q.   Well, I only have Bates stamps on my copy.  Do

20   you have the Bates stamps on yours?

21     A.   No, just like regular page numbers.

22     Q.   What does the first page look like?  Does it

23   have the corrections?

24     A.   Yes.

25     Q.   And is the second page basically where it

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 48

1  BY MR. SINCICH:

2      Q.   Right.  Is that one of reasons why you used

3   deadly force in this incident, because you thought he

4   was at a close distance?

5      A.   Well --

6          MR. BOJORQUEZ:  One second.  Objection.

7   Completely misstates the witness's testimony.

8          THE WITNESS:  Yeah.  So that wasn't, you know,

9   the sole purpose why I used deadly force.  De Anda -- is

10  my camera moving?  Oh, I'm sorry.

11          MR. BOJORQUEZ:  It is.

12          THE WITNESS:  It is.

13          MR. BOJORQUEZ:  It was, yeah.

14          THE WITNESS:  Okay.

15          I'm sorry.  Can you repeat your question one

16  more time?

17          MR. SINCICH:  Could you do a read back, please?

18          THE CERTIFIED STENOGRAPHER:  Yes, one moment.

19          (Record read.)

20          THE WITNESS:  No, that wasn't the sole purpose

21  of why I used deadly force.  De Anda, he had a knife and

22  he closed that distance.  But, I mean, it was close.  But

23  he -- that -- he dictated that and he took that distance

24  from me.

25  BY MR. SINCICH:

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 49

1      Q.    Okay.  So one of the reasons was that he had a

2   knife; right?

3      A.    Yeah, of course.

4      Q.    And is one of the reasons also that you

5   believed he was at a close distance?

6      A.    I mean, whether he was at a close distance,

7   whether it was 12, 18 feet, 25 feet, I mean, it's --

8   it's still reasonable why, because he posed an imminent

9   threat to me.

10     Q.    Based on your training, is there a difference

11  between a person with a knife who's at a distance of 12

12  feet as opposed to a person at 25 feet?

13     A.    I'm sorry.  Can you repeat that?

14          MR. BOJORQUEZ:  Again, objection.  I think it's

15  an incomplete, improper hypothetical.  Lacks foundation.

16  Calls for speculation.

17          THE WITNESS:  So --

18  BY MR. SINICICH:

19     Q.    Did you understand the question?

20     A.    No. Can you repeat it, please?

21          MR. SINICICH:  Can I have a read back, please?

22          THE CERTIFIED STENOGRAPHER:  Yes, one moment.

23          (Record read.)

24          THE WITNESS:  I mean, regardless, though, he

25  was -- he was armed with the knife and his intentions

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 50

1  were -- he's posing an imminent threat of death to me,

2  other officers.  So he was still armed with that knife

3  and not -- he wasn't willingly trying to comply with us.

4  BY MR. SINCICH:

5      Q.   Based on your training, is there a difference

6  between a person with a knife at a distance of 12 feet

7  as opposed to 25 feet?

8      A.   I mean, again, I don't think the distance --

9  that distance doesn't really matter because it's -- it's

10 still a threat.

11     Q.   In order to use deadly force, based on your

12 training, does the threat have to be specifically of

13 death or serious bodily injury?

14     A.   I'm sorry.  Can you repeat that?

15     Q.   In order to use deadly force, based on your

16 training --

17     A.   Uh-huh.

18     Q.   -- is it fair to say that the threat has to

19 specifically be a threat of death or serious bodily

20 injury?

21     A.   Yes, yes.  He poses an imminent threat of

22 death.

23     Q.   Okay.  So it's not just any threat in order to

24 use deadly force.  It has to rise to the level of a

25 deadly force threat; is that fair?

