# EXHIBIT P

**ABRIDGED SUMMARY OF CATEGORICAL USE OF FORCE INCIDENT AND FINDINGS BY THE LOS ANGELES BOARD OF POLICE COMMISSIONERS**

**OFFICER-INVOLVED SHOOTING – 048-23**

| Division | Date | Duty-On ( ) Off (X)  Uniform-Yes ( ) No(X) |
|---|---|---|
| Olympic | 09/13/23 | |

| Officer(s) Involved in Use of Force | Length of Service |
|---|---|
| Officer B | 1 years, 3 months |
| Officer E | 3 years, 10 months |

**Reason for Police Contact**

On Wednesday, September 13, 2023, Olympic Patrol Division uniformed officers responded to a radio call of a man armed with a knife.  Upon arrival, the officers were directed to the subject.  The subject entered a gated parking lot and armed him/herself with a large kitchen knife.  The officers ordered the subject to drop the knife multiple times, but he did not comply.  The subject ran toward the officers while holding the knife, resulting in an Officer-Involved Shooting (OIS).

| Subject | Deceased (X)   Wounded ( )    Non-Hit ( ) |
|---|---|
| Male: 35 years of age. | |

**Board of Police Commissioners' Review**

This/her is a brief summary designed only to enumerate salient points regarding this categorical use of force (CUOF) incident and does not reflect the entirety of the extensive investigation by the Los Angeles Police Department (Department) or the deliberations by the Board of Police Commissioners (BOPC).  In evaluating this matter, the BOPC considered the following:  the complete Force Investigation Division (FID) investigation (including all of the transcribed statements of witnesses, pertinent subject criminal his/hertory, and addenda items); the relevant Training Evaluation and Management System materials of the involved officers; the Use of Force Review Board (UOFRB) recommendations, including any Minority Opinions; the report and recommendations of the BOPC of Police (BOPC); and the report and recommendations of the Office of the Inspector General.  The Department Command staff presented the matter to the BOPC and made itself available for any inquiries by the BOPC.

The following incident was adjudicated by the BOPC on September 3, 2024.

1

**Incident Summary**

On September 13, 2023, at approximately 1814 hours, Communications Division (CD) Emergency Board Operators (EBO) received several 911 calls reporting the subject robbing, stealing, vandalizing and making threats to citizens within a relative geographical area.  At least one of the callers reported that the Subject was armed with a knife and 'edged weapon' protocol was initiated by CD.  Several patrol units responded as did two supervisors.  The Subject was ultimately located in a large, fenced in, unoccupied parking lot.

At approximately 2022 hours, Olympic Patrol Division uniformed Sergeant A, advised CD that he/she would be responding. The sergeant did not activate the vehicle's emergency equipment and responded Code-Two to the location.

At 2023:30 hours, Olympic Patrol Division uniformed Police Officers A and B advised CD that they would be backing.

The officers did not activate the vehicle's emergency equipment and responded Code-Two to the location.

As they responded, Officer A removed the 40mm LLL from the vehicle's gun rack, obtained an impact round from the holder, and inserted it into the chamber. Officer A said he/she pointed the 40mm LLL toward his/her feet in a safe direction as he/she loaded the round.

At 2027:58 hours, Officer A broadcast that they were Code-Six.  Officer A's BWV captured him/her discussing tactics by advising Officer B of the strategic parking of the police vehicle and available cover.

Officer B parked the police vehicle along the west curb.  Officers A and B exited their police vehicle and walked north.  Officer A was equipped with a 40mm LLL.

Officer A approached a group of citizens, including Witness A, who were standing near the church driveway.  Witness A advised Officer A that the Subject was walking north.

Officers A and B began walking north on from the church parking lot driveway.  As they did so, Officer A broadcast for Officers B and C to respond south, hoping to contain the Subject in the area.  Officer A broadcast that the witnesses indicated the Subject was walking north on the east sidewalk.

As the officers walked north, Officer A's BWV captured the electronic sliding gate on the southern portion of a secured parking lot on the east side, which was closed.

At the time of this incident, the parking lot was located mid-block.  The western portion of the lot was secured by a fence approximately eight feet, one inch tall. The bottom portion of the fence consisted of concrete blocks, and the top portion had wrought iron.  The fence had two automatic sliding gates on the lot's north and south sides that opened remotely.

2

The parking lot measured approximately 230 feet north/south by 130 feet east/west and had four overhanging lights that were non-operational.

As the officers continued walking north, Officer B observed the Subject on the east side of the street, adjacent to the parking lot, and communicated his/her observations with Officer A.  Officer B then observed the Subject enter the parking lot through a gap in the fence line.

The investigation revealed that the northern portion of the wrought iron fence had approximately two pickets missing, causing a gap in the fence line.

As captured on BWV, the Subject began running south inside the lot.  As he did so, Officer B paralleled the Subject by walking south on the east sidewalk, followed by Officer A.

Officer A requested an Air-Unit and broadcast that the Subject was running south in the parking lot.  Officer B heard the Subject mumbling in Spanish; therefore, he/she transitioned from English to Spanish.  While positioned on the east sidewalk, Officer B told the Subject to stop and that he/she wanted to talk to him.  Officer B retrieved his/her flashlight then illuminated the Subject

At 2029:37 hours, Officer A's BWV captured the Subject bending down and arming himself with a large knife that he picked up from the pavement.  Officers A and B both indicated that they observed the Subject arm himself with the knife.

At 2029:40 hours, Officer A broadcast that they needed 'back up.'

Meanwhile, Officer B continued communicating with the Subject in Spanish by telling him that they wanted to converse and informed him that he was not in trouble.

In response to the backup broadcast, numerous Patrol Division and Olympic Area uniformed personnel responded, including Officers E and F.

According to Officer A, he/she had a good view of the parking lot from his/her position and was able to see the Subject through the gaps in the fence clearly.  Due to the height of the fence, Officer A believed the Subject was unable to get to him/her and his/her partner.

As they waited for additional resources to arrive, Officer B continued to verbalize with the Subject and give him commands.  As captured on BWV, Officer B ordered the Subject to put the knife down, but he did not comply.

