# EXHIBIT E

CONFIDENTIAL

**OFFICIAL INFORMATION**CONFIDENTIAL**EVIDENCE CODE SECTION 1040
INTRADEPARTMENTAL CORRESPONDENCE**

DATE:     August 26, 2024

TO:        Honorable Board of Police Commissioners

FROM:     Inspector General

SUBJECT:  OFFICER-INVOLVED SHOOTING 048-23 FOR 9/3/24 CLOSED-
          SESSION AGENDA.

| **Division** | **Date** | **Time** | **Duty-On (X) Off ( )  Uniform-Yes (X) No ( )** |
|---|---|---|---|
| Olympic | 9/13/23 | 8:35 p.m. | |

**Officer(s) Involved in Use of Force          Length of Service**

Artega Mayen, J./PO I                    1 years, 3 months
Rodriguez, K./PO II                       3 years, 10 months

**Total Involved Officer(s)**

1 x Sgt. I
1 x PO III
1 x PO II
2 x PO I

**Suspect                      Deceased (X)    Wounded ( )    Non-Hit ( )**

Carlos De Anda: Male Hispanic, 35 years.

**COP Recommendations**

**Tactics –** Tactical Debrief, Officers Morse, Artega Mayen, Rodriguez and Hernandez.
Administrative Disapproval, Sergeant Guerrero.
**Drawing/Exhibiting –** In Policy, No Further Action, Officers Artega Mayen, Rodriguez
and Hernandez.
**Lethal Use of Force –** In Policy, No Further Action, Officers Artega Mayen and
Rodriguez.

CONFIDENTIAL

CONFIDENTIAL

**IG Recommendations**

**Tactics –** Same as COP.
**Drawing/Exhibiting –** Same as COP.
**Lethal Use of Force –** Same as COP.

MB V. CITY OF LA
2:24cv07642SVW SSC

SUBJECT TO
PROTECTIVE ORDER

CONFIDENTIAL

2

CITY   001243

## Table of Contents

I.    Investigation

    i.    Annotated Force Investigation Division (FID) Incident Summary    p. 4

II.   Chief of Police Report

    i.    Chief of Police Findings    p. 44

    ii.   Chief of Police Analysis    p. 44

III.  Inspector General Review

    i.    Inspector General Analysis    p. 65

    ii.   Inspector General Recommendations    p. 66

3



**INVESTIGATION**

### Annotated Force Investigation Division (FID) Incident Summary[1]

**Synopsis:** On Wednesday, September 13, 2023, Olympic Patrol Division uniformed officers responded to a radio call of a man armed with a knife. Upon arrival, the officers were directed to the suspect. The suspect entered a gated parking lot and armed himself with a large kitchen knife. The officers ordered the suspect to drop the knife multiple times, but he did not comply. The suspect ran toward the officers while holding the knife, resulting in an Officer-Involved Shooting (OIS). The suspect was struck by gunfire and subsequently died from his injuries.

**Investigative Summary**

███████████████████████████████████████████████

At approximately 1820 hours, CD broadcast, *"Any Olympic Unit, 211 just occurred, 1133 South Vermont. Suspect is a male Hispanic, 30-35 years old, tall thin built, wearing a brown and white plaid shirt, orange shirt. Last seen running southbound Vermont toward Pico. Weapon was a knife. Property taken was PR's knife, Code-Two, Incident 3850, RD 2056."*

---

[1] The Incident Summary presented here is reproduced from FID's report regarding this case and is supplemented with annotations by the OIG. All OIG annotations are referenced as an "OIG Note." All other references and citations in the reproduced FID Incident Summary (e.g., Investigators' Notes or Addenda Items) are reproduced directly from FID's report. Hyperlinks to evidence included in FID's report have been removed here, as the links would not be active in this report; in some instances, the evidence accessible via the hyperlinks may have been inserted into this report by the OIG in place of the hyperlink itself. Unless otherwise stated, all information provided in OIG annotations is derived from FID's investigation of this incident.

███████████████████████████████████████████████

CITY   001245

At approximately 2008 hours, CD broadcast, *"Any Olympic Unit, 415 Man in the Korean Church parking lot across from 1235 South New Hampshire. Tall male, red shorts, has a possible edged weapon in his hand. Code-Two, Incident 4317, RD 2056."*

At approximately 2010 hours, CD received a 911 call from Witness Young Ho Ro, who requested a police response to 2531 West Pico Boulevard. Ro informed CD that he was at a Korean Church, and a male, later identified as De Anda, was inside the church parking lot. Ro indicated that the male was armed with a knife, vandalized a vehicle, and had thrown rocks at people.

At approximately 2013 hours, CD broadcast, *"Any Olympic Unit, 415 Man with a knife, 2531 West Pico, at the church parking lot. Male Hispanic transient, 20's, two-toned, dark blue upper white bottom, pink shorts, vandalizing vehicle's window, holding a knife, threw rocks at patrons. Code-Two, Incident 4334, RD 2056."*

At approximately 2021 hours, CD broadcast, *"20A1, 20A1, handle the 415 Man, at 1235 South New Hampshire, Code-Two, Incident 4317, RD 2056."* Olympic Patrol Division uniformed Police Officer III Jason Dollente, Serial No. 39437, driver, and Police Officer I Erick Ordaz, Serial No. 45124, passenger, Unit 20A1W3, acknowledged the call and broadcast they were responding from 3rd Street and Western Avenue.[9] [10]

Communications Division broadcast, *"20A1, it's going to be Code-Two. Are you Code Sam, Code 40 equipped?"* Officer Ordaz acknowledged they were equipped with a 40mm Less-Lethal Launcher (LLL). Communications Division then broadcast, *"Olympic supervisor to respond with 20A1 to an edged weapon call identify?"*

At approximately 2022 hours, Olympic Patrol Division uniformed Sergeant I Madai Guerrero, Serial No. 40361, Unit 20L30W3, advised CD that she would be responding. The sergeant did not activate the vehicle's emergency equipment and responded Code-Two to the location.

At approximately 2023 hours, CD broadcast, *"20A1 for your 415 Man on New Hampshire, we are holding a 415 man with a knife at 2531 West Pico with the cross street of 1200 South New Hampshire. Unknown if related to your stack. It's for a male Hispanic, wearing a two-toned, dark blue upper with white bottom top, and pink shorts, armed with a knife, possibly related. Can we add it to your stack?"* Officer Ordaz acknowledged the broadcast.

At 2023:30 hours, Olympic Patrol Division uniformed Police Officer III Matthew Morse, Serial No. 32297, passenger, and Police Officer I Jose Arteaga Mayen, Serial No.

---

[9] Force Investigation Division investigators did not interview Officers Dollente and Ordaz because they were not witnesses to the OIS and were not significantly involved in the incident.

[10] Per Google Maps, the distance from 3rd Street and Western Avenue to 1235 New Hampshire Avenue was approximately 2.5 miles.

6

45139, driver, Unit 20A53W3, advised CD that they were backing Officers Dollente and Ordaz.[11]

The officers did not activate the vehicle's emergency equipment and responded Code-Two to the location.

As they responded, Officer Morse removed the 40mm LLL from the vehicle's gun rack, obtained a 40mm eXact Impact round from the holder, and inserted it into the chamber. According to Officer Morse, *"My idea was if we pulled up and the suspect was there and immediately ran for the car, that would give me a chance to immediately deploy the less lethal and then I wouldn't have to go to lethal force and I -- you know, I'd be able to -- to subdue him that way if he just was right there in the street when we pulled up."*[12] Officer Morse said he pointed the 40mm LLL toward his feet in a safe direction as he loaded the round.

> **Note**: Officer Morse stated that this was the first day that he and Officer Arteaga Mayen had been assigned as partners. At the start of their watch, they discussed tactics regarding contact/cover responsibilities and their weapon systems.
>
> According to Officer Arteaga Mayen, he had worked with Officer Morse twice and had prior tactics discussions regarding contact/cover responsibilities, weapons carried on their persons, lethal/less-lethal options, and de-briefed radio calls.

At 2027:58 hours, Officer Morse broadcast that they were Code-Six.[13] Officer Morse's BWV captured him discussing tactics by advising Officer Arteaga Mayen of the strategic parking of the police vehicle and available cover.

At approximately 2028 hours, Officer Arteaga Mayen parked the police vehicle along the west curb of New Hampshire Avenue, north of Pico Boulevard. Officers Morse and

---

[11] **Officer Morse**, 50 years of age, 6 feet 3 inches tall, 220 pounds, 27 years, 10 months with the Department, equipped with a canister of OC spray, a TASER, a flashlight, two pairs of handcuffs, a side-handle baton, a Department-approved handgun, a BWV camera, a HRD, and a ballistic vest.

**Officer Arteaga Mayen**, 28 years of age, 5 feet 7 inches tall, 150 pounds, one year, three months with the Department, equipped with a canister of OC spray, a TASER, a flashlight, two pairs of handcuffs, a Department-approved handgun, a BWV camera, and a ballistic vest. Officer Arteaga Mayen had his side-handle baton and a HRD inside his police vehicle. Officers Morse and Arteaga Mayen were driving Shop No. 83469, a marked black and white police SUV equipped with ballistic door panels and a DICVS. The officers had a 40mm LLL stored within their police vehicle.

[12] Officer Morse's statement, Page 10, Lines 7-13.

[13] At 2027:49 hours, Officer Morse activated his BWV camera as they approached the scene.

7

Arteaga Mayen exited their police vehicle and walked north on New Hampshire Avenue.[14]  Officer Morse was equipped with a 40mm LLL.

Officer Morse approached a group of citizens, including Witness Ro, who were standing near the Korean Church driveway at 2531 West Pico Boulevard.  Ro advised Officer Morse that De Anda was walking north on New Hampshire Avenue.[15]

Officers Morse and Arteaga Mayen began walking north on New Hampshire Avenue from the Korean Church parking lot driveway.  As they did so, Officer Morse broadcast for Officers Dollente and Ordaz to respond south on New Hampshire Avenue, hoping to contain De Anda in the area.  Officer Morse broadcast that the witnesses indicated De Anda was walking north on New Hampshire Avenue on the east sidewalk.[16]

As the officers walked north, Officer Morse's BWV captured the electronic sliding gate on the southern portion of a secured parking lot on the east side of New Hampshire Avenue, which was closed.



**Screenshot from Officer Morse's BWV depicting the southern electronic gate closed.**

---

[14] At 2028:36 hours, Officer Arteaga Mayen activated his BWV camera.

[15] Gleaned from Officer Morse's BWV at 2028:40 hours.

[16] Gleaned from Officer Morse's BWV at 2028:48 hours.

8



**Satellite view depicting the parking lot and location
of the north/south electronic sliding gates.**

**Note**: At the time of this incident, the parking lot was located mid-block on New Hampshire Avenue, between Pico Boulevard and 12th Street. The western portion of the lot was secured by a fence approximately eight feet, one inch tall. The bottom portion of the fence consisted of concrete blocks, and the top portion had wrought iron. The fence had two automatic sliding gates on the lot's north and south sides that opened remotely.

The parking lot measured approximately 230 feet north/south by 130 feet east/west and had four overhanging lights that were non-operational. [17]

At approximately 2029 hours, in response to the information provided by Witness Cruz, CD broadcast, *"And I have another PR on the line related to New Hampshire. She said that the suspect just passed her house, 1235 South New Hampshire. He is wearing a white t-shirt and shorts on, Incident 4317."*

**Note:** The church parking lot was across from 1235 New Hampshire Avenue.

---

[17] During the interview with FID investigators, Ro indicated that the parking lot belonged to the Korean Church.

CITY   001250

As the officers continued walking north, Officer Arteaga Mayan observed De Anda on the east side of the street, adjacent to the parking lot, and communicated his observations with Officer Morse. Officer Arteaga Mayen then observed De Anda enter the parking lot through a gap in the fence line. Officer Arteaga Mayen yelled, *"Hey! Hey!"* but received no response from De Anda.

> **Note**: The investigation revealed that the northern portion of the wrought iron fence had approximately two pickets missing, causing a gap in the fence line.

As captured on BWV, De Anda began running south inside the lot. As he did so, Officer Arteaga Mayen paralleled De Anda by walking south on the east sidewalk, followed by Officer Morse.

At 2029:28 hours, Officer Morse requested an Air-Unit and broadcast that De Anda was running south in the parking lot. Officer Arteaga Mayen heard De Anda mumbling in Spanish; therefore, he transitioned from English to Spanish. While positioned on the east sidewalk, Officer Arteaga Mayen told De Anda to stop and that he wanted to talk to him. Officer Arteaga Mayen retrieved his flashlight with his right hand, transitioned it into his left hand, then illuminated De Anda

> **Note:** According to Witness Beatriz Garcia, she recalled officers giving commands to De Anda in English only. The investigation determined that most of the commands given to De Anda throughout this incident were given in Spanish by Officer Arteaga Mayen.

At 2029:37 hours, Officer Morse's BWV captured De Anda bending down and arming himself with a large knife that he picked up from the pavement. Officers Morse and Arteaga Mayen both indicated that they observed De Anda arm himself with the knife.

This space was intentionally left blank.

10



**Gleaned from Officer Morse's BWV.**

At 2029:40 hours, Officer Morse broadcast, *"53, we need a backup.  He re-armed himself with a knife."*  Officer Morse then broadcast, *"53, let's set up a containment perimeter.  So, I want a unit at Vermont and Pico; New Hampshire and Pico; Vermont and 12th; and New Hampshire and 10th…12th.  He is still walking around the parking lot still."*

> **Note:** Officer Morse described the knife as a *"really big"* kitchen knife.  He estimated the blade was approximately 10 to 12 inches long.  Officer Arteaga Mayen estimated the blade was approximately 10 inches long.

