**HYDEE FELDSTEIN SOTO**, City Attorney (SBN 106866)
**DENISE C. MILLS**, Chief Deputy City Attorney (SBN 191992)
**KATHLEEN KENEALY**, Chief Assistant City Attorney
**CORY M. BRENTE**, Senior Assistant City Attorney (SBN 115453)
**CHRISTIAN R. BOJORQUEZ**, Deputy City Attorney (SBN 192872)
200 N. Main Street, 6th Floor, City Hall East, Los Angeles, California 90012
Tel: (213) 978-7023 | Fax: (213) 978-8785 | Email: christian.bojorquez@lacity.org

*Attorneys for Defendant* CITY OF LOS ANGELES et al.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| M.B., by and through her Guardian ad litem, Nayelli Bautista and L.D., by and L.D., by and through his Guardian ad litem, Jasmin Trinidad, individually and as successors in interest to Carlos De Anda, deceased, <br><br> Plaintiff, <br><br> vs. <br><br> CITY OF LOS ANGELES, JOSE ARTEAGA MAYAN; KASSANDRA RODRIGUEZ; and DOES 1-10, Inclusive, <br><br> Defendants. | **Case No. 2:24-CV-07642 SVW (SSC)** <br> *Hon. Stephen V. Wilson, Ctrm 10A (First Street)* <br> *Mag. Stephanie Christensen, Ctrm 790 (Roybal)* <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' ADDITIONAL MATERIAL FACTS (DKT. 53-2)** <br><br><br> Date: April 28, 2025 <br> Time: 1:30 p.m. <br> Court: 10A (First Street) |

**TO THE HONORABLE STEPHEN V. WILSON, UNITED STATES DISTRICT COURT JUDGE, AND TO PLAINTIFFS AND PLAINTIFFS' COUNSEL:**

Pursuant to Fed. R. Civ. Proc. 56 and Central District Local Rule 56-1, Defendants CITY OF LOS ANGELES et al. hereby submit their Opposition to Plaintiffs' Additional Material Facts (Dkt. 53-2).

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| 62. | Officers were not responding to a violent crime.<br><br>**Clark Decl**. ¶7.<br><br>**Exh. N, Ring Video**, Sincich Decl ¶15, at 00:00-01:00. | Disputed<br><br>The officers knew they were responding to an agitated man visibly armed with a knife, which could lead to a violent crime. As ¶7 of the Clark declaration acknowledges: "The Defendant Officers knew that this was a '415-man' call, for a man suspected of having a knife and alleged to have been vandalizing vehicles." See Dkt. 53-3 at ECF p. 4<br><br>Furthermore, the Ring Video, which is less than 1½ minutes long, simply shows officers running down the street while a civilian exits her home before running back inside. It does not support this fact. |
| 63. | The call was alleging a 415-man (i.e., disturbing the peace) armed with a knife vandalizing vehicles; a property crime that could be a misdemeanor.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 72:13-20.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 201:23-25.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 33:18-34:17. | Disputed<br><br>As Officer Mayen testified at deposition, he did not know whether he was responding to a misdemeanor or felony offense. See Dkt. 53-5 at ECF p. 48<br><br>As Officer Rodriguez testified at deposition, she did not know whether she was responding to a misdemeanor or felony offense but, even if it was a misdemeanor, De Anda was "still armed with a knife … [i]t was just more that he had that huge knife and he could have hurt me or somebody else." Thus, it was not particularly relevant whether De Anda's reported vandalism was misdemeanor or felony-level. See Dkt. 53-7 at ECF pp. 28-29 |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| 64. | Officer Mayen admitted that it is not a crime to be a "415 man" and not a crime to have a knife in a parking lot.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 71:13-20. | Disputed.<br><br>When asked: "Is it always a crime to be a 415 man?" Officer Mayen answered: "It's not always a crime to be 415. I mean, we get radio calls where there's an argument going on and it's just an argument. I mean, just because you're yelling doesn't mean that a crime has occurred."<br><br>When asked: "Is it a crime for a man to have a knife in the parking lot?" Officer Mayen answered: "It's not a crime to have a knife. It's a crime to – it's how you wield that knife and you put other people's life in danger." See Dkt. 53-5 at ECF p. 47. |
| 65. | This incident occurred in an empty parking lot, with no cars and no pedestrians.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 8:12-15, 70:10-16, 95:16-17, 96:21-22.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 225:19-20. | Undisputed |
| 66. | Officers used their spotlights and the light from a helicopter to illuminate De Anda during the incident.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 12:14-13:2. | Undisputed |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
|  | **Exh. D, Rodriguez Statement**, Sincich Decl ¶5, at 325:12-23— positioned the vehicle so that the spotlights illuminated De Anda. |  |
| 67. | Officer Mayen illuminated De Anda with his flashlight and did not see a knife on him or on his person.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 203:19-21. | Disputed<br><br>According to Officer Mayen, when he first spotted De Anda, he did not see him with a knife. But when De Anda walked midway through the parking lot and bent down, that's when the officer saw De Anda had armed himself with a knife. See Dkt. 53-6 at ECF p. 8. |
| 68. | However, Officer Mayen saw De Anda walk to the middle of the parking lot and pick up a knife off the ground after about 1-2 minutes.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 97:3-12.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 203:22-24. | Disputed<br><br>When De Anda walked midway through the parking lot and bent down, that's when the officer saw De Anda had armed himself with a knife. See Dkt. 53-6 at ECF p. 8.<br><br>However, the "1-2 minutes" refers to the amount of time Mayen was at scene before De Anda picked up his knife off the ground. See Dkt. 53-5 at ECF p. 71 |
| 69. | Then Officer Morse immediately called for backup.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 203:25-204:2. | Undisputed |
| 70. | Officers established a perimeter and contained De Anda in the parking lot. | Undisputed |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | **Exh. A, Mayen Depo**, Sincich Decl ¶2, at 84:18-23.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 204:3-4. | |
| 71. | Officer Mayen began to make verbal contact with him, screaming at De Anda.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 204:8-19. | Disputed<br><br>This grossly mischaracterizes the contact. According to Officer Mayen, he spoke to De Anda for an appreciable amount of time and did not need to raise his voice until De Anda kept walking away the officers. "And at this point, I'm screaming at him so I – I could hear him – I—so he could hear me talk to him." See Dkt. 53-6 at ECF p. 9 |
| 72. | Officer Mayen knew De Anda could have been suffering from a mental health crisis.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 66:1-7, 69:3-8, 69:14-17, 70:2-9, 70:22-71:1—knew De Anda was possibly suicidal, and that based on De Anda's apparent symptoms, that De Anda could have been suffering a mental health crisis. 65:3-9—De Anda was rambling with inconsistent statements.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 205:14-18—heard De Anda say, "I just want to kill myself"; 206:1-2—and that he wanted to kill himself because | Disputed<br><br>According to Officer Mayen, he thought: "Well, potentially, maybe they could be going through something, mentally, health-related. But we, as officers, don't react or don't act upon a person's mental health. We react on that person's behavior." See Dkt. 53-5 at ECF p. 45<br><br>Officer Mayen also believed De Anda was possibly under the influence of narcotics and that he was possibly suicidal given that De Anda said that he wanted to kill himself. See Dkt. 53-5 at ECF p. 45<br><br>When Officer Mayen heard De Anda say he just wanted to kill himself, the officer told his partner to get a SMART unit |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | people think he is crazy. 219:17—heard De Anda mumbling.<br><br>**Clark Decl**. ¶8. | because De Anda was suicidal. See Dkt. 53-6 at ECF p. 10. |
| 73. | In response, Officer Mayen told Officer Morse to call for the mental health unit.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 205:19-20. | Undisputed |
| 74. | Officer Mayen did not know if the mental health unit was ever requested.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 224:11-13. | Undisputed<br><br>As Officer Mayen explained: "I believe my partner did not request one. I think he -- he said he wanted to have that situation at a Code 4." Dkt. 53-6 at ECF p. 17. |
| 75. | Officer Rodriguez had mental illness training with the Mental Evaluation Unit on how to de-escalate situations.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 20:19-21:10. | Undisputed |
| 76. | From her training, Officer Rodriguez knew that persons potentially suffering from a mental illness are not in complete control of their actions and thought processes.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 21:20-22:17. | Disputed<br><br>When asked: "Based on that training, is it fair to say that sometimes a person doesn't have complete control over their actions?" Officer Rodriguez answered: "I think it depends on the individual for -- when it comes to illness. They could choose to get the help that they need and maybe try to overcome that." See Dkt. 53-7 at ECF p. 18. |