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 51

```
 1      A.   Yes, that's correct.  And that's what he, you

 2  know -- he dictated that at that moment, unfortunately.

 3      Q.   So, for instance, if he was on the other side

 4  of the parking lot, he may still be a threat because he

 5  has a knife; right?

 6      A.   Yes, but it would have gave us time to, you

 7  know, maybe use other resources, like how I said

 8  de-escalate the situation would have been obviously

 9  ideal, but he didn't allow us to.

10      Q.   Right.  So although he might have been a

11  threat, he wasn't an imminent threat because of his

12  distance?

13      A.   At that time, since he was further on the east

14  side, it wasn't imminent at that time, until he chose to

15  run and enclose on me.  And that's when I needed -- you

16  know, my job was to -- to stop that imminent threat.

17      Q.   Did you receive any training as to whether or

18  not officers should estimate distance with regard to

19  persons armed with a knife, in order to determine the

20  imminence of their threatened?

21           MR. BOJORQUEZ:  Objection.  I think it assumes

22  facts not in evidence.

23           THE WITNESS:  I mean, I think regardless of,

24  like, how I said, of distance, he was still -- he was

25  still, like, armed.  And he was still -- he was still a
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 52

1  threat to me, and he wasn't willing to comply.  So I

2  think he, you know, made that decision, regardless of the

3  distance, because he -- he could have dropped that knife

4  and we could have, you know -- there wouldn't be the

5  situation.

6  BY MR. SINCICH:

7      Q.   So when in your mind, at the time of the

8  incident, did he move from being a threat to an imminent

9  deadly threat?

10     A.   When he ran at me.  When he was running towards

11  me with the knife.

12     Q.   So the whole time that he was running, or was

13  there a particular place in time?

14     A.   When he ran towards me and he stopped at what I

15  said was around 25 feet, yes, when he stopped initially.

16  So he had the chance to -- and he had the choice to drop

17  that knife, but he dictated me to -- to use deadly force

18  against him.

19     Q.   In your mind, was he an imminent threat of

20  death or serious bodily injury when he stopped at

21  approximately 25 feet away?

22     A.   When he stopped, no, because -- and that's why

23  I didn't fire until he advanced towards me and closed

24  that.

25     Q.   And you believed, at least at the time, that he

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 53

1    had closed the distance significant enough that you

2    estimated the distance to be the length of the table in

3    that room?

4         A.   Yes, at the time.  That's why I didn't give,

5    you know -- it seems fairly close to me.  And even at

6    that apron there's -- or how the driveway was set,

7    there's like a -- I guess you could say like a little --

8    not hill, but it did seem very, very close.

9         Q.   Okay.  Do you recall -- well, strike that.

10             When you fire, where were you on the apron, in

11   relation to the gate?

12        A.   I was maybe estimating, like, 3 feet away from

13   the gate.

14        Q.   And which part or direction were you 3 feet

15   away from?

16        A.   I'm sorry.  I'm not really understanding.  From

17   the gate?

18        Q.   Yeah, 3 feet away from the gate, in which

19   direction?

20        A.   Towards the west side.  So I was -- yeah.

21        Q.   Okay.  So you were on the sidewalk, about 3

22   feet away from the line that the gate would essentially

23   pass through?

24        A.   Yes, on the apron.

25        Q.   Okay.  And did you have cover at the time of

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 54

1    your use of force?

2        A.   So initially, yes, I had that dumpster.  There

3    was a dumpster located right there.  So I did use that

4    dumpster as cover.  And then I had to move, because when

5    De Anda was running at me, advancing towards me, I

6    needed to get a clear visual of -- of him.  And so

7    that's when I moved and I used my firearm as cover.

8        Q.   Could you have moved to the right side of the

9    gate where the brick wall was, to use that as cover?

10       A.   I mean, no.  I -- I didn't -- that wasn't

11   really a thought process to me, because I had a better

12   visual of him from the dumpster, from what I could see.

13   And his main focus was on -- on me.  He couldn't -- he

14   saw me right there.  Like how I said earlier, we -- he

15   looked at me, directly.

16       Q.   Did you ever receive any training with the LAPD

17   or in the academy on distance estimation?

18       A.   I mean, our training -- we, you know, we're

19   taught time, distance, and cover.  Yes, if that's what

20   you're asking.

21       Q.   The training for time, distance, and cover, is