According to Officer B, he/she could hear the Subject speaking; however, was unable to decipher what he said.  Officer B informed the Subject that he/she was having difficulty hearing him/her and requested that he move closer.  The Subject did not comply.  Officer A directed Officer B to continue verbalizing with the Subject.

3

According to Officer B, he/she attempted to establish a rapport with the Subject by asking his name and attempting to ascertain what was wrong.

At 2030:53 hours, Air-10, advised CD they were responding.

As captured on BWV, the Subject approached the eastern portion of the parking lot and began pacing. According to Officer A, the Subject was yelling, talking fast, and appeared agitated. The Subject's demeanor caused Officer A to believe that he was possibly experiencing "excited delirium."

Officer A knew there was a gas station south of the parking lot. Officer A feared that the Subject might try to jump over the southernmost wall and gain access to the gas station. Officer A was concerned that the Subject could harm individuals with the knife if he escaped containment.

At 2031:33 hours, Officers E and F arrived at the scene.

At approximately 2032 hours, Officers B and C broadcast that they were Code-Six and arrived at the scene.

Olympic Patrol Division uniformed Sergeant A advised CD that he/she would be responding to the backup request.

Meanwhile, Officers G and H arrived at the scene. Officer G drove north and parked his/her vehicle adjacent to Officers A and B. Officers G and H exited their police vehicle and approached Officers A and B. Officer A asked Officer G to drive around the area and ensure all the positions on the perimeter were covered. Officer G informed Officer A that the perimeter was already secure.

During the interview with FID investigators, Witness A indicated he opened the south gate with a key fob after Officers A and B arrived at the scene. According to Witness A, he opened the gate after seeing the Subject enter the parking lot. He intended to give Officers A and B access to the parking lot.

Officer A broadcast to CD and advised that the perimeter was set and the subject was contained within the parking lot. Officer A then asked if an Air Unit was en route. Air-10 broadcast that they would be at the scene in approximately 30 seconds.

At approximately 2033 hours, Officer B's BWV captured the Subject standing in the eastern portion of the parking lot as Officer B continued communicating with the Subject in Spanish. The Subject was captured saying in Spanish that he no longer wanted to live.

As captured on BWV, Officer G walked north along the fence line and verified that the sliding gate on the north side of the parking lot was secure. As Officer G was checking the fence, Officer A informed Officer H that the Subject was armed with a "big knife" and directed him/her to don protective gloves, which he/she did. Officer A then requested Officers G and H to cover the northern portion of the parking lot.

4

In the interim, Officers E and F exited their police vehicle and walked north. According to Officer E, he/she observed a police vehicle but did not see Officers A or B, which caused him/her concern. Officer E approached the group of citizens gathered outside the church parking lot and spoke with Witness A. Witness A advised Officer E that the Subject was inside the parking lot north of their location.

According to Officer E, he/she observed the Subject in the parking lot holding a "large object" in his left hand. Officer E wanted to utilize their police vehicle as cover; therefore, he/she directed Officer F to move their police vehicle further north. As Officer F was retrieving their vehicle, Officer E began walking in a northeasterly direction, toward the south entrance of the parking lot.

Officer E noted that there appeared to be two entrances into the parking lot: a north entrance and a south entrance. Officer E observed Officer A near the north entrance in "containment mode" and heard him/her establishing a perimeter over the radio. Officer E heard officers communicating with the Subject but was unable to decipher what was being said.

Officer F entered his/her police vehicle and moved it further north toward the south entrance of the parking lot. As Officer F was parking the vehicle, Officer E approached the front passenger side window. Officer E directed Officer F to the Subject's location and said they could use the police vehicle as cover. Officer F parked the vehicle facing in a northeasterly direction, toward the driveway.

According to Officer E, he/she did not like the positioning of their police vehicle and wanted it parked at more of an angle. Officer E repositioned their vehicle and parked at more of an angle, still facing in a northeasterly direction toward the driveway and activated the driver's side spotlight. Officer F then activated the front passenger spotlight. The police vehicle's headlights and spotlights illuminated the Subject as he paced on the east side of the lot. According to Officer F, the Subject was holding a knife in his right hand. As captured on BWV, Officer F stood behind their vehicle's front passenger side door.

After repositioning the police vehicle, Officer E exited the police vehicle and walked toward the southern entrance of the parking lot. According to Officer E, he/she saw a dumpster near the mouth of the driveway and decided to utilize it as cover.

As he/she neared the driveway, Officer E identified the object the Subject was holding as a "large knife."

As Officer E approached the south driveway, Officer F closed the passenger side door of his/her vehicle and joined Officer E.

Officer F informed Officer E that the Subject was against the wall. Officers E and F then unholstered their service pistols. Officer E held his/her flashlight in his/her left hand and briefly illuminated the Subject.

Officer E crossed the fence's threshold and walked a few feet into the parking lot. He/she positioned him/herself on the south side of the dumpster while Officer F stood to his/her right, but slightly off-set.

According to Officers A and B, they observed officers (Officers E and F) enter the south parking lot area. Officer A was worried that Officers E and F may be unaware that the Subject was inside that parking lot and told them not to enter the lot.

Following Officer A's broadcast, Officers E and F walked backward and exited the lot. They redeployed west of the gate and remained unholstered. Officer E looked in Officer B's direction and advised that they were behind cover.

According to Officer B, the Subject looked north and then began moving in that direction.

As Officer B was yelling commands to the Subject, Officers E and F walked in an easterly direction, toward the threshold of the gate and looked in the Subject's direction. Officers E and F then redeployed back to the east sidewalk, west of the dumpster.

At this time, Air-10 arrived overhead. As captured on BWV, the helicopter emitted loud noise as it orbited over the scene.

According to Officer B, the Subject began stabbing the wall located on the eastern portion of the parking lot with the knife. Officer B continued to verbalize with the Subject and asked what his name was. He told the Subject that he/she wanted to speak with him and asked him to place the knife on the ground. The Subject did not comply.

According to Officer B, he/she looked in a southerly direction and observed Officer E standing near the south entrance gate. Officer B then realized that the southern gate was open.