Meanwhile, Officer Arteaga Mayen continued communicating with De Anda in Spanish by apprising him that they wanted to converse and informed him that he was not in trouble.

In response to the backup broadcast, the following Olympic Patrol Division and Olympic Area uniformed personnel responded:

- Police Officer II David Shin, Serial No. 40577, driver, and Police Officer I Jocelyn Lutzker, Serial No. 45054, passenger, Unit 20A71W3;
- Police Officer III Maria Soto, Serial No. 37357, passenger, and Police Officer II Aesop Lee, Serial No. 42002, driver, Unit 20A34W7;
- Police Officers II Anna Welch, Serial No. 43669, driver, and Anel Cholico, Serial No. 44608, passenger, Unit 20A39W3;

11

- Police Officer III Brianna Terrance, Serial No. 42559, driver, and Police Officer II Cristopher Villegas, Serial No. 43157, passenger, Unit 20G22W7; and
- Police Officer II Kassandra Rodriguez, Serial No. 43023, driver, and Police Officer I Cristian Hernandez, Serial No. 45248, passenger, Unit 20A33W3.[18]

> **Note:** Officers Rodriguez and Hernandez indicated that this was the first day that they had been assigned as partners. At the start of their watch, they discussed tactics regarding contact/cover responsibilities and their weapon systems. Officers Rodriguez and Hernandez activated their BWV cameras at approximately 2030:42 hours. [19]

According to Officer Morse, he had a good view of the parking lot from his position and was able to see De Anda through the gaps in the fence clearly. Due to the height of the fence, Officer Morse believed De Anda was unable to get to him and his partner.

As they waited for additional resources to arrive, Officer Arteaga Mayen continued to verbalize with De Anda and give him commands. As captured on BWV, Officer Arteaga Mayen ordered De Anda to put the knife down, but he did not comply.

According to Officer Arteaga Mayen, he could hear De Anda speaking; however, was unable to decipher what he said. Officer Arteaga Mayen informed De Anda that he was having difficulty hearing him and requested that he move closer. De Anda did not comply. Officer Morse directed Officer Arteaga Mayen to continue verbalizing with De Anda and to *"Just keep him* [De Anda] *talking."*[20]

According to Officer Arteaga Mayen, he attempted to establish a rapport with De Anda by asking his name and attempting to ascertain what was wrong.

According to Officer Morse, *"So even though I didn't know what they were saying, I could tell it was a back and forth conversation. I actually, you know, I -- I encouraged my partner because it seemed like he was at the very least, if not building a rapport, he was opening up a line of communication with our suspect."*[21]

---

[18] Force Investigation Division investigators did not interview Officers Shin, Cholico, and Villegas because they were not witnesses to the OIS and were not significantly involved in the incident.

[19] **Officer Rodriguez**, 30 years of age, 5 feet 2 inches tall, 145 pounds, three years, ten months with the Department, equipped with a canister of OC spray, a TASER, a flashlight, two pairs of handcuffs, a Department-approved handgun, a BWV camera, and a ballistic vest. Officer Rodriguez had her side-handle baton and HRD inside her police vehicle. Officer Rodriguez was driving Shop No. 81090, a marked black and white police SUV equipped with ballistic door panels and a DICVS.

**Officer Hernandez**, 27 years of age, 5 feet 9 inches tall, 190 pounds, one year, one month with the Department, equipped with a canister of OC spray, a TASER, a flashlight, two pairs of handcuffs, a side-handle baton, a Department-approved handgun, a BWV camera, a HRD, and a ballistic vest.

[20] Gleaned from Officer Morse's BWV at 2030:19 hours.

[21] Officer Morse's statement, Pages 28, Line 20 through Page 29, Line 1.

12

At 2030:25 hours, Officer Morse broadcast, *"Suspect is a male Hispanic, he is wearing a T-shirt where is dark blue on top, white on the bottom, and orange shorts."*

At 2030:53 hours, Air Support Division (ASD) Police Officer II+6 Vanessa Henson, Serial No. 38628, Pilot, and Police Officer II+6 Michael O'Connor, Serial No. 34596, Tactical Flight Officer (TFO), assigned Air-10, advised CD they were responding.[22]

At approximately 2031 hours, Officers Welch and Cholico arrived at the scene. Officer Cholico broadcast they were at 12th Street and New Hampshire Avenue.

As captured on BWV, De Anda approached the eastern portion of the parking lot and began pacing. According to Officer Morse, De Anda was yelling, talking fast, and appeared agitated. De Anda's demeanor caused Officer Morse to believe that he was possibly experiencing *"excited delirium."*

Officer Morse knew there was a gas station at the intersection of Pico Boulevard and Vermont Avenue, south of the parking lot.[23] Officer Morse feared that De Anda might try to jump over the southernmost wall and gain access to the gas station. Officer Morse was concerned that De Anda could harm individuals with the knife if he escaped containment.

At 2031:29 hours, Officer Morse broadcast, *"Alright we got a unit at Pico and New Ham, now, let me, sorry, yeah. Pico and New Ham, now let me get the next unit to Pico and Vermont in case he jumps the wall to the gas station there."*

At 2031:33 hours, Officers Rodriguez and Hernandez arrived at the scene. Officer Rodriguez parked the police vehicle on the east curb of New Hampshire Avenue, just north of Pico Boulevard.

> **Note:** The investigation determined that Officers Rodriguez and Hernandez did not broadcast or indicate on their Mobile Digital Computer (MDC) that they were at the scene.
>
> According to Officers Rodriguez and Hernandez, they did not broadcast their status because they wanted to keep the frequency clear for Officers Morse and Arteaga Mayen.

At approximately 2032 hours, Officers Dollente and Ordaz broadcast that they were Code-Six at Pico Boulevard and Vermont Avenue and arrived at the scene.

---

[22] Force Investigation Division investigators did not interview Officer Henson because she did not witness the OIS, nor was she significantly involved in the incident.

[23] At the time of the incident, a gas station was located at 2503 West Pico Boulevard, on the northwest corner of Vermont Avenue and Pico Boulevard.

At 2032:15 hours, Olympic Patrol Division uniformed Watch Commander Lieutenant I Manuel Hernandez, Serial No. 35609, broadcast, *"Verify what crime do we have?"* Officer Morse responded, *"53, we have at least a vandalism that we know of but we haven't been able to go back and talk to the other victims."*

Olympic Patrol Division uniformed Sergeant I Joseph Gonzalez, Serial No. 36215, Unit 20L40W3, advised CD that he would be responding to the backup request. Sergeant Gonzalez then broadcast, "*Set up the perimeter then get the next unit or the primary to meet the victim or PR…once the perimeter is set.*"

Meanwhile, Officers Shin and Lutzker arrived at the scene. Officer Shin drove north on New Hampshire Avenue and parked his vehicle adjacent to Officers Morse and Arteaga Mayen. Officers Shin and Lutzker exited their police vehicle and approached Officers Morse and Arteaga Mayen. Officer Morse asked Officer Shin to drive around the area and ensure all the positions on the perimeter were covered. Officer Shin informed Officer Morse that the perimeter was already secure.

> **Note**: At 2032:05 hours, the DICVS for Shop No. 81096 captured the electronic sliding gate on the south side of the parking lot now open as Officers Shin and Lutzker traveled north on New Hampshire Avenue.
>
> During the interview with FID investigators, Ro indicated he opened the south gate with a key fob after Officers Morse and Arteaga Mayen arrived at the scene. According to Ro, he opened the gate after seeing De Anda enter the parking lot. He intended to give Officers Morse and Arteaga Mayen access to the parking lot.

Officer Morse broadcast to CD and advised that the perimeter was set and the suspect was contained within the parking lot. He requested that the Incident Commander (IC) and any additional units respond to New Hampshire Avenue, north of Pico Boulevard. Officer Morse then asked if an Air Unit was en route. Tactical Flight Officer O'Connor broadcast that they would be at the scene in approximately 30 seconds.

At approximately 2033 hours, Officer Arteaga Mayen's BWV captured De Anda standing in the eastern portion of the parking lot as Officer Arteaga Mayen continued communicating with De Anda in Spanish. De Anda was captured saying in Spanish that he no longer wanted to live. Due to De Anda's statement, Officer Arteaga Mayen advised Officer Morse to request a System-wide Mental Assessment Response Team (SMART). Officer Arteaga Mayen informed Officer Morse that De Anda indicated he did not want to live.

Officer Morse did not request a SMART, told Officer Arteaga Mayen that he was doing a good job, and directed him to continue verbalizing with De Anda. According to Officer Morse, he believed a SMART request was premature. Officer Morse explained, *"So I took the - - I understand that to mean my partner was concerned that this guy might be suicidal. And even without knowing the context of those comments, it certainly sounded*

14

*like if someone says, 'I don't want to live', that there's a concern they might be suicidal. But I thought it was premature to request a SMART team. I have been to CNT school so I'm - - I'm, you know, aware of the considerations when you're - - when you're trying to interact with somebody in a heightened emotional state, including somebody who is armed, somebody who is suicidal. But I also knew from experience that the SMART team won't come into a hot tactical situation. In fact, usually, the SMART team is going to want to respond to the CP* [Command Post], *and I didn't want a CP yet.*[24]

> **Note:** Office Morse completed the Los Angeles Police Department (LAPD), Metropolitan Division Special Weapons and Tactics (SWAT), Use of Force De-Escalation Course on Crisis Negotiation (CNT basic).

As captured on BWV, Officer Shin walked north along the fence line and verified that the sliding gate on the north side of the parking lot was secure. As Officer Shin was checking the fence, Officer Morse informed Officer Lutzker that De Anda was armed with a *"big knife"* and directed her to don protective gloves, which she did. Officer Morse then requested Officers Shin and Lutzker to cover the northern portion of the parking lot.

In the interim, Officers Rodriguez and Hernandez exited their police vehicle and walked north on New Hampshire Avenue from Pico Boulevard. According to Officer Rodriguez, she observed a police vehicle but did not see Officers Morse or Arteaga Mayen, which caused her concern. Officer Rodriguez approached the group of citizens gathered outside the Korean Church parking lot and spoke with Ro. Ro advised Officer Rodriguez that De Anda was inside the parking lot north of their location.

According to Officer Rodriguez, she observed De Anda in the parking lot holding a *"large object"* in his left hand. Officer Rodriguez wanted to utilize their police vehicle as cover; therefore, she directed Officer Hernandez to move their police vehicle further north. As Officer Hernandez was retrieving their vehicle, Officer Rodriguez began walking in a northeasterly direction, toward the south entrance of the parking lot.

This space was intentionally left blank.

---

[24] Officer Morse's statement, Page 15, Line 19 through Page 16, Line 8.



2023-09-13 20:32:58 -0700
AXON BODY 3 X60A8647P

De Anda

**Gleaned from Officer Rodriguez' BWV.**

Officer Rodriguez noted that there appeared to be two entrances into the parking lot: a
north entrance and a south entrance. Officer Rodriguez observed Officer Morse near
the north entrance in *"containment mode"* and heard him establishing a perimeter over
the radio. Officer Rodriguez heard officers communicating with De Anda but was
unable to decipher what was being said.

Officer Hernandez entered his police vehicle and moved it further north toward the
south entrance of the parking lot. As Officer Hernandez was parking the vehicle, Officer
Rodriguez approached the front passenger side window. Officer Rodriguez directed
Officer Hernandez to De Anda's location and said they could use the police vehicle as
cover. Officer Hernandez parked the vehicle facing in a northeasterly direction, toward
the driveway.

According to Officer Rodriguez, she did not like the positioning of their police vehicle
and wanted it parked at more of an angle. Officer Rodriguez then entered the driver's
seat of the vehicle. She advised Officer Hernandez that she was going to *"rearrange"*
the vehicle and directed Officer Hernandez to keep an eye on De Anda as she did so.

Officer Rodriguez repositioned their vehicle and parked at more of an angle, still facing
in a northeasterly direction toward the driveway and activated the driver's side spotlight.
Officer Hernandez then activated the front passenger spotlight. The police vehicle's
headlights and spotlights illuminated De Anda as paced on the east side of the lot.
According to Officer Hernandez, De Anda was holding a knife in his right hand. As

16

captured on BWV, Officer Hernandez stood behind their vehicle's front passenger side door.

Meanwhile, Officer Arteaga Mayen continued communicating with De Anda and asked him why he did not want to live. Officer Arteaga Mayen's BWV captured De Anda say in English, *"I can't go to jail because it's in my brain."*[25]

> **Note:** According to Witness Beatriz Garcia, she heard the officers communicating with De Anda and heard him say at one point, *"I don't want to go to jail. I want to die."* Garcia did not recall if De Anda made that statement in English or Spanish.

After repositioning the police vehicle, Officer Rodriguez exited the police vehicle and walked toward the southern entrance of the parking lot. According to Officer Rodriguez, she saw a dumpster near the mouth of the driveway and decided to utilize it as cover. Officer Rodriguez explained, *"I saw the other officers, Officer Morse, and then they were kind of taking cover behind the gate or I'm not too sure, but I wanted to be leveled with them and to also get a better visual. So that's why I figured we could bump up to cover, and if I need to redeploy to more, at least I have the black-and-white there, because I saw that I had a dumpster, as least for my cover."*[26]

As she neared the driveway, Officer Rodriguez identified the object De Anda was holding as a *"large knife."* As captured on BWV, Officer Hernandez told Officer Rodriguez, *"So, he's armed with a um."* Officer Rodriguez interrupted Officer Hernandez and replied, *"With a knife."*

As Officer Rodriguez approached the south driveway, Officer Hernandez closed the passenger side door of his vehicle and joined Officer Rodriguez. According to Officer Hernandez, *"And so at that point when I saw my partner go up, you know, obviously, I was not gonna stay behind and, you know, leave her alone up there. So I had to go up there and follow her and - - in which we got cover behind the dumpster."*[27]

Officer Hernandez informed Officer Rodriguez that De Anda was against the wall. Officer Rodriguez replied, *"We can stay right here behind the dumpster."* Officers Rodriguez and Hernandez then unholstered their service pistols. Officer Rodriguez held her flashlight in her left hand and briefly illuminated De Anda.