6

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| 77. | At the time of the incident, Officer Mayen was a probationally officer with only 10 months' experience.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 31:24-32:2, 53:11-13. | Undisputed<br><br>Officer Mayen was a probationary officer at the time of this incident and had been an officer for about 10 months. See Dkt. 53-5 at ECF pp. 24, 35 |
| 78. | Yet, Officer Mayen led the communication with De Anda.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 98:7-10. | Disputed<br><br>Although Officer Mayem testified that he communicated with De Anda, he did not testify that he *led* the communication with De Anda. See Dkt. 53-5 at ECF p. 72. |
| 79. | Further, Officer Rodriguez did not consider the possibility that De Anda was experiencing a mental health crisis because she did not evaluate him and had no dialogue with him.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 23:7-24:2. | Undisputed |
| 80. | Officer Rodriguez did observe De Anda acting erratic but did not contact the mental health unit and did not know if it was ever contacted.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 16:10-12, 29:6-16.<br><br>**Exh. D, Rodriguez Statement**, Sincich Decl ¶5, at 335:21-23. | Disputed<br><br>According to Officer Rodriguez, while De Anda was acting in an erratic manner, she did not have contact with De Anda and was not near the primary officers, so she didn't hear whether the MEU was contacted. See Dkt. 53-7 at ECF p. 25<br><br>Nor did she have time to contact MEU once De Anda started jogging toward her. See Dkt. 53-8 at ECF p. 12 |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| 81. | At this point, Officer Mayan already knew that other officers had arrived and created the perimeter surrounding the parking lot.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 206:4-6. | Undisputed |
| 82. | When Officer Mayen was attempting to communicate with De Anda, offices had time, distance, and cover, and no one's life was in danger.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 222:17-20. | Undisputed |
| 83. | Then, Officer Mayen saw De Anda distracted by officers attempting to enter the north-side parking lot, so Officer Mayen told the officers, "Hey, back up, back up. Stand by."<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 206:13, 19-21. | Disputed<br><br>According to Officer Mayen: "At one point, I see that he's (De Anda) distracted looking towards the direction that he came in through on the – on the north entrance of the – of the parking lot. And I kind of noticed that he kind of steps over and he kind of tries to rush in that direction." See Dkt. 53-6 at ECF p. 11.<br><br>"And then I look in that direction and I see officers attempting to possibly enter the parking lot structure, so I tell them, like, 'Hey, back up, back up. Stand by … Just move back." *Id*. |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| 84. | Officer Rodriguez admitted that it would be unsafe to go inside the parking lot, yet went inside the fence, inside the parking lot.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 81:23-25.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 56:10-12. | Disputed<br><br>According to Officer Mayen, he saw Officer Rodriguez go inside the fence, inside the parking lot but did not testify that doing so would be unsafe. See Dkt. 53-5 at ECF p. 57.<br><br>As for Officer Rodriguez, when asked: "Would it be unsafe to go inside the parking lot?" she answered: "Yeah. If he has a really large knife, I think it would have been, obviously -- there was no need to go towards him at that time, because we were there -- officers were there to try to de-escalate him, and hopefully drop the knife." See Dkt. 53-7 at ECF p. 48 |
| 85. | Officer Mayen saw Officer Rodriguez enter the parking lot gate on the south side and had to call Officer Rodriguez out of the parking lot, saying, "No, no. Back up. Back up. Do not enter the parking structure."<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 82:2-3.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 206:25-207:2, 207:7-10. | Disputed<br><br>When asked: "And did you call her (Rodriguez) out of the parking lot?" Officer Mayen answered: "Yes. I -- I called her out of the parking lot so we could have a line and that we could observe Mr. De Anda from -- from where we were standing. Like, that I could have a perception where she's at, and she could see possibly see where we're standing at, and we try not to cross that line." Officer Mayen did know if Officer Rodriguez was in an unsafe position. See Dkt. 53-5 at ECF p. 58<br><br>According to Officer Mayen, when Officer Rodriguez entered the open gate, and De Anda saw her and tried to make an approach toward her, he told Officer |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | | Rodriguez: "No, no … Back up. Back up … Partner, back up, man … Move back. Move back." (It is unclear if Officer Mayem actually said "Do not enter the parking structure" or if that was just the message he was trying to convey.) <br><br> See Dkt. 53-6 at ECF p. 12 |
| 86. | Officer Mayen learned that the parking lot gate was open by observing Officer Rodriguez inside the parking lot. <br><br> **Exh. A, Mayen Depo**, Sincich Decl ¶2, at 81:2-5. 81:18-25. | Undisputed |
| 87. | By reasonable inference, Officer Mayen knew that officers entering the parking lot escalated the situation. <br><br> **Exh. B, Mayen Statement**, Sincich Decl ¶3, at 207:16-18. | Disputed <br><br> Officer Mayen stated that: "At this point, we could have – we're de-escalating by just staying outside the parking lot and making sure that we could talk to him." See Dkt. 53-6 at ECF p. 12 |
| 88. | Prior to arriving on scene, officers knew they may be confronting a person with a knife but had no plan. <br><br> **Exh. A, Mayen Depo**, Sincich Decl ¶2, at 76:18-77:9—knew that he may be confronting a person armed with a knife. <br><br> **Exh. B, Mayen Statement**, Sincich Decl ¶3, at 244:1-5— | Undisputed |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
|  | there was never a discussion about what officers were going to do to take De Anda into custody.<br><br>**Exh. D, Rodriguez Statement**, Sincich Decl ¶5, at 351:24-352:7—according to Officer Rodriguez, Officer Morse was in command and control of the incident but provided her with no direction. |  |
| 89. | The officers had multiple options for cover at the time of their use of deadly force.<br><br>**Exh. I, Scene photos**, Sincich Decl ¶10, at 1-5.<br><br>**Clark Decl**. ¶9. | Disputed<br><br>Because still photos do not provide the best evidence of the officers' cover options, from their point of view, Defendants refer the Court to the officers' body worn video instead |
| 90. | When confronting a person potentially armed with a knife, officers are trained to consider taking cover.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 77:10-19. | Undisputed |
| 91. | Cover is important because it provides officers with time and distance from the subject and an opportunity to verbally de-escalate the situation.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 77:20-23. | Undisputed |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| 92. | If cover is available, officers should take it.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 79:17-20. | Disputed<br><br>When asked: "Is it fair to say that if cover is available, officers should attempt to stay behind cover?" Officer Mayen answered: "If -- if cover is available, me, as an officer, I will try to take cover, but we to go different scenarios and every location is different. Sometimes it could be an open field to an indoor apartment, and you don't have the luxury to always have cover." See Dkt. 53-5 at ECF p. 55 |