22   to utilize distance as your -- to your advantage; is

23   that correct?

24       A.   Yes, but the suspect -- or who we're dealing

25   with, that individual dictates that, as well, because

1    they could take that away from us.  They could take away

2    that distance.  They could take away that time.

3        Q.    Right.  Is part of your training to attempt to

4    create distance and time?

5        A.    I mean, we try to.  But again, that individual

6    dictates that and could take away that -- that distance

7    and time.

8        Q.    How do you try to create distance and time,

9    based on your training?

10        A.    Well, I mean, in this situation, for example, I

11    mean, I created that distance by staying on that side of

12    the dumpster and the fence.  I'm not going to -- I'm not

13    going to go in the parking lot towards a man with a

14    knife.

15            So I'm already creating that distance when I

16    arrived at seen.  Just how all the other officers --

17    well, how Officer Morse and them, as well.  They weren't

18    going to, you know -- I -- I can't speak for them.  But

19    I'm saying myself, I'm not going to -- to go close to a

20    man with a knife.

21            So I think what -- what I did, I already

22    created that distance from where I was set up at.

23    Because he could have, you know -- even if I did have --

24    create as much distance as possible, he still had the

25    opportunities to -- to go anywhere in that parking lot.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 56

1    But I feel like he chose to go directly towards

2    me.  He could have -- how I mentioned earlier, he could

3    have went to the wall on the south side, towards the gas

4    station.  He could have went to the apartment and jumped

5    that wall.

6    And I noticed this because, I mean, I'm not

7    that tall, but I know that -- and those walls, as well,

8    they're maybe a little, like, smaller than me.  So I

9    think anybody could jump that.

10   Q.   Would it be unsafe to go inside the parking

11   lot?

12   A.   Yeah.  If he has a really large knife, I think

13   it would have been, obviously -- there was no need to go

14   towards him at that time, because we were there --

15   officers were there to try to de-escalate him, and

16   hopefully drop the knife.

17   Q.   Okay.  I'm going to refer you to what I have as

18   the PDF page 32, and Bates stamp 335 of your statement.

19   Can you see your statement?

20   A.   Now can I, yes.

21   Q.   Okay.  You say on the top here:  "He was

22   originally 20 to 25 yards and then he started closing

23   the distance."

24   Do you see that?

25   A.   Uh-huh.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 58

1      Q.   And so you had confirmed that he was jogging

2   towards you?

3      A.   Yes.

4           MR. BOJORQUEZ:  Objection.  I think it lacks

5   foundation.  Calls for speculation.  It's vague and

6   ambiguous as to time.

7           Just for the record, it's at whatever -- City

8   335 on that particular page, and what was being discussed

9   is what she's referring to.

10  BY MR. SINCICH:

11     Q.   Did we get a response to the question?

12     A.   What was your question on that?

13     Q.   I believe you already responded.  I didn't want

14   to have to ask again.

15          THE CERTIFIED STENOGRAPHER:  One moment.  I

16  believe she did.  Just a moment.

17          (Record read.)

18          THE WITNESS:  Yes.

19  BY MR. SINCICH:

20     Q.   And then in the context of him jogging towards

21   you, the detective asked if he said anything to you.

22   And you responded, "No"; is that correct?

23     A.   Yes, he did not say anything to me.

24     Q.   And then in that same context, the next

25   question is whether or not you saw any sort of facial

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 59

1    expressions.  And the question says -- and it's broken

2    up a little bit but --

3              (Simultaneous speakers.)

4         A.   Uh-huh.

5         Q.    -- from lines 14 to 20 the question was:

6    "Could you see any sort of facial expressions or --  is

7    this a possibility he do have been coming to you for --

8    to get -- for safety or to get help?"

9              And then because there was some back and

10    forth --

11        A.   Uh-huh.

12        Q.    -- your answer at first was, "I don't

13    remember."

14        A.   Uh-huh.

15        Q.   And then "No"; is that correct?

16              MR. BOJORQUEZ:  Well, again, objection.  I

17    think that's being read out -- I think -- it states:

18    "Okay.  As he's jogging towards you" -- at line 11 --

19    "did he say anything towards you?"

20              Officer Rodriguez, at line 13:  "No, not that I

21    recall."

22              Line 14, Detective Arteaga, which is

23    A-R-T-E-A-G-A, it states:  "Could you see any sort of

24    facial expressions or" --

25              At line 16, Officer Rodriguez:  "I don't