Meanwhile, Officer G discovered that the wrought iron fence on the north side of the parking lot had approximately two pickets missing, which would allow access to the lot.

Officer E directed Officer F to retrieve the 40mm LLL from their police vehicle, while Officer G directed Officer H to retrieve one from their vehicle.

Officer G directed Officer H to get a "40" (40mm LLL) from their police vehicle; however, on the night of this incident, they were only equipped with a beanbag shotgun. Therefore, he/she ran back to their police vehicle to retrieve the beanbag shotgun.

Officer F walked to his/her vehicle and holstered his/her service pistol. He/she then retrieved the 40mm LLL from the vehicle's gun rack, obtained an impact round from the holder, and inserted the round into the chamber.

At 2035:17 hours, Air-10 broadcast that they were at the scene, indicated the perimeter was established, and inquired about the type of crime that had been committed.

At this time, Officer F was still retrieving the 40mm LLL from their police vehicle.  As he/she did so, Officer E was positioned on the east sidewalk behind the wrought iron fence.  He/she was utilizing the dumpster as cover.

As Air-10 concluded its broadcast, the Subject began running southwesterly toward the south parking lot entrance.  Officer A was cognizant that Officers E and F were positioned near that location and that the Subject was "sprinting" toward them with the knife raised.

Officer B ran south on the east sidewalk, followed by Officer A.  According to Officer A, he/she was hoping to intercept the Subject and utilize the 40mm LLL.

As Officer B ran south, he/she ordered the Subject to stop and put the knife down.  The Subject did not comply with Officer B's commands and continued running with the knife.  Officer B secured his/her flashlight and unholstered his/her service pistol with his/her right hand.

As he/she jogged in a southerly direction, Officer B pointed the muzzle of his/her pistol in an easterly direction toward the Subject.  Officer B transitioned his/her pistol into a two-hand grip and yelled to the Subject, "No! Stop!"  Officer B then repeated his/her command for the Subject to drop the knife, but he did not comply.

Simultaneously, Officer E observed the Subject running toward her and closing the distance.  According to Officer E, he/she wanted to maintain a visual on the Subject and see the "distance of the threat."  As captured on BWV, Officer E redeployed in a southerly direction toward the south entrance of the parking lot.

Officer E stood in the middle of the driveway and pointed his/her pistol in a northeasterly direction toward the Subject and yelled, "Hey!"  The Subject stopped running and began sidestepping in a southerly direction while holding the knife in his right hand.  Officer E commanded the Subject to put the knife down multiple times in English, but he did not comply with his/her commands.

While still at the passenger door of his/her police vehicle, Officer F observed the Subject approaching Officers E and B with the knife.  According to Officer F, the Subject was holding the knife aggressively and in a "stabbing manner."  Officer F transitioned to his/her pistol instead of maintaining the 40mm LLL.

Officer F held his/her pistol in a two-hand shooting position with the muzzle pointed in a northeasterly direction toward the Subject.  Officer F ordered the Subject in English to stop and put the knife down, but he did not comply with the commands.

According to Officer F, to defend Officer E's life, he/she placed his/her index finger on the trigger with the intention of firing at the Subject.  Simultaneously, Officer E side-stepped in a northerly direction and within Officer F's line of fire.  Therefore, Officer F immediately lowered his/her pistol into a low-ready position and removed his/her index

7

finger from the trigger.  Officer F then redeployed and sought cover behind a wall on the south side of the driveway.

Simultaneously, Officer B arrived at the south gate entrance and positioned him/herself on the north side of the driveway to the left of Officer E.  Officer B continued to verbalize in Spanish and ordered the Subject to place the knife down, but he did not comply.

The Subject did not comply with the officers' commands.  Instead, he abruptly ran toward the south gate entrance with the knife in his right hand, where Officers F, B, and E were positioned.  Body Worn Video captured the Subject advance toward the officers.

According to Officer E, he/she was scared and perceived the Subject as a threat to him/herself, the other officers, and citizens.  Believing that the Subject was going to cause great bodily injury or death to him/herself and the other officers, Officer E fired one round at the Subject in an easterly direction from an approximate distance of 28 feet.  According to Officer E, he/she was aiming at the Subject's center body mass area.

Officer E assessed after firing his/her first round and determined that the Subject was still standing and armed with the knife.

Civilian video footage revealed that the Subject initially ran towards the officers at a full sprint.  According to Officer E's BWV, the Subject stopped running while approximately 30 feet away from the officers and began to scissor-step sideways to his left.  The Subject took approximately seven steps over the course of approximately four seconds.  Meanwhile, Officer E began to side-step to his/her left, back toward cover.  The Subject then resumed his advance toward officers, taking approximately one and a half steps or skips, before Officer E fired his/her first shot, followed immediately by Officer B's first shot.  The Subject began to collapse, with his momentum carrying him approximately 2-3 additional feet before completely collapsing.

Officer E fired two additional rounds at the Subject, also in an easterly direction, from an approximate decreasing distance of 25 to 23 feet.  Officer E stated that he/she stopped firing after his/her third round because the Subject went down and was no longer a threat.

Nearly simultaneously, Officer B believed the Subject was going to kill or seriously injure him/her or one of the other officers.

Officer B fired two rounds at the Subject in an easterly direction from an approximate decreasing distance of 25 to 23 feet.  According to Officer B, he/she was aiming at the Subject's center mass when he/she fired both rounds.

The Subject was struck by gunfire and fell onto the pavement.  He landed on his right side with his head facing in a southwesterly direction.  The Subject's knife landed on top of his body, in between his left bicep and chin.  The investigation determined that the Subject sustained a gunshot wound to his right eye.  He was transported to the hospital where he was declared deceased.