According to Officer Rodriguez, *"So as we did that, I got out and I kind of bumped up because I saw a dumpster. So I wanted to use that as cover as well. And to see, and*

---

[25] Gleaned from Officer Arteaga Mayen's BWV at approximately 2034:22 hours. De Anda made other statements that were unintelligible around the same time.

[26] Officer Rodriguez' statement, Page 22, Lines 15-22.

[27] Officer Hernandez' statement, Page 19, Lines 9-12.

17

get a better visual of the suspect and identify, you know, the weapon. *I identified and I saw that he did have a large knife even though he was maybe - - he was far away. So that's when I unholstered knowing, you know, that this - - this man is armed with a knife and could close distance in very fast."*[28] Officer Rodriguez held her pistol in her right hand in a low-ready position with her index finger along the frame.

According to Officer Hernandez, *"I see my partner move up to a dumpster towards the entrance of the parking lot, in which I go ahead and follow her. We go ahead and unholster our firearms, due - - well, policy states that we're able to draw and exhibit a firearm if circumstances surrounding the incident create reasonable belief that it may be necessary. Since he [De Anda] was holding the knife, you know, there was a chance that he - - he might approach us."*[29] Officer Hernandez' BWV captured him holding his pistol in his right hand in a low-ready position.

Officer Rodriguez crossed the fence's threshold and walked a few feet into the parking lot. She positioned herself on the south side of the dumpster while Officer Hernandez stood to her right, but slightly off-set, as depicted in the screenshot below.



**Gleaned from Officer Hernandez' BWV.**

---

[28] Officer Rodriguez' statement, Page 10, Line 19 through Page 11, Line 2.

[29] Officer Hernandez' statement, Page 9, Lines 2-10.

CITY   001259

According to Officers Morse and Arteaga Mayen, they observed officers (Officers Rodriguez and Hernandez) enter the south parking lot area. Officer Morse was worried that Officers Rodriguez and Hernandez may be unaware that De Anda was inside that parking lot.

At 2034:31 hours, Officer Morse broadcast, *"Okay, the units that are entering the gate do not go in the gate. We have him contained…Yeah, whatever unit is at that gate is just, just cover the opening but I don't want to approach him. He has a really big knife."* Simultaneously, Officer Arteaga Mayen yelled for Officer Rodriguez to get back.

> **OIG Note No. 1:** *According to Officer Arteaga Mayen, "It was just himself [De Anda] armed with a knife. So there was no need to put other officers in danger entering the parking lot or escalating the situation.*[30]

Following Officer Morse's broadcast, Officers Rodriguez and Hernandez walked backward and exited the lot. They redeployed west of the gate and remained unholstered. Officer Rodriguez looked in Officer Arteaga Mayen's direction and advised that they were behind cover.

According to Officer Arteaga Mayen, De Anda looked north and then began moving in that direction. As captured on BWV, Officer Arteaga Mayen yelled, *"Hey! Hey! No! Hey, no!"* and ordered him in Spanish to stop right there. Officer Arteaga Mayen then directed the officers positioned on the north side of the parking lot to *"Stand back."*

As Officer Arteaga Mayen was yelling commands to De Anda, Officers Rodriguez and Hernandez walked in an easterly direction, toward the threshold of the gate and looked in De Anda's direction. As captured on BWV, Officer Rodriguez asked Officer Hernandez, *"What did he* (Presumably Officer Arteaga Mayen) *say?"* Officers Rodriguez and Hernandez then redeployed back to the east sidewalk, west of the dumpster.

> **Note:** At this time, Air-10 arrived overhead. As captured on BWV, the helicopter emitted loud noise as it orbited over the scene.

According to Officer Arteaga Mayen, De Anda began stabbing the wall located on the eastern portion of the parking lot with the knife. Officer Arteaga Mayen continued to verbalize with De Anda and asked what his name was. He told De Anda that he wanted to speak with him and asked him to place the knife on the ground. De Anda did not comply.

According to Officer Arteaga Mayen, he looked in a southerly direction and observed Officer Rodriguez standing near the south entrance gate. Officer Arteaga Mayen then realized that the southern gate was open.

---

[30] Officer Arteaga Mayan's statement, Page 16, Lines 13-15.

19

Meanwhile, Officer Shin discovered that the wrought iron fence on the north side of the parking lot had approximately two pickets missing, which would allow access to the lot, as depicted in the screenshot below.

At 2034:54 hours, Officer Shin broadcast, *"A53, be advised there is a opening on the north side of the fence that he probably used to gain access to. We are standing right in front of it."*



**Screenshot from Officer Shin's BWV depicting the gate with approximately two pickets missing.**

At 2035:06 hours, Officer Morse broadcast, *"Yeah, what I would really like to have is a bean bag or a 40* [40mm LLL] *at each of those openings in case he rushes one of those. Otherwise, we have him contained."* Following Officer Morse's broadcast, Officer Rodriguez directed Officer Hernandez to retrieve the 40mm LLL from their police vehicle, while Officer Shin directed Officer Lutzker to retrieve one from their vehicle.

> **Note:** Officer Shin directed Officer Lutzker to get a *"40"* (40mm LLL) from their police vehicle; however, on the night of this incident, they were only equipped with a beanbag shotgun. Therefore, she ran back to their police vehicle to retrieve the beanbag shotgun.

> *OIG Note No. 2: Officer Shin maintained containment of the opening in the fence and did not witness the OIS. Officer Lutzker was near their police vehicle at the time of the OIS and witnessed a portion of it.*

20

CONFIDENTIAL

Officer Hernandez walked to his vehicle and holstered his service pistol. He then retrieved the 40mm LLL from the vehicle's gun rack, obtained a 40mm eXact Impact round from the holder, and inserted the round into the chamber.

> **OIG Note No. 3:** *From the time Officer Hernandez reached the police vehicle to obtain the 40mm LLL, to the time he began to return to cover, approximately 28 seconds elapsed.*[31]

At 2035:17 hours, TFO O'Connor broadcast that they were at the scene, indicated the perimeter was established, and inquired about the type of crime that had been committed. Officer Morse broadcast that vandalism had occurred, but there could be additional crimes because De Anda was armed with a *"really big knife."* Tactical Flight Officer O'Connor broadcast, *"Okay, sounds good. Your perimeter is good and male Hispanic, blue over white T-shirt, and orange shorts. Is that right?"*

At this time, Officer Hernandez was still retrieving the 40mm LLL from their police vehicle. As he did so, Officer Rodriguez was positioned on the east sidewalk of New Hampshire Avenue behind the wrought iron fence. She was utilizing the dumpster as cover, as depicted in the screenshot below.



**Gleaned from Officer Rodriguez' BWV.**

---

[31] Officer Hernandez' BWV, 20:35:19-20:35:47.

21

CONFIDENTIAL

CONFIDENTIAL

As TFO O'Connor concluded his broadcast, De Anda began running southwesterly toward the south parking lot entrance. Officer Morse was cognizant that Officers Rodriguez and Hernandez were positioned near that location and that De Anda was *"sprinting"* toward them with the knife raised.

Officer Arteaga Mayen ran south on the east sidewalk, followed by Officer Morse. According to Officer Morse, he was hoping to intercept De Anda and utilize the 40mm LLL. As he ran, Officer Morse broadcast to the Air Unit, *"Roger, he has orange shorts. You see him running?"*

At 2035:48 hours, TFO O'Connor broadcast, *"Unit westbound* [Officers Rodriguez and Hernandez] *guys, he is running right at you, big parking lot. Everybody hold what you have. Hold what you have."*

As Officer Arteaga Mayen ran south, he ordered De Anda to stop and put the knife down. De Anda did not comply with Officer Arteaga Mayen's commands and continued running with the knife. Officer Arteaga Mayen secured his flashlight and unholstered his service pistol with his right hand.[32]

According to Officer Arteaga Mayen, *"I - - he stays back. I keep talking to him. And at one point, I just see him running, like running hard, running fast. And he's closing the distance from the back, which seemed to me like in a - - like to me, it seemed like in a blink of an eye that he got from the wall he was at, that seemed to me very far, like approximate - - like I said, over - - a little bit over a hundred feet away. He closed the distance extremely fast. I started running in the direction towards where my partner was on the south entry of the parking lot structure. As he's getting closer and closer and closer, he raises his arm in a stabbing motion with his knife on his right hand. At this point, I put my flashlight away. I draw my gun. And I point the gun at the suspect."*[33]

As he jogged in a southerly direction, Officer Arteaga Mayen pointed the muzzle of his pistol in an easterly direction toward De Anda. Officer Arteaga Mayen transitioned his pistol into a two-hand grip and yelled to De Anda, *"No! Stop!"* Officer Arteaga Mayen then repeated his command for De Anda to drop the knife, but he did not comply.

Officer Morse stopped on the sidewalk, north of the south gate entrance, aimed the 40mm LLL at De Anda, and shouted, *"40, 40."*[34] According to Officer Morse, *"So I started running down toward them hoping to intercept him so we could maybe use my 40. But I wasn't getting there as fast as he was. I paused at the fence hoping maybe I'd be able to get him through the fence. But at the angle, there was no way I was going*

---

[32] Gleaned from Officer Arteaga Mayen's BWV at 2035:49 hours.

[33] Officer Arteaga Mayen's statement, Page 16, Line 19 through Page 17, Line 8.

[34] Gleaned from Officer Morse's BWV at 2035:56 hours.

CONFIDENTIAL

to be able to keep the 40. It's just too big and at an angle that fence is going to block around."[35]

Simultaneously, Officer Rodriguez observed De Anda running toward her and closing the distance. According to Officer Rodriguez, she wanted to maintain a visual on De Anda and see the *"distance of the threat."* As captured on BWV, Officer Rodriguez redeployed in a southerly direction toward the south entrance of the parking lot.

Officer Rodriguez stood in the middle of the driveway and pointed her pistol in a northeasterly direction toward De Anda and yelled, *"Hey!"* De Anda stopped running and began sidestepping in a southerly direction while holding the knife in his right hand. Officer Rodriguez commanded De Anda to put the knife down multiple times in English, but he did not comply with her commands.

While still at the passenger door of his police vehicle, Officer Hernandez observed De Anda approaching Officers Rodriguez and Arteaga Mayen with the knife. According to Officer Hernandez, De Anda was holding the knife aggressively and in a *"stabbing manner."* Officer Hernandez transitioned to his pistol instead of maintaining the 40mm LLL.

Officer Hernandez explained, *"While I'm getting the 40, and I'm getting it loaded, I see that the suspect is running towards my partner and a primary officer near the dumpster. I then, at that point, drop the 40 because I see him approaching with the knife that, you know, could possibly - - You know, I'm - - I'm not able to defend my partner with a 40, so - - a knife that could cause SBI or GBI. I then go ahead and go towards my partner. I unholster."*[36]

Officer Hernandez added, *"You know, what they teach us is that we're able to defend against, you know, an imminent threat of death or serious bodily injury to an officer or another person, which - - you know, the suspect had a knife that could cause, you know, GBI. In a point, you know, where my partner's gun has a malfunction, and she's unable to defend herself, you know, I'm there, and I could protect her."*[37] Officer Hernandez dropped the 40mm LLL and unholstered his pistol.

> **OIG Note No. 4:** Although there is no evidence that Officer Hernandez was aware of it, Officers Arteaga Mayen and Morse were both in positions to assist Officer Rodriguez if necessary. Officers Lutzker and Shin were also in the immediate area.

---

[35] Officer Morse's statement, Page 19, Lines 18-24.

[36] Officer Hernandez' statement, Page 9, Lines 13-20.

[37] Officer Hernandez' statement, Page 22, Lines 5-12.

23

**Note:** Officer Hernandez recalled dropping the 40mm LLL inside his police vehicle. However, the investigation determined that the 40mm LLL landed on the roadway adjacent to his police vehicle.

Officer Hernandez held his pistol in a two-hand shooting position with the muzzle pointed in a northeasterly direction toward De Anda. Officer Hernandez ordered De Anda in English to stop and put the knife down, but he did not comply with the commands.

According to Officer Hernandez, to defend Officer Rodriguez' life, he placed his index finger on the trigger with the intention of firing at De Anda. Simultaneously, Officer Rodriguez side-stepped in a northerly direction and within Officer Hernandez' line of fire. Therefore, Officer Hernandez immediately lowered his pistol into a low-ready position and removed his index finger from the trigger. Officer Hernandez then redeployed and sought cover behind a wall on the south side of the driveway.

**Note:** According to Officer Hernandez, he aimed his pistol at De Anda's center body mass. Officer Hernandez stated that De Anda's background consisted of a brick wall and an empty parking lot.

Simultaneously, Officer Arteaga Mayen arrived at the south gate entrance and positioned himself on the north side of the driveway to the left of Officer Rodriguez. Officer Arteaga Mayen continued to verbalize in Spanish and ordered De Anda to place the knife down, but he did not comply.