| 93. | There were civilian vehicles parked on both sides of the streets that could have been used as cover.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 79:1-80:5.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 202:18-21.<br><br>**Exh. I, Scene Photos**, Sincich Decl ¶10, at 1-5.<br><br>**Exh. N, Ring Video**, Sincich Decl ¶15, at 00:00-01:00. | Disputed<br><br>Officer Mayen's complete depo answer is: "There were civilian vehicles parked on both sides of the street. And, yes, they could have been used as cover. But De Anda was not in the street; he was inside a parking lot where we were using a fence as cover." See Dkt. 53-5 at ECF p. 56<br><br>According to Officer Mayen, they did use the cars as cover before locating De Anda. See Dkt. 53-6 at ECF p. 7 |
| 94. | Officers were using the parking lot fence atop a 3-foot wall as cover.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 80:5-7.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 203:12-17. | Undisputed |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | **Exh. I, Scene Photos**, Sincich Decl ¶10, at 1-5. | |
| 95. | The officers used the fence and the wall as cover and had several cars as options to redeploy behind as cover if needed.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 205:5-8. | Undisputed |
| 96. | At the south gate, Officer Rodriguez placed her vehicle, with ballistic panels, south of the apron facing east so that it could be utilized as cover if needed.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 55:1-8.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 31:5-12.<br><br>**Exh. I, Scene Photos**, Sincich Decl ¶10, at 1-5. | Undisputed |
| 97. | Officer Rodriguez specifically positioned her patrol vehicle in a manner so that if De Anda came running towards officers, and they had no cover, the officer would have the vehicle close by to use as cover.<br><br>**Exh. D, Rodriguez Statement**, Sincich Decl ¶5, at 314:2-5. | Undisputed |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| 98. | There were officer vehicles just behind the officers when they used force.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 55:1-8. | Disputed<br><br>According to Officer Mayen, there was a police vehicle to the west of where he was standing. See Dkt. 53-5 at ECF p. 37 |
| 99. | Officer Mayen admitted to investigators that officers could have redeployed behind vehicles that were right next to the curb. However, Officer Mayen did not redeploy behind cover because Officer Rodriguez did not redeploy behind cover.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 238:20-239:6.<br><br>**Exh. I, Scene Photos**, Sincich Decl ¶10, at 1-5. | Disputed<br><br>When asked: "Was there ever any consideration of redeploying from the sidewalk to maybe to the behind the vehicles that were parked on the east side of the curb?" Officer Mayen answered: "Yes. I think we could have -- I think I could have redeployed, but if I would have redeployed and my partner, Officer Kassandra, did not redeploy, then it would have become a -- a hazard for the officer. There is -- because if she -- if I would have moved behind cover, behind a vehicle, she would have been in front of me, sir, and I would not be able to shoot."<br><br>See Dkt. 53-6 at ECF p. 20 |
| 100 | Officer Rodriguez left the cover of her vehicle because she saw Officers Morse and Mayen at the fence and wanted to be in line with them.<br><br>**Exh. D, Rodriguez Statement**, Sincich Decl ¶5, at 326:7-18. | Disputed<br><br>According to Officer Rodriguez, she wanted to be "leveled" with them and to also get a better visual. See Dkt. 53-8 at ECF p. 10 |
| 101 | Officers Rodriguez and Mayen did not give a warning prior to using deadly force. | Disputed |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | **Exh. A, Mayen Depo**, Sincich Decl ¶2, at 128:19-22.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 14:10-15.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 14:4-9—only command she gave was drop the knife.<br><br>**Clark Decl**. ¶10. | According to Officer Mayen: "At that time, I did not give him a warning, due to the fact that everything happened so quick. Everything happened so fast that I was unable to give him a warning that if he stops -- if he doesn't stop I will shoot him. But I did tell him multiple times to drop the knife … and I believe that a reasonable person would have dropped the knife if they see that officers have guns pointed at them." See Dkt. 53-5 at ECF p. 75<br><br>(Defendants have attached p. 129 of Officer Mayen's depo transcript—the next page in the transcript—so the Court can see the officer's *entire* quote)<br><br>According to Officer Rodriguez: "I yelled to 'Drop the knife!' when he had stood still when he ran towards me … I would have (warned him that if he didn't drop the knife, I'd use deadly force) if I had time, but he didn't allow me to have that time. And we're, you know – we're – we would do so if it's feasible, but at that moment it was not feasible for me to be able to tell him that." See Dkt. 53-7 at ECF p. 11 |
| 102 | No officer gave a warning prior to the use of deadly force.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 15:6-17. | Disputed<br><br>According to Officer Rodriguez: "Again, De Anda didn't allow us that time. But from what I heard and observed, I didn't hear anything like that (didn't hear anybody give a deadly force warning). And I think, you know, him armed with a |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | | knife, I think, like, a rational person wouldn't – how do I say this? A rational person doesn't need to be told that when they're running at a -- with a knife towards an officer." <br><br> See Dkt. 53-7 at ECF p. 12 |
| 103 | Officer Mayen used deadly force approximately seven to eight minutes after arriving on scene. <br><br> **Exh. A, Mayen Depo**, Sincich Decl ¶2, at 8:5-9, 14:2-15, 91:3-10, 98:2-6. <br><br> **Exh. J, Mayen BWC**, Sincich Decl ¶11, at 20:28:00 – 20:35:56. | Undisputed |
| 104 | Officer Rodriguez was on scene for 4-5 minutes prior to using deadly force. <br><br> **Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 14:16-21. <br><br> **Exh. L, Rodriquez BWC**, Sincich Decl ¶13, at 20:31-00 – 20:35:56. | Undisputed |
| 105 | According to Officer Mayen, after 7 minutes, De Anda ran for about 13 seconds, and stopped for 3 seconds prior to the officer-involved shooting. <br><br> **Exh. A, Mayen Depo**, Sincich Decl ¶2, at 91:3-10. | Undisputed |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| 106 | Defendants admit that they fired within a fraction of a second of De Anda in a stopped position.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 91:3-10.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 12:12-23.<br><br>**Exh. J, Mayen BWC**, Sincich Decl ¶11, at 20:35-47—approximately time that De Anda starts moving toward gate to 20:35:56 – approximate time of first shot.<br><br>**Exh. K, Screenshots of Mayen BWC**, Sincich Decl ¶12, at 1-11.<br><br>**Exh. L, Rodriquez BWC**, Sincich Decl ¶13, at 20:35-47—approximately time that De Anda starts moving toward gate to 20:35:56 – approximate time of first shot.<br><br>**Exh. M, Screenshots of Rodriguez BWC**, Sincich Decl ¶12, at 1-22. | Disputed<br><br>According to Office Rodriguez, DeAnda stopped, made eye contact, moved toward Rodriguez and then she shot.<br><br>When asked: "How long was (De Anda) stopped for?" Officer Rodriguez said: "Maybe a second, a fragment of a second." When asked: "And then how long was it from the time that he started moving again until you fired your first shot?" she said: "Yeah, less -- the same. A second or a fragment of it." When asked: "So it was approximately less than a second to a second that he was stopped?" she said yes. When asked: "And then he started moving and it was less than a second to a second before you fired your first round?" she said yes.<br><br>See Dkt. 53-7 at ECF p. 10 |