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 60

1  remember."

2          Line 17, Detective Arteaga:  "Is this a

3  possibility he could have been coming to you for -- to

4  get -- for safety or get help."

5          Line 20, Officer Rodriguez:  "No."

6          MR. SINCICH:  Thank you for reading that.

7          MR. BOJORQUEZ:  Well, Counsel, like I said, I'm

8  just trying to make sure that you're being honest and

9  fair.  And the way that you read it was not.  So I just

10  wanted to make sure we don't have any error on City 335

11  in a document that you're representing to the witness.

12  BY MR. SINCICH:

13      Q.   Officer Rodriguez?

14      A.   Yes, sir.

15      Q.   Did you see a facial expression when he was

16  jogging towards you?

17      A.   So, I know right here I said "I don't

18  remember."  Obviously, this was a big thing in my life

19  that I've never gone through.  But -- and how I had said

20  in the past that eye -- or what I said previously is the

21  eye contact that he made with me, it wasn't some sort of

22  eye -- facial expression, I guess.

23          But it was -- it was something I said that I

24  would never forget because the eye contact that he made

25  with me was just -- it was just -- it just seemed evil

M.B. vs CITY OF LOS ANGELES, ET AL.
Kassandra Rodriguez on 02/07/2025

Page 61

1    and aggressive, especially running at you with a knife.

2        Q.   Did you ever tell the detectives that he had an

3    evil look in his eyes?

4        A.   No, because I didn't, again -- I went through

5    something that was, you know -- my adrenalin was all

6    over.  And that was something, I guess, that -- that

7    popped up later on, my adrenalin had went down after

8    this interview.

9        Q.   Did you ever tell the detectives that he made

10   eye contact with you?

11       A.   They didn't ask me that.

12       Q.   Did you ever tell them that when you were

13   describing the incident?

14       A.   No.  I wasn't asked that, so I didn't -- I

15   didn't say that.

16       Q.   Were you asked to describe why you used deadly

17   force?

18       A.   Yes, I did.  And that's when I told them how

19   the incident occurred.

20       Q.   Okay.  Do you recall telling the detectives

21   that his eyes were really big?

22       A.   Yes, I do.

23       Q.   And at that point in time, did you describe

24   whether or not he made eye contact with you?

25           MR. BOJORQUEZ:  I guess, vague and ambiguous.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

1  I don't understand the question.

2          THE WITNESS:  Yeah.  I'm not understanding

3  that, as well.  If you could rephrase that.

4  BY MR. SINICICH:

5      Q.   **When you described how you noticed his eyes**

6  **being big, did you also describe whether or not he made**

7  **eye contact with you?**

8      A.   I mean, if I did, could you show me where it

9  says that in the FID interview?

10     Q.   **I'm wondering if you recall saying that?**

11     A.   I don't recall and I don't want to guess,

12  either.  So if that's what it said, I'd prefer to look.

13     Q.   **Okay.  How long after the incident did you give**

14  **your statement?**

15     A.   Maybe four or five hours after.

16     Q.   **Is it fair to say that your memory of the**

17  **incident was better four or five hours after the**

18  **incident than it is today?**

19     A.   No.  Because like how I said before, going

20  through something like that and your adrenalin and your

21  thoughts of how things happened so quickly, it's very

22  hard to, I guess -- how do you say it?

23          I guess, during that moment was just hard for

24  me to, I guess, recall.  Like, I did -- I wasn't able to

25  see my body-worn and stuff, but now that I'm here and

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 63

1   time has passed, I was able to review my body-worn and

2   to review my transcripts.  And to, you know,

3   unfortunately, have this incident that I was put in real

4   life, you know, replay in my head, as well.  Not just my

5   body-worn.

6       Q.   Prior to giving your statement, were you able

7   to watch your body-worn camera video?

8       A.   During my FID interview, you're saying, or

9   prior to that?

10      Q.   Prior to the FID interview.

11      A.   Yes, I did.

12      Q.   And you went back to the scene?

13      A.   Yes, they had us go back to the scene.

14      Q.   And did you have an opportunity to talk to a

15   representative or attorney?

16      A.   I did, yes.

17      Q.   And did the detectives ask you if you were able

18   to continue with the interview?

19      A.   Yes.

20      Q.   And did you say yes?

21      A.   Yes, I did.  But I guess, like how I said now,

22   now it's better because I was able to review my

23   body-worn and to recall everything that, you know, had

24   happened.

25      Q.   Did you ever go to supervisors and let them

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 64