**BWV and Digital In-Car Video (DICV) Policy Compliance**

| NAME | TIMELY BWV ACTIVATION | FULL 2-MINUTE BUFFER | BWV RECORDING OF ENTIRE INCIDENT | TIMELY DICV ACTIVATION | DICV RECORDING OF ENTIRE INCIDENT |
|---|---|---|---|---|---|
| Sergeant A | No | Yes | Yes | Yes | Yes |
| Officer A | Yes | Yes | Yes | N/A | N/A |
| Officer B | Yes | Yes | Yes | N/A | N/A |
| Officer E | Yes | Yes | Yes | Yes | Yes |
| Officer F | Yes | Yes | Yes | Yes | Yes |

**Los Angeles Board of Police Commissioners' (BOPC) Findings**

The BOPC reviews each categorical use of force (CUOF) incident based upon the totality of the circumstances, namely all of the facts, evidence, statements and all other pertinent material relating to the particular incident.  In every case, the BOPC makes specific findings in three areas: tactics of the involved officer(s), drawing/exhibiting of a firearm by any involved officer(s), and the use of force by any involved officer(s).  Based on the BOPC's review of the instant case, the BOPC made the following findings:

**A. Tactics**

The BOPC found the tactics of Officers A, B, E and F to warrant a finding of Tactical Debrief.  The BOPC found Sergeant A's tactics to warrant a finding of Administrative Disapproval.

**B. Drawing and Exhibiting**

The BOPC found Officers B, E and F's drawing and exhibiting of a firearm to be In Policy.

**C. Lethal Use of Force**

The BOPC found Officer B and E's lethal use of force to be In Policy.

**Basis for Findings**

In making its decision in this matter, the Commission is mindful that every "use of force by members of law enforcement is a matter of critical concern both to the public and the law enforcement community.  It is recognized that some individuals will not comply with the law or submit to control unless compelled to do so by the use of force; therefore, law enforcement officers are sometimes called upon to use force in the performance of their duties.  The Los Angeles Police Department also recognizes that members of law enforcement derive their authority from the public and therefore must be ever mindful that they are not only the guardians, but also the servants of the public.

The Department's guiding principle when using force shall be reverence for human life. Officers shall attempt to control an incident by using time, distance, communications, and available resources in an effort to de-escalate the situation, whenever it is safe, feasible, and reasonable to do so.  As stated below, when warranted, Department personnel may use objectively reasonable force to carry out their duties.  Officers may use deadly force only when they reasonably believe, based on the totality of circumstances, that such force is necessary in defense of human life.  Officers who use unreasonable force degrade the confidence of the community we serve, expose the Department and fellow officers to physical hazards, violate the law and rights of individuals upon whom unreasonable force or unnecessary deadly force is used, and subject the Department and themselves to potential civil and criminal liability. Conversely, officers who fail to use force when warranted may endanger themselves, the community and fellow officers." (Special Order No. 23, 2020, Policy on the Use of Force - Revised.)

The Commission is cognizant of the legal framework that exists in evaluating use of force cases, including the United States Supreme Court decision in *Graham v. Connor*, 490 U.S. 386 (1989), stating that:

> "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation."

The Commission is further mindful that it must evaluate the actions in this case in accordance with existing Department policies.  Relevant to our review are Department policies that relate to the use of force:

**Use of De-Escalation Techniques:**  It is the policy of this Department that, whenever practicable, officers shall use techniques and tools consistent with Department de-escalation training to reduce the intensity of any encounter with a Subject and enable an officer to have additional options to mitigate the need to use a higher level of force while maintaining control of the situation.

**Verbal Warnings:**  Where feasible, a peace officer shall, prior to the use of any force, make reasonable efforts to identify themselves as a peace officer and to warn that force may be used, unless the officer has objectively reasonable grounds to believe that the person is already aware of those facts.

**Proportionality:**  Officers may only use a level of force that they reasonably believe is proportional to the seriousness of the Subjected offense or the reasonably perceived level of actual or threatened resistance.

**Fair and Unbiased Policing:**  Officers shall carry out their duties, including use of force, in a manner that is fair and unbiased.  Discriminatory conduct in the basis of race, religion, color, ethnicity, national origin, age, gender, gender identity, gender

expression, sexual orientation, housing status, or disability while performing any law enforcement activity is prohibited.

**Use of Force – Non-Deadly:**  It is the policy of the Department that personnel may use only that force which is "objectively reasonable" to:

- Defend themselves;
- Defend others;
- Effect an arrest or detention;
- Prevent escape; or,
- Overcome resistance.

**Factors Used to Determine Objective Reasonableness:**  Pursuant to the opinion issued by the United States Supreme Court in *Graham v. Connor*, the Department examines the reasonableness of any particular force used: a) from the perspective of a reasonable Los Angeles Police Officer with similar training and experience, in the same situation; and b) based on the facts and circumstances of each particular case.  Those factors may include, but are not limited to:

- The feasibility of using de-escalation tactics, crisis intervention or other alternatives to force;
- The seriousness of the crime or subjected offense;
- The level of threat or resistance presented by the subject;
- Whether the subject was posing an immediate threat to the officers or a danger to the community;
- The potential for injury to citizens, officers or subjects;
- The risk or apparent attempt by the subject to escape;
- The conduct of the subject being confronted (as reasonably perceived by the officer at the time);
- The amount of time and any changing circumstances during which the officer had to determine the type and amount of force that appeared to be reasonable;
- The availability of other resources;
- The training and experience of the officer;
- The proximity or access of weapons to the subject;
- Officer versus subject factors such as age, size, relative strength, skill level, injury/exhaustion and number of officers versus subjects;
- The environmental factors and/or other exigent circumstances; and,
- Whether a person is a member of a vulnerable population.

**Drawing or Exhibiting Firearms:**  Unnecessarily or prematurely drawing or exhibiting a firearm limits an officer's alternatives in controlling a situation, creates unnecessary anxiety on the part of citizens, and may result in an unwarranted or accidental discharge of the firearm.  Officers shall not draw or exhibit a firearm unless the circumstances surrounding the incident create a reasonable belief that it may be necessary to use the firearm.  When an officer has determined that the use of deadly force is not necessary, the officer shall, as soon as practicable, secure or holster the firearm.  Any drawing and exhibiting of a firearm shall conform with this policy on the use of firearms.  Moreover,

any intentional pointing of a firearm at a person by an officer shall be reported.  Such reporting will be published in the Department's year-end use of force report.