De Anda did not comply with the officers' commands. Instead, he abruptly ran toward the south gate entrance with the knife in his right hand, where Officers Hernandez, Arteaga Mayen, and Rodriguez were positioned. Body Worn Video captured De Anda advance toward the officers, as depicted in the following screenshot.

This space was intentionally left blank.

24



**Gleaned from Officer Rodriguez' BWV.**

According to Officer Rodriguez, she was scared and perceived De Anda as a threat to herself, the other officers, and citizens. Believing that De Anda was going to cause great bodily injury or death to herself and the other officers, Officer Rodriguez fired one round at De Anda in an easterly direction from an approximate distance of 28 feet. According to Officer Rodriguez, she was aiming at De Anda's center body mass area.

> **Note:** Officer Rodriguez estimated that De Anda was approximately 12 feet away from her when she fired her first round.[38] However, the investigation determined that the actual distance was approximately 28 feet.

Officer Rodriguez assessed after firing her first round and determined that De Anda was still standing and armed with the knife, as depicted in the screenshot below.

> ***OIG Note No. 5:*** *Civilian video footage revealed that De Anda initially ran towards the officers at a full sprint. According to Officer Rodriguez' BWV, De Anda stopped running while approximately 30 feet away from the officers and began to scissor-step sideways to his left. De Anda took approximately seven steps over the course of approximately four seconds.*

---

[38] During her interview with FID investigators, Officer Rodriguez referenced the length of a table within the interview room to assist in establishing her distance from De Anda when she fired her first round. The table was measured by investigators and determined to be approximately 12 feet in length.

CITY   001266

*Meanwhile, Officer Rodriguez began to side-step to her left, back toward cover. De Anda then resumed his advance toward officers, taking approximately one and a half steps or skips, before Officer Rodriguez fired her first shot, followed immediately by Officer Arteaga Mayen's first shot. De Anda began to collapse, with his momentum carrying him approximately 2-3 additional feet before completely collapsing.[39]*



**Image of De Anda after Officer Rodriguez' first round was fired, gleaned from Officer Rodriguez' BWV.**

Officer Rodriguez fired two additional rounds at De Anda, also in an easterly direction, from an approximate decreasing distance of 25 to 23 feet. According to Officer Rodriguez, she did not have time to assess in between her second and third rounds. Officer Rodriguez stated that she stopped firing after her third round because De Anda went down and was no longer a threat.

Officer Rodriguez explained, *"And, you know, I shot those three rounds because he was closing distance and, you know, was coming towards me, which, you know, obviously, I was scared and, you know, I want to protect myself and my partner and I knew that those citizens that originally flagged me down were behind me are in close proximity."[40]*

---

[39] Witness Villalpando video footage and Officer Rodriguez' BWV, 20:35:52-20:35:26.

[40] Officer Rodriguez' statement, Page 12, Lines 14-20.

Nearly simultaneously, Officer Arteaga Mayen believed De Anda was going to kill or seriously injure him or one of the other officers. According to Officer Arteaga Mayen, *"And it was at this time that for the safety of myself, for the safety of my partner, I fired approximately two rounds in the direction of the suspect, which would be east."*[41]

Officer Arteaga Mayen fired two rounds at De Anda in an easterly direction from an approximate decreasing distance of 25 to 23 feet. According to Officer Arteaga Mayen, he was aiming at De Anda's center mass when he fired both rounds.

> **Note:** Officer Arteaga Mayen believed De Anda was approximately 10 feet away from him when he fired his first round. The investigation determined that the actual distance was approximately 25 feet.
>
> According to Officer Arteaga Mayen, he assessed after firing his first round and determined that De Anda was still moving in his direction and closing the distance. Therefore, he fired one additional round.
>
> According to Officers Rodriguez and Arteaga Mayen, De Anda's background was clear and consisted of an empty parking lot at the time of the OIS. Neither officer observed any citizens within his background. (Investigators' Note No. 1)
>
> The FID Video Technology Unit (VTU) completed a sound graph analysis of the gunshots using BWV. The VTU utilized Adobe Audition 2023, version 23.6.1.3 software to complete the analysis. They determined a total of five rounds were fired within 1.119 seconds.
>
> The analysis determined that Officer Rodriguez fired the first, third, and fifth gunshots. All three shots were fired within approximately 1.119 seconds. The time that elapsed between Officer Rodriguez' first and second rounds was approximately .786 seconds.
>
> The VTU determined that Officer Arteaga Mayen fired the second and fourth gunshots. Both of his rounds were fired within approximately 0.333 seconds.

The following diagram depicts the officers' and De Anda's approximate positions when Officer Rodriguez fired her first round.

---

[41] Officer Arteaga Mayen's statement, Page 17, Lines 21-24.

27



**Diagram depicting the officers' and De Anda's approximate positions
when Officer Rodriguez first fired**

The following diagram depicts the officers' and De Anda's approximate positions at the time of Officer Arteaga Mayen's first round and Officer Rodriguez' second round.



**Diagram depicting the officers' and De Anda's approximate positions
at the time of the OIS]**

28

According to Witness Sofia Villalpando, she recorded a portion of the incident on Social Media via Facebook Live and provided the link to investigators.

De Anda was struck by gunfire and fell onto the pavement. He landed on his right side with his head facing in a southwesterly direction. De Anda's knife landed on top of his body, in between his left bicep and chin. The investigation determined that De Anda sustained a gunshot wound to his right eye.

At the time of the OIS, Officer Lutzker was standing at the trunk of her police vehicle and was still in the process of loading the beanbag shotgun.

At 2036:01 hours, as captured on BWV, Office Arteaga Mayen broadcast, *"Shots fired! Shots fired! Officer needs help!"* Tactical Flight Officer O'Connor was broadcasting simultaneously; therefore, Officer Arteaga Mayen's help call was not heard on Olympic Frequency.

Simultaneously, TFO O'Connor broadcast, *"Alright, looks like they may have used a TASER on him. They are going to have a hard time getting in there. Just, just hold what you have for now."* According to TFO O'Connor, *"And I immediately said, 'Hey, the suspect's running at you.' And then I saw the suspect drop - - which I thought was a Taser. Because I've seen so many people being tased, I - - immediately, the way the guy dropped, it looked like a Taser hit. That's what I put out."*[42]

> **Note:** According to TFO O'Connor, he initially believed the south gate was closed, which is why broadcast that the officers may have a difficult time entering the location. He illuminated the area with their light during the orbit and realized the gate was open.

Following the OIS, Officer Morse directed Officer Hernandez to put on a pair of protective gloves. Officer Hernandez holstered his service pistol and donned protective gloves.

At 2036:08 hours, Officer Morse broadcast, *"53, We have shots fired. Let's get an RA rolling. We are going to need a rescue team for the suspect."*

> **Note:** From the time of the last gunshot until Officer Morse broadcast for a Rescue Ambulance (RA), approximately 11 seconds had elapsed.

Meanwhile, Officers Soto and Lee arrived at the scene and parked along the east curb of New Hampshire Avenue, north of Pico Boulevard. They exited their police vehicle and began to walk north on New Hampshire Avenue.

---

[42] Tactical Flight Officer O'Connor's statement, Page 9, Line 2-6.

CITY   001270

At 2036:13 hours, as Officers Lee and Soto walked north, Officer Lee's BWV captured him recover Officer Hernandez' 40mm LLL and a 40mm LLL round from the roadway. According to Officer Lee, *"When I was heading over to the location, I noticed a 40-millimeter that was on the ground. I did not know whose it belonged to. But because it's department property, I immediately secured it and - - immediately secured the 40 and a 40-mill - - 40-millimeter round that was on the ground. I checked the chamber, observed one in the chamber. So I knew all three rounds were secure with me. I closed it. I held it with me because I didn't know if there was a Code 4. I don't know the condition of the suspect. I did not know if the suspect was continuously resisting where an incident where I need a less lethal might - - might be needed."*[43]

Officers Lee and Soto then arrived at the OIS scene as Officer Morse slung the 40mm LLL over his shoulder. Officer Morse then directed Officer Soto to don protective gloves, which she did. Officer Morse advised the officers at scene that De Anda still had the knife and retrieved his flashlight with his right hand. Officer Morse transitioned his flashlight into his left hand and illuminated De Anda. Officer Morse informed Officers Hernandez and Soto that he was going to *"Get the knife out of the way"* and directed them to take De Anda into custody.[44]

As Officer Morse and the arrest team began to approach De Anda, Officer Arteaga Mayen yelled out, *"Wait"* multiple times. Officer Morse said, *"We've got to help this guy."* Officer Arteaga Mayen replied, *"Alright."*

According to Officer Morse, *"I felt that he was disabled enough that it was safe for us to approach. But that didn't mean that he was completely incapable of doing something or fighting back. And I felt like if he got ahold of the knife, then we were back in a situation where we were in pretty big danger. However, if I was able to get the knife away from him, I thought we would be able to control it pretty well. So that - - to me, that was the big tipping point between being able to help him. If we could get the knife away from him, then we would be able to do First Aid and we wouldn't be in any danger."*[45]

Officers Morse, Arteaga Mayen, Rodriguez, Soto, and Hernandez approached De Anda. As they did so, Officer Arteaga Mayen remained unholstered and in a low-ready position. Using his right hand, Officer Morse retrieved De Anda's knife, which appeared to be tucked between his left bicep and chin. Officer Morse then backed away from De Anda and placed the knife onto the pavement, northwest of De Anda's body.

> **Note:** The investigation determined that Officer Morse was not wearing protective gloves when he moved De Anda's knife.

---

[43] Officer Lee's statement, Page 8, Lines 13-25.

[44] Gleaned from Officer Soto's BWV at 2036:25 hours.

[45] Officer Morse's statement, Page 43, Lines 14-25.

Officer Hernandez grabbed De Anda's left arm and rolled him onto his stomach. Officer Morse asked the officers if they could tell where De Anda was struck. Officer Soto replied, *"His head."* Officer Soto pulled De Anda's right arm out from underneath his body and placed his arm behind his back. Officer Hernandez handcuffed De Anda's left wrist first, then his right wrist. Officer Hernandez then conducted a pat-down search of De Anda's outer clothing. No additional weapons and/or contraband were found.

Meanwhile, Officers Terrance and Villegas arrived at the scene. The officers exited their vehicle at which time Officer Terrance placed gloves on her hands.

At 2036:43 hours, Sergeant Gonzalez broadcast to CD and declared himself the Incident Commander (IC).

At 2037:35 hours, Officer Morse broadcast, *"53, Code-Four, suspect in custody. The RA is clear to come in. Let's get them here as quick as we can."*

Officer Welch retrieved a knife from her person and cut a portion of De Anda's shirt off. Officer Soto used the cut portion of the shirt to apply pressure on the back of De Anda's head. Officers Soto and Welch then placed De Anda in a left-lateral recovery position and checked him for additional injuries.

Officer Morse advised the officers at scene that it appeared that De Anda's heart was not beating, due to the lack of movement in the blood. He directed officers to begin chest compressions. Officer Welch asked if she could remove De Anda's handcuffs and Officer Morse replied, *"Yeah, that's fine."*

Officer Hernandez then removed the left handcuff from De Anda's left wrist. According to Officer Hernandez, *"I think they just wanted to have him in a - - I think they - - what I heard is they wanted to have him in a better fetal position, if I remember correctly."*[46]

At 2038:51 hours, Sergeant Guerrero arrived at the scene.[47]

> **Note:** At 2022:13 hours, Sergeant Guerrero broadcast that she was responding to the scene. Approximately 16 minutes, 38 seconds elapsed from the time she broadcast she was responding until she arrived at the scene.
>
> During her interview with FID investigators, Sergeant Guerrero indicated she had a delayed response because she was utilizing the restroom and was having MDC issues.

---

[46] Officer Hernandez' statement, Page 41, Lines 6-9.

[47] At 2037:57 hours, Sergeant Guerrero broadcast she was Code-Six.

CITY    001272

At 2039:01 hours, Officer Morse directed Officer Lee to move Officers Rodriguez and
Hernandez' police vehicle to clear a path for the LAFD personnel. Officer Lee
broadcast to CD and requested the RA to respond north on New Hampshire Avenue
from Pico Boulevard. He then repositioned the vehicle further south on New Hampshire
Avenue.

Officer Terrance checked De Anda's neck for a pulse and advised the officers at the
scene that she felt a pulse.[48] Officer Morse told the officers that because there was a
pulse, cardiopulmonary resuscitation (CPR) was not necessary. According to Officer
Morse, *"If the heart's still beating, you know, CPR, you know, you're not - - you don't
want to do chest compressions. And especially if somebody's bleeding, that's going to
accelerate the bleeding."*[49]

The officers continued rendering aid to De Anda and applying pressure to his wound
until the LAFD arrived at the scene.

At approximately 2041 hours, Officer Morse's BWV captured Los Angeles Fire
Department (LAFD) personnel arrive at the scene. They approached De Anda and
began rendering medical aid to him at approximately 2042:42 hours.

Rescue Ambulance No. 211, staffed by Firefighter/Paramedics Jein Lin and Jonathan
Bos, transported De Anda to Dignity Health-California Hospital Medical Center.
According to Officer Welch, she was going accompany De Anda in the ambulance
during transportation; however, was informed by LAFD personnel that they were
providing treatment to De Anda and there was no room for the officers in the
ambulance.

Therefore, Officers Welch and Cholico followed the RA in their police vehicle. Upon
arrival, Doctor Reginald Jones began life-saving procedures. De Anda succumbed to
his injuries and was pronounced dead by Doctor Jones at 2100 hours.

At approximately 2055 hours, Olympic Area Captain III Aaron Ponce, Serial No. 31135,
notified the Department Operations Center (DOC) of the Categorical Use of Force
incident.