| 107 | Officer Rodriguez admitted that De Anda's speed of movement was important to her analysis.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 10:23-25. | Undisputed<br><br>According to Officer Rodriguez: "It is important. Because, you know, someone armed with a knife advancing towards me, it could close distance, which in this |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | | case, he did, very quickly." See Dkt. 53-7 at ECF pp. 8-9 |
| 108 | Officer Mayen stated that De Anda "was still standing," not running, after he fired his first shot.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 234:20-22. | Disputed<br><br>Officer Mayen was asked: "So you fired your first round. Was it effective?" when he answered: "He was still standing, sir, so – " See Dkt. 53-6 at ECF p. 19 |
| 109 | After stopping, De Anda took a few steps to the side, away from the Defendant Officers, both south and east, then in the process of taking about one slow step, the officers used deadly force.<br><br>**Exh. E, LAPD Correspondence**, Sincich Decl. ¶6, at 28.<br><br>**Exh. J, Mayen BWC**, Sincich Decl ¶11, at 20:35-47 – 20:35:56.<br><br>**Exh. K, Screenshots of Mayen BWC**, Sincich Decl ¶12, at 1-11.<br><br>**Exh. L, Rodriquez BWC**, Sincich Decl ¶13, at 20:35-47 – 20:35:56.<br><br>**Exh. M, Screenshots of Rodriguez BWC**, Sincich Decl ¶12, at 1-22.<br><br>**Exh. O, Cell Phone Video**, Sincich Decl ¶16, at 00:00 –00:06. | Undisputed<br><br>Because still photos do not provide the best evidence of the officers' cover options, from their point of view, Defendants refer the Court to the officers' body worn video instead |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| 110 | Knowing the subject may be armed with a knife, the officers armed themselves with less lethal force options.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 77:23-9. | Undisputed |
| 111 | Officer Mayen admitted to investigators, "[w]e could have considered using less lethal."<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 238:7-14. | Disputed<br><br>This mischaracterizes the officer's answer. When asked: "Was there any consideration of maybe waiting to see if that less lethal could have been utilized prior to you using lethal force?" Officer Mayen said: "We could have considered using less lethal but at this point, the suspect had closed distance too quickly for us to deploy the 40-millimeter. He was approaching us in a -- with a knife in a stabbing motion. And there was -- there was -- there was an immediate threat to our life and our safety. And therefore, we were unable to use the 40-millimeter."<br><br>See Dkt. 53-6 at ECF p. 20 |
| 112 | Officer Rodriguez was armed with OC spray and a Taser and had a 40 mm launcher in the vehicle.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 25:16-22. | Undisputed |
| 113 | Officer Mayen had another 40 mm launcher available in his unit. | Undisputed |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | **Exh. A, Mayen  Depo**, Sincich Decl ¶2, at 90:3-5. | |
| 114 | Officer Mayen was equipped with a Taser and pepper spray.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 55:21-24. | Undisputed |
| 115 | Officers Rodriguez and Mayen knew that the Taser could cause neuromuscular incapacitation for 5 seconds to allow officers to take the subject into custody.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 56:9-17, 57:14-20, 57:22-58:6.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 63:10-12, 65:16-18. | Disputed<br><br>According to Officer Mayen, if the Taser is working correctly and you actually hit the target, then the Taser would cause neuromuscular incapacitation. See Dkt. 53-5 at ECF p. 38<br><br>According to Officer Rodriguez, if the Taser is used correctly, it can cause neuromuscular incapacitation. But the Taser's effectiveness may be diminished by a subject's body mass, narcotic use, clothing. She has seen a Taser *not* work. See Dkt. 53-7 at ECF p. 56 |
| 116 | Officer Morse was equipped with the 40 millimeter, less lethal launcher, just to Officer Mayen's left at the time of the force.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 28:2-6, 28:10-13. | Undisputed |
| 117 | During the use of force, Officer Hernandez was just to the right of the Defendant Officers with a 40 mm launcher. | Undisputed |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
|  | **Exh. B, Mayen Statement**, Sincich Decl ¶3, at 209:4-5.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 72:9-11— Officer Rodriguez directed her partner to be equipped with less-lethal force.<br><br>**Exh. D, Rodriguez Statement**, Sincich Decl ¶5, at 329:1— Officer Rodriguez knew her partner was equipped with less lethal. |  |
| 118 | Officer Rodriguez knew that an airship was requested and arrived prior to the use of force.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 28:3-10. | Undisputed |
| 119 | Officer Mayen admits that one option was for officers to re-deploy behind the civilian vehicles.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 80:15-17. | Disputed<br><br>When asked: "One of the options was to re-deploy behind the civilian vehicles, if necessary?" Officer Mayen answered: "If necessary, yes. But like I said, he was behind bars, so, therefore, there was no -- he never -- he never charged at us through those bars. He saw an opening, and he decided to charge where the opening was." Dkt. 53-5 at ECF p. 56 |
| 120 | When Officer Rodriguez arrived she considered bringing less lethal and admitted that she "should | Undisputed |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | have voiced it sooner but [] I didn't." **Exh. D, Rodriguez Statement**, Sincich Decl ¶5, at 320:11-16. | |
| 121 | Officer Rodriguez never considered moving the vehicle onto the apron to block the gate. **Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 31:19-21. **Exh. I, Scene Photos**, Sincich Decl ¶10, at 1-5. | Disputed When asked whether she considered moving the vehicle onto the apron, Officer Rodriguez said: "No, because tactically, I feel that's not safe. Because if I would have moved it onto the apron, it would have overpenetrated because it's a small or … it's a small area of the driveway and apron. So for whatever reason, if we needed to – if Officer Mayen and Officer Morris needed to render aid or help to me, it would be in the way of – if I would have moved it onto the apron." See Dkt. 53-7 at ECF pp. 26-27 |
| 122 | No officer attempted less lethal force during the incident despite officers being armed with less lethal force. **Exh. A, Mayen Depo**, Sincich Decl ¶2, at 27:20-25. **Clark Decl**. ¶11. | Disputed In this citation, Officer Mayen said no one used less lethal force. But he did not say whether an officer had attempted to use less lethal force. |
| 123 | Officer Mayen used deadly force when he fired two hollow-point rounds from his 9-millimeter | Disputed |