```
 1    know that you recall additional information?

 2       A.   No, I never went to any of that.

 3       Q.   In what hand did you see the knife?

 4       A.   So that was one thing I saw on my transcript.

 5    I said that I saw it in his left.  But after reviewing

 6    my body-worn and seeing that, it was his right hand.

 7       Q.   Is there anything else in your transcript that

 8    you want to point out --

 9       A.   No.  That would be my only correction, that

10    I -- yes, I definitely did see that mistake on my end.

11       Q.   Okay.  I'm going to mark as Exhibit 7.  It's

12    three pages.

13            (Exhibit Number 7 was marked.)

14    BY MR. SINCICH:

15       Q.   And the first page is City 1162.

16            Is this a photograph of you after the incident?

17       A.   Yes, that's me after the incident.

18       Q.   The second page is 1163.

19            Is that a photograph of you, as well, full

20    body?

21       A.   Yes.  That's a picture of me, full body.

22       Q.   And is this the uniform you were wearing at the

23    time of the incident?

24       A.   Yes, that is the uniform.

25       Q.   I can't really tell from the quality of the
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 65

1   photograph, but are you right-handed?

2        A.   Yes, I'm right-handed.

3        Q.   So is your pistol on your right hip?

4        A.   Yes.  That's correct.

5        Q.   What's on your left hip?

6        A.   It's my -- my rover.  And hanging down is my

7   Taser.  I have a drop-down holstered Taser.

8        Q.   And where do you keep your pepper spray?

9        A.   My pepper spray is behind my rover.

10       Q.   Did you have an understanding that a Taser can

11   cause neuromuscular incapacitation?

12       A.   It can if it's used correctly, and if that

13   person -- if it's effective to that person.  We have to

14   come into other things in play as far as narcotics, body

15   mass.  Yeah, I've seen it not work.

16       Q.   At the time of the incident, did you know how

17   to use it correctly?

18       A.   Yes.

19       Q.   And what is it about body mass that might make

20   a difference on its use?

21       A.   It just depends if they have, I guess, a larger

22   body mass, it might not work.  Their clothing, the

23   layers of clothing, you know.  There's people with thick

24   jackets, and layers of clothing, it might be

25   ineffective.

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 67

1    Q.   Okay.

2    A.   That's an estimate.  Yeah.

3    Q.   And what was your height at the time of the

4    incident?

5    A.   I am 5'2".

6    Q.   And what was your weight at the time of the

7    incident?

8    A.   I believe I was 140.

9    Q.   The Taser that you had, what was the maximum

10   effective range?

11   A.   So it's 0 to 21.

12   Q.   And the pepper spray is one of the common

13   causes based off of -- strike that.

14       The pepper spray that you had, are one of the

15   common effects of that pepper spray, a person closing

16   their eyes and not being able to see?

17   A.   For the pepper spray, it can be, yes, if used

18   correctly.

19   Q.   And do you know the maximum range of the pepper

20   spray that you had?

21   A.   It's -- it's 0 to 15.

22   Q.   And is that feet, as well?

23   A.   Oh, yes.  Feet.

24   Q.   Okay.  Page 3 of Exhibit 7 is City 1167.

25       Is that your firearm?

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 69

```
 1        A.    Yes, I see it.

 2        Q.    When you said you were 3 feet from the gate,

 3    were you saying that you were three feet to the west of

 4    that line?

 5        A.    Three feet.  Yes, that's what I was referring

 6    to.

 7              (Exhibit Number 8 was marked.)

 8              THE WITNESS:  Maybe 3 feet from the line and 3

 9    feet from that gate.

10    BY MR. SINCICH:

11        Q.    So 3 feet west and 3 feet south of the gate?

12        A.    Yes.  I would say, maybe in that general area.

13        Q.    Okay.  Page 2, the second page is City 1209.

14              Is this another view of that area?

15        A.    Yes.  That's the -- a different angle from it.

16        Q.    Now, your vehicle, how far was it parked --

17              (Zoom connection dropped.)

18              (Off the record.)

19    BY MR. SINCICH:

20        Q.    I think the question was:  How far was it

21    parked from the gutter area?

22        A.    Uh-huh.  Yes.

23        Q.    And then -- and you can just respond again.

24        A.    Okay.  I would say in that general area, 5 to 6

25    feet.
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 71

1  BY MR. SINCICH:

2     Q.   Can you see my screen?

3     A.   Not yet.  It's loading.

4          Oh, okay.

5     Q.   Okay.  And this is what purports to be

6  diagrams, presumably done by detectives of the incident

7  scene.  And there's two diagrams on this particular

8  page; is that fair?

9     A.   Yes, I see the two diagrams.

10    Q.   I'm going to zoom in, if I can, on the top

11 diagram.

12         The description says that:  "The diagram

13 depicts the officers' and De Anda's approximate

14 positions when Officer Rodriguez first fired."

15         Is that what that says?

16    A.   Yes.  That's what it says.

17    Q.   And based off of looking at the legend and what

18 was placed in this diagram produced by the City, does it

19 accurately reflect your position at the time you fired?

20    A.   In that general area, yes.  I could say that.

21    Q.   And did you know if Officer Mayen was to the

22 left of you at the time of your shots?

23         (Zoom connection dropped.)

24         (Off the record.)

25         THE WITNESS:  Again, my focus was -- was

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 72