**Use of Force – Deadly:**  It is the policy of the Department that officers shall use deadly force upon another person only when the officer reasonably believes, based on the totality of circumstances, that such force is necessary for either of the following reasons:

- To defend against an imminent threat of death or serious bodily injury to the officer or another person; or,
- To apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended.

In determining whether deadly force is necessary, officers shall evaluate each situation in light of the particular circumstances of each case and shall use other available resources and techniques if reasonably safe and feasible.  Before discharging a firearm, officers shall consider their surroundings and potential risks to bystanders to the extent feasible under the circumstances.

> **Note:**  Because the application of deadly force is limited to the above scenarios, an officer shall not use deadly force against a person based on the danger that person poses to themselves, if an objectively reasonable officer would believe the person does not pose an imminent threat of death or serious bodily injury to the officer or another person.

**The Department's Evaluation of Deadly Force:**  The Department will analyze an officer's use of deadly force by evaluating the totality of the circumstances of each case consistent with the California Penal Code Section 835(a), as well as the factors articulated in *Graham v. Connor*.

**Rendering Aid:**  After any use of force, officers shall immediately request a rescue ambulance for any person injured.  In addition, officers shall promptly provide basic and emergency medical assistance to all members of the community, including victims, witnesses, subjects, Subjects, persons in custody, subjects of a use of force and fellow officers:
- To the extent of the officer's training and experience in first aid/CPR/AED; and
- To the level of equipment available to the officer at the time assistance is needed.

**Warning Shots:**  It is the policy of this Department that warning shots shall only be used in exceptional circumstances where it might reasonably be expected to avoid the need to use deadly force.  Generally, warning shots shall be directed in a manner that minimizes the risk of injury to innocent persons, ricochet dangers and property damage.

**Shooting at or From Moving Vehicles:**  It is the policy of this Department that firearms shall not be fired at a moving vehicle unless a person in the vehicle is immediately threatening the officer or another person with deadly force by means other than the vehicle.  The moving vehicle itself shall not presumptively constitute a threat that

justifies an officer's use of deadly force.  An officer threatened by an oncoming vehicle shall move out of its path instead of discharging a firearm at it or any of its occupants. Firearms shall not be fired from a moving vehicle, except in exigent circumstances and consistent with this policy regarding the use of Deadly Force.

> **Note:**  It is understood that the policy regarding firing a firearm at or from a moving vehicle may not cover every situation that may arise.  In all situations, officers are expected to act with intelligence and exercise sound judgement, attending to the spirit of this policy.  Any deviations from the provisions of this policy shall be examined rigorously on a case by case basis.  The involved officer must be able to clearly articulate the reasons for the use of deadly force.  Factors that may be considered include whether the officer's life or the lives of others were in immediate peril and there was no reasonable or apparent means of escape.

**Requirement to Report Potential Excessive Force:**  An officer who is present and observes another officer using force that the present and observing officer believes to be beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances based upon the totality of information actually known to the officer, shall report such force to a superior officer.

**Requirement to Intercede When Excessive Force is Observed:**  An officer shall intercede when present and observing another officer using force that is clearly beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances, taking into account the possibility that other officers may have additional information regarding the threat posed by a subject.

**Definitions**

**Deadly Force:**  Deadly force is defined as any use of force that creates a substantial risk of causing death or serious bodily injury, including but not limited to, the discharge of a firearm.

**Feasible:**  Feasible means reasonably capable of being done or carried out under the circumstances to successfully achieve the arrest or lawful objective without increasing risk to the officer or another person.

**Imminent:**  Pursuant to California Penal Code 835a(e)(2), "[A] threat of death or serious bodily injury is "imminent" when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to a peace officer or another person.  An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed."

**Necessary:**  In addition to California Penal Code 835(a), the Department shall evaluate whether deadly force was necessary by looking at: a) the totality of the circumstances from the perspective of a reasonable Los Angeles Police Officer with similar training and

13

experience; b) the factors used to evaluate whether force is objectively reasonable; c) an evaluation of whether the officer exhausted the available and feasible alternatives to deadly force; and d) whether a warning was feasible and/or given.

**Objectively Reasonable:** The legal standard used to determine the lawfulness of a use of force is based on the Fourth Amendment to the United States Constitution. See *Graham v. Connor*, 490 U.S. 386 (1989). *Graham* states, in part, "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain and rapidly evolving - about the amount of force that is necessary in a particular situation. The test of reasonableness is not capable of precise definition or mechanical application."

The force must be reasonable under the circumstances known to or reasonably believed by the officer at the time the force was used. Therefore, the Department examines all uses of force from an objective standard rather than a subjective standard.

**Serious Bodily Injury:** Pursuant to California Penal Code Section 243(f)(4) Serious Bodily Injury includes but is not limited to:

- Loss of consciousness;
- Concussion;
- Bone Fracture;
- Protracted loss or impairment of function of any bodily member or organ;
- A wound requiring extensive suturing; and,
- Serious disfigurement.

**Totality of the Circumstances:** All facts known to or reasonably perceived by the officer at the time, including the conduct of the officer and the subject leading up to the use of force.

**Vulnerable Population:** Vulnerable populations include, but are not limited to, children, elderly persons, people who are pregnant, and people with physical, mental, and developmental disabilities.

**Warning Shots:** The intentional discharge of a firearm off target not intended to hit a person, to warn others that deadly force is imminent.

## A. Tactics

### Tactical De-Escalation

Tactical de-escalation involves the use of techniques to reduce the intensity of an encounter with a subject and enable an officer to have additional options to gain voluntary compliance or mitigate the need to use a higher level of force while maintaining control of the situation.

14

*Tactical De-Escalation Techniques*

- ***P****lanning*
- ***A****ssessment*
- ***T****ime*
- ***R****edeployment and/or Containment*
- ***O****ther Resources*
- ***L****ines of Communication*
  *(Use of Force - Tactics Directive No. 16, October 2016, Tactical De-Escalation Techniques)*

Tactical de-escalation does not require that an officer compromise his/her/her/her or her safety or increase the risk of physical harm to the public.  De-escalation techniques should only be used when it is safe and prudent to do so.