Force Investigation Division Detective III Luis Alarcon, Serial No. 30383, was the first
representative from FID to arrive at the scene at approximately 2155 hours.

Force Investigation Division Detective I Erika Sanchez, Serial No. 40986, reviewed all
documents and circumstances surrounding the separation, monitoring, and admonition

---

[48] Gleaned from Officer Terrance's BWV at 2039:14 hours.

[49] Officer Morse's statement, Page 23, Lines 18-22.

32

CONFIDENTIAL

of the involved officers not to discuss the incident prior to being interviewed by FID investigators.

**Scene Description**

The OIS occurred in the parking lot located at 1234 South New Hampshire Avenue in the City of Los Angeles. New Hampshire Avenue was a north/south roadway with a single traffic lane in each direction and vehicle parking along the east and west curbs.

The western portion of the lot was secured by a tall fence, which contained two wrought iron electric sliding gates, located on the north and south sides of the lot. The parking lot was located mid-block on New Hampshire Avenue on the east side of the street. At the time of the incident, the lot measured approximately 230 feet north/south by 130 feet east/west. The parking lot had four overhanging lights that were non-operational.

The surrounding area consisted of commercial businesses, multi-unit apartment buildings, and single-family residences. The incident occurred during the hours of darkness at approximately 2035 hours. Artificial illumination was provided by lighting emitting from an apartment complex located behind the parking lot at 1225 South Vermont Avenue as well as overhanging streetlights on the west sidewalk of New Hampshire Avenue. Additional lighting was provided by the front headlights and both spotlights from Shop No. 81090 (Officers Rodriguez and Hernandez' police vehicle).

fire of Officers Rodriguez and Arteaga Mayen's pistols.  Criminalist Saucedo determined that the bullet that struck De Anda was fired from Officer Rodriguez' pistol.

**Visual Documentation**

**Digital In-Car Video System (DICVS)**

Force Investigation Division investigators reviewed the DICVS associated with the officers mentioned in this administrative summary.  The investigation determined that there was no DICVS footage that captured the actual OIS; however, multiple police vehicles captured the sound of the gunshots.

**Body Worn Video (BWV)**

The BWVs of officers mentioned in this administrative summary were reviewed in detail for compliance with the Office of Constitutional Policing and Policy Notice entitled, Powering Off Body Worn Camera Devices While in Department Facilities, dated December 20, 2018, as well as compliance with section 3/579.15 of the Department Manual – Objectives of Body Worn Video.

The following is a synopsis of the BWVs that had significant evidentiary value.

- Officers Morse and Arteaga Mayen's BWVs captured their initial contact with De Anda, the OIS, and the moments preceding and following it.  Their videos also captured De Anda's apprehension and officers rendering aid.

  Additionally, Officer Morse's BWV captured him implement command and control at the crime scene, and moving De Anda's knife post-OIS.

- Officers Rodriguez and Hernandez' BWVs captured the moments preceding and following the OIS, De Anda's apprehension, and officers rendering aid to De Anda.

- Officers Soto, Welch, Cholico, and Terrance's BWVs captured the officers rendering aid to De Anda.

- Sergeant Gonzalez' BWV captured his arrival at the scene and declaring himself as the IC.

**Social Media**

Personnel assigned to FID's Cyber Unit monitored social media sites from the date of the incident until the submission of this investigation.  No additional evidence, information, or witnesses were identified via social media.

CONFIDENTIAL

40

CONFIDENTIAL

**Other Department Video:**

None.

**Outside Video**

On September 13, 2023, and September 20, 2023, FID investigators canvassed the areas of the robbery and OIS for surveillance cameras.

Investigators identified and obtained security footage from the following locations and stored them under Control No. 665794:

- **2525 West Pico Boulevard** (La Mariposa Beauty Salon) - The video captured De Anda in the parking prior to the officers' arrival holding a shiny object.[51]

  The camera also captured an unidentified male enter the parking lot at approximately 2006 hours, prior to Officers Morse and Arteaga Mayen's arrival. The individual lied down in a patch of grass at the north end of the parking lot.

  The investigation determined that the unidentified male was in the parking lot at the time of the OIS; however, was still at the north end of the lot and not within De Anda's background.

- **1235 New Hampshire Avenue -** Ring surveillance video from Witness Cruz' residence. The video captured De Anda walking north on New Hampshire Avenue prior to the OIS.

- **1225 South Vermont Avenue** (Apartment building) **-** Video clip recorded by Villalpando with her cellular phone via Facebook Live. Villalpando provided investigators with the Facebook website links. The video captured De Anda running toward officers just prior to the OIS.

  The apartment building had exterior security cameras that were motion activated; however, they did not capture the incident. The cameras did not cover the portion of the parking lot where the OIS occurred.

**Photographs**

Technical Investigation Division Photographer III Andrew Millett, Serial No. N3782, and Photographer III Francisco Govea, Serial No. N5606, responded to the scene and photographed the OIS scene and associated evidence under Control Nos. 0899043, 0899672, and 0899673.

---

[51] The investigation determined that the timestamp on this video was approximately four minutes and 18 seconds behind actual time.

CONFIDENTIAL

41

CONFIDENTIAL

**Notifications**

On September 13, 2023, at approximately 2055 hours, the DOC was notified of the Categorical Use of Force and the details of the subsequent notifications are attached.

> **Note**: The Watch Commander's Daily Report indicates that the DOC was notified at approximately 2040 hours.

**Personnel at Scene**

Detective Alarcon was the first representatives from FID to arrive at the scene at approximately 2155 hours. Crime scene logs documenting additional personnel at the location are contained within the FID case file and are available for review.

**Communications**

A copy of the CD Incident Recall printouts related to Incident Nos. 23091300003842, 23091300003850, 23091300004317, and 23091300004334 are on file at FID. A digital recording of Olympic Division's base frequency and 911 calls related to this incident are also stored at FID.

**Justice System Integrity Division**

This case met the criteria for presentation to the Justice System Integrity Division (JSID) and will be presented shortly after completion of this administrative report.

**Investigators' Notes**

1. As captured on the La Mariposa Beauty Salon security video at approximately 2006 hours, an unidentified person entered the parking lot prior to Officers Morse and Arteaga Mayen's arrival and proceeded to lie down on the northern end of the parking lot.

   The investigation determined that the unidentified person was in the parking lot at the time of the incident; however, was still at the north end of the lot and not within De Anda's background at the time of the OIS.

   At approximately 2050:25 hours, Sergeant Gonzalez directed Officer Cholico to check the parking lot and ensure that no one else was injured. As Officer Cholico walked around the parking lot, she encountered a male Hispanic (presumably the same person) lying underneath a tree in a patch of grass near the northern end of the lot. Officer Cholico asked the male if he was okay and he said he was. Officer Cholico did not complete a Field Interview (FI) Card on the person or ascertain if he witnessed the incident.

CONFIDENTIAL

42

To date, the person remains unidentified and has not been interviewed by investigators.

2. On October 4, 2023, Detective Sanchez called Department of Corrections Parole Agent I Pedro Ordonez regarding De Anda. According to Agent Ordonez, he had been De Anda's parole officer since June of 2023. According to Agent Ordonez, De Anda was required to wear an ankle monitor as part of his parole conditions.

On September 13, 2023, at approximately 1200 hours, Agent Ordonez received a notification that De Anda's ankle monitor had been removed. Agent Ordonez responded to De Anda's residence to make contact with him and arrest him for the violation. As he drove toward De Anda's residence, Agent Ordonez observed De Anda walking in the area. As Agent Ordonez parked his vehicle, De Anda abruptly ran in his direction and threw his ankle monitor at Agent Ordonez's vehicle. De Anda then fled the location and evaded apprehension. According to Agent Ordonez, he recovered De Anda's ankle monitor and requested a warrant for his arrest.

On September 15, 2023, two days after the OIS, a No-Bail warrant for De Anda's arrest was issued for the aforementioned parole violation. According to Agent Ordonez, he was unaware of the OIS incident and that De Anda was deceased.

## Supplemental FID Report[52]

Following the distribution of this case, Critical Incident Review Division (CIRD) Sergeant II Susan Torres, Serial No. 32569, requested Force Investigation Division (FID) generate a timeline documenting the response time of Olympic Patrol Division Sergeant I Madai Guerrero, Serial No. 40361, to this incident.

Force Investigation Division investigators completed the timeline below utilizing the times referenced in the administrative summary and the Olympic Base Frequency.
- 2022:13 hours – Sergeant Guerrero broadcast that she would respond to the radio call.
- 2029:40 hours – Officer Morse requested back-up and a perimeter.
- 2030:17 hours – Sergeant Guerrero broadcast she was en route to the radio call.
- 2035:56 hours – The Officer-Involved Shooting (OIS) occurred.
- OIS + 2:01 – Sergeant Guerrero broadcast she was Code-Six (2037:57 hours).
- OIS + 2:55 – Sergeant Guerrero parked her vehicle and exited (2038:51 hours).

---

[52] On June 17, 2024, the Commanding Officer, Force Investigation Division, issued a supplemental report regarding this case.

## CHIEF OF POLICE REPORT[53]

### Chief of Police Findings

**Tactics** – Tactical Debrief, Officers Morse, Arteaga, Rodriguez and Hernandez. Administrative Disapproval, Sergeant Guerrero.
**Drawing/Exhibiting** – In Policy, No Further Action, Officers Artega Mayen, Rodriguez and Hernandez.
**Lethal Use of Force** – In Policy, No Further Action, Officers Artega Mayen and Rodriguez.

### Chief of Police Analysis

#### Detention

- Officers Morse and Artega Mayen responded to a radio call of a "415 man" armed with an edged weapon and an additional related call of a "415 man" armed with a knife who was vandalizing vehicles and throwing rocks at patrons. Arriving at scene, Officers Morse and Artega Mayen were directed by witnesses to De Anda's location where they located him inside a parking lot. While in the parking lot, De Anda armed himself with a knife and did not comply with commands to drop it. After additional officers arrived on scene, De Anda, still armed with a knife, ran toward officers resulting in an OIS. Based on the totality of the circumstances, officers had reasonable suspicion to detain De Anda prior to the OIS.

#### Tactics

- *Department policy relative to a Tactical Debrief is: "The collective review of an incident to identify those areas where actions and decisions were effective and those areas where actions and decisions could have been improved. The intent of a Tactical Debrief is to enhance future performance by reviewing and analyzing Department-wide training, practices, policies and procedures."*

  *Department policy relative to Administrative Disapproval is: "A finding, supported by a preponderance of the evidence that the tactics employed during a CUOF incident unjustifiably and substantially deviated from approved Department tactical training" (Los Angeles Police Department Manual, Volume 3, Section 792.05).*

  *The evaluation of tactics requires that consideration be given to the fact that officers are forced to make split-second decisions under very stressful and dynamic circumstances. Tactics are conceptual and intended to be flexible and incident*

---

[53] The information provided in this section summarizes the analysis and findings set forth in the Chief of Police's report for this case.

44

*specific, which requires that each incident be looked at objectively and the tactics be evaluated based on the totality of the circumstances.*

## Tactical De-Escalation[54]

- *Tactical de-escalation involves the use of techniques to reduce the intensity of an encounter with a suspect and enable an officer to have additional options to gain voluntary compliance or mitigate the need to use a higher level of force while maintaining control of the situation.*

  *Tactical de-escalation does not require that an officer compromise his or her safety or increase the risk of physical harm to the public. De-escalation techniques should only be used when it is safe and prudent to do so.*

**Tactical De-Escalation Techniques:**
- *Planning,*
- *Assessment,*
  *Time,*
  *Redeployment and/or Containment,*
  *Other Resources and*
  *Lines of Communication.*

**Planning –** According to Officer Artega Mayen, he and Officer Morse discussed contact, cover and less-lethal roles. Officer Artega Mayen was designated as the contact officer and Officer Morse would be the intermediate force option. Prior to arriving at the location, Officer Morse was familiar with the location and informed Officer Artega Mayen of the church and parking lot and directed him where to park to use the wall as cover. Arriving at scene, Officer Morse deployed the 40mm LLL launcher as planned.

On the day of the incident, this was the first time Officers Rodriguez and Hernandez worked together. Officers Rodriguez and Hernandez discussed contact and cover roles at the start of their shift. While at scene, Officer Rodriguez directed Officer Hernandez to reposition their police vehicle to have it available as cover if needed.

During containment, Officer Morse requested a 40mm LLL at each opening of the parking lot. In response, Officer Rodriguez directed Officer Hernandez to retrieve the 40mm LLL as she was positioned on the south gate with a lethal force option. As Officer Hernandez retrieved the 40mm LLL, De Anda began running toward Officer Rodriguez's direction. Rather than remain in his role with the 40mm LLL, Officer Hernandez dropped the 40mm LLL and unholstered his service pistol.

---

[54] Los Angeles Police Department, Use of Force Tactics Directive No. 16, Tactical De-Escalation Techniques, October 2016.

Officer Hernandez explained his reasoning for transitioning from the 40mm LLL to his duty weapon as follows, "…an imminent threat of death or serious bodily injury to an officer or another person, which you know, the suspect had a knife that could cause GBI [great bodily injury]. In a point, where my partner's gun has a malfunction and she's unable to defend herself. I'm there and I could protect her."[55]

The UOFRB assessed Officer Hernandez' decision to relinquish his 40mm LLL and transition to his service pistol. The Board noted the rapid advancement of De Anda toward Officer Rodriguez and considered Officer Hernandez' articulation regarding this decision and his concern should Officer Rodriguez' service pistol malfunction. Officer Rodriguez would have had limited options in which to defend herself against the knife De Anda had in his hand; therefore, the Board found Officer Hernandez' decision to transition to his service pistol reasonable and not a deviation.