22

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | pistol, designed to open and spread after hitting their target.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 7:23-8:4, 11:19-12:2, 53:16-54:8, 54:16-20. | In this citation, Officer Mayen did not say that the rounds were designed to *open* and spread. |
| 124 | Officer Mayen aimed center mass, intentionally pressed the trigger for each shot, assessed between his shots, and intended that his shots strike De Anda.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 24:8-9, 25:1-7, 25:19-25, 26:1-9, 26:12-16. | Disputed<br><br>With respect to his first shot, Officer Mayen said he was aiming at center mass. According to Officer Mayen: "It was not an accidental shot … De Anda was approaching me, and I pressed the trigger." When asked: "And did you intend for that shot to strike Mr. De Anda?" Officer Mayen answered: "Yes. Mr. De Anda was approaching me, and I had to stop the threat at that time." See Dkt. 53-5 at ECF pp. 16-17.<br><br>With respect to his second shot, Officer Mayen said he was aiming at center mass. According to Officer Mayen: "I did intend to press the trigger, due to the fact that De Anda was still charging on my -- on myself … and Officer Kassandra." See Dkt. 53-5 at ECF pp. 17-18 |
| 125 | Officer Rodriguez used deadly force when she fired 3 rounds from her 9 mm pistol, aiming center mass, intentionally pulled the trigger for each shot, assessed between each round, and intended to strike De Anda. | Disputed<br><br>According to Officer Rodriguez, she did intend to strike De Anda in order to stop the threat he still posed. She also assessed between rounds as best as she could but stated: "It happened so quickly that it was a fragment of a second." Dkt. 53-7 at ECF p. 7 |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
|  | **Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 7:2-16, 8:18-22, 9:2-7, 9:12-13. |  |
| 126 | Officers are trained to assess between rounds to determine if the subject is a deadly threat, including whether still advancing.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 9:15-10:4. | Undisputed |
| 127 | However, Officer Rodriguez told investigators that she did not assess between her second and third round.<br><br>**Exh. D, Rodriguez Statement**, Sincich Decl ¶5, at 342:3-6. | Disputed<br><br>When asked why she fired a third round, Officer Rodriguez said: "Because I -- I did the shots, the -- my second and third round, you know, back to back because I saw that the threat was still there after, you know, my first one." See Dkt. 53-8 at ECF p. 16 |
| 128 | At the time of firing her second round, Officer Rodriguez did not know how De Anda was holding the knife.<br><br>**Exh. D, Rodriguez Statement**, Sincich Decl ¶5, at 341:20-24. | Disputed<br><br>When asked: "And when you fired your second round, how did he have that knife? How was he holding the knife?" Officer Rodriguez stated: "I don't remember but I know he still had it in his hand." See Dkt. 53-8 at ECF p. 15 |
| 129 | De Anda was not an immediate threat of death or serious bodily injury at the time.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 50:15-51:1 – in order to use deadly force, there must be | Disputed<br><br>When asked: "Okay. So it's not just any threat in order to use deadly force. It has to rise to the level of a deadly force threat; is that fair?" Officer Rodriguez said: "Yes, that's correct. And that's what |

24

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | specific threat of death or serious bodily injury.<br><br>**Exh. I, Scene Photos**, Sincich Decl ¶10, at 1-5.<br><br>**Exh. J, Mayen BWC**, Sincich Decl ¶11, at 20:35-40 – 20:36:00.<br><br>**Exh. K, Screenshots of Mayen BWC**, Sincich Decl ¶12, at 1-11.<br><br>**Exh. L, Rodriquez BWC**, Sincich Decl ¶13, at 20:35-40 – 20:36:00.<br><br>**Exh. M, Screenshots of Rodriguez BWC**, Sincich Decl ¶12, at 1-22.<br><br>**Exh. N, Ring Video**, Sincich Decl ¶15, at 00:00-01:00.<br><br>**Exh. O, Cell Phone Video**, Sincich Decl ¶16, at 00:00 – 00:06.<br><br>**Clark Decl.** ¶12-13. | he (De Anda), you know -- he dictated that at that moment, unfortunately." Dkt. 53-7 at pp. 42-43 |
| 130 | Prior to his use of deadly force, officers had no information that De Anda had ever physically injured anybody in the past.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 74:10-14. | Disputed<br><br>Officer Rodriguez said she had no knowledge of De Anda's criminal history or if he had ever harmed a person. See Dkt. 53-7 at p. 30<br><br>But Officer Rodriguez "did hear previously the call come out, or at least |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | **Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 24:9-17, 32:18-23, 35:18-36:5. | one of them, that there was a man armed with a knife." See Dkt. 53-7 at p. 27 |
| 131 | Officers never saw De Anda physically injure anybody, including himself.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 40:10-16, 74:20-22.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 34:21-23. | Disputed<br><br>According to Officer Rodriguez: "I didn't see him harm anybody. But, I mean, that's why -- the whole reason why I was there and why I had to use deadly force, because he made me to, because I prevented that from happening to myself and to anyone else behind me, which there was quite a few people from the church." Dkt. 53-7 at ECF p. 29-30 |
| 132 | De Anda never attempted to slash, stab, or swing a knife at anyone.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 16:19-22, 17:15-18:4.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 36:15-19, 37:24-25.<br><br>**Exh. J, Mayen BWC**, Sincich Decl ¶11, at 20:35-40 – 20:36:00.<br><br>**Exh. K, Screenshots of Mayen BWC**, Sincich Decl ¶12, at 1-11.<br><br>**Exh. L, Rodriquez BWC**, Sincich Decl ¶13, at 20:35-40 – 20:36:00.<br><br>**Exh. M, Screenshots of Rodriguez BWC**, Sincich Decl ¶12, at 1-22. | Disputed<br><br>When asked: "Is it your testimony today that Mr. De Anda attempted to stab you?" Officer Mayen answered: "It is not my testimony whether he attempted to stab me. It is my testimony today that I believe that he charged at officers. He charged at officers armed with a deadly weapon, and he gave me no choice at that point to defend myself."<br><br>See Dkt. 53-5 at ECF p. 10<br><br>When asked: "Did you ever see Mr. De Anda slash or stab at anybody with the knife?" Officer Rodriguez answered: "I mean, besides running at me with the knife and being a violent threat to myself, I didn't observe him. And that's why, you know, I was forced to do what I did, so I could prevent him from hurting |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | **Exh. O, Cell Phone Video**, Sincich Decl ¶16, at 00:00 – 00:06. | somebody or me … But, yes, I personally felt that he wanted to kill me or hurt me."<br><br>See Dkt. 53-7 at ECF pp. 31-32 |
| 133 | Prior to his use of deadly force, officers had no information that De Anda had ever verbally threatened anybody.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 75:1-4.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 24:9-17, 32:18-23, 35:18- 36:5. | Undisputed |
| 134 | Officers never heard De Anda verbally threaten anybody.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 95:12-14.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 24:4-8. | Undisputed |
| 135 | Officers had never met De Anda before.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 72:22-24.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 35:18-36:5. | Undisputed |
| 136 | De Anda did not attempt to jump over a fence or run towards any civilian. | Disputed |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | **Exh. A, Mayen Depo**, Sincich Decl ¶2, at 96:1-13, 96:18-20. | When asked: "Did you ever see Mr. De Anda run towards a civilian?" Officer Mayen answered: "I did not see Mr. De Anda run towards a civilian, but I did see him run towards the exit where the gate was open. If he was reasonable and he did not want anything to do with officers, he could have easily jumped over one of the north or south fences and had left the location." See Dkt. 53-5 at ECF p. 70 |
| 137 | There were no civilians within 200 feet of the incident location.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 35:4-12.<br><br>**Exh. D, Rodriguez Statement**, Sincich Decl ¶5, at 321:7-22. | Disputed<br><br>When asked: "Was there any other civilians that were -- other than the people at the church, did you see any other civilians around?" Officer Rodriguez said: "I didn't see anybody presently, but I knew he definitely had access to the public, because of the parking lot, there's apartments on the east side." Dkt. 53-7 at ECF p. 30 |
| 138 | De Anda was contained.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 27:24-28:2. | Undisputed |
| 139 | Officer Mayen was about 30 feet from De Anda when he first saw him walking away from officers.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 98:11-16.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 203:4-5. | Undisputed |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| 140 | De Anda walked eastbound to the back of the parking lot, about 100 feet away from offices.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 98:17-99:2.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 204:6-7. | Undisputed |
| 141 | De Anda began pacing back and forth.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 206:8. | Undisputed<br><br>In this citation, Officer Mayen also noted that De Anda still had a knife in his hand while pacing back and forth |
| 142 | Both Defendants admit that De Anda moved towards the exit where the gate was open.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 96:13-14.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 74:12-14.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 71:12-20 – the City diagram accurately reflects the positions of the officers and De Anda during the shots.<br><br>**Exh. E, Correspondence**, Sincich Decl ¶6, at 28—De Anda was not moving towards Officers Rodriguez or Mayen. | Disputed<br><br>According to Officer Mayem: "I did not see Mr. De Anda run towards a civilian, but I did see him run towards the exit where the gate was open. If he was reasonable and he did not want anything to do with officers, he could have easily jumped over one of the north or south fences and had left the location."<br><br>See Dkt. 53-5 at p. 70 |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| 143 | De Anda was moving towards the opening of the gate before Officer Rodriguez moved south to block him.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 74:20-75:3. | Disputed<br><br>According to Officer Rodriguez, she moved south to get a visual on De Anda, not block him.<br><br>When asked: "So before you started moving south, did you see him running towards the opening of the gate?" Officer Rodriguez answered: "He was still, I believe … 25 feet away, but in that general of the south side area, yes." When asked: "And then after you saw him running towards the gate, that's when you started moving to the south?" she said: "Yes, to get a visual of him."<br><br>See Dkt. 53-7 at ECF pp. 61-62 |
| 144 | Officer Rodriguez was on the apron, 3 feet south and 3 feet west of the gate, when she used deadly force.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 53:10-24, 69:2-12. | Undisputed |
| 145 | Using the fence as cover, Officer Mayen ran southbound, toward Officer Rodriguez prior to using deadly force.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 21:5-10.<br><br>**Exh. B, Mayen Statement**, Sincich Decl ¶3, at 208:13-15. | Undisputed |