```
 1  De Anda.  So as far as the shots, I -- I know he came
 2  there at some point.  At what point, I -- I -- I don't
 3  know.  I was more focused -- on him, on De Anda.
 4  BY MR. SINCICH:
 5      Q.   Did you know where your partner was at the time
 6  of your shots?
 7      A.   I did not, no.  The last I -- I do not know.  I
 8  didn't see him.
 9      Q.   Was your partner considered the less-lethal
10  officer in your pair?
11      A.   I directed him to grab the less lethal.
12      Q.   I'm going to mark as Exhibit 10, your video --
13  or a portion of your video.  This is City 967.  It's a
14  one-minute and two-second clip of your video.
15           (Exhibit Number 10 was marked.)
16           (Video being played.)
17  BY MR. SINCICH:
18      Q.   Okay.  I don't see you because now my
19  perspective changed, but now I can see you.  Okay.
20           I'm going to press play and then stop and ask
21  you if you recognize this is your video?
22      A.   Yes, sir.
23           (Video is being played.)
24  BY MR. SINCICH:
25      Q.   A moment ago, did you hear yourself tell your
```

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 74

1  BY MR. SINCICH:

2      Q.   At about 41 seconds, did you see that you

3  started to move to your right?

4      A.   Yes.  I went towards the south, or I went

5  southbound, yes.

6      Q.   Why did you move south?

7      A.   I needed to see a better visual of De Anda.  I

8  saw that he was running towards me, but if I would have

9  stood at that same position, I wouldn't have visibly

10  seen him.  So I needed to reposition to visually see him

11  armed with that knife advancing towards me.

12      Q.   When you say advancing towards you, do you mean

13  advancing towards this opening in the gate?

14      A.   Advancing towards the gate, yes.

15      Q.   Okay.  And before, you were to the north and he

16  was running towards the opening of the gate; right?

17      A.   He was running towards my direction where he

18  saw officers and our black-and-white vehicle with the

19  spotlight, yes.

20      Q.   So before you started moving south, did you see

21  him running towards the opening of the gate?

22      A.   He was still, I believe, like, you know, 25

23  feet away, but in that general of the south side area,

24  yes.

25      Q.   Okay.  And then after you saw him running

**M.B. vs CITY OF LOS ANGELES, ET AL.**
**Kassandra Rodriguez on 02/07/2025**

Page 75

1    towards the gate, that's when you started moving to the

2    south?

3         A.   Yes, to get a visual of him.

4         Q.   Okay.

5              (Video is being played.)

6    BY MR. SINCICH:

7         Q.   I stopped at 45 seconds.

8         A.   Uh-huh.

9         Q.   Is that about the time that he had stopped

10   running?

11        A.   About this time or maybe a few seconds after.

12        Q.   Okay.

13             (Video is being played.)

14   BY MR. SINCICH:

15        Q.   Okay.  And that was the end of the video.

16             Does that reflect the shooting incident from

17   your officer worn camera -- body-worn camera?

18        A.   Yes.  That does show the incident of what

19   happened.

20             MR. SINCICH:  Okay.  All right.  I have no

21   further questions at this time.

22             Counsel, do you have anything?

23             MR. BOJORQUEZ:  Nothing from the City.

24             THE CERTIFIED STENOGRAPHER:  Same orders,

25   Counsel?

M.B. vs CITY OF LOS ANGELES, ET AL.
Kassandra Rodriguez on 02/07/2025

Page 77

 1  STATE OF CALIFORNIA)
                      ) ss:
 2  COUNTY OF ALAMEDA  )

 3

            I, KIMBERLY E. D'URSO, do hereby certify:
 4

 5          That the witness named in the foregoing

 6  deposition was present remotely and duly sworn to testify

 7  to the truth in the within-entitled action on the day and

 8  date and at the time and place therein specified;

 9          That the testimony of said witness was reported

10  by me in shorthand and was thereafter transcribed through

11  computer-aided transcription;

12          That the foregoing constitutes a full, true and

13  correct transcript of said deposition and of the

14  proceedings which took place;

15          Further, that if the foregoing pertains to the

16  original transcript of a deposition in a federal case,

17  before completion of the proceedings, review of the

18  transcript [ ] was [ ] was not requested.

19          That I am a certified stenographic reporter and

20  a disinterested person to the said action;

21          IN WITNESS WHEREOF, I have hereunder subscribed

22  my hand this 21st day of February, 2025.

23  _____

24  KIMBERLY D'URSO, CSR NO. 11372, RPR

25