**Planning –** According to Officer B, he/she and Officer A discussed contact, cover and less-lethal roles.  Officer B was designated as the contact officer and Officer A would be the intermediate force option.  Prior to arriving at the location, Officer A was familiar with the location and informed Officer B of the church and parking lot and directed him/her where to park to use the wall as cover.  Arriving at scene, Officer A deployed the 40mm LLL launcher as planned.

On the day of the incident, this was the first time Officers E and F worked together.  Officers E and F discussed contact and cover roles at the start of their shift.  While at scene, Officer E directed Officer F to reposition their police vehicle to have it available as cover if needed.

During containment, Officer A requested a 40mm LLL at each opening of the parking lot.  In response, Officer E directed Officer F to retrieve the 40mm LLL as he/she was positioned on the south gate with a lethal force option.  As Officer F retrieved the 40mm LLL, the Subject began running toward Officer E's direction.  Rather than remain in his/her role with the 40mm LLL, Officer F dropped the 40mm LLL and unholstered his/her service pistol.

The UOFRB assessed Officer F's decision to relinquish his/her 40mm LLL and transition to his/her service pistol.  The UOFRB noted the rapid advancement of the Subject toward Officer E and considered Officer F's articulation regarding this decision and his/her concern should Officer E's service pistol malfunction.   Officer E would have had limited options in which to defend him/herself against the knife the Subject had in his hand; therefore, the UOFRB found Officer F's decision to transition to his/her service pistol reasonable and not a deviation.

Based on the totality of the circumstances, the UOFRB determined, and the BOPC concurred, Officer F's decision to transition to his/her service pistol from the 40mm LLL was not a deviation from Department-approved tactical training.

**Assessment –** Arriving on scene, Officers A and B located the Subject in the parking lot.  Shortly after, Officers A and B observed the Subject retrieve a knife from the ground and Officer A requested a back-up.

After retrieving the 40mm LLL, Officer F observed the Subject running toward Officer E armed with a knife.  In an effort to protect Officer E from serious bodily injury or death, Officer F dropped the 40mm LLL, unholstered his/her service pistol, and came up on target with the intent to shoot the Subject.  However, as Officer F was on target with his/her service pistol, Officer E moved into Officer F's line of fire.  Officer F assessed Officer E's position and immediately came off target and sought cover.

**Time –** Officer A and B used the benefit of time to de-escalate the incident.  Officer A established containment, used cover and continued verbalization which provided them additional time to continue to employ de-escalation efforts.  Additional efforts were eclipsed when the Subject ran toward officers armed with a kitchen knife.

**Redeployment and/or Containment –** Arriving at scene, Officers A and B stood outside the parking lot where the Subject was located.  When the Subject armed himself with a knife, Officer A requested responding units establish containment.  Officers A and B maintained the perimeter as Officer B communicated with the Subject to gain compliance.

Officer E directed Officer F to reposition their police vehicle with the intent to have it available as cover if needed.

**Other Resources –** Upon locating the Subject in the parking lot, Officer A requested the air unit to respond.  After the Subject armed himself with a knife, Officer A requested a back-up.  After establishing containment, Officer A requested a 40mm LLL at each opening of the parking lot.

**Lines of Communication –** Officer B communicated with the Subject in English and Spanish to attempt to gain his compliance.  Officer B continued to verbalize with the Subject in Spanish throughout the incident leading up to the OIS.

Officer A called out "40, 40," to warn others he/she would deploy a less-lethal device to avoid contagious fire.  Officer A attempted to deploy the 40mm LLL but he/she could not use it due to the wrought iron fence that minimized his/her angle and line of sight.

During the review of the incident, the following debriefing points were noted:

**Debriefing Point No. 1: Code Six**

- Arriving at scene, Officers E and F did not broadcast they were Code Six, nor did they use the Mobile Digital Computer (MDC) to show themselves Code Six upon their arrival.  According to Officer F, he/she did not want to "tie up the air."

The UOFRB assessed Officers E and F's tactics as it pertained to not broadcasting their Code Six location.  The UOFRB noted Officers E and F's response from the station was short as the incident was a few blocks from the station and Officer A was actively using the radio to establish a perimeter.  The UOFRB noted the officers did not want to occupy the frequency as pertinent information was being broadcast.  The UOFRB considered the MDC was not used as the officers deployed from their police vehicle to contain the Subject at an open driveway where the Subject could exit, providing him/her access to pedestrians in the surrounding area.  Furthermore, with the airship overhead and being in line of sight of Officers A and B, the UOFRB opined Officers E and F's location was known in the event assistance was needed.  The UOFRB determined Officer E and F's decision not to broadcast their Code Six status or utilize the MDC upon arrival was a substantial deviation, with justification.

Based on the totality of the circumstances, the UOFRB determined, and the BOPC concurred, the tactics employed by Officers E and F were a substantial deviation, with justification, from Department-approved tactical training.

**Debriefing Point No. 2: Cover/Concealment**

- Prior to the OIS, Officer E was standing behind the wrought iron gate, using a dumpster for cover, and the police vehicle was parked on the street behind him/her.  When the Subject began running toward the south gate entrance, Officer E stepped toward the center area of the entrance gate and was without cover and concealment at the time of the OIS.

The UOFRB assessed Officer E's tactics as it pertained to his/her lack of cover at the time of the OIS.  The UOFRB noted prior to the OIS, Officer E kept his/her distance and used a dumpster for cover.  It was not until the Subject began charging toward his/her direction that Officer E sidestepped away from cover and stood in the middle of the south entrance gate.  The UOFRB opined had Officer E not repositioned, he/she would have lost his/her visual on the Subject as his/her view would have blocked by the dumpster putting him/her at a tactical disadvantage.  The UOFRB noted after repositioning and upon observing the Subject, Officer E began redeploying back toward cover.  As the Subject charged at an angle and side-stepped toward Officer E, the UOFRB noted Officer E's movements mirrored the Subject as he/she attempted to keep distance and utilize angles that afforded him/her a tactical advantage.  The UOFRB opined Officer E's decision to leave cover was necessary to observe and assess the Subject's location and movement and changed angles in response to the Subject's movements.  The UOFRB determined Officer E's decision to leave cover was not a deviation from Department-approved tactical training.