Based on the totality of the circumstances, the UOFRB determined, and the Chief concurred, Officer Hernandez' decision to transition to his service pistol from the 40mm LLL was not a deviation from Department-approved tactical training.

**Assessment** – Arriving on scene, Officers Morse and Artega Mayen located De Anda in the parking lot. Shortly after, Officers Morse and Artega Mayen observed De Anda retrieve a knife from the ground and Officer Morse requested a back-up.

After retrieving the 40mm LLL, Officer Hernandez observed De Anda running toward Officer Rodriguez armed with a knife. In an effort to protect Officer Rodriguez from serious bodily injury or death, Officer Hernandez dropped the 40mm LLL, unholstered his service pistol, and came up on target with the intent to shoot De Anda. However, as Officer Hernandez was on target with his service pistol, Officer Rodriguez moved into Officer Hernandez' line of fire. Officer Hernandez assessed Officer Rodriguez' position and immediately came off target and sought cover.

**Time** – Officer Morse and Artega Mayen used the benefit of time to de-escalate the incident. Officer Morse established containment, used cover and continued verbalization which provided them additional time to continue to employ de-escalation efforts. Additional efforts were eclipsed when De Anda ran toward officers armed with a kitchen knife.

**Redeployment and/or Containment** – Arriving at scene, Officers Morse and Artega Mayen stood outside the parking lot where De Anda was located. When De Anda armed himself with a knife, Officer Morse requested responding units establish containment. Officers Morse and Artega Mayen maintained the perimeter as Officer Artega Mayen communicated with De Anda to gain compliance.

---

[55] Officer Hernandez' transcript, Page 22, Lines 5-12.

Officer Rodriguez directed Officer Hernandez to reposition their police vehicle with the intent to have it available as cover if needed.

**Other Resources** – Upon locating De Anda in the parking lot, Officer Morse requested the air unit to respond. After De Anda armed himself with a knife, Officer Morse requested a back-up. After establishing containment, Officer Morse requested a 40mm LLL at each opening of the parking lot.

**Lines of Communication** – Officer Artega Mayen communicated with De Anda in English and Spanish to attempt to gain his compliance. Officer Artega Mayen continued to verbalize with De Anda in Spanish throughout the incident leading up to the OIS.

Officer Morse called out "40, 40," to warn others he would deploy a less-lethal device to avoid contagious fire. Officer Morse attempted to deploy the 40mm LLL but he could not use it due to the wrought iron fence that minimized his angle and line of sight.

During the review of this incident, the following Debriefing Topics were noted:

**Debriefing Point No. 1: Code Six**

- Arriving at scene, Officers Rodriguez and Hernandez did not broadcast they were Code Six, nor did they use the Mobile Digital Computer (MDC) to show themselves Code Six upon their arrival. According to Officer Hernandez, he did not want to "tie up the air."

The UOFRB assessed Officers Rodriguez and Hernandez' tactics as it pertained to not broadcasting their Code Six location. The Board noted Officers Rodriguez and Hernandez' response from the station was short as the incident was a few blocks from the station and Officer Morse was actively using the radio to establish a perimeter. The Board noted the officers did not want to occupy the frequency as pertinent information was being broadcast. The Board considered the MDC was not used as the officers deployed from their police vehicle to contain De Anda at an open driveway where De Anda could exit, providing him access to pedestrians in the surrounding area. Furthermore, with the airship overhead and being in line of sight of Officers Morse and Artega Mayen, the Board opined Officers Rodriguez and Hernandez' location was known in the event assistance was needed. The UOFRB determined Officer Rodriguez and Hernandez' decision not to broadcast their Code Six status or utilize the MDC upon arrival was a substantial deviation, with justification.

Based on the totality of the circumstances, the UOFRB determined, and the Chief concurred, the tactics employed by Officers Rodriguez and Hernandez were a substantial deviation, with justification, from Department-approved tactical training.

47

CONFIDENTIAL

**Debriefing Point No. 2: Cover/Concealment**

- Prior to the OIS, Officer Rodriguez was standing behind the wrought iron gate, using a dumpster for cover, and the police vehicle was parked on the street behind her. When De Anda began running toward the south gate entrance, Officer Rodriguez stepped toward the center area of the entrance gate and was without cover and concealment at the time of the OIS.

  The UOFRB assessed Officer Rodriguez' tactics as it pertained to her lack of cover at the time of the OIS. The Board noted prior to the OIS, Officer Rodriguez kept her distance and used a dumpster for cover. It was not until De Anda began charging toward her direction that Officer Rodriguez sidestepped away from cover and stood in the middle of the south entrance gate. The Board opined had Officer Rodriguez not repositioned, she would have lost her visual on De Anda as her view would have blocked by the dumpster putting her at a tactical disadvantage. The Board noted after repositioning and upon observing De Anda, Officer Rodriguez began redeploying back toward cover. As De Anda charged at an angle and side-stepped toward Officer Rodriguez, the Board noted Officer Rodriguez' movements mirrored De Anda as she attempted to keep distance and utilize angles that afforded her a tactical advantage. The Board opined Officer Rodriguez' decision to leave cover was necessary to observe and assess De Anda's location and movement and changed angles in response to De Anda's movements. The Board determined Officer Rodriguez' decision to leave cover was not a deviation from Department-approved tactical training.

  Based on the totality of the circumstances, the UOFRB determined, and the Chief concurred, the tactics employed by Officer Rodriguez were a not a deviation from Department approved tactical training.

**Debriefing Point No. 3: Basic Firearms Safety Rules**

- According to Officer Hernandez, to defend Officer Rodriguez' life as De Anda charged toward her holding a knife, he placed his index finger on the trigger of his service pistol with the intention of firing at De Anda. Simultaneously, Officer Rodriguez side-stepped into Officer Hernandez' line of fire. Therefore, Officer Hernandez immediately lowered his pistol into a low-ready position and removed his index finger from the trigger.

  The UOFRB assessed Officer Hernandez' tactics as it pertained to coming up on target and placing his finger on the trigger of his service pistol. The investigation revealed Officer Hernandez observed what he believed to be an imminent threat of serious bodily injury when De Anda began charging at his partner while armed with a large knife. The Board noted Officer Hernandez assessed his sight picture while he was on target and identified Officer Rodriguez had stepped into his line of fire. As a result, Officer Hernandez lowered his service pistol and removed his finger off the trigger and sought cover. The Board determined Officer Hernandez properly

48

assessed the situation, responded as trained and did not violate any of the basic firearms safety rules. Furthermore, the Board noted the distance from Officer Hernandez and De Anda. The investigation determined at the time of the OIS, Officer Rodriguez was approximately 28 feet away from De Anda and Officer Hernandez was approximately 10 to 15 feet behind Officer Rodriguez when he identified the deadly threat. The Board considered the greater distance Officer Hernandez was from De Anda and opined the distance would take longer to assess and press the trigger. The Board determined Officer Hernandez properly assessed and did not deviate from Department-approved tactical training.

Based on the totality of the circumstances, the UOFRB determined, and the Chief concurred, the tactics employed by Officer Hernandez were a not a deviation from Department-approved tactical training.

During the review of this incident, the following Additional Debriefing Topics were noted:

**Additional Tactical Debrief Topics**

- **Securing of 40mm Less-Lethal Launcher –** While Officer Hernandez was retrieving and loading the 40mm LLL, he observed De Anda approaching his partner while armed with a knife. In deciding to transition to his service pistol, Officer Hernandez dropped the 40mm LLL on the roadway next to his police vehicle. To enhance future performance, the Chief will direct this be a topic of discussion during the Tactical Debrief.

  **Personal Protective Equipment (PPE) –** Officer Morse did not don protective gloves prior to approaching and removing the knife from De Anda's possession. To enhance future performance, the Chief will direct this be a topic of discussion during the Tactical Debrief.

**Command and Control**

- *Command and Control is the use of active leadership to direct others while using available resources to coordinate a response, accomplish tasks and minimize risk. Command uses active leadership to establish order, provide stability and structure, set objectives, and create conditions under which the function of control can be achieved with minimal risk. Control implements the plan of action while continuously assessing the situation, making necessary adjustments, managing resources, managing the scope of the incident (containment), and evaluating whether existing Department protocols apply to the incident.*

  *Command and Control is a process where designated officers use active leadership to command others while using available resources to accomplish tasks and minimize risk. Active leadership provides clear, concise, and unambiguous communication to develop and implement a plan, direct officers, and manage resources. The senior officer or any person on scene who has gained sufficient*

49

situational awareness shall initiate Command and Control and develop a plan of action. Command and Control will provide direction, help manage resources, and make it possible to achieve the desired outcome. Early considerations of PATROL will assist with the Command and Control process (Los Angeles Police Department, Training Bulletin, Volume XLVII Issue 4, July 2018).

Prior to the OIS, there was no supervisor on scene and Officer Morse was the senior officer. Officer Morse established command and control by setting up a perimeter, directing continued communication with De Anda and requesting intermediate force options. Officer Morse continued exercising command and control by recognizing De Anda required medical attention after the OIS. Officer Morse formed an arrest team and directed officers to don protective gloves to take De Anda into custody. Officer Morse requested the response of a rescue ambulance (RA) and directed officers to cut De Anda's shirt to use to apply pressure to his wound. Officer Morse separated himself and Officer Hernandez as they witnessed the OIS and notified a supervisor. Officer Morse instructed Officer Hernandez not to discuss the incident.

Sergeant J. Gonzalez, Serial No, 36215, Olympic Patrol Division, arrived on scene after the OIS when De Anda was already in custody and assessed medical aid was already being rendered to De Anda. Sergeant Gonzalez declared himself as the incident commander (IC) and identified Officers Artega Mayen and Rodriguez as the officers involved in the OIS. Sergeant Gonzalez separated them and directed them to turn off their body worn video (BWV) cameras. Sergeant Gonzalez obtained a Public Safety Statement (PSS) from Officer Rodriguez and directed Sergeant Guerrero to monitor and obtain a PSS to Officer Artega Mayen.

At 2022:13 hours, Sergeant Guerrero broadcast she was responding to the call. Approximately 16 minutes, 38 seconds elapsed from the time she broadcast she was responding until she arrived at the scene. During her interview with FID investigators, Sergeant Guerrero indicated she had a delayed response because she was utilizing the restroom and was having MDC issues and needed to verify the address where she was going. Sergeant Guerrero obtained a PSS from Officer Artega Mayen and transported him to Olympic Community Police Station (CPS) and continued to monitor him.

Detective R. Lona, Serial No. 34522, Olympic Area Detectives, relieved Sergeant Gonzalez and assumed responsibility for monitoring Officer Rodriguez and transported her to Olympic CPS.

Sergeant B. Cook, Serial No. 38984, Olympic Patrol Division, separated and monitored Officers Morse and Hernandez and transported them to Olympic CPS. The UOFRB assessed Officer Morse's actions as a senior officer at the scene of a critical incident. The Board commended the actions of Officer Morse and the leadership he displayed during the incident. The Board noted the command and control asserted by Officer Morse surpassed the expectations of an officer on scene

50

during a critical incident and his exemplary handling of the incident would be used as a training tool for others.

The UOFRB assessed Sergeant Guerrero's actions as a supervisor responding to a radio call that met the criteria for edged weapon protocols and Code Two response. The Board considered although Sergeant Guerrero was not at scene prior to or during the OIS, her lack of urgency to respond to the location as it continued to escalate could have played a significant role in the outcome of the incident. The investigation identified an approximate 16-minute delay in her response from Olympic CPS to the scene. The Board considered the requirement for a supervisor to immediately respond to radio calls involving edged weapons and to respond without delay to Code Two calls. The Board opined her lack of action and failure to assume supervisory oversight could have impacted the outcome of the incident, thereby necessitating she be evaluated as a substantially involved party in this incident.

The Board determined when Sergeant Guerrero advised Communications Division (CD) she would be responding, she effectively asserted command and control and ownership of the incident. Sergeant Guerrero's failure to respond in a timely manner after declaring her intention to assume a supervisory role substantially deviated from Department standards and expectations of a field supervisor. In assessing the credibility of Sergeant Guerrero's explanation for failing to respond in a timely manner, the Board noted Sergeant Guerrero had been assigned to Olympic Division for approximately one year, the distance from Olympic CPS to the OIS scene was only a couple blocks away and she could have been guided by the air unit already on scene when she began to respond. The Board deemed Sergeant Guerrero's reasons insufficient to form a reasonable justification for her deviation. Furthermore, Sergeant Guerrero's advisement she would respond gave the impression to CD, the Olympic Watch Commander and Sergeant Gonzalez, that she was responding to satisfy the requirement of the edged weapon protocols. Had Sergeant Guerrero advised her response would be delayed, that would have alerted CD, the Olympic Watch Commander or another supervisor that a timelier supervisor response was still needed, consistent with the edged weapon protocols. The Board determined Sergeant Guerrero's delay, resulting in a failure to respond in a timely manner was a substantial deviation, without justification, from Department standards and expectations of a Department supervisor.

The UOFRB determined, and the Chief concurred, the overall actions of Sergeant Guerrero were not consistent with Department training and the Chief's expectations of supervisors during a critical incident. Therefore, the Chief found Sergeant Guerrero's actions to be a substantial deviation, without justification, from Department-approved tactical training requiring a finding of Administrative Disapproval for Tactics.

51

The overall actions of Officer Morse and Sergeant Gonzalez, along with Detective Lona and Sergeant Cook, were consistent with Department training and the Chief's expectations of a senior officer and Department supervisors during a critical incident.