30

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| 146 | De Anda never made a furtive or threatening movement with the knife.<br><br>**Exh. J, Mayen BWC**, Sincich Decl ¶11, at 20:35-47—20:35:56.<br><br>**Exh. K, Screenshots of Mayen BWC**, Sincich Decl ¶12, at 1-11.<br><br>**Exh. L, Rodriquez BWC**, Sincich Decl ¶13, at 20:35-47—20:35:56.<br><br>**Exh. M, Screenshots of Rodriguez BWC**, Sincich Decl ¶12, at 1-22.<br><br>**Exh. O, Cell Phone Video**, Sincich Decl ¶16, at 00:00 – 00:06. | Disputed<br><br>Because still photos do not provide the best evidence of the officers' cover options, from their point of view, Defendants refer the Court to the officers' body worn video instead |
| 147 | When confronting a person armed with a knife, it is important for officers to maintain a distance.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 83:5-10. | Undisputed |
| 148 | Distance gives officers time to use other resources and de-escalate the situation.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 51:3-9. | Undisputed |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| 149 | Officers are trained to attempt to create distance and time.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 55:3-5. | Undisputed |
| 150 | Both officers admit that their use of deadly force is contingent on De Anda's distance.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 39:7-20.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 48:2-9, 48:20-24. | Disputed<br><br>According to Officer Mayen: "De Anda posed -- posed a threat that could cause death to myself or serious bodily injury by him being armed with a knife and closing the distance the way that he did. He -- we -- he gave us no choice for us to use deadly force because he was armed with a deadly weapon."<br><br>See Dkt. 53-5 at ECF p. 28<br><br>According to Officer Rodriguez: "No, that wasn't the sole purpose of why I used deadly force. De Anda, he had a knife and he closed that distance. But, I mean, it was close. But he -- that -- he dictated that and he took that distance from me."<br><br>See Dkt. 53-7 at ECF p. 40 |
| 151 | Officer Mayen admitted that if a person is 20 feet away, they are too far to swing the knife at anyone or stab anyone.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 16:1-5, 20:12-14. | Disputed<br><br>According to Officer Mayen: "I mean, it's -- a person 20 feet away from me armed with a knife doesn't necessarily -- I mean, it's not at that distance to stab me, no; but he does pose a threat once he starts closing that distance, which could be very -- in a few seconds -- in a few seconds." See Dkt. 53-5 at ECF p. 12 |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| 152 | Officer Rodriguez admitted that De Anda was not an imminent threat when he stopped 25 feet away.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 51:10-14, 52:19-22. | Disputed<br><br>When asked: "So although he might have been a threat, he wasn't an imminent threat because of his distance?" Officer Rodriguez answered: "At that time, since he was further on the east side, it wasn't imminent at that time, until he chose to run and enclose on me. And that's when I needed – you know, my job was to -- to stop that imminent threat." See Dkt. 53-7 at ECF p. 43<br><br>When asked: "In your mind, was he an imminent threat of death or serious bodily injury when he stopped at approximately 25 feet away?" Officer Rodriguez answered: "When he stopped, no, because -- and that'd why I didn't fire until he advanced towards me and closed that." See Dkt. 53-7 at ECF p. 44 |
| 153 | According to Officer Rodriguez, the City diagram accurately reflects the positions of the officers and De Anda during the shots.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 71:12-20. | Undisputed |
| 154 | The City determined that Officer Rodruguez was approximately 28 feet away from De Anda at the time of her first shot.<br><br>**Exh. E, Correspondence**, Sincich Decl ¶6, at 25. | Undisputed |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| 155 | Nevertheless, Defendant Officers were approximately 28-30 feet away from De Anda at the time the deadly force began.<br><br>**Exh. I, Scene photos**, Sincich Decl ¶10, at 1-5.<br>**Exh. Q, Distance Demonstrative**, Sincich Decl ¶18—a reasonable jury could determine that the Defendant Officers were 28-30 feet away from De Anda at the time of her first shot.<br><br>**Clark Decl. ¶12.** | Disputed<br><br>Because still photos do not provide the best evidence of the officers' cover options, from their point of view, Defendants refer the Court to the officers' body worn video instead |
| 156 | De Anda was seen as 5'6" and 150 pounds and alone in the parking lot.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 75:6-9, 95:16-17. | Undisputed |
| 157 | Officer Mayen was 5'7" and 150 pounds, equipped with OC spray, a Taser, flashlight, baton, and ballistic vest.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 54:21-25, 75:13-21.<br><br>**Exh. E, LAPD Correspondence**, Sincich Decl. ¶6, at 7. | Undisputed |
| 158 | Officer Rodriguez was 5'2" and 145 pounds, with nearly 4-years' experience, equipped with OC | Undisputed |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | spray, a Taser, flashlight, baton, and ballistic vest.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 26:3-4.<br><br>**Exh. E, LAPD Correspondence**, Sincich Decl. ¶6, at 12. | |
| 159 | Officer Morse was 5'7" and 220 pounds, with 27 years' experience, equipped with OC spray, a Taser, flashlight, baton, and ballistic vest.<br><br>**Exh. E, LAPD Correspondence**, Sincich Decl. ¶6, at 7. | Disputed (Officer Morse is 6'3") |
| 160 | Officer Henandez was 5'9" and 190 pounds, equipped with OC spray, a Taser, flashlight, baton, and ballistic vest.<br><br>**Exh. E, LAPD Correspondence**, Sincich Decl. ¶6, at 12. | Undisputed |
| 161 | Backup was called about 5 minutes prior to the use of force and officers could hear backup arriving.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 88:2-12, 89:7-11. | Undisputed |
| 162 | There were four officers in the immediate area at the time of the force, including Officers Mayen, Rodriguez, Morse, and Hernandez. | Undisputed |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | **Exh. A, Mayen Depo**, Sincich Decl ¶2, at 29:19-22, 30:1-6. | |
| 163 | A total of 14 officers responded to this incident.<br><br>**Exh. D, Rodriguez Statement**, Sincich Decl ¶5, at 318:1-9.<br>**Exh. E, Correspondence**, Sincich Decl ¶6, at 6-7, 11-12. | Undisputed |
| 164 | Knowing the law was clearly established that officers could not use deadly force under these circumstances, Defendants first told investigators that De Anda was less than half the distance he really was from them in order to justify their shots and still attempt to shorten the distance between De Anda and themselves despite the City's investigation and their own scene visits to take measurements.<br><br>**PAMF Nos.** 165-167 below.<br><br>**Exh. H, Use of Force Directive**, Sincich Decl ¶9, at 1, 2, 4, 6, 7.<br><br>**Clark Decl.** ¶14. | Disputed<br><br>The declaration submitted by Plaintiffs' expert, see Dkt. 53-3, cannot create a triable issue of material fact.<br><br>The fact that an expert disagrees with an officer's actions does not render the actions unreasonable. See *Reynolds v. County of San Diego*, 84 F.3d 1162, 1170 (9th Cir. 1995); *Brown v. Ransweiler*, 171 Cal.App.4th 516, 530 (2009) (finding that several opinions offered by plaintiff's expert Roger Clark "appeared to be based on conjecture, rather than on actual evidence" and were not binding). |