Based on the totality of the circumstances, the UOFRB determined, and the BOPC concurred, the tactics employed by Officer E were a not a deviation from Department approved tactical training.

**Debriefing Point No. 3: Basic Firearms Safety Rules**

- According to Officer F, to defend Officer E' life as the Subject charged toward him/her holding a knife, he/she placed his/her index finger on the trigger of his/her service pistol with the intention of firing at the Subject.  Simultaneously, Officer E side-stepped into Officer F's line of fire.  Therefore, Officer F immediately lowered his/her pistol into a low-ready position and removed his/her index finger from the trigger.

  The UOFRB assessed Officer F's tactics as it pertained to coming up on target and placing his/her finger on the trigger of his/her service pistol.  The investigation revealed Officer F observed what he/she believed to be an imminent threat of serious bodily injury when the Subject began charging at his/her partner while armed with a large knife.  The UOFRB noted Officer F assessed his/her sight picture while he/she was on target and identified Officer E had stepped into his/her line of fire.  As a result, Officer F lowered his/her service pistol and removed his/her finger off the trigger and sought cover.  The UOFRB determined Officer F properly assessed the situation, responded as trained and did not violate any of the basic firearms safety rules.  Furthermore, the UOFRB noted the distance from Officer F and the Subject.  The investigation determined at the time of the OIS, Officer E was approximately 28 feet away from the Subject and Officer F was approximately 10 to 15 feet behind Officer E when he/she identified the deadly threat.  The UOFRB considered the greater distance Officer F was from the Subject and opined the distance would take longer to assess and press the trigger.  The UOFRB determined Officer F properly assessed and did not deviate from Department-approved tactical training.

  Based on the totality of the circumstances, the UOFRB determined, and the BOPC concurred, the tactics employed by Officer F were a not a deviation from Department-approved tactical training.

During the review of this incident, the following Additional Debriefing Topics were noted:

- **Securing of 40mm Less-Lethal Launcher –** While Officer F was retrieving and loading the 40mm LLL, he/she observed the Subject approaching his/her partner while armed with a knife.  In deciding to transition to his/her service pistol, Officer F dropped the 40mm LLL on the roadway next to his/her police vehicle.

  **Personal Protective Equipment (PPE) –** Officer A did not don protective gloves prior to approaching and removing the knife from the Subject's possession.

**Command and Control**

- Prior to the OIS, there was no supervisor on scene and Officer A was the senior officer.  Officer A established command and control by setting up a perimeter, directing continued communication with the Subject and requesting intermediate force options.  Officer A continued exercising command and control by recognizing the Subject required medical attention after the OIS.  Officer A formed an arrest team and directed officers to don protective gloves to take the Subject into custody.

Officer A requested the response of a rescue ambulance (RA) and directed officers to cut the Subject's shirt to use to apply pressure to his wound.  Officer A separated him/herself and Officer F as they witnessed the OIS and notified a supervisor. Officer A instructed Officer F not to discuss the incident.

Sergeant B, from Olympic Patrol Division, arrived on scene after the OIS when the Subject was already in custody and assessed medical aid was already being rendered to the Subject.   Sergeant B declared him/herself as the incident commander (IC) and identified Officers B and E as the officers involved in the OIS. Sergeant B separated them and directed them to turn off their body worn video (BWV) cameras.  Sergeant B obtained a Public Safety Statement (PSS) from Officer E and directed Sergeant A to monitor and obtain a PSS to Officer B.

At 2022:13 hours, Sergeant A broadcast he/she was responding to the call. Approximately 16 minutes, 38 seconds elapsed from the time he/she broadcast he/she was responding until he/she arrived at the scene.  During his/her interview with FID investigators, Sergeant A indicated he/she had a delayed response because he/she was utilizing the restroom and was having MDC issues and needed to verify the address where he/she was going.  Sergeant A obtained a PSS from Officer B and transported him/her to Olympic Community Police Station (CPS) and continued to monitor him/her.

A detective relieved Sergeant B and assumed responsibility for monitoring Officer E and transported him/her to Olympic CPS.

Another sergeant separated and monitored Officers A and F and transported them to Olympic CPS.

The UOFRB assessed Officer A's actions as a senior officer at the scene of a critical incident.  The UOFRB commended the actions of Officer A and the leadership he/she displayed during the incident.  The UOFRB noted the command and control asserted by Officer A surpassed the expectations of an officer on scene during a critical incident and his/her exemplary handling of the incident would be used as a training tool for others.

The UOFRB assessed Sergeant A's actions as a supervisor responding to a radio call that met the criteria for edged weapon protocols and Code Two response.  The UOFRB considered although Sergeant A was not at scene prior to or during the OIS, his/her lack of urgency to respond to the location as it continued to escalate could have played a significant role in the outcome of the incident.  The investigation identified an approximate 16-minute delay in his/her response from Olympic CPS to the scene.  The UOFRB considered the requirement for a supervisor to immediately respond to radio calls involving edged weapons and to respond without delay to Code Two calls.  The UOFRB opined his/her lack of action and failure to assume supervisory oversight could have impacted the outcome of the incident, thereby necessitating he/she be evaluated as a substantially involved party in this incident.

The UOFRB determined when Sergeant A advised Communications Division (CD) he/she would be responding, he/she effectively asserted command and control and ownership of the incident.  Sergeant A's failure to respond in a timely manner after declaring his/her intention to assume a supervisory role substantially deviated from Department standards and expectations of a field supervisor.  In assessing the credibility of Sergeant A's explanation for failing to respond in a timely manner, the UOFRB noted Sergeant A had been assigned to Olympic Division for approximately one year, the distance from Olympic CPS to the OIS scene was only a couple blocks away and he/she could have been guided by the air unit already on scene when he/she began to respond.  The UOFRB deemed Sergeant A's reasons insufficient to form a reasonable justification for her deviation.  Furthermore, Sergeant A's advisement he/she would respond gave the impression to CD, the Olympic Watch Commander and Sergeant B, that he/she was responding to satisfy the requirement of the edged weapon protocols.  Had Sergeant A advised his/her response would be delayed, that would have alerted CD, the Olympic Watch Commander or another supervisor that a timelier supervisor response was still needed, consistent with the edged weapon protocols.  The UOFRB determined Sergeant A's delay, resulting in a failure to respond in a timely manner was a substantial deviation, without justification, from Department standards and expectations of a Department supervisor.