**Tactical Debrief**

- In conducting an objective assessment of this case, the UOFRB determined, and the Chief concurred, the actions of Officers Morse and Artega Mayen were not a deviation from Department-approved tactical training. The UOFRB also determined, and the Chief concurred, the actions of Officers Rodriguez and Hernandez were a substantial deviation, with justification, from Department-approved tactical training. Lastly, the UOFRB determined, and the Chief concurred, the actions of Sergeant Guerrero were a substantial deviation, without justification, from Department-approved tactical training.

  Each tactical incident merits a comprehensive debriefing. In this case, there were identified areas where improvements could be made. A Tactical Debrief is the appropriate forum for the involved officers to discuss individual actions that took place during this incident.

  Therefore, the Chief will direct Officers Morse, Artega Mayen, Rodriguez and Hernandez, along with Sergeant Guerrero, to attend a Tactical Debrief and the identified topics be discussed.

**General Training Update (GTU)**

- Officers Rodriguez, Artega Mayen and Hernandez attended a GTU on September 21, 2023. Officer Morse attended a GTU on October 4, 2023.

**Drawing/Exhibiting**

- *Department policy relative to drawing and exhibiting a firearm is: "Unnecessarily or prematurely drawing or exhibiting a firearm limits an officer's alternatives in controlling a situation, creates unnecessary anxiety on the part of citizens, and may result in an unwarranted or accidental discharge of the firearm. Officers shall not draw or exhibit a firearm unless the circumstances surrounding the incident create a reasonable belief that it may be necessary to use the firearm in conformance with this policy on the use of firearms."*

  *During a special meeting on September 29, 1977, the Board of Police Commissioners adopted the following as a valid interpretation of this Section: "Unnecessarily or prematurely drawing or exhibiting a firearm limits an officer's alternatives in controlling a situation, creates unnecessary anxiety on the part of citizens, and may result in an unwarranted or accidental discharge of the firearm. An officer's decision to draw or exhibit a firearm should be based on the tactical*

52

*situation and the officer's reasonable belief there is a substantial risk that the situation may escalate to the point where deadly force may be justified. When an officer has determined that the use of deadly force is not necessary, the officer shall, as soon as practicable, secure or holster the firearm" (Los Angeles Police Department Manual, Volume No. 1, Section 556.80).*

**Officer Rodriguez**

- According to Officer Rodriguez, when she took cover at the dumpster, she observed De Anda armed with "large" knife. Although Officer Rodriguez recognized De Anda was far away, she believed he could close the distance quickly. Believing the situation could escalate to the use of deadly force, Officer Rodriguez unholstered her service pistol.

  *"So as we did that, I got out and I kind of bumped up because I saw a dumpster. So I wanted to use that as cover as well. And to see, to get a better visual of the suspect and identify, you know, the weapon. I identified and I saw that he did have a large knife even though he was maybe - - he was far away. So that's when I unholstered knowing, you know, that this - - this man is armed with a knife and could close distance in very fast. So, obviously, that could be a possible threat to myself or to, you know, others."[56]*

  *"I saw that he was armed with a knife. And base on, you know, my training and experience, people with knives, they could - - it - - the a threat because they could close that - - that distance, you know, in a matter of a few seconds. And, you know, obviously, I know the nature of the call with this guy was, you know, he had a knife, and that's very threatening just as much as a, you know, a firearm. And it's very quick to close distance."[57]*

**Officer Artega Mayen**

- According to Officer Artega Mayen, he recognized De Anda was armed with a knife. When Officer Artega Mayen observed De Anda raise his arm in a *"stabbing motion"* and close the distance, he secured his flashlight and unholstered his service pistol because he believed the situation could escalate to the use of deadly force.

  *As he's getting closer and closer and closer, he raises his arm in a stabbing motion with his knife on his right hand. At this point, I put my flashlight away. I draw my gun. And I point the gun at the suspect."[58]*

---

[56] Officer Rodriguez' transcript, Pages 10 and 11, Lines 19-4.

[57] Officer Rodriguez' transcript, Page 24, Lines 15-23.

[58] Officer Artega Mayen's transcript, Page 17, Lines 4-8.

53

*"I unholstered when the suspect made, I want to say probably feet away from us. That's when I unholstered."*[59]

*"I unholstered because I had to (UNINTELLIGIBLE) the suspect had a - - a large knife with him which could cause bodily - - serious bodily injury to an - - to an officer, which could be lead to a deadly - - deadly force. Therefore, I had to match his deadly forces with - - with what I could protect myself and protect my partner. So that will be my firearm, sir."*[60]

## Officer Hernandez (1st occurrence)

- Arriving at scene, Officer Hernandez observed De Anda armed with a knife. According to Officer Hernandez, he unholstered his service pistol because he believed the situation could escalate to the use of deadly force and the knife could cause serious bodily injury.

*"We go ahead and unholster our firearms, due - - well, policy states that we're able to draw and exhibit a firearm if circumstances surrounding the incident create reasonable belief that it may be necessary. Since he was holding the knife, you know, there was a chance that he - - he might approach us."*[61]

*"The first time, we obviously saw the suspect with a knife. So, you know, we have policies that state, you know, officers shall draw and exhibit a firearm if circ - - circumstances surrounding the incident create a reasonable belief that it would be necessary to use a firearm. So in this case, suspect has a knife that could cause, you know, GBI or SBI."*[62]

## Officer Hernandez (2nd occurrence)

After retrieving the 40mm LLL, Officer Hernandez observed De Anda running toward Officer Rodriguez while armed with a knife. In response, Officer Hernandez dropped the 40mm LLL and unholstered his service pistol with the intent to protect Officer Rodriguez' life from serious bodily injury.

*"While I'm getting the 40, and I'm getting it loaded, I see that the suspect is running towards my partner and a primary officer near the dumpster. I then, at that point, drop the 40 because I see him approaching with the knife that, you know, could possibly - - You know, I'm - - I'm not able to defend my partner with a 40, so - - a*

---

[59] Officer Artega Mayen's transcript, Page 39, Lines 23-25.

[60] Officer Artega Mayen's transcript, Page 40, Lines 13-20.

[61] Officer Hernandez' transcript, Page 9, Lines 5-10.

[62] Officer Hernandez' transcript, Page 32, Lines 2-8.

*knife that could cause SBI or GBI. I then go ahead and go towards my partner. I unholster."* [63]

*"While I was loading up the 40, I did see the suspect approach the - - my partner with a - - the knife still in his hand. So at that point, you know, the less lethal was - - I don't want to say it's useless. But in order for me to defend my partner, I think the best option was my primary - - was my handgun. That's why I decided to drop the 40 and go ahead and unholster and draw my firearm."* [64]

*"The second time I unholstered was because I saw the suspect approaching the - - my partner."* [65]

**OFFICER HERNANDEZ:** *"Unholstered. That's when I saw the suspect was rapidly charging at my suspect - - at my partner. So that's when I went and go ahead and drew out my firearm."*

**DETECTIVE MERCADO:** *"Why?"*

**OFFICER HERNANDEZ:** *"So it was to defend my partner. You know, like I told - - like I said, in a case where, you know, my partner's firearm, you know, has a malfunction, and she's not able to fix it, you know, I'm - - I'm there to protect her. And since he does have a knife, you know, you know, we're able to use deadly force to - - when it comes down to, you know, something that could cause, you know, GBI or serious - - or - - or possibly death."* [66]

The UOFRB assessed Officers Rodriguez, Artega Mayen and Hernandez' drawing and exhibiting of their service pistols. The Board noted Officers Rodriguez and Hernandez unholstered their service pistols when they arrived on scene and observed De Anda armed with a knife. The Board noted although Officer Rodriguez felt De Anda was far away, they considered her belief he could close the distance quickly and, as noted in BWV, De Anda was rapidly advancing. As such, the Board opined it was objectively reasonable to believe the situation could escalate to the use of deadly force when faced with an individual armed with a knife.

As it pertained to Officer Hernandez' second drawing and exhibiting and Officer Artega Mayen's drawing and exhibiting, the Board noted at the time they unholstered their service pistols, De Anda began running toward officers' direction while armed with a large knife. The Board opined Officer Hernandez and Artega Mayen's

---

[63] Officer Hernandez' transcript, Page 9, Lines 13-20.

[64] Officer Hernandez' transcript, Pages 20 and 21, Line 25-7.

[65] Officer Hernandez' transcript, Page 32, Lines 11-12.

[66] Officer Hernandez' transcript, Page 35, Lines 13-25.

55

drawing and exhibiting was objectively reasonable when faced with an individual running toward officers while armed with a knife.

Based on the totality of the circumstances, the UOFRB determined, and the Chief concurred, an officer with similar training and experience as Officers Rodriguez, Artega Mayen and Hernandez would reasonably believe there was a substantial risk the situation may escalate where deadly force could be justified.

Therefore, the Chief found Officers Rodriguez, Artega Mayen and Hernandez' Drawing/Exhibiting to be In-Policy, No Further Action.

**Policy on the Use of Force[67]**

**Use of De-Escalation Techniques**

- *It is the policy of this Department that, whenever feasible, officers shall use techniques and tools consistent with department de-escalation training to reduce the intensity of any encounter with a suspect and enable an officer to have additional options to mitigate the need to use a higher level of force while maintaining control of the situation.*

**Verbal Warnings**

- *Where feasible, a peace officer shall, prior to the use of any force, make reasonable efforts to identify themselves as a peace officer and to warn that force may be used, unless the officer has objectively reasonable grounds to believe that the person is aware of those facts.*

**Proportionality**

- *Officers may only use a level of force that they reasonably believe is proportional to the seriousness of the suspected offense or the reasonably perceived level of actual or threatened resistance.*

**Rendering Aid**

- *After any use of force, officers shall immediately request a rescue ambulance for any person injured. In addition, officers shall promptly provide basic and emergency medical assistance to all members of the community, including victims, witnesses, subjects, persons in custody, subjects of a use of force and fellow officers: To the extent of the officer's training and experience in first aid/CPR/AED; and, To the level of equipment available to an officer at the time assistance is needed.*

---

[67] LAPD Manual, Volume 1, Section 556.10.

56

**Requirement to Intercede When Excessive Force is Observed**

- *An officer shall intercede when present and observing another officer using force that is clearly beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances, taking into account the possibility that other officers may have additional information regarding the threat posed by a subject.*

**Factors Used to Determine Objective Reasonableness**

- *Pursuant to the opinion issued by the United States Supreme Court in Graham v. Connor, the Department examines the reasonableness of any particular force used: a) from the perspective of a reasonable Los Angeles Police Officer with similar training and experience, in the same situation; and b) based on the facts and circumstances of each particular case. Those factors may include, but are not limited to:*
  - *The feasibility of using de-escalation tactics, crisis intervention or other alternatives to force;*
  - *The seriousness of the crime or suspected offense;*
  - *The level of threat or resistance presented by the subject;*
  - *Whether the subject was posing an immediate threat to officers or a danger to the community;*
  - *The potential for injury to citizens, officers or subjects;*
  - *The risk or apparent attempt by the subject to escape;*
  - *The conduct of the subject being confronted (as reasonably perceived by the officer at the time);*
  - *The amount of time and any changing circumstances during which the officer had to determine the type and amount of force that appeared to be reasonable;*
  - *The availability of other resources;*
  - *The training and experience of the officer;*
  - *The proximity or access of weapons to the subject;*
  - *Officer versus subject factors such as age, size, relative strength, skill level, injury/exhaustion and number officers versus subjects;*
  - *The environmental factors and/or other exigent circumstances; and,*
  - *Whether a person is a member of a vulnerable population.*

**Use of Force – Deadly**

- *It is the policy of this Department that officers shall use deadly force upon another person only when the officer reasonably believes, based on the totality of circumstances, that such force is necessary for either of the following reasons:  To defend against an imminent threat of death or serious bodily injury to the officer or to another person; or, To apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the*

57

*person will cause death or serious bodily injury to another unless immediately apprehended.*

*In determining whether deadly force is necessary, officers shall evaluate each situation in light of the particular circumstances of each case and shall use other available resources and techniques if reasonably safe and feasible. Before discharging a firearm, officers shall consider their surroundings and potential risks to bystanders to the extent reasonable under the circumstances.*

> **Note**: *Because the application of deadly force is limited to the above scenarios, an officer shall not use deadly force against a person based on the danger that person poses to themselves, if an objectively reasonable officer would believe the person does not pose an imminent threat of death or serious bodily injury to the officer or another person.*

**The Department's Evaluation of Deadly Force**

- *The Department will analyze an officer's use of deadly force by evaluating the totality of the circumstances of each case consistent with the California Penal Code Section 835(a), as well as the factors articulated in Graham v. Connor.*

**Lethal Use of Force**

- Per the FID investigation, a sound graph analysis determined a total of five rounds were fired within 1.119 seconds between both Officers Rodriguez and Artega Mayen. The analysis determined that Officer Rodriguez fired the first, third and fifth gunshots. Officer Artega Mayen fired the second and fourth gunshots.

- **Officer Rodriguez –** Smith & Wesson, Model M&P, 9mm, three rounds from an approximate decreasing distance of 28 feet to 23 feet in an easterly direction.

    **Background –** According to Officer Rodriguez, her background was clear and consisted of an empty parking lot at the time of the OIS. Officer Rodriguez did not observe any community members in the background.

    While in the parking lot, De Anda began running toward Officer Rodriguez while armed with a knife. De Anda briefly paused as he approached Officer Rodriguez and continued toward her direction while he sidestepped. As De Anda continued to close the distance on Officer Rodriguez and refused to listen to commands, Officer Rodriguez discharged three rounds from her service pistol in De Anda's direction. According to Officer Rodriguez, she was scared and shot three rounds to protect herself and her partner's life.