| 165 | The Defendant Officers know that they cannot use deadly force merely for seeing a knife in a subject's hand.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 36:7-13—admits that | Disputed<br><br>According to Officer Mayen: "Based on my training and experience, I would not just shoot a person just armed with a knife and just, like, talking. Like in this incident, De Anda was armed with a |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | officers may not use deadly force against a person merely for having a knife in their hand.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 32:20-33:13 – has encountered 20-30 subjects with a knife in their hand. 31:1-3, 31:13-15—had never used deadly force before.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 19:2-14 – Officer Rodriguez has had experience with over a hundred subjects who were armed with a knife. 16:22-23—had never been in an officer-involved shooting before.<br><br>**Exh. H, Use of Force Directive**, Sincich Decl ¶9, at 1, 2, 4, 6, 7. | knife. I attempted to talk to him. I attempted to have a conversation with him. And at one point, he made the choice to charge at officers. So, like I said earlier, our goal is to talk people into compliance. Not -- we don't want to go in there and shoot somebody." See Dkt. 53-5 at ECF p. 26 |
| 166 | If a person is merely not complying with commands, officers may only use less lethal force to deescalate the situation.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 36:21-37:5.<br><br>**Exh. H, Use of Force Directive**, Sincich Decl ¶9, at 1, 2, 4, 6, 7. | Disputed<br><br>According to Officer Mayen: "I understand that deadly weapons should only be used when it's an imminent threat or death or bodily injury to myself or others. But, like I said earlier, that person decides how we're going to treat the situation. Every situation is different. We can't treat one situation the same as the next, because we are not in control of what that person is doing or saying. And our goal is to get compliance. Take them into custody. And like I said earlier, there's other force that we could use that is less lethal, and deadly force should be |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | | our last resort. But if that person decides that he's going to charge at us or put my life or the life of others in danger, then he made that choice for us to use that -- that level of force." See Dkt. 53-5 at ECF p. 27 (Defendants have attached p. 38 of Officer Mayen's depo transcript—the next page in the transcript—so the Court can see the officer's *entire* quote) |
| 167 | In explanation of his excessive use of deadly force, Officer Mayen told investigators that he was only 10 feet away from De Anda when he fired his first shot and 8 feet away at the time of his second shot. **Exh. A, Mayen Depo**, Sincich Decl ¶2, at 13:20-22, 21:11-14, 21:18-22:4, 23:10-20, 43:17-20. **Exh. B, Mayen Statement**, Sincich Decl ¶3, at 234:3-6, 245:6-8. | Undisputed |
| 168 | Likewise, Officer Rodriguez estimated that the distance from De Anda to her at the time of her first shot was from the end of the table to the investigator, which investigators measured and determined to be 12 feet. | Disputed (Investigators were unsure of this and indicated they would have to measure it) |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | **Exh. D, Rodriguez Statement**, Sincich Decl ¶5, at 338:5-9, 338:22-339:7.<br><br>**Exh. E, Correspondence**, Sincich Decl ¶6, at 25. | |
| 169 | Defendants' still incorrect but updated measurements presently provided are based on their scene visit three days prior to the deposition.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 43:21-23, 44:4-10, 45:4-6, 49:5-9.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 43:14-19, 44:14-20.<br><br>**Exh. Q, Distance Demonstrative**, Sincich Decl ¶18—a reasonable jury could determine that Officer Rodruguez was 28-30 feet away from De Anda at the time of her first shot.<br><br>**Clark Decl.** ¶12. | Disputed<br><br>(There is no evidence the updated measurements are incorrect) |
| 170 | Defendant Officers had insufficient training to handle the situation.<br><br>**Exh. E, Correspondence**, Sincich Decl ¶6, at 1, 2, 44-66.<br><br>**Exh. F, BOPC Results**, Sincich Decl ¶6, at 1. | Disputed<br><br>The fact that an expert disagrees with an officer's actions (or training) does not render the actions unreasonable. See *Reynolds v. County of San Diego*, 84 F.3d 1162, 1170 (9th Cir. 1995); *Brown v. Ransweiler*, 171 Cal.App.4th 516, 530 (2009) (finding that several opinions |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | **Exh. H, Use of Force Directive**, Sincich Decl ¶9, at 1, 2, 4, 6, 7.<br><br>**Exh. P, BOPC OIS Report**, Sincich Decl ¶17, at 1-23.<br><br>**Clark Decl.** ¶15. | offered by plaintiff's expert Roger Clark "appeared to be based on conjecture, rather than on actual evidence" and were not binding). |
| 171 | Defendant Officers violated City Policy and basic officer training.<br><br>**Exh. E, Correspondence**, Sincich Decl ¶6, at 44-66.<br><br>**Exh. H, Use of Force Directive**, Sincich Decl ¶9, at 1, 2, 4, 6, 7.<br><br>**Exh. P, BOPC OIS Report**, Sincich Decl ¶17, at 1-23.<br><br>**Clark Decl.** ¶15. **PAMF Nos.** 62-161. | Disputed<br><br>The fact that an expert disagrees with an officer's actions (or training) does not render the actions unreasonable. See *Reynolds v. County of San Diego*, 84 F.3d 1162, 1170 (9th Cir. 1995); *Brown v. Ransweiler*, 171 Cal.App.4th 516, 530 (2009) (finding that several opinions offered by plaintiff's expert Roger Clark "appeared to be based on conjecture, rather than on actual evidence" and were not binding). |
| 172 | Defendant City has ratified this officer-involved shooting.<br><br>**Exh. E, Correspondence**, Sincich Decl ¶6, at 1-66.<br><br>**Exh. F, BOPC Results**, Sincich Decl ¶6, at 1.<br><br>**Exh. P, BOPC OIS Report**, Sincich Decl ¶17, at 1-23.<br><br>**Clark Decl.** ¶16. | Disputed<br><br>In order to prove ratification, Plaintiffs must show "authorized policymakers approved a subordinate's decision and the basis for it." *Christie v. Iopa*, 176 F.3d 1231 (9th Cir. 1999). There is no evidence of that here and the "mere failure to overrule a subordinate's actions, without more, is insufficient" to establish liability under § 1983. *Sheehan v. City and County of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014). |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| 173 | Every officer must be Peace Officer Standards and Training ("POST") certified and trained.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 52:13-24.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 18:5-8. | Undisputed |
| 174 | The training and law was clearly established at the time of the incident that officers may not use deadly force unless *necessary* to defend against an imminent threat of death or serious bodily injury.<br><br>**Exh. G, POST LD 20**, Sincich Decl ¶8, at 4-4—citing Penal Code § 835a(c)(1)(A).<br><br>**Exh. E, Correspondence**, Sincich Decl ¶6, at 57-58.<br><br>**Exh. H, Use of Force Directive**, Sincich Decl ¶9, at 1, 2, 4.<br><br>**Exh. P, BOPC OIS Report**, Sincich Decl ¶17, at 12-14.<br><br>**Clark Decl.** ¶14. | Disputed<br><br>Under the qualified immunity analysis, it was immaterial what degree of threat De Anda posed, as the Fourth Amendment "does not require the court to determine whether an officer was in actual, imminent danger of serious injury, but rather, whether the officer reasonably believed that the suspect posed a threat of serious harm to the officer or to others." *Harris v. Serpas*, 745 F.3d 767, 773 (5th Cir. 2014) (internal quotation marks and brackets omitted)<br><br>"The objective reasonableness test will not be met if, on an objective basis, it is obvious that no reasonably competent officer would have concluded in that moment that … use of deadly force was necessary." *Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (internal citation and quotation marks omitted). |
| 175 | Officers also know that for there to be an imminent threat to use deadly force, the subject must | Undisputed<br><br>A threat of death or serious injury is "imminent" when, based on the totality of |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | have the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury.<br><br>**Exh. G, POST LD 20**, Sincich Decl ¶8, at 4-7—citing Penal Code § 835a(e)(2).<br><br>**Exh. E, Correspondence**, Sincich Decl ¶6, at 57-58.<br><br>**Exh. H, Use of Force Directive**, Sincich Decl ¶9, at 4, 6, 7. | the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the officer or another person. |
| 176 | Further, officers know that an imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed.<br><br>**Exh. G, POST LD 20**, Sincich Decl ¶8, at 4-7.<br><br>**Exh. H, Use of Force Directive**, Sincich Decl ¶9, at 6, 7.<br><br>**Exh. P, BOPC OIS Report**, Sincich Decl ¶17, at 13.<br><br>**Clark Decl.** ¶14. | Undisputed |
| 177 | Finally, officers know that the totality of the circumstances includes the conduct of the officer | Disputed |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | leading up to the use of deadly force.<br><br>**Exh. G, POST LD 20**, Sincich Decl ¶8, at 4-7.<br><br>**Exh. H, Use of Force Directive**, Sincich Decl ¶9, at 7.<br><br>**Exh. P, BOPC OIS Report**, Sincich Decl ¶17, at 12.<br><br>**Clark Decl. ¶14.** | Under Penal Code § 835a(e)(3), the totality of the circumstances means all facts known to the peace officer at the time, including the conduct of the officer *and the subject* leading up to the use of deadly force. |
| 178 | Officers Rodriguez and Hernandez did not broadcast or indicate on their Mobile Digital Computer that they were at the scene.<br><br>**Exh. E, Correspondence**, Sincich Decl ¶6, at 13. | Undisputed |
| 179 | Officer Mayen admitted that in tactical situations it is important for every officer to know what is going on.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 84:24-85:4. | Undisputed |
| 180 | Officer Rodriguez did not know where her partner was at the time of the shots.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 72:5-7. | Undisputed |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| 181 | Officer Mayen claims he did not know where Officers Hernandez or Rodruguez were at the time of his use of deadly force.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 21:1-3, 30:7-10. | Undisputed |
| 182 | Officer Rodriguez never told her partners that the gate was open.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 31:14-17. | Undisputed<br><br>According to Officer Rodriguez, she did not tell her partners this "because I assumed that they knew it was open. I -- I just kind of got to the scene and just kind of worked with what I had." See Dkt. 53-7 at ECF p. 26 |
| 183 | Officer Mayen never told Officer Rodriguez that De Anda was potentially suicidal.<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 32:14-33:17. | Undisputed |
| 184 | According to Officer Rodriguez, it does not matter if De Anda was 12 or 25 feet away, "distance doesn't really matter."<br><br>**Exh. C, Rodriguez Depo**, Sincich Decl ¶4, at 49:4-9, 50:5-9. | Disputed<br><br>According to Officer Rodriguez: "I mean, whether he (De Anda) was at a close distance, whether it was 12, 18 feet, 25 feet, I mean, it's – it's still reasonable why (she used deadly force), because he posed an imminent threat to me." See Dkt. 53-7 at ECF p. 41 |
| 185 | By reasonable inference, Officer Mayen did not know whether or not symptoms such as rambling, ranting, inconsistent statements, | Disputed<br><br>When asked: "Based on based on training that you received, are symptoms such as |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | and walking back and forth were consistent with a person suffering from a mental health crisis.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 66:13-23. | rambling, ranting, inconsistent statements, and walking back and forth, are they consistent with a person that could be suffering from a mental health crisis?" Officer Mayen said that "based on what he (De Anda) was doing and those actions, to my knowledge, he was under – possibly under some narcotics. And just my knowledge and extent to his -- if any, had any mental illness, it was just based on the statement that he made that he was suicidal."<br><br>See Dkt. 53-5 at ECF p. 42 |
| 186 | Officer Mayen admitted to going through training and receiving information on possible symptoms of mental health.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 67:19-25. | Undisputed |
| 187 | By reasonable inference, Officer Mayen indicated that the training he received regarding person in a mental health crisis was not effective and not realistic to what officers see in the field.<br><br>**Exh. A, Mayen Depo**, Sincich Decl ¶2, at 68:8-24. | Disputed<br><br>When asked: "Based on your training in dealing with persons suffering -- potentially suffering from a mental health crisis, did the instructors tell you that some of the symptoms that a person could be exhibiting include pacing, such as walking back and forth?" Officer Mayen said: "I mean, like I said earlier, it just depends on the patient, whether or not -- whatever they're experiencing at the time. Every scenario is different. Every person is different." |

| NO. | PLAINTIFFS' ADDITIONAL MATERIAL FACTS | DEFENDANTS' OPPOSITION TO PLAINTIFFS' FACTS |
|---|---|---|
| | | When asked: "And is that one of the things the instructors told you to look out for?" Officer Mayan said: "Just based -- if you're talking about academy training, a lot of times when we do these trainings, people are rambling, incoherent. They do different things, and that's just for training purposes. But when we're out there in the field, people act different, you know." See Dkt. 53-5 at ECF p. 44 |

DATED: April 14, 2025

HYDEE FELDSTEIN SOTO, City Attorney
DENISE C. MILLS, Chief Deputy City Attorney
KATHLEEN KENEALY, Chief Assistant City Attorney
CORY M. BRENTE, Senior Assistant City Attorney


By: /s/ *Christian R. Bojorquez*
CHRISTIAN R. BOJORQUEZ, Deputy City Attorney
*Attorneys for Defendant* CITY OF LOS ANGELES