The UOFRB determined, and the BOPC concurred, the overall actions of Sergeant A were not consistent with Department training and the BOPC's expectations of supervisors during a critical incident.  Therefore, the BOPC found Sergeant A's actions to be a substantial deviation, without justification, from Department-approved tactical training requiring a finding of Administrative Disapproval for Tactics.

## B. Drawing/Exhibiting

### Officer E

- According to Officer E, when he/she took cover at the dumpster, he/she observed the Subject armed with "large" knife.  Although Officer E recognized the Subject was far away, he/she believed he/she could close the distance quickly.  Believing the situation could escalate to the use of deadly force, Officer E unholstered her service pistol.

### Officer B

- According to Officer B, he/she recognized the Subject was armed with a knife.  When Officer B observed the Subject raise his arm in a "stabbing motion" and close the distance, he/she secured his/her flashlight and unholstered his/her service pistol because he/she believed the situation could escalate to the use of deadly force.

### Officer F (1st occurrence)

- Arriving at scene, Officer F observed the Subject armed with a knife.  According to Officer F, he/she unholstered his/her service pistol because he/she believed the

situation could escalate to the use of deadly force and the knife could cause serious bodily injury.

**Officer F (2nd occurrence)**

After retrieving the 40mm LLL, Officer F observed the Subject running toward Officer E while armed with a knife.  In response, Officer F dropped the 40mm LLL and unholstered his/her service pistol with the intent to protect Officer E's life from serious bodily injury.

The UOFRB assessed Officers E, B and F's drawing and exhibiting of their service pistols.  The UOFRB noted Officers E and F unholstered their service pistols when they arrived on scene and observed the Subject armed with a knife.  The UOFRB noted although Officer E felt the Subject was far away, they considered her belief he could close the distance quickly and, as noted in BWV, the Subject was rapidly advancing.  As such, the UOFRB opined it was objectively reasonable to believe the situation could escalate to the use of deadly force when faced with an individual armed with a knife.

As it pertained to Officer F's second drawing and exhibiting and Officer B's drawing and exhibiting, the UOFRB noted at the time they unholstered their service pistols, the Subject began running toward officers' direction while armed with a large knife.  The UOFRB opined Officer F and B's drawing and exhibiting was objectively reasonable when faced with an individual running toward officers while armed with a knife.

Based on the totality of the circumstances, the UOFRB determined, and the BOPC concurred, an officer with similar training and experience as Officers E, B and F would reasonably believe there was a substantial risk the situation may escalate where deadly force could be justified.

Therefore, the BOPC found Officers E, B and F's Drawing/Exhibiting to be In-Policy.

**C. Lethal Use of Force**

- **Officer E –** Pistol, three rounds from an approximate decreasing distance of 28 feet to 23 feet in an easterly direction.

**Background –** According to Officer E, his/her background was clear and consisted of an empty parking lot at the time of the OIS.  Officer E did not observe any community members in the background.

While in the parking lot, the Subject began running toward Officer E while armed with a knife.  The Subject briefly paused as he approached Officer E and continued toward him/her direction while he sidestepped.  As the Subject continued to close the distance on Officer E and refused to listen to commands, Officer E discharged three rounds from his/her service pistol in the Subject's direction.  According to

Officer E, he/she was scared and shot three rounds to protect him/herself and his/her partner's life.

**Round One**

The Subject did not comply with the officers' commands to drop the knife. Instead, he abruptly ran toward the south gate entrance with the knife in his right hand where Officers F, B and E were positioned. According to Officer E, he/she was scared and perceived the Subject as a threat to him/herself, the other officers and community members. Believing the Subject was going to cause great bodily injury or death to him/herself and the other officers, Officer E fired one round at the Subject in an easterly direction from an approximate distance of 28 feet.

**Rounds Two and Three**

Officer E assessed after firing his/her first round and determined the Subject was still standing and armed with the knife. Officer E fired two additional rounds at the Subject, also in an easterly direction, from an approximate decreasing distance of 25 to 23 feet.

- **Officer B –** Pistol, two rounds from a decreasing distance of approximately 25 to 23 feet in an easterly direction.

**Background –** According to Officer B, his/her background was clear and consisted of an empty parking lot at the time of the OIS. Officer B did not observe any community members in the background.

When the Subject began running toward the south entrance where officers were positioned, Officer B ran south toward their direction. While armed with a knife, the Subject began to close the distance on Officer E. In response, Officer B discharged two rounds in the Subject's direction. According to Officer B, the Subject was closing the distance while holding the knife in his right hand in a "stabbing motion." Officer B assessed the Subject was closing the distance too quickly to utilize intermediate force options and believed the Subject posed a threat of serious bodily injury to the officers.

The UOFRB assessed the circumstances and evidence related to the use of deadly force. In their assessment of the OIS, the UOFRB considered Officer B's numerous attempts to convince the Subject to drop the knife. The UOFRB noted the Subject charged at officers while armed with a knife, dictating the officers' actions. The UOFRB further considered the distance the Subject had traveled in a short span of time and determined the Subject had rapidly closed the distance on the officers. The UOFRB opined the use of deadly force by Officers E and B to stop the deadly threat posed by the Subject was objectively reasonable, proportional and necessary.

Based on the totality of the circumstances, the UOFRB determined, and the BOPC concurred, an officer with similar training and experience as Officers E and B in the

same situation, would reasonably believe the use of lethal force was objectively reasonable, proportional and necessary.

Therefore, the BOPC found Officer E and B's use of Lethal Use of Force, all rounds, to be In Policy.