    *"...he started kind of running up quickly, closing distance. So, I moved with my gun at low-ready still on the opposite side of the dumpster, the driveway. As I did that, I hurried up to, you know, move from there on the opposite side of the dumpster so I*

CONFIDENTIAL

*could have visual on him and, obviously, to see the distance of the threat, but he started running with the knife, waving it, and I gave him a few commands to drop the knife. And he didn't. And he - - that's when he came in and closed distance and that's when I shot approximately three rounds."[68]*

*"And, you know, I shot those three rounds because he was closing distance and, you know, was coming towards me, which, you know, obviously, I was scared and, you know, I want to protect myself and my partner and I knew that those citizens that originally flagged me down were behind me are in close proximity. And so that's why, you know, I had to do that."[69]*

*"I was scared. I was scare - - yeah. I was scared that he was, you know, coming at me with the knife and, you know, at the end of the day, I want to go home to my family and I had a two - - or a P-I with me too, and I knew I was lethal so I knew I had to stop the threat. And as he, you know, didn't listen to my commands and, yeah, I had to, you know?"[70]*

When asked by FID investigators what she thought would happen if she did not use lethal force, Officer Rodriguez recalled, "*He would have hurt me or my partner because he was charging directly at us quickly with the knife.*"[71]

### Round One

De Anda did not comply with the officers' commands to drop the knife. Instead, he abruptly ran toward the south gate entrance with the knife in his right hand where Officers Hernandez, Artega Mayen and Rodriguez were positioned. According to Officer Rodriguez, she was scared and perceived De Anda as a threat to herself, the other officers and community members. Believing De Anda was going to cause great bodily injury or death to herself and the other officers, Officer Rodriguez fired one round at De Anda in an easterly direction from an approximate distance of 28 feet.[72]

*"He didn't listen to my commands and he - - he was closing distance still running after - - us with the knife.[73]*

---

[68] Officer Rodriguez' transcript, Page 12, Lines 1-12.

[69] Officer Rodriguez' transcript, Page 12, Line 14-21.

[70] Officer Rodriguez' transcript, Page 30, Lines 6-12.

[71] Officer Rodriguez' transcript, Page 30, Lines 15-16.

[72] Officer Rodriguez estimated De Anda was 12 feet away from her when she fired her first round.

[73] Officer Rodriguez' transcript, Page 44, Line 11-13.

59

CONFIDENTIAL

**Rounds Two and Three**

Officer Rodriguez assessed after firing her first round and determined De Anda was still standing and armed with the knife. Officer Rodriguez fired two additional rounds at De Anda, also in an easterly direction, from an approximate decreasing distance of 25 to 23 feet.

*"Or after the first one, which is why I saw that the threat still was there and he wasn't down, so that's why I fired the second one."*[74]

When FID investigators asked why she fired the third round, Officer Rodriguez recalled, *"Because I - - I did the shots, the - - my second and third round, you know, back to back because I saw that the threat was still thereafter, you know, my first one* [Round One]*."*[75]

• **Officer Artega Mayen–** Smith & Wesson, Model M&P, 9mm, two rounds from a decreasing distance of approximately 25 to 23 feet in an easterly direction.

**Background –** According to Officer Artega Mayen, his background was clear and consisted of an empty parking lot at the time of the OIS. Officer Artega Mayen did not observe any community members in the background.

When De Anda began running toward the south entrance where officers were positioned, Officer Artega Mayen ran south toward their direction. While armed with a knife, De Anda began to close the distance on Officer Rodriguez. In response, Officer Artega Mayen discharged two rounds in De Anda's direction. According to Officer Artega Mayen, De Anda was closing the distance while holding the knife in his right hand in a "stabbing motion." Officer Artega Mayen assessed De Anda was closing the distance too quickly to utilize intermediate force options and believed De Anda posed a threat of serious bodily injury to the officers.

*"At this point, I took approximately like six steps over, a really quick sprint next to my partner. I had the fence in front of me as coverage and the suspect is just charging towards us with a knife, a black handle. The blade was approximately like 10 inches long charging towards us and he's coming down the little ramp and he's coming fast, the knife in his right hand in a stabbing motion. And it was at this time that for the safety of myself, for the safety of my partner, I fired approximately two rounds in the direction of the suspect, which would be east.*[76]

---

[74] Officer Rodriguez' transcript, Page 36, Lines 21-23.

[75] Officer Rodriguez' transcript, Page 38, Lines 9-12.

[76] Officer Artega Mayen's transcript, Page 17, Lines 13-24.

CONFIDENTIAL

60

"At that point, I felt that he became an immediate threat to the life of officers due to
the fact that he was just sprinting so fast. And he started closing the distance. I felt
that - - I felt that he had closed that distance so quick that like he was approaching
Officer Kassandra [Rodriguez] and I saw him moving forward."[77]

"At this point, he - - it was an immediate - - immediate threat to the life of officers.
He kind of stops a little but then proceeded to run again in our direction."[78]

"We could have considered using less lethal but at this point, the suspect had closed
distance too quickly for us to deploy the 40-millimeter. He was approaching us in a -
- with a knife in a stabbing motion. And there was - - there was - - there was an
immediate threat to our life and our safety."[79]

"If I would not fire at the suspect, my partner or myself, we could have been
seriously body - - we could have had serious bodily injuries. Like I stated earlier, it
was a - - it was a large knife. And the speed that he was coming towards us, if he
would have made contact, one of us would have been seriously injured or possibly
cause death."[80]

"I quickly - - I - - I - - I shot my first round and then I saw him still moving. And that's
when I shot my second round, sir."[81]

"I shot my second round because the suspect was still moving in our direction, sir,
closing distance."[82]

The UOFRB assessed the circumstances and evidence related to the use of deadly
force. In their assessment of the OIS, the Board considered Officer Artega Mayen's
numerous attempts to convince De Anda to drop the knife. The Board noted De
Anda charged at officers while armed with a knife, dictating the officers' actions. The
Board further considered the distance De Anda had traveled in a short span of time
and determined De Anda had rapidly closed the distance on the officers. The Board
opined the use of deadly force by Officers Rodriguez and Artega Mayen to stop the
deadly threat posed by De Anda was objectively reasonable, proportional and
necessary.

---

[77] Officer Artega Mayen's transcript, Page 38, Lines 14-20.

[78] Officer Artega Mayen's transcript, Pages 38 and 39, Lines 23-1.

[79] Officer Artega Mayen's transcript, Page 47, Lines 11-17.

[80] Officer Artega Mayen's transcript, Pages 54 and 55, Lines 24-5.

[81] Officer Artega Mayen's transcript, Page 44, Lines 1-3.

[82] Officer Artega Mayen's transcript, Page 44, Lines 6-8.

CITY   001302

Based on the totality of the circumstances, the UOFRB determined, and the Chief concurred, an officer with similar training and experience as Officers Rodriguez and Artega Mayen in the same situation, would reasonably believe the use of lethal force was objectively reasonable, proportional and necessary.

Therefore, the Chief found Officer Rodriguez and Artega Mayen's use of Lethal Use of Force, all rounds, to be In Policy, No Further Action.

## Medical Treatment/Rendering Aid

- At 2036:08 hours, Officer Morse requested a Los Angeles Fire Department (LAFD) RA for De Anda. With regard to officers' rendering aid to De Anda, the Board opined officers treated him to the extent of their knowledge and available equipment. Officer A. Welch, Serial No. 43669, Olympic Patrol Division, cut a portion of De Anda's shirt and used it to apply pressure to the back of his head, moved him into a left-lateral recovery position and checked him for additional injuries. Officer Morse directed officers begin chest compressions so the left handcuff was removed; however, a pulse was detected so chest compressions were not necessary. The LAFD personnel provided emergency medical treatment to De Anda for a gunshot wound to his head. According to the autopsy report, the projectile entered the right eye, struck the brain and fragmented. No exit wound was present.

  **Note:** Although the LAFD Incident Details Report indicated RA No. 211 arrived at scene at approximately 2051:15 hours, they were captured arriving on Officer Shin's BWV at approximately 2048 hours.

  At approximately 2053 hours, LAFD RA personnel transported De Anda to Dignity Health-California Hospital Medical Center. Upon arrival, De Anda was taken to the emergency room where Doctor Jones initiated lifesaving protocols. De Anda did not respond to treatment and was pronounced deceased at 2100 hours.[83]

## Additional/Equipment

| Body Worn Video | | | | |
|---|---|---|---|---|
| Sworn Employee | Issue | Inspection Date Range | Inspection Results | Disposition |
| Sergeant Guerrero | Late Activation | N/A – assigned to DSVD, not field | N/A | SAI/Counseled |

---

[83] Toxicology analysis results documented De Anda had amphetamine and methamphetamine in his blood at the time of his death.

62

CONFIDENTIAL

- **Crime Broadcast –** Officers Tse and Pedroza did not conduct a crime broadcast for the initial robbery investigation in which De Anda stole the knife from De Leon. Officers Tse and Pedroza were not interviewed since they were not witnesses to the OIS. As this issue was addressed via Divisional Training, with Operations – West Bureau (OWB) and Office of Operations (OO) concurrence, the Chief deemed no further action necessary.

- **Required Equipment –** Officers Rodriguez and Artega Mayen did not have a baton or Hobble Restraint Device (HRD) on their person at the time of the incident. Their respective HRDs and batons were left in their police vehicles. As this issue was addressed via Divisional Training, with OWB and OO concurrence, the Chief deemed no further action necessary.

- **Visible Tattoo –** Officer Rodriguez can be seen on BWV with her tattoo exposed on her right forearm. As this issue was addressed via an SAI and Divisional Counseling, with OWB and OO concurrence, the Chief deemed no further action necessary.

- **Watch Commander's Daily Log –** According to FID, the Department Operations Center (DOC) was notified at 2055 hours. Lieutenant M. Hernandez, Serial No. 35609, Olympic Patrol Division Watch Commander, indicated in his Watch Commander's Daily log the DOC was notified at 2040 hours. As this issue was addressed via Divisional Training, with OWB and OO concurrence, the Chief deemed no further action necessary.

- **Witness Identification –** After the OIS, Sergeant Gonzalez directed Officer A. Cholico, Serial No. 44608, Olympic Patrol Division, to canvass the parking lot for any injured community members. As Officer Cholico walked around the parking lot, she encountered a male Hispanic lying underneath a tree in a patch of grass near the northern end of the lot. Officer Cholico asked the male if he was "okay," and he said he was. Officer Cholico did not complete a Field Interview (FI) Card on the person or ascertain if he witnessed the incident. As this issue was addressed via Divisional Training, with OWB and OO concurrence, the Chief deemed no further action necessary.

- **Rescue Ambulance Transport –** Officers Welch and Cholico followed the RA to the hospital in their police vehicle rather than one officer riding in the RA. Los Angeles Fire Department advised them there was no room in the RA due to them providing treatment. No interviews of LAFD personnel were conducted; therefore, it is unknown if seating in the front of the RA was available. As this issue was addressed via Divisional Training, with OWB and OO concurrence, the Chief deemed no further action necessary.

CONFIDENTIAL

63

**Requirement to Intercede**

- Based on the review of this incident, the UOFRB determined, and the Chief concurred, the force used by Officers Rodriguez and Artega Mayen was not clearly beyond that which was necessary, as determined by an objectively reasonable officer under the circumstances and would not have required an officer to intercede.

**Audio/Video Recordings**

- Force Investigation Division investigators reviewed the Digital In-Car Video Systems (DICVS) and BWVs of the officers mentioned in the FID administrative summary. Force Investigation Division investigators also located and reviewed outside video sources and monitored social media sites for information pertaining to this incident. Details surrounding the collection of audio, video and social media accounts are contained in the FID administrative summary.

CITY    001305

INSPECTOR GENERAL REVIEW

### Inspector General Analysis

**Investigation Quality**

- No significant issues of concern were identified in relation to investigation quality.

**Training Issues**

- No significant issues of concern were identified in relation to training.

**Equipment Issues**

- No significant issues of concern were identified in relation to equipment.

**Detention**

- The OIG concurs with the Chief's analysis.

**Tactical De-Escalation**

- The OIG concurs with the Chief's analysis.

**Requirement to Intercede**

- The OIG concurs with the Chief's analysis.

**BWV and DICVS Policy Compliance**

| SERIAL | NAME | TIMELY BWV ACTIVATION | FULL 2-MINUTE BUFFER | BWV RECORDING OF ENTIRE INCIDENT | TIMELY DICVS ACTIVATION | DICVS RECORDING OF ENTIRE INCIDENT |
|--------|------|------------------------|----------------------|-----------------------------------|--------------------------|-------------------------------------|
| 40361 | Sgt. Guerrero | No | Yes | Yes | Yes | Yes |
| 32297 | Officer Morse | Yes | Yes | Yes | N/A | N/A |
| 45139 | Officer Arteaga Mayen | Yes | Yes | Yes | N/A | N/A |
| 43023 | Officer Rodriguez | Yes | Yes | Yes | Yes | Yes |
| 45248 | Officer Hernandez | Yes | Yes | Yes | Yes | Yes |

65

**Inspector General Recommendations**

**Tactics**

- The OIG concurs with the Chief's findings.

**Drawing/Exhibiting**

- The OIG concurs with the Chief's findings.

**Lethal Use of Force**

- The OIG concurs with the Chief's findings.

JOHN GARNER
Acting Assistant Inspector General


FLORENCE YU
Acting Inspector General

66

CITY